IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

                                     Case No. 2:09-CV-10756
vs.                                    Hon.

NAVIGATION CATALYST SYSTEMS, INC.,
    a Delaware corporation; BASIC FUSION, INC.,
    a Delaware corporation; CONNEXUS CORP.,
    a Delaware corporation; and FIRSTLOOK, INC.,
    a Delaware corporation,

        Defendant.
_____

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

       FOR ITS COMPLAINT in this matter, Plaintiff, THE WEATHER UNDERGROUND,

INC., by and through its attorneys, TRAVERSE LEGAL, PLC, states:

## I. PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, The Weather Underground, Inc. (hereinafter "Wunderground"), is a for profit corporation organized and existing under the laws of the State of Michigan, with its principal place of business located at 300 N. Fifth #240, Ann Arbor, Michigan 48104.

2.     Defendant, Navigation Catalyst Systems, Inc. ("NCS"), is a for profit corporation organized and existing under the laws of the State of Delaware and a foreign corporation in the State of California with its principal place of business at 2141 Rosecrans Ave., #2020, El Segundo, CA 90245.

3.     Defendant, Basic Fusion, Inc. ("Basic Fusion"), is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 335 Madison Avenue, Ste. 840, New York, New York 10017.

4.     Defendant, Connexus Corporation ("Connexus"), is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2141 Rosecrans Ave. #2020, El Segundo, California, 90245.

5.     Defendant, Firstlook, Inc. ("Firstlook"), is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2141 Rosecrans Ave. #2020, El Segundo, California, 90245.

6.     This action arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, including without limitation the Anti-cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), and the common laws of the State of Michigan.

7.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) as well as 15 U.S.C. §§ 1121 and 1125(d).

8. This court has supplemental jurisdiction over the claims in this Complaint that arise under the common laws in the State of Michigan pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

9. This Court has personal jurisdiction over Defendant NCS, Defendant Basic Fusion, Defendant Firstlook, and Defendant Connexus (collectively "Defendants") because Defendants have: (a) committed intentional and tortious acts within this State; (b) conducted substantial business within this State related to the unlawful activity at issue in this Complaint; and (c) otherwise have availed themselves of this forum. The harm suffered by Plaintiff is a result of the business conducted by these Defendants within this district and elsewhere.

10. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct substantial business within this judicial district related to the unlawful activity at issue in this Complaint and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including, but not limited to, registering, monetizing and using/parking the infringing domain names for consumers and internet visitors within this judicial district.

## II. PLAINTIFF'S BUSINESS AND USE OF THE INTERNET

11. Plaintiff, Wunderground, has been providing real-time online weather information via the Internet as a commercial entity since 1995. Prior to that, the menu-based telnet interface program that displayed real-time weather information via the Internet had originated at the University of Michigan. It was later developed for use on numerous operating platforms and evolved to a user-friendly web interface.

12.     Wunderground was one of the first organizations to provide users with an online weather service.  Wunderground pioneered the offering of real-time weather conditions with such features as severe weather warnings and advisories, international conditions, marine weather, and detailed local forecasts.  Internet users can find weather for any city, state, zip code, airport code, or country.  Users can also customize the web site by selecting a language, a time zone, units (metric or English), and site appearance (e.g. show favorites, photos, promos).  Moreover, users can listen to local weather radio stations, track radar, and even customize and print a Forecast Flyer.

13.     Wunderground provides Internet users with access to various blogs, such as Climate Change Blog, Tropical Weather Discussion, and Forecast Competition, wherein the users post, share, and comment on weather related information and discussions with other users from around the world.  *See Exhibit A, Wunderground's Blog Directory.*

14.     Internet users can become members to the web site, and as a result, have access to enhanced features of the web site.  Moreover, users may opt to pay for a one year membership giving them longer radar animations, ad-free weather, universal favorites, and U.S. forecasts and alerts through email (known as "no ads members").  Wunderground has over 80,000 no ads members.

15.     Wunderground has developed the world's largest network of personal weather stations (i.e. weather information provided by individuals and other entities from their exact location from around the globe) to provide users with the most localized weather conditions.  Wunderground displays weather information provided by over 40,000 personal weather stations.

16.     Wunderground makes its services available through mobile devices, such as T-Mobile and the Apple iPhone cell phones.

17.     Wunderground made its web site multilingual in 1998.  In fact, the <wunderground.com> domain has now added language identifiers, e.g. <swedish.wunderground.com>, with the corresponding language available at said web site.

18.     Wunderground has offered its services via its official web sites, www.wunderground.com, www.weatherunderground.com, and www.wund.com, since 1995, 1998, and 2001 respectively.  *See Exhibit B, Printout of <wunderground.com>.*

19.     Wunderground's official web site, located at <wunderground.com>, attracts approximately 12.0 million global visitors each month.  9.5 million of these visitors are from the United States alone.  As a result, Quantcast ranks wunderground.com within or near the top 100 amongst all United States web sites.  *See Exhibit C, Quantcast Results for <wunderground.com>.*

20.     Over 400,000 Internet users utilize Wunderground's weather services at its web sites.   Over 300,000 individuals upload photographs of current weather conditions to Wunderground's web sites.

21.     Numerous organizations utilize Wunderground's technologies, hardware, and software to power their products and services, including, but not limited to, the Chicago Tribune, State Farm Insurance, Associated Press, and the Mayo Clinic.

22.     While many of the weather related offerings at Wunderground's web site are free, Wunderground generates revenue from its web site via advertising.  Such major organizations as

eBay, H&R Block, VacationsToGo.com, and Classmates.com advertise on Wunderground's web sites.

23.     Wunderground also advertises on over 15 million third party web sites by providing an application that displays Wunderground's logo and name along with the local temperature. *See, e.g., Exhibit D, Printout of Display on Third Party Web Site.* An Internet user can click on the display, which Wunderground refers to as a WEATHER STICKER®, in order to be redirected to Wunderground's website where more detailed weather information is provided to the Internet user. *See Exhibit E, Printout of Wunderground's Web Site After User Clicked the Display.*

24.     Wunderground is the registrant of a portfolio of domain names that includes over 125 domain names, the majority of which incorporate its trademarks and service marks. *See Exhibit F, List of Domains Owned by Wunderground.*

25.     The Internet has become an indispensable tool through which Complainant communicates, markets, and services its customers.

### III. PLAINTIFF'S TRADEMARKS AND SERVICE MARKS

26.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark THE WEATHER UNDERGROUND. Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

    a.  THE WEATHER UNDERGROUND
         i.  Reg. No. 2,297,683
        ii.  Registration Date: December 7, 1999
       iii.  Providing weather information via a global computer network

*See Exhibit G a true copy of U.S. Reg. No. 2,297,683.* The USPTO acknowledged the incontestability of U.S. Reg. No. 2,297,683 pursuant to 15 U.S.C. § 1065 on April 1, 2005. *See*

*Exhibit H, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,297,683.*

27.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERGROUND.  Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

     a.  WUNDERGROUND.COM
         i.  Reg. No. 2,324,272
        ii.  Registration Date: February 29, 2000
      iii.  Computer services, namely providing on-line information services in the field of weather.

*See Exhibit I a true copy of U.S. Reg. No. 2,324,272.*  The USPTO acknowledged the incontestability of U.S. Reg. No. 2,324,272 pursuant to 15 U.S.C. § 1065 on July 26, 2005.  *See Exhibit J, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,324,272.*

28.     Wunderground's registration and continued use in interstate commerce of the THE WEATHER UNDERGROUND and WUNDERGROUND.COM distinctive marks, since as early as 1995, have enabled those marks to become well-known and famous.

29.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WEATHER STICKER.  Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

     a.  WEATHER STICKER

         i.  Reg. No. 2,281,088
        ii.  Registration Date: September 28, 1999
      iii.  Providing weather information via a global computer network

*See Exhibit K, a true copy of U.S. Reg. No. 2,281,088.* The USPTO acknowledged the incontestability of U.S. Reg. No. 2,281,088 pursuant to 15 U.S.C. § 1065 on January 18, 2005. *See Exhibit L, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,281,088.*

30.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERSEARCH.  Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

    a.  WUNDERSEARCH
        i.  Reg. No. 2,447,954
        ii.  Registration Date: May 1, 2001
        iii.  Computer services, namely, creating indexes of information, sites, and other references available on computer networks; searching and retrieving information, sites and other resources available on computer networks for others; providing an on-line link to news, weather, sports, current events, and reference materials

*See Exhibit M, a true copy of U.S. Reg. No. 2,447,954.* The USPTO acknowledged the incontestability of U.S. Reg. No. 2,447,954 pursuant to 15 U.S.C. § 1065 on March 19, 2007. *See Exhibit N, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,447,954.*

31.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERMAP.  Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

    a.  WUNDERMAP
        i.  Reg. No. 3,527,030
        ii.  Registration Date: November 4, 2008
        iii.  Providing a web site and web site links to geographic information in the nature of geospatial maps: Computer services, namely, providing on-line information services in the field of weather and geospatial weather maps;

> providing location-specific weather data and geospatial weather maps via a global computer network; on-line computer generated cartography

*See Exhibit O a true copy of U.S. Reg. No. 3,527,030.*

32.    Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERRADIO. Wunderground filed for a trademark (Serial No. 77/631,410) with the USPTO on December 11, 2008 in connection with "software used for playing radio or audio streams on a mobile device or cell phone." *See Exhibit P, Printout of Serial No. 77/631,410.*

33.    Wunderground is also the owner of all rights, common law or otherwise, in and to the mark WUNDERPHOTOS.

34.    Wunderground is also the owner of all rights, common law or otherwise, in and to the mark WUNDERBLOG.

35.    Wunderground is also the owner of all rights, common law or otherwise, in and to the mark WUND.

36.    Through its efforts, Wunderground has also established tremendous value and goodwill associated with its family of marks, all of which include the distinctive, common element of WUNDER. As a result, Wunderground's family of marks (hereinafter "WUNDER Family of Marks") have reached a high degree of consumer recognition.

37.    Wunderground's registered trademarks, common law trademarks, trade names, service marks, family of marks, and variants are collectively referred to as the "Wunderground Marks".

38.    The Wunderground Marks are distinctive and were distinctive in the marketplace at the time of all acts alleged herein and, as such, designate a source of origin attributable to Plaintiff.

39. The Wunderground Marks were and continue to be used in interstate commerce and are widely known and recognized among the general consuming public.

40. As a result of Wunderground's substantial investment, the Wunderground Marks have developed a reputation for excellence and extensive goodwill in the market. As such, the Wunderground Marks are extremely valuable to Plaintiff as the true indicator of source for its offerings and services.

41. Wunderground has received press, unsolicited or otherwise, from such major publications as Forbes, People Magazine, Wired, the Wall Street Journal, U.S.A. Today, and the New York Times.

## IV. DEFENDANTS' BUSINESSES

### a. Domain Name Scheme Used by Defendants

42. "Direct Navigation" describes the method of typing a domain name or URL directly into the browser address bar in order to arrive at a specific website as opposed to using a search engine to find a domain or web site. Direct navigation generates what is known as "type-in traffic" related to internet-users who (a) remember the domain name of a known company or web site and type it directly into the browser address bar, (b) mistakenly enter words or a company name into the browser address bar instead of a search engine because they do not know any better or (c) use the browser address bar as a search tool on purpose.

43. "Domain Parking" refers to the registration of an internet domain name without that domain being associated with any established business or services. "Parked Domains" or "Parked Pages" typically do not show up in any search engine results. Instead, Parked Domains rely on direct navigation traffic. Parked Domains resolve to a web page containing hyperlinks

which, often unbeknownst to the web site visitor, link to advertiser web sites. In many instances, the advertisers themselves are unaware that their advertisements, typically placed through Google's Adword program or Yahoo's Overture program, are being displayed on Parked Domains with no content beyond the advertisements themselves.

44.     "Typosquatting,"[1] also called URL hijacking, is a form of cybersquatting which relies on mistakes such as typographical errors made by Internet users when inputting a trademark protected website address into a web browser. Typo-variants of famous trademarks are registered because of the high traffic generated by those web sites and the fact that a certain percentage of people directly navigating to the trademark protected web site will accidentally misspell or mis-type the domain name into the address bar. Typosquatted domains can generate significant pay-per-click (PPC) revenue, especially when registered en masse with automated software.

45.     Predicting typographical errors by Internet users is part of the typosquatting strategy, with logic built into automated domain registration software for "Qwerty Typos" (users accidentally hitting letters adjacent to the correct key-stroke on the qwerty-style keyboard), "Letter Swaps" (users typing the domain name in the wrong letter-order) and "Sticky Keys" (users accidently hitting a letter twice or missing it all together).

46.     "Domain Tasting" is the practice using the five-day "grace period" (the "Add Grace Period" or "AGP") to test the marketability of the domain. A registrant utilizes to the AGP and then elects to either keep the domain and pay the registration fee or return it to the

---

[1] See Wikipedia, http://en.wikipedia.org/wiki/Typosquatting ("Typosquatting, also called URL hijacking, is a form of cybersquatting which relies on mistakes such as typographical errors made by Internet users when inputting a website address into a web browser. Should a user accidentally enter an incorrect website address, they may be led to an alternative website owned by a cybersquatter.").

registry and pay no or a limited fee. The AGP was originally instituted by the Internet's governing body ICANN (International Corporation for Assigned Names and Numbers) to allow users to obtain a refund if they mistakenly register the wrong domain. Companies such as these Defendants determined a way to use the AGP to mass register domains and 'taste' them for traffic during the AGP, returning those domains for a full refund which they predict will not derive enough income from PPC advertisements on Parked Pages. Domain Tasting has been a controversial practice which recently resulted in policy changes by ICANN in order to reduce or eliminate mass Domain Tasting by companies with Parking Page business models.

47.    The software which generates the Parked Page and used to pull in Google Adwords or Yahoo Overture advertisements is designed to predict the interests of the visitor and, in many instances, shows advertisements in violation of third party trademark rights (i.e. qwunderground.com [note typo] serving up advertisements for weather web sites and competitors of Wunderground and its wunderground.com web site). *See, e.g., Exhibit Q, Printout of <qwunderground.com>*. The typo-domain Registrant is paid based on how many links have been clicked on the Parked Page, and as such receives PPC revenue.

### b.    The Means by Which Defendants Accomplished Their Calculated Scheme

48.    Defendants have engaged in Domain Tasting, Domain Parking and Typosquatting.

49.    Defendants, during the relevant period, used automated domain registration software to register en masse typo-domains, using the practice of Domain Tasting during the AGP in order to target, register and park high traffic typo-domain names such as the Infringing Domains, *infra,* which are the subject of this lawsuit and as more fully detailed below.

50.     NCS is, or was, listed as the Registrant of the Infringing Domains, *infra,* which are the subject of this lawsuit on its own behalf and on behalf of Co-Defendants.   Upon information and belief, NCS registered the Infringing Domains which are the subject of this lawsuit during the ICANN Add Grace Period ("AGP").   In doing so, NCS used process, technology and/or software developed by itself and co-Defendants to 'taste' the typo-traffic on those domains during the AGP to ensure adequate direct navigation traffic and revenue. Defendants then kept the typo-domains which have adequate direct navigation traffic and monetized those domains using Parking Page software, process and technology conceived, designed, developed and maintained through their collaborative efforts.

51.     Upon information and belief, Connexus, on its behalf and on behalf of and in collaboration with its Co-Defendants, designs, develops and maintains an online marketing software platform offering Parking Page software technology to parking companies, domain registrants and others.   Connexus provided technology and know-how which enabled the registration and parking of the Infringing Domains which are the subject of this lawsuit.

52.     Upon information and belief, Firstlook is primarily a domain parking company using processes, technology and software, including Parking Page software, owned, licensed, developed and/or designed by itself and its Co-Defendants, as well as its own parking and monetization tools.  Firstlook is a wholly-owned subsidiary of Connexus.  Firstlook is also the parent corporation of NCS and Basic Fusion.  Firstlook provided software and technology which enabled the Parked Pages and advertising of the Infringing Domains which are the subject of this lawsuit.

53.     Upon information and belief, Basic Fusion is an ICANN accredited registrar of Internet domain names and acted as the registrar for the Infringing Domains which are the subject of this lawsuit.

54.     Defendants have devised a system using automated software by which high traffic web sites, which are often trademark protected, are identified and typographical variations of the domains are registered, renewed and parked for PPC monetization.  Defendants' business model is essentially to monetize traffic of trademark protected domains until a trademark holder complains, at which point Defendants voluntarily turn over the domains(s) after enjoying PPC revenue in the interim.

55.     Defendants' business model has come under increasing attack, as further discussed below, *infra* ¶ 89, in numerous cases.  In defending these cases, Defendants (a) argue for the legitimacy of the systems and software that they designed for registering domain names which they, in fact, knew, and continue to know, would contain trademark protected domains, (b) argue that they exercise due diligence in turning over trademark protected domains upon complaint by the trademark holder, and (c) argue that they take measures to blacklist certain trademarks from registration in their portfolio.

56.     Essentially, Defendants rely upon the fact that most trademark holders do not pursue these matters in Court under the ACPA if they are able to voluntarily secure the typo-domains or that they can settle cases alleging bad faith infringement for an amount well below the money they earn as a result of infringement.  Similarly, Defendants wait to be a named Respondent in a UDRP Complaint before voluntarily transferring the infringing domain names.

57.     Upon information and belief, Defendants have created and utilize software for registering typo-domains that target domain names with a high amount of traffic, many of which they know will be, and in fact are, trademark protected.

58.     Defendants are working together or have worked together to conceive, design, conspire and commit the unlawful activities complained of in this Complaint.

59.     Each of the Defendants was the agent, servant, employee, partner, alter ego, subsidiary, or joint venture of each of the other Defendants, and the acts of each of Defendants were in the scope of such relationship.  Each of the Defendants acted with the knowledge, permission, and consent of each of the other Defendants.  Each of the Defendants aided and abetted the other Defendants in the acts or omissions alleged in this Complaint.

## V.  DEFENDANTS' UNLAWFUL ACTIONS

### a.  Past Registration and Use of Infringing Domain Names

60.     Defendant NCS registered and/or used 41 domain names which are typographical or other derivations of Plaintiff's trademarks (collectively referred to as "Infringing Domains"), all of which are listed in Paragraph 77, *infra*.   *Exhibit R (which includes the date each Infringing Domain was created, and if no creation date is available, the earliest WHOIS entry).*

61.     Wunderground never authorized Defendants to register, traffic in or use the Infringing Domains or otherwise register or use its marks in any way.

62.     Eleven of the Infringing Domains were misspellings, or typo-domains, of Plaintiff's federally registered WUNDERGROUND.COM service mark.

63. Twenty-nine of the Infringing Domains were misspellings, or typo-domains, and word swaps wherein Defendant replaced the first word with the second word of Plaintiff's federally registered THE WEATHER UNDERGROUND service mark.

64. One of the Infringing Domains, namely <wwwund.com>, was a misspelling, or typo-domain, of, but not limited to, Plaintiff's WUNDER Family of Marks and a typo of Plaintiff's official web site www.wund.com.

65. Defendants used the 41 Infringing Domains to redirect to web sites that consisted of either contextual pay-per-click parking pages or paid search engine listings. *See, e.g., Exhibit Q, Printout of <qwunderground.com>; Exhibit S, Printout of <udergroundweather.com>*.

66. The majority of the links on the web sites redirected to by the Infringing Domains were those of Wunderground's competitors, including WeatherBug, Top-Weather.net, ALOT Weather, DTN Meteorlogix, and others. *See Exhibit T, Printout of Links from <udergroundweather.com>*.

67. Upon information and belief, NCS's earliest registration, <udergroundweather.com>, was on or near July 7, 2004. This is approximately 9 years after Wunderground had registered and used <wunderground.com>, approximately 10 years after Wunderground had registered and used <weatherunderground.com>, over 4 years after Wunderground received its Certificate of Registration from the USPTO for WUNDERGROUND.COM, and over 9 years after Wunderground received its Certificate of Registration from the USPTO for THE WEATHER UNDERGROUND.

68. Since the publicly-available Internet Archive (www.archive.org) does not contain entries for the majority of sites that are redirected to pay-per-click or paid search sites, it is unclear how long after registration of the Infringing Domains Defendants provided a web site.

69. The Infringing Domains were identical or confusingly similar to the Wunderground Marks.

70. NCS's registration and Defendants use of the Infringing Domains created a likelihood of consumer confusion.

71. By means of their registration and use of the Infringing Domains, Defendants intended to capitalize on the goodwill associated with the Wunderground Marks and Wunderground's own web sites.

72. Defendants wrongfully profited from the unlawful use of the Wunderground Marks.

73. Defendants' use of the Infringing Domains was in commerce, including United States commerce, as defined by 15 U.S.C. § 1127.

74. Defendants' use of the Infringing Domains created a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of those web sites.

75. Defendants were typosquatting on Wunderground's distinctive and famous trademarks.

76. On or about August 18, 2008, Plaintiff filed a Complaint against Defendant NCS with the National Arbitration Forum in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy.

77.     The Complaint named 41 domain names, including <qwunderground.com>, <swunderground.com>, <wundertground.com>, <wunedergroundcom>, <wunnderground.com>, <winderground.com>, <wumderground.com>, <wundeergroundcom>, <wunderfround.com>, <wundergtound.com>, <wundergroundr.com>, <udergroundweather.com>, <undegroundweather.com>, <undergoundweather.com>, <undergroudweather.com>, <undergroundwaether.com>, <undergroundwweather.com>, <undergrounweather.com>, <watherunderground.com>, <weaherunderground.com>, <weahterunderground.com>, <weartherunderground.com>, <weatehrunderground.com>, <weatgerunderground.com>, <weathernuderground.com>, <weatherunbderground.com>, <weatherundergound.net>, <weatherundergriund.com>, <weatherundergrouind.com>, <weatherundergroumd.com>, <weatherundergrounf.com>, <weatherunderrround.com>, <weatherundergrpound.com>, <weatherundewrground.com>, <weatherundreground.com>, <weathrunderground.com>, <weatherunferground.com>, <wewatherunderground.com>, <wetaherunderground.com>, <wweatherunderground.com>, and <wwwund.com>.

78.     On October 13, 2008, the Panel, composed of The Honorable Charles K. McCotter, Jr. (Ret.), ordered that all domain names be transferred to Plaintiff.[2]

79.     Thereafter, the above 41 domains were transferred to Plaintiff.

### b.  Current Registration and Use of Infringing Domain Name

80.     Defendant NCS is the current registrant of <wunderphotos.com>.  *See Exhibit U, WHOIS for <wunderphotos.com>.*

---

[2] Opinion available at http://domains.adrforum.com/domains/decisions/1221002.htm.

81.    Defendants use <wunderphotos.com> to display a web site that features links to competitors of Plaintiff and sources to access weather conditions and forecasts. *See Exhibit V, Printout of web site from <wunderphotos.com>.*

82.    The <wunderphotos.com> domain name is identical or confusingly similar to the Wunderground Marks, namely its WUNDER Family of Marks, and violates Plaintiff's common law trademark rights in WUNDERPHOTOS.

83.    Defendants' registration and use of <wunderphotos.com> creates a likelihood of consumer confusion as to the source, sponsorship, affiliation, or endorsement of Defendants' web site by Plaintiff Wunderground.

84.    Defendants' use of <wunderphotos.com> has been and continues to be in commerce, including United States commerce, as defined by 15 U.S.C. § 1127.

85.    Defendant's registration and use of <wunderphotos.com> was and is intended to capitalize on the goodwill associated with the Wunderground Marks and Wunderground's own web sites.

86.    Defendants wrongfully profit from the unlawful use of the Wunderground Marks, including the Plaintiff's WUNDERPHOTOS mark.

### c.    Continued Mass Cybersquatting Evidences Defendants' Unlawful Business Model

87.    Defendants committed, and continue to commit, the unlawful acts cited herein intentionally, as part of their regular way of conducting business.

88.    As noted above, Defendants utilize software and a process to register the domain names with sufficient direct navigation traffic to generate a positive Return on Investment ("ROI"). Defendants have been and remain aware that their domain registration strategy,

software and process will register and monetize typographical variations of trademark protected domain names such as the Infringing Domains listed herein, as well as many other famous brands. Its current registration of other typo-domains is easily identified by searching for typo-variations of Alexa.com's "Global Top Sites" list of the highest ranked traffic web sites on the Internet and shows that Defendants continue to engage in cybersquatting. A representative sampling includes, but is not limited to, the following typo-domains:

a. Wikipedua.org, Wikiperdia.com, Ikipedia.com, Wikipedika.com, Wikipwdia.com, Wikioedia.com infringing the USPTO trademark registration for WIKIPEDIA (Reg. No. 3,040,722);

b. Facebooko.com, Facevbook.com, Favebook.com and Facebhook.com infringing the USPTO trademark for FACEBOOK (Reg. No. 3,122,052);

c. Myspacer.org, Myspace3.com, Myspce.org, Myspqce.com, Myspacxe.com, M6yspace.com, Wwwlmyspace.com, Myspzce.com, Myspacwe.com infringing the USPTO trademark for MYSPACE (Reg. No. 2,911,041);

d. Eszpn.com, esxpn.com, espb.org infringing the USPTO trademark registration for ESPN (Reg. No. 1,345,096);

e. Oerkut.com, 9orkut.com infringing the USPTO trademark registration for ORKUT (Reg. No. 2,970,421);

f. Flikckr.com, Glickr.net infringing the USPTO trademark registration for FLICKR (Reg. No. 3455275);

g. Mi9ninova.org, Mininovs.org, Mimninova.org, Minionova.org, Mninova.net, Mininiva.org, Mioninova.org, Mioninova.com, Mininovca.org, Mininopva.com, Mininnova.com infringing the USPTO trademark for MININOVA (Reg. No. 3,491,970);

h. Beob.org, Bebho.com, Bewbo.com, Bnebo.com, Bgebo.com, Gbebo.com, Bebpo.com, Bebno.com infringing the USPTO trademark for BEBO (Reg. No. 3,138,515);

i. Yourube.com, Y6outube.com, Youtubge.com, Youtune.net, Youthbe.com, Tyoutube.com com infringing the USPTO trademark for YOUTUBE (Reg. No. 3,525,802);

j. Neftflix.com infringing the USPTO trademark for NETFLIX (Reg. No. 2,552,950); and

k. Huffinftonpost.com infringing the USPTO trademark for THE HUFFINGTON POST (Reg. No. 3,095,331).

89.     In fact, Defendant NCS has been sued in federal court by distinctive and/or famous trademark holders for its typosquatting and cybersquatting activities in violation of federal trademark law under the Lanham Act.  These lawsuits include:

a.  Mesa Garage Doors v. Navigation Catalyst Systems Inc. et al. Case No. 8:2009cv00053 (CA Central Jan. 13, 2009);

b.  Verizon California Inc. et al v. Navigation Catalyst Systems, Inc. et al. Case No. 2:2008cv02463 (CA Central Apr. 15, 2008);

c.  Rodman & Renshaw, LLC v. Navigation Catalyst Systems, Inc. Case No. 2:2008cv01081 (CA Central Feb. 15, 2008);

d.  Kaplan, Inc. v. Navigation Catalyst Systems, Inc. Case No. 2:2008cv00439 (CA Central Jan. 24, 2008);

e.  Station Casinos, Inc. v. Navigation Catalyst Systems, Inc. Case No. 2:2006cv01401 (NV Nov. 2, 2006);

f.  Virgin Enterprises Limited v. Navigation Catalyst Systems, Inc. et al. Case No. 1:2006cv03651 (NY Southern May 12, 2006);

g.  Wynn Resorts Holdings, LLC v. Navigation Catalyst Systems, Inc. Case No. 2:2005cv00924 (NV Aug. 1, 2005);

h.  Wachovia Corporation v. Navigation Catalyst Systems Inc. Case No. 2:2004cv10087 (CA Central Dec. 10, 2004); and

i.  Federated Western Properties Inc. et al v. Navigation Catalyst Systems Inc. et al. Case No. 8:2004cv01171 (CA Central Oct. 6, 2004). Verizon, Kaplan, Virgin, Wachovia, Wynn Resorts, and Federated Western.    [case numbers and jurisdictions]

90.     Any efforts Defendants make to avoid typo-squatting is disingenuous and half-hearted at best, done only to distract from their unlawful business model which targets high traffic, and thus often trademark protected, domain names and typographical errors made by consumers attempting to access the legitimate domain names corresponding to the respective underlying entity.  Any use of human screeners that manually "blacklist" or remove trademark protected domains is insufficient to immunize, shield, or otherwise exonerate Defendants from liability in connection with the registration and use of infringing domains in the first instance.

91.     Defendants business, including its domain registration practices, relies upon third-party victims having to discover Defendants' unlawful use their trademarks and/or service marks

as part of a domain registration and use. Only upon discovery of Defendants' infringing or otherwise unlawful domain registrations and uses, and subsequent notification to the Defendants, do the Defendants try to avoid liability.

92.     Defendants claimed "policy" of voluntarily transferring disputed domain names after being notified of a dispute or adverse claim is insufficient to immunize, shield, or otherwise exonerate Defendants from liability in connection with the unlawful business model.[3]

93.     Defendant NCS has exhibited a pattern of mass, unlawful domain name registrations of typo-graphical errors of third-party trademarks.

94.     Defendant NCS's domain name registrations utilize, in bad faith, qwerty typos and sticky keys to capitalize off of the errors or shortcomings of Internet users seeking the legitimate domain name that incorporates an entity's trademark protected goods/services.

95.     Defendant NCS has registered and/or acquired multiple domain names which it knows, or has the ability to know absent its willful blindness, are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties.

96.     Defendants have used multiple domain names which they know, or have the ability to know absent their willful blindness, are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties.

97.     Defendant NCS has registered and/or acquired multiple domain names which Defendant knows, or has the ability to know absent its willful blindness, are identical or

---

[3] To find otherwise would be equivalent to not punishing or penalizing someone for stealing a car because, upon being caught, that someone offered to return the car to its lawful owner.

confusingly similar to the marks of others that are dilutive of famous marks of others that are famous at the time of registration of such domain names without regard to the goods or services of the parties.

98.    Defendants have used multiple domain names which Defendant knows, or has the ability to know absent its willful blindness, are identical or confusingly similar to the marks of others that are dilutive of famous marks of others that are famous at the time of registration of such domain names without regard to the goods or services of the parties.

99.    Defendant NCS has registered thousands of domain names that are identical, or confusingly similar, to distinctive and/or famous trademarks and service marks owned by unrelated third parties.

100.    Defendants have registered and/or used thousands of domain names that are identical, or confusingly similar, to distinctive and/or famous trademarks and service marks owned by unrelated third parties.

### COUNT I
### Cybersquatting under the Anti-Cybersquatting
### Consumer Protection Act – 15 U.S.C. § 1125(d)

101.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-100 above as though fully restated herein.

102.    Defendants registered, trafficked in, or used the Infringing Domains.  Defendant NCS continues to be the registrant for the <wunderphotos.com> domain name.  Defendants continue to use the <wunderphotos.com> domain name.

103. The Wunderground Marks were distinctive, and the THE WEATHER UNDERGROUND and WUNDERGROUND.COM marks were federally registered with the USPTO, at the time Defendants registered and/or used the Infringing Domains.

104. THE WEATHER UNDERGROUND and WUNDERGROUND.COM marks were famous at the time of Defendant NCS's registration of the Infringing Domains and are famous and protected under 15 U.S.C. § 1125(c).

105. THE WEATHER UNDERGROUND and WUNDERGROUND.COM marks were famous at the time of Defendants' use of the Infringing Domains.

106. The Infringing Domains are identical or confusingly similar to the Wunderground Marks.

107. The <wunderphotos.com> domain name is identical or confusingly similar to the Wunderground Marks, including without limitation, Plaintiff's WUNDER Family of Marks and WUNDERPHOTOS mark.

108. Defendant NCS, as domain name registrant, registered and/or used the Infringing Domain Names in bad faith with bad faith intent to profit from Wunderground's goodwill in the Wunderground Marks with such registration and/or use.

109. Defendants used the Infringing Domain Names in bad faith with bad faith intent to profit from Wunderground's goodwill in the Wunderground Marks with such registration and/or use.

110. Defendant NCS, as domain name registrant, registered and uses the <wunderphotos.com> domain name in bad faith with a bad faith intent to profit from Wunderground's goodwill in the Wunderground Marks with such registration and/or use.

111.    Defendants use the <wunderphotos.com> domain name in bad faith with bad faith intent to profit from Wunderground's goodwill in the Wunderground Marks with such use.

112.    Defendants do not have any intellectual property rights or any other rights in the Wunderground Marks or in the Infringing Domains.

113.    Neither the Infringing Domains nor <wunderphotos.com> consists of the legal name of any of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

114.    Defendants have not made any prior use of the Infringing Domains or <wunderphotos.com> in connection with a *bona fide* offering of any goods or services.

115.    Defendants' use of Infringing Domains and <wunderphotos.com> was and is in federally regulated commerce, consistent with the definition set forth in 15 U.S.C. § 1127.

116.    Defendants registered and/or used the Infringing Domains to divert consumers from Plaintiff's web sites to a web site accessible at the Infringing Domains for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the web site.

117.    Defendants registered and/or used <wunderphotos.com> to divert consumers from Plaintiff's web site to a web site accessible at <wunderphotos.com> for Defendants' commercial gain by creating a likelihood of consumer confusion as to the source, sponsorship, affiliation, or endorsement of the web site.

118.    Defendants registered and/or used Infringing Domains that Defendants knew were dilutive of famous marks owned by Plaintiff.

119. Defendants have registered and/or used multiple domain names that Defendant knew were distinctive of marks of others and/or dilutive of famous marks of others when the domain names were registered.

120. Defendants' registration, use, or trafficking in the Infringing Domains constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiff to relief.

121. By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

122. By reason of Defendants' acts alleged herein, Plaintiff is entitled to recover Defendants' profits, actual damages and the costs of the action, or statutory damages under 15 U.S.C. § 1117, on election by Plaintiff, in an amount of one hundred thousand dollars ($100,000) for each domain name found to constitute cybersquatting.

123. This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT II
## Trademark Infringement Under the Lanham Act – 15 U.S.C. § 1114(1)

124. Plaintiff, Wunderground, restates and incorporates paragraphs 1-123 above as though fully restated herein.

125. Defendants' use in commerce of the Wunderground Marks is likely to cause confusion, initial or otherwise, mistake and/or to deceive.

126. Defendants' use in commerce of the Infringing Domains and <wunderphotos.com> is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

127. Defendants' use in commerce of the web sites and advertisements displayed at the Infringing Domains and <wunderphotos.com> is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

128. Defendants' acts constitute trademark infringement in violation of 15 U.S.C. § 1114(1), entitling Plaintiff to relief.

129. Defendants have unfairly profited from the infringing actions alleged.

130. By reason of Defendants' acts, Plaintiff has suffered damage to the goodwill associated with the Wunderground Marks.

131. By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

132. By reason of Defendants' willful acts, Plaintiff is entitled to damages, including but not limited to any and all damages available under 15 U.S.C. § 1117.

133. This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT III
## False Designation of Origin Under the Lanham Act – 15 U.S.C. § 1125(a)

134.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-133 above as though fully restated herein.

135.    Defendants' use in commerce of the Wunderground Marks is likely to cause confusion, mistake and to deceive the relevant public by suggesting the Infringing Domains and <wunderphotos.com> and the web sites and advertisements displayed at the Infringing Domains and <wunderphotos.com> are authorized, sponsored, approved by or are affiliated with Plaintiff.

136.    Defendants' use of the Wunderground Marks, including variations of WUNDERGROUND.COM and THE WEATHER UNDERGROUND, as well as the Infringing Domains and <wunderphotos.com> is likely to cause confusion among the general public.

137.    The above-described acts of Defendants constitutes trademark infringement of the Wunderground Marks and false designation of origin in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

138.    Defendants have unfairly profited from the actions alleged.

139.    By reason of Defendants' acts alleged herein, Plaintiff has suffered monetary damage and damage to the goodwill associated with the Wunderground Marks.

140.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

141.    By reason of Defendants' willful acts, Plaintiff is entitled to damages, including but not limited to treble damages under 15 U.S.C. § 1117.

142.    This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT IV
## Dilution Under 15 U.S.C. § 1125(c)

143.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-142 above as though fully restated herein.

144.    The Wunderground Marks, including without limitation WUNDERGROUND.COM and THE WEATHER UNDERGROUND, are famous, as that term is used in 15 U.S.C. § 1125(c), and were famous before Defendants' registration and use of them and the Infringing Domains in commerce, due in part to the inherent distinctiveness and federal registration of the WUNDERGROUND.COM and THE WEATHER UNDERGROUND marks and the extensive and exclusive nationwide use, advertising, promotion, and recognition of the Wunderground Marks.

145.    Defendants' use of the Wunderground Marks, Infringing Domains and <wunderphotos.com>, and corresponding web sites and advertisements in commerce is likely to cause dilution by blurring or dilution by tarnishment of the Wunderground Marks, including without limitation WUNDERGROUND.COM and THE WEATHER UNDERGROUND.

146.    Defendants' acts constitute dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Plaintiff to relief.

147.    Defendants have unfairly profited from the actions alleged.

148.    By reason of Defendants' acts, Plaintiff has suffered monetary damage and damage to the goodwill associated with the Wunderground Marks and has suffered irreparable harm.

149.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

150.    By reason of Defendants' willful acts, Plaintiff is entitled to damages, including but not limited to treble damages under 15 U.S.C. § 1117.

151.    This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT V
## Unfair Competition and Trademark Infringement Under State Common Law

152.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-151 above as though fully restated herein.

153.    Defendants' use in commerce of the Wunderground Marks is likely to cause confusion, initial or otherwise, mistake and/or to deceive.

154.    Defendants' use in commerce of the Infringing Domains and <wunderphotos.com> is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

155.    Defendants' use in commerce of the web sites and advertisements displayed at the Infringing Domains and <wunderphotos.com> is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

156.    Defendants are palming off themselves as Plaintiffs, thus falsely inducing the public, in order to obtain benefits properly belonging to Plaintiff.

157.    Defendants' acts constitute unfair competition and trademark infringement, in violation of Michigan law.

158.    Defendants have unfairly profited from the infringing and unfair actions alleged.

159.    By reason of Defendants' acts, Plaintiff has suffered irreparable damage to the goodwill and reputation associated with Plaintiff itself, its products and services, and the Wunderground Marks.

160.    By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

161.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

**COUNT VI**
**Civil Conspiracy**

162.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-161 above as though fully restated herein.

163.     Defendants have acted in concert with a shared intent to harm Wunderground.

164.     The combination of the four Defendants enabled them to register the Infringing Domain Names as a registrar, maintain ownership as a registrant, offer a domain parking service, and utilize monetization services in order to unlawfully earn revenue and correspondingly divert it from the Plaintiff.

165.     Defendants had a real agreement or confederation with a common design.  In particular, Defendants intentionally agreed to capitalize off of Internet users by diverting consumers from Plaintiff's web sites to a web site accessible at the Infringing Domains by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the web site as well as dilutive of Plaintiff's famous marks.

166.     Defendants' purpose was unlawful and to capitalize off of the poor typing abilities of unsuspecting Internet users who sought out Wunderground and its products and services. Defendants further sought to offer links to Wunderground's competitors knowing that Internet users would click-through to these weather-related products and services, and in doing so, generate click-through revenue for Defendants.

167.     Defendants' unlawful acts were done in furtherance of the conspiracy. Defendants cybersquatted when they registered and/or used domain names that were identical or confusingly similar to Wunderground's trademarks and service marks in bad faith to capitalize off of the goodwill associated with Wunderground's marks.

168.     Defendants have committed separate, actionable torts for trademark infringement, trademark dilution, and unfair competition by Defendants' intentionally registering Wunderground's registered trademarks as domain names.

169.   Defendants have unfairly profited from the tortious, infringing and dilutive acts.

170.   By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

171.   By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendant.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

**COUNT VII**
**Contributory Trademark Infringement**

172.   Plaintiff, Wunderground, restates and incorporates paragraphs 1-171 above as though fully restated herein.

173.   Defendant Connexus provides a service, namely an online marketing service, which may include services as an affiliate marketer, to Defendant NCS.  Defendant Connexus routes Internet traffic to and from the web sites housed at the Infringing Domains.

174.   Defendant Firstlook provides a service, namely domain parking services, to Defendant NCS.  Defendant First Look physically hosts web sites, which are displayed at the Infringing Domains, on their servers.

175.   Defendant Basic Fusion provides a service, namely domain name registration services, to Defendant NCS.

176.   Defendants Connexus, Firstlook, and Basic Fusion intentionally induced Defendant NCS to infringe the Wunderground Marks.

177.    Defendants Connexus, Firstlook, and Basic Fusion continue to supply services to Defendant NCS that they know, or have reason to know, is engaging in trademark infringement.

178.    Defendant Basic Fusion had actual knowledge of Defendant NCS's trademark infringement based upon the fact that it has had to implement the transfer order following an adverse UDRP decision against NCS.

179.    Defendants Connexus, Firstlook, and Basic Fusion had constructive knowledge of Defendant NCS's trademark infringement in light of the numerous federal lawsuits filed against it.

180.    Defendants Connexus, Firstlook, and Basic Fusion exercise control, including without limitation the ability to terminate said services, over Defendant NCS's means of infringement.

181.    Defendant Connexus failed to terminate its online marketing services which directed Internet traffic to Defendant NCS.

182.    Defendant Firstlook failed to remove the web sites that appeared at Infringing Domains and contained links to competitors of Wunderground.

183.    Defendant Basic Fusion failed to terminate, remove, or otherwise disable the URL for the Infringing Domains that offered content that infringed the Wunderground Marks.

184.    Defendants Connexus, Firstlook, and Basic Fusion, who host and permit Defendant NCS to use their online services, acted with wilfull blindness.

185.    Defendants have unfairly profited from their contributory infringement.

186.    By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

187.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendant.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

**COUNT VIII**
**Vicarious Trademark Infringement**

188.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-187 above as though fully restated herein.

189.    Defendants Connexus, Firstlook, and Basic Fusion, as service providers, have an actual or apparent partnership with Defendant NCS.

190.    Upon information and belief, Defendants Connexus, Firstlook, and Basic Fusion, as service providers, and Defendant NCS have the authority to bind one another in actions with third parties.

191.    Upon information and belief, Defendants Connexus, Firstlook, and Basic Fusion, as service providers, have exercised control, jointly with Defendant NCS or otherwise, over the infringing actions of Defendant NCS.

192.    Upon information and belief, Defendants have exercised joint ownership over the infringing products and services.

193.    Defendants Connexus, Firstlook, and Basic Fusion deal directly with Defendant NCS, and upon information and belief, receive money from Defendant NCS.

194.    Defendants have unfairly profited from their contributory infringement.

195.    By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

196.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendant.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief as it relates to <wunderphotos.com> and any other domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

<u>**COUNT IX**</u>
<u>**Declaratory Judgment**</u>

197.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-194 above as though fully restated herein.

198.    Defendants' above acts and omissions reveal an actual and substantial controversy between the parties, who possess adverse legal interests, to this Complaint.

199.    Defendants' above acts and omissions described herein are of sufficient immediacy and reality to warrant declaratory judgment.

200.    Defendants above acts and omissions warrant an order by this court for declaratory relief pursuant to 28 U.S.C. § 2201 and consistent with the Prayer for Relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1. That the Court enter a judgment that Defendants have:

   a. violated Plaintiff's rights in the Wunderground Marks in violation of 15 U.S.C. § 1125(d);

   b. infringed Plaintiff's rights in the Wunderground Marks in violation of 15 U.S.C. § 1114(1);

   c. violated Plaintiff's rights in the Wunderground Marks in violation of 15 U.S.C. § 1125(a);

   d. violated Plaintiff's rights in the Wunderground Marks in violation of 15 U.S.C. § 1125(c);

   e. unfairly competed with Plaintiff by infringing Plaintiff's rights in the Wunderground Marks in violation of Michigan law;

2. That Defendants, including without limitation Defendant NCS, be ordered to produce a list of every domain name it has registered and/or used which is identical or confusingly similar to the Wunderground Marks;

3. That Defendants be ordered to transfer every domain name it owns which is identical or confusingly similar to the Wunderground Marks to The Weather Underground, Inc., including without limitation, <wunderphotos.com>;

4. That the Court issue temporary and permanent injunctive relief against Defendants, and that Defendants, its officers, agents, representatives, servants, employees, attorneys, successors, assignees, licensees and all others in active concert or participation with Defendants, be enjoined and restrained from:

a. registering, using or trafficking in, in any manner, any domain name that incorporates, in whole or in part, the Wunderground Marks;

b. registering, using or trafficking in, in any manner, any domain name that is identical or confusingly similar to the Wunderground Marks;

c. using any of the Wunderground Marks, or any other name, mark, designation or depiction in a manner that is likely to cause consumer confusion as to whether Defendants are affiliated with, associated with, or sponsored by Plaintiff;

d. infringing, diluting, unfairly competing, falsely designating the origin of, passing off, or falsely advertising Plaintiff's trademarks and service marks, including the Wunderground Marks set forth above;

e. registering, maintaining, or using any domain name that incorporates, in whole or in part, the trademark or service mark of another, or anything confusingly similar thereto, in the matter of the public interest;

f. registering any domain name using an automated tool or process;

g. registering and maintaining any domain name without providing complete and accurate contact information, including Defendants' full legal name as the registrant;

h. assisting, aiding, or abetting any other person or business entity from engaging in or performing any of the activities referred to in subparagraphs above.

5. That Defendants be ordered to account to Plaintiff for, and disgorge, all profits it has derived by reason of the unlawful acts complained of above;

6. That Defendants be ordered to issue corrective advertising to the extent necessary to correct any consumer confusion resulting from Defendant's unlawful acts complained of above;

7. That Defendants be ordered to pay damages, and that those damages be trebled, pursuant to 15 U.S.C. § 1117;

8. That Defendants be ordered to pay statutory damages under 15 U.S.C. § 1117(d), on election by Plaintiff, in an amount of One Hundred Thousand Dollars ($100,000) per domain name infringement for cybersquatting;

9. That Defendants be ordered to pay Plaintiff's attorneys' fees and costs; and

10. That the Court grant Plaintiff all other relief to which it is entitled and such other or additional relief as is just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all matters triable as of right in the instant cause of action.

Respectfully submitted this 26th day of February, 2009,

_/s/Enrico Schaefer_____
Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com

Lead Counsel for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com

Attorneys for Plaintiff