IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

vs.

NAVIGATION CATALYST SYSTEMS,
INC., a Delaware corporation;
CONNEXUS CORP., a Delaware
corporation; FIRSTLOOK, INC., a
Delaware corporation; and EPIC
MEDIA GROUP, INC., a Delaware
corporation,

        Defendants.

Case No. 2:09-CV-10756
Hon. Marianne O. Battani

_____

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

_____

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

FOR ITS FIRST AMENDED COMPLAINT in this matter, Plaintiff, THE WEATHER UNDERGROUND, INC., by and through its attorneys, TRAVERSE LEGAL, PLC, states:

## I.  PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, The Weather Underground, Inc. (hereinafter "Wunderground"), is a for profit corporation organized and existing under the laws of the State of Michigan, with its principal place of business located at 300 N. Fifth #240, Ann Arbor, Michigan 48104.

2.     Defendant, Navigation Catalyst Systems, Inc. ("NCS"), is a for profit corporation organized and existing under the laws of the State of Delaware and a foreign corporation in the State of California with its principal place of business at 2141 Rosecrans Ave., #2020, El Segundo, CA 90245.

3.     Defendant, Connexus Corporation ("Connexus"), is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2141 Rosecrans Ave. #2020, El Segundo, California 90245 and has merged with Defendant Epic Media Group.

4.     Defendant, FirstLook, Inc. ("FirstLook"), is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2141 Rosecrans Ave. #2020, El Segundo, California 90245. FirstLook is a wholly owned subsidiary of Connexus, which has merged with Epic Media Group.

5.     Defendant, Epic Media Group, Inc. ("Epic Media"), is a for profit corporation organized and existing under the laws of the State of Delaware with its

principal place of business at 2141 Rosecrans Avenue, #2020, El Segundo, California 90245 and has merged with Connexus.

6.     Defendant NCS is a shell company with no employees, bank accounts or tangible assets.

7.     NCS was incorporated merely to serve as the registrant of domain names in an effort to take advantage of limited liability protections while not being exposed to a risk of loss or having sufficient assets to cover potential liability for cybersquatting or other unlawful acts.

8.     Defendants Epic Media and Connexus continue to operate under the Epic Media and Connexus names.

9.     Defendant Epic Media has accepted the liabilities of Defendant FirstLook, Defendant NCS and Defendant Connexus, or is otherwise subject to liabilities of NCS, FirstLook and Connexus under law.

10.     Defendant NCS, or Defendants' proxy service, Domain Name Proxy, LLC ("DNP"), is, or was, listed as the Registrant of the Infringing Domains, *infra,* which are the subject of this lawsuit.

11.     Connexus, now Epic Media, and FirstLook provided funding, employees, technology, know-how and other resources that enabled the unlawful acts complained of in this Complaint.

12.     Connexus, now Epic Media, and FirstLook controlled the business plan, policies and procedures of the unlawful acts complained of in this Complaint.

13.     Connexus, now Epic Media, and FirstLook are a primary financial beneficiary of the acts complained of in this Complaint.

14.     Connexus, now Epic Media, and FirstLook employees, contractors, officers and/or directors engaged in and are responsible for the unlawful acts complained of in this Complaint.

15.     Each of the Defendants was the agent, servant, employee, partner, alter ego, subsidiary, or joint venture of each of the other Defendants and NCS, and the acts of each of Defendants were in the scope of such relationship.  Each of the Defendants acted with the knowledge, permission, and consent of each of the other Defendants and NCS.  Each of the Defendants aided and abetted the other Defendants and NCS in the acts or omissions alleged in this Complaint.

16.     Defendants, in their corporate capacity, as well as their officers, directors, employees, agents and/or contractors, have acted individually, collectively and as agents within the scope of their agency for the others concerning the acts complained of herein.

17.     Defendants, in their corporate capacity, as well as their officers, directors, employees, agents and/or contractors, have acted on behalf of, and for, each other concerning the acts complained of herein.

18.     Defendants are individually and on behalf of each other jointly and severally liable for the commission of the unlawful acts complained of herein.

19.     This action arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq*., including without limitation the Anti-cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), and the common laws of the State of Michigan.

20.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) as well as 15 U.S.C. §§ 1121 and 1125(d).

21.     This court has supplemental jurisdiction over the claims in this Complaint that arise under the common laws in the State of Michigan  pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

22.     This Court has personal jurisdiction over Defendant NCS, Defendant Epic Media, Defendant FirstLook, and Defendant Connexus (collectively "Defendants") because Defendants have: (a) committed intentional and tortious acts within this State; (b) conducted substantial business within this State related to the unlawful activity at issue in this Complaint; and (c) otherwise have availed themselves of this forum.  The harm suffered by Plaintiff is a result of the business conducted by these Defendants within this district.

23.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because (a) Defendants conduct substantial business within this judicial district related to the unlawful activity at issue in this Complaint, (b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including, but not limited to, registering, using, trafficking, monetizing and using/parking the

infringing domain names within this judicial district, and (c) for the reasons stated by this Court related to various motions filed by the parties.

## II. PLAINTIFF'S BUSINESS AND USE OF THE INTERNET

24.     Plaintiff Wunderground has been providing real-time online weather information via the Internet as a commercial entity since 1995.  Prior to that, the menu-based telnet interface program that displayed real-time weather information via the Internet had originated at the University of Michigan.  It was later developed for use on numerous operating platforms and evolved to a user-friendly web interface.

25.     Wunderground was one of the first organizations to provide users with an online weather service.  Wunderground pioneered the offering of real-time weather conditions with such features as severe weather warnings and advisories, international conditions, marine weather, and detailed local forecasts.  Internet users can find weather for any city, state, zip code, airport code, or country.  Users can also customize the web site by selecting a language, a time zone, units (metric or English), and site appearance (e.g. show favorites, photos, promos).  Moreover, users can listen to local weather radio stations, track radar, and even customize and print a Forecast Flyer.

26.     Wunderground provides Internet users with access to various blogs, such as Climate Change Blog, Tropical Weather Discussion, and Forecast Competition, wherein the users post, share, and comment on weather related information and discussions with other users from around the world.  *See Exhibit A, Wunderground's Blog Directory.*

27.     Internet users can become members to the web site, and as a result, have access to enhanced features of the web site.  Moreover, users may opt to pay for a one year membership giving them longer radar animations, ad-free weather, universal favorites, and U.S. forecasts and alerts through email (known as "no ads members").  Wunderground has over 80,000 no ads members.

28.     Wunderground has developed the world's largest network of personal weather stations (i.e. weather information provided by individuals and other entities from their exact location from around the globe) to provide users with the most localized weather conditions.  Wunderground displays weather information provided by over 40,000 personal weather stations.

29.     Wunderground makes its services available through mobile devices, such as T-Mobile and the Apple iPhone cell phones.

30.     Wunderground made its web site multilingual in 1998.  In fact, the <wunderground.com> domain has now added language identifiers, e.g. <swedish.wunderground.com>, with the corresponding language available at said web site.

31.     Wunderground has offered its services via its official web sites, www.wunderground.com, www.weatherunderground.com, and www.wund.com, since 1995, 1998, and 2001 respectively.  *See Exhibit B, Printout of <wunderground.com>.*

32.     Wunderground's official web site, located at <wunderground.com>, attracts approximately 14 million global visitors each month.  11 million of these visitors are from the United States alone.  As a result, wunderground.com ranks within or near

the top 100 amongst all United States web sites, per quantcast.com.  *See Exhibit C, Quantcast.com Results for <wunderground.com>.*

33.    Hundreds of thousands of Internet users utilize Wunderground's weather services at its web sites each day.

34.    Numerous organizations utilize Wunderground's technologies, hardware, and software to power their products and services, including, but not limited to, the Chicago Tribune, State Farm Insurance, Associated Press, and the Mayo Clinic.

35.    While many of the weather related offerings at Wunderground's web site are free, Wunderground generates revenue from its web site via advertising.  Such major organizations as eBay, H&R Block, VacationsToGo.com, and Classmates.com advertise on Wunderground's web sites.

36.    Wunderground also places millions of advertisements on third party web sites by providing an application that displays Wunderground's logo and name along with the local temperature.  *See, e.g., Exhibit D, Printout of Display on Third Party Web Site.*  An Internet user can click on the display, which Wunderground refers to as a WEATHER STICKER®, in order to be redirected to Wunderground's website where more detailed weather information is provided to the Internet user.  *See Exhibit E, Printout of Wunderground's Web Site after User Clicked the Display.*

37.    Wunderground is the registrant of a portfolio of domain names that includes over 125 domain names, the majority of which incorporate its trademarks and service marks.  *See Exhibit F, List of Domains Owned by Wunderground.*

38.    The Internet has become an indispensable tool through which Plaintiff communicates, markets, and services its customers.

### III. PLAINTIFF'S TRADEMARKS AND SERVICE MARKS

39.    Wunderground is the owner of all rights, common law or otherwise, in and to the mark THE WEATHER UNDERGROUND.   Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

a.  THE WEATHER UNDERGROUND

   i.  Reg. No. 2,297,683

   ii.  Registration Date: December 7, 1999

   iii.  Providing weather information via a global computer network

*See Exhibit G a true copy of U.S. Reg. No. 2,297,683.*  The USPTO acknowledged the incontestability of U.S. Reg. No. 2,297,683 pursuant to 15 U.S.C. § 1065 on April 1, 2005.   *See Exhibit H, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,297,683.*  Furthermore, the USPTO accepted the declaration of continued use and renewal on December 20, 2008.  *See Exhibit I, a true copy of Acceptance of Section 8 Declaration and Section 9 Renewal.*

40.    Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERGROUND.   Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

a. WUNDERGROUND.COM

    i. Reg. No. 2,324,272

    ii. Registration Date: February 29, 2000

    iii. Computer services, namely providing on-line information services in the field of weather.

*See Exhibit J a true copy of U.S. Reg. No. 2,324,272.* The USPTO acknowledged the incontestability of U.S. Reg. No. 2,324,272 pursuant to 15 U.S.C. § 1065 on July 26, 2005. *See Exhibit K, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,324,272.* Furthermore, the USPTO accepted the declaration of continued use and renewal on June 6, 2009. *See Exhibit L, a true copy of Acceptance of Section 8 Declaration and Section 9 Renewal.*

41.    Wunderground's registration and continued use in interstate commerce of the THE WEATHER UNDERGROUND and WUNDERGROUND.COM distinctive marks, since as early as 1995, have enabled those marks to become well-known and famous.

42.    Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERSEARCH. Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

a. WUNDERSEARCH

    i. Reg. No. 2,447,954

    ii. Registration Date: May 1, 2001

   iii. Computer services, namely, creating indexes of information, sites, and other references available on computer networks; searching and retrieving information, sites and other resources available on computer networks for others; providing an on-line link to news, weather, sports, current events, and reference materials

*See Exhibit M, a true copy of U.S. Reg. No. 2,447,954.*  The USPTO acknowledged the incontestability of U.S. Reg. No. 2,447,954 pursuant to 15 U.S.C. § 1065 on March 19, 2007.  *See Exhibit N, a true copy of Section 8 Acceptance and Section 15 Acknowledgement for U.S. Reg. No. 2,447,954.*

  43. Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERMAP.  Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

  a. WUNDERMAP

   i. Reg. No. 3,527,030

   ii. Registration Date: November 4, 2008

   iii. Providing a web site and web site links to geographic information in the nature of geospatial maps: Computer services, namely, providing on-line information services in the field of weather and geospatial weather maps; providing location-specific weather data and geospatial weather maps via a global computer network; on-line computer generated cartography

*See Exhibit O a true copy of U.S. Reg. No. 3,527,030.*

44.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERRADIO.   Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

  a.  WUNDERRADIO

      i.  Reg. No. 3,647,301

      ii.  Registration Date: June 30, 2009

      iii.  Downloadable computer software used for playing radio or audio streams on a mobile device or cell phone

*See Exhibit P, a true copy of U.S. Reg. No. 3,647,301.*

45.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERPHOTOS.   Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

  a.  WUNDERPHOTOS

      i.  Reg. No. 3,739,351

      ii.  Registration Date: January 19, 2010

      iii.  Providing a web site that gives multiple computer users simultaneously the ability to upload, share, rate, review and exchange digital photos relating to the earth sciences, weather and natural phenomena

*See Exhibit Q, a true copy of U.S. Reg. No. 3,739,351.*

46.     Wunderground is the owner of all rights, common law or otherwise, in and to the mark WUNDERBLOG.   Wunderground owns the following service mark registered on the Principal Register of the United States Patent and Trademark Office (USPTO).

    a.  WUNDERBLOG

        i.  Reg. No. 3,742,092

        ii.  Registration Date: January 26, 2010

        iii.  On-line journals, namely blogs featuring information about weather

*See Exhibit R, a true copy of U.S. Reg. No. 3,742,092.*

47.     Wunderground is also the owner of all rights, common law or otherwise, in and to the mark WUNDER in connection with its services.

48.     Through its efforts, Wunderground has also established tremendous value and goodwill associated with its family of marks, all of which include the distinctive, common element of WUNDER.   As a result, Wunderground's family of marks (hereinafter "WUNDER Family of Marks") have reached a high degree of consumer recognition.

49.     Wunderground's registered trademarks, common law trademarks, trade names, service marks, family of marks, and variants are collectively referred to as the "Wunderground Marks".

50.     The Wunderground Marks are distinctive and were distinctive in the marketplace at the time of all acts alleged herein and, as such, designate a source of origin attributable to Plaintiff.

51.     The Wunderground Marks were and continue to be used in interstate commerce and are widely known and recognized among the general consuming public.

52.     As a result of Wunderground's substantial investment, the Wunderground Marks have developed a reputation for excellence and extensive goodwill in the market. As such, the Wunderground Marks are extremely valuable to Plaintiff as the true indicator of source for its offerings and services.

53.     Wunderground has received press, unsolicited or otherwise, from such major publications as Forbes, People Magazine, Wired, the Wall Street Journal, USA Today, and the New York Times.

## IV. DEFENDANTS' BUSINESSES

54.     "Direct Navigation" describes the method of typing a domain name or URL directly into the browser address bar in order to arrive at a specific website as opposed to using a search engine to find a domain or web site.  Direct navigation generates what is known as "type-in traffic" related to internet-users who (a) remember the domain name of a known company or web site and type it directly into the browser address bar, (b) mistakenly enter words or a company name into the browser address bar instead of a search engine because they do not know any better or (c) use the browser address bar as a search tool on purpose.

55.     DNS error data is data related to a user of the Internet who attempts direct navigation and, because of a typo or other error related to the domain name, does not return a registered domain.  DNS error data shows domain names that have not been

registered but which receive traffic.  DNS error data can be purchased and obtained from various sources.

56.    "Domain Parking" refers to the registration of an internet domain name without that domain being associated with any established business or services. "Parked Domains" or "Parked Pages" typically do not show up in any search engine results.  Instead, Parked Domains rely on direct navigation traffic.  Parked Domains resolve to a web page containing hyperlinks which, often unbeknownst to the web site visitor, link to advertiser web sites.  In many instances, the advertisers themselves are unaware that their advertisements, typically placed through Google's Adword program or Yahoo's Overture program, are being displayed on Parked Domains with no real content beyond the advertisements themselves.

57.    "Typosquatting"[1], also called URL hijacking, is a form of cybersquatting which relies on mistakes such as typographical errors made by Internet users when inputting a trademark protected website address into a web browser.  "Qwerty Typos" (users accidentally hitting letters adjacent to the correct key-stroke on the qwerty-style keyboard), "Letter Swaps" (users typing the domain name in the wrong letter-order) and "Sticky Keys" (users accidently hitting a letter twice or missing it all together) all generate traffic on high traffic trademark protected domain names.  Typo-variants of famous trademarks identified through DNS error data are registered, trafficked in and

---

[1] See Wikipedia, http://en.wikipedia.org/wiki/Typosquatting ("Typosquatting, also called URL hijacking, is a form of cybersquatting which relies on mistakes such as typographical errors made by Internet users when inputting a website address into a web browser.  Should a user accidentally enter an incorrect website address, they may be led to an alternative website owned by a cybersquatter.").

used for advertising revenue and profits. Because of the traffic generated by those web sites and the fact that a certain percentage of people directly navigating to the trademark protected web site will accidentally misspell or mis-type the domain name into the address bar, typosquatted domains can generate significant pay-per-click (PPC) revenue, especially when registered, trafficked and used en masse with automated software.

58.     Predicting typographical errors by Internet users and collecting/analyzing DNS error data is part of the typosquatting strategy, with logic built into domain identification, registration and advertising software for profit.

59.     "Domain Tasting" is the practice using the five-day "grace period" (the "Add Grace Period" or "AGP") to test the marketability of the domain. A registrant utilizes to the AGP and then elects to either keep the domain and pay the registration fee or return it to the registry and pay no or a limited fee. The AGP was originally instituted by the Internet's governing body ICANN (International Corporation for Assigned Names and Numbers) to allow users to obtain a refund if they mistakenly register the wrong domain. Companies such as these Defendants determined a way to use the AGP to mass register, traffic and use domains and 'taste' them for traffic during the AGP, returning those domains for a full refund which they predict will not derive enough income from PPC advertisements on Parked Pages. Some companies such as these Defendants further abused the AGP by repeatedly registering, trafficking in and using domains during the registration period in order to avoid registration fees while they determine profitability of a particular domain. Domain Tasting has been a

controversial practice that recently resulted in policy changes by ICANN in order to reduce or eliminate mass Domain Tasting by companies with Parking Page business models.

60.    The software which generates the Parked Page and formerly pulled in Yahoo Overture and other advertisements is designed to predict the interests of the visitor and, in many instances, shows advertisements in violation of third party trademark rights (i.e. qwunderground.com [note typo] serving up advertisements for weather web sites and competitors of Wunderground and its wunderground.com web site).  *See, e.g., Exhibit S, Printout of <qwunderground.com>*.   The typo-domain Registrant is paid based on how many links have been clicked on the Parked Page, and as such receives PPC revenue.

61.    Defendants registered, used and trafficked typo-domains such as the Infringing Domains*, infra,* which are the subject of this lawsuit and as more fully detailed below.

62.    Defendants have created and utilize software for registering, trafficking in and using typo-domains that target domain names with a high amount of traffic, many of which with actual or constructive knowledge will be, and in fact are, trademark protected.

63.    DNP is a proxy service to hold the registrations NCS in an effort to obscure the identity of NCS as the actual registrant of many of the domain names making it more difficult for trademark holders to identify NCS as the actual registrant of

Infringing Domains and more difficult to pursue remedies for trademark infringement against NCS for infringement of those domains.

64.    Defendants have devised a system using automated software by which high traffic web sites, which are often trademark protected, are identified and typographical variations of the domains are registered, renewed, optimized, offered for sale parked for PPC monetization.

65.    Defendants' business model is, in part, to monetize traffic of trademark-protected domains.  If a trademark holder complains, sends a threat letter, or files a UDRP complaint or lawsuit, Defendants turn over the infringing domains(s) after enjoying PPC revenue in the interim.

66.    Defendants understand that most trademark holders are unaware that typo variations of their domains are being registered and monetized for profit, thereby allowing Defendants to profit from infringement and cybersquatting largely without detection.

67.    NCS, FirstLook, Connexus, and Epic Media are under common ownership and control.

## V.  DEFENDANTS' UNLAWFUL ACTIONS

### a.    Registration, Trafficking and Use of Infringing Domain Names

68.    Defendants registered, trafficked in and used 264 domain names which are typographical or other derivations of Plaintiff's trademarks (collectively referred to as "Infringing Domains"), listed in *Exhibit T* and *Exhibit U* and other domains yet to be

identified. Wunderground never authorized Defendants to register, traffic in or use the Infringing Domains or otherwise register or use its marks in any way.

69.    The Infringing Domains are misspellings, inversions, typos or otherwise confusingly similar to the Wunderground Marks.

70.    Defendants used the Infringing Domains to redirect to web sites that consisted of either contextual pay-per-click parking pages or paid search engine listings. *See, e.g., Exhibit S, Printout of <qwunderground.com>; Exhibit V, Printout of <udergroundweather.com>.*

71.    Many of the web sites on the infringing domains redirect or show advertisements to Plaintiff's competitors, including WeatherBug, Top-Weather.net, ALOT Weather, DTN Meteorlogix, and others.   *See Exhibit V, Printout of Links from <udergroundweather.com>.*

72.    Upon    information    and    belief,    the    earliest    registration, <udergroundweather.com>, was on or near July 7, 2004.  This is approximately nine years    after    Wunderground    had    registered    and    used    <wunderground.com>, approximately    ten    years    after    Wunderground    had    registered    and    used <weatherunderground.com>, over four years after Wunderground received its Certificate of Registration from the USPTO for WUNDERGROUND.COM, and over nine years after Wunderground received its Certificate of Registration from the USPTO for THE WEATHER UNDERGROUND.

73.    Defendants registered, trafficked in and used some of the Infringing Domains that are the subject of this lawsuit during the ICANN Add Grace Period

("AGP"). In doing so, Defendants used process, technology and/or software developed Defendants to 'taste' the typo-traffic on those domains during the AGP to ensure adequate direct navigation traffic and revenue. Defendants then kept the typo-domains which have adequate direct navigation traffic and monetized those domains using Parking Page software, process and technology conceived, designed, developed and maintained through their collaborative efforts.

74.     On or about August 18, 2008, Plaintiff filed a Complaint against NCS with the National Arbitration Forum in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy regarding domains of which Plaintiff was then aware.

75.     The UDRP Complaint named 41 domain names which Plaintiff was aware of at that time, including <qwunderground.com>, <swunderground.com>, <wundertground.com>, <wunederground.com>, <wunnderground.com>, <winderground.com>, <wumderground.com>, <wundeerground.com>, <wunderfround.com>, <wundergtound.com>, <wundergroundr.com>, <udergroundweather.com>, <undegroundweather.com>, <undergoundweather.com>, <undergroudweather.com>, <undergroundwaether.com>, <undergroundwweather.com>, <undergrounweather.com>, <watherunderground.com>, <weaherunderground.com>, <weahterunderground.com>, <weartherunderground.com>, <weatehrunderground.com>, <weatgerunderground.com>, <weathernuderground.com>, <weatherunbderground.com>, <weatherundergound.net>, <weatherundergriund.com>, <weatherundergrouind.com>, <weatherundergroumd.com>,

<weatherundergrounf.com>, <weatherunderround.com>, <weatherundergrpound.com>,

<weatherundewrground.com>, <weatherundreground.com>,

<weathrunderground.com>, <weatherunferground.com>, <wewatherunderground.com>,

<wetaherunderground.com>, <wweatherunderground.com>, and <wwwund.com>.

76.    On October 13, 2008, the Panel, composed of The Honorable Charles K.

McCotter, Jr. (Ret.), ordered that all domain names be transferred to Plaintiff.[2]

77.    Thereafter, the above then known 41 domains were transferred to Plaintiff.

78.    Defendants attempted to conceal the existence of other Infringing

Domains, including during discovery in this lawsuit.

79.    Plaintiff has since become aware of the other infringing Domains as set

forth in Exhibits T and U.

**b.    Continued Mass Cybersquatting Evidences Defendants' Unlawful**
**       Business Model and Bad Faith Intent to Profit**

80.    Defendants committed, and continue to commit, the unlawful acts cited

herein intentionally in bad faith as part of their usual way of conducting business.

81.    As noted above, Defendants utilize software and a process to register the

domain names with sufficient direct navigation traffic to generate a positive Return on

Investment ("ROI").   Defendants have been and remain aware that their domain

registration strategy, software and process will register and monetize typographical

variations of trademark protected domain names such as the Infringing Domains listed

herein, as well as many other famous brands. Defendants former and current

---

[2] Opinion available at http://domains.adrforum.com/domains/decisions/1221002.htm.

registration, trafficking and use of other typo-domains which violate third party trademarks is easily identified by searching for typo-variations high-traffic web sites on the Internet.  A representative sampling of infringing domains includes, but is not limited to, the following typo-domains which are or have been registered, trafficked or used by Defendants:

    a. Wikipedua.org,    Wikiperdia.com,    Ikipedia.com,    Wikipedika.com, Wikipwdia.com,    Wikioedia.com,    Wikipegia.org,    Wikiepidia.org, Wikipediao.org,    Wikipededia.org,    Wikepiedia.org,    Wikipeid.org, Winkepedia.org,    Wikipedida.org,    Wikpipedia.org,    Wikipipedia.org, Wikiepadia.org,    Wickapedia.org,    Wickipedia.org,    Wikipediea.org, Winkipedia.org,    Wikiredia.org,    Wikipedig.org,    Wikidedia.org, Wikipedin.org,    Kipedia.org,    Wixipedia.org,    Wkikpedia.org, Wiwkipedia.org,    Wicpedia.org,    Wikiedpedia.org,    Mikipedia.org, Whikipedia.org,    Wikipedira.org,    Wikikipedia.org,    Wikipekia.org, Wikiwedia.org,    Wickopedia.org,    Wikitedia.org,    Wikwpedia.org, Winipedia.org    infringing the USPTO trademark registration for WIKIPEDIA (Reg. No. 3,040,722);

    b. Facebooko.com, Facevbook.com, Favebook.com and Facebhook.com, Faceooik.com,    Faceoo.com,    Acebok.com,    Facobook.com, Facabook.com,    Facebrook.com,    Pacebok.com,    Facebob.com, Faebookc.com,    Facenoo.com,    Acebbok.com,    Fabebook.com, Facedook.com,    Faceomk.com,    Facevok.com,    Facebbo.com,

Acebookf.com,    Facebppok.com,    Faceboon.com,    Fsceboo.com,
Faveboo.com,    coacebook.com,    facook.com,    Faceblock.com,
Tracebook.com,    Faeook.com,    Facebooth.com,    Hacebook.com,
Faceboolc.com,    Facenok.com,    Faceokk.com,    Afebook.com,
Faceboow.com infringing the USPTO trademark for FACEBOOK (Reg.
No. 3,122,052);

c.  Myspacer.org,    Myspace3.com,    Myspce.org,    Myspqce.com,
Myspacxe.com,    M6yspace.com,    Wwwlmyspace.com,    Myspzce.com,
Myspacwe.com,    Myspdace.com,    Mdyspace.com,    Miyspase.com
Mzyspace.com,    Mysppae.com,    Myesspace.com,    Mwyspace.com,
Hmyspace.com,    My-spase.com,    Myapce.com,    Myfpace.com,
Mymyspace.com,    Myspae.com,    Mysapoce.com,    Myscace.com,
Myscapce.com,    Myscpae.com,    Myspacwe.com,    Myspaece.com,
Myspces.com,    Myspecae.com,    Myspece.com,    Myspve.com,
Yspacec.com,    Mspsace.com,    Mypacw.com,    Msapace.com,
Ysace.com,    Myspease.com,    Ysoace.com,    Mybpace.com,
Mydpsace.com,    Mysdapce.com,    Myspic.com,    Mysoapce.com,
Mayspce.com,    Myaspase.com,    Myospace.com,    Myspppace.com,
Myspacle.com,    Mypapce.com,    3myspace.com,    Chmyspace.com,
Mysoac.com,    Mymace.com,    Myspacev.com,    0yspace.com,
Myspcaace.com,    Myspacn.com,    Mcpace.com,    Mysspase.com,
Myspakce.com,    Nnyspace.com,    mayapace.com,    Myspasee.com,

Mysach.com, Mysacee.com, Mysaoace.com, Msoace.com, Myaace.com, Djmyspace.com, Myyyspace.com, Myspasc.com, Mysoacce.com, Ydpace.com, Mdpace.com, Gmyspace.com infringing the USPTO trademark for MYSPACE (Reg. No. 2,911,041);

d. Eszpn.com, esxpn.com, espb.org infringing the USPTO trademark registration for ESPN (Reg. No. 1,345,096);

e. Oerkut.com, 9orkut.com infringing the USPTO trademark registration for ORKUT (Reg. No. 2,970,421);

f. Flikckr.com, Glickr.net infringing the USPTO trademark registration for FLICKR (Reg. No. 3455275);

g. Mi9ninova.org, Mininovs.org, Mimninova.org, Minionova.org, Mninova.net, Mininiva.org, Mioninova.org, Mioninova.com, Mininovca.org, Mininopva.com, Mininnova.com infringing the USPTO trademark for MININOVA (Reg. No. 3,491,970);

h. Beob.org, Bebho.com, Bewbo.com, Bnebo.com, Bgebo.com, Gbebo.com, Bebpo.com, Bebno.com infringing the USPTO trademark for BEBO (Reg. No. 3,138,515);

i. Yourube.com, Y6outube.com, Youtubge.com, Youtune.net, Youthbe.com, Tyoutube.com, Yo0tube.com, Outude.com, Youtble.com, Yoretube.com, Youtb8.com, Youtunb.com, Youtne.com, Pountube.com, Yopube.com, Yuturbe.com, Oiutube.com, Youbutube.com, Yopuitube.com, Youtuc.com, Youubw.com,

Youtae.com, Youune.com, Youtude.com, Yurtube.com, Yourtub.com, Yayoutube.com, Youstube.com, Youbue.com, Youtubeg.com, Yoetub.com, Youtube6.com, Myoutube.com, Outbube.com, Yourlube.com, Yourtue.com, Youttuve.com, yutub8.com, Yoyurube.com, Youyuobe.com, Youubt.com, Bountube.com, Yououb.com, Iyo-tube.com, Outubw.com infringing the USPTO trademark for YOUTUBE (Reg. No. 3,525,802);

j. Neftflix.com infringing the USPTO trademark for NETFLIX (Reg. No. 2,552,950); and

k. Huffinftonpost.com, Huffingztonpost.com, Huffingtonspost.com, Ffingtonpost.com, Huggingtonpost.com, Haffingtonpost.com, Huffintongpost.com infringing the USPTO trademark for THE HUFFINGTON POST (Reg. No. 3,095,331).

82.   NCS, as the named registrant of the domain names, has been sued in federal court by distinctive and/or famous trademark holders for its typosquatting and cybersquatting activities in violation of federal trademark law under the Lanham Act. These lawsuits include:

a. Mesa Garage Doors v. Navigation Catalyst Systems Inc. et al. Case No. 8:2009cv00053 (CA Central Jan. 13, 2009);

b. Verizon California Inc. et al v. Navigation Catalyst Systems, Inc. et al. Case No. 2:2008cv02463 (CA Central Apr. 15, 2008);

c.  Rodman & Renshaw, LLC v. Navigation Catalyst Systems, Inc. Case No. 2:2008cv01081 (CA Central Feb. 15, 2008);

d.  Kaplan, Inc. v. Navigation Catalyst Systems, Inc. Case No. 2:2008cv00439 (CA Central Jan. 24, 2008);

e.  Station Casinos, Inc. v. Navigation Catalyst Systems, Inc. Case No. 2:2006cv01401 (NV Nov. 2, 2006);

f.  Virgin Enterprises Limited v. Navigation Catalyst Systems, Inc. et al. Case No. 1:2006cv03651 (NY Southern May 12, 2006);

g.  Wynn Resorts Holdings, LLC v. Navigation Catalyst Systems, Inc. Case No. 2:2005cv00924 (NV Aug. 1, 2005);

h.  Wachovia Corporation v. Navigation Catalyst Systems Inc. Case No. 2:2004cv10087 (CA Central Dec. 10, 2004); and

i.  Federated Western Properties Inc. et al v. Navigation Catalyst Systems Inc. et al. Case No. 8:2004cv01171 (CA Central Oct. 6, 2004). Verizon, Kaplan, Virgin, Wachovia, Wynn Resorts, and Federated Western.

83.    Any efforts Defendants make to avoid typo-squatting is disingenuous and half-hearted at best, done only to distract from their unlawful business model which targets high traffic, and thus often trademark protected, domain names and typographical errors made by consumers attempting to access the legitimate domain names corresponding to the respective underlying entity.

84.  Any use of human screeners that manually "blacklist" or remove trademark protected domains is insufficient to immunize, shield, or otherwise exonerate Defendants from liability in connection with the registration and use of infringing domains.

85.  Defendants claimed "policy" of voluntarily transferring disputed domain names after being notified of a dispute or adverse claim is insufficient to immunize, shield, or otherwise exonerate Defendants from liability in connection with the unlawful business model.[3]

86.   NCS, as the named registrant of the domains, was set up to hold no assets and thus remain uncollectible in litigation.

87.  Defendants Connexus/Epic Media and FirstLook created DNP in order to shield the public WHOIS data which would otherwise show NCS as the registrant of domains infringing third party trademarks.

**COUNT I**

**DIRECT & CONTRIBUTORY CYBERSQUATTING UNDER THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT – 15 U.S.C. § 1125(d)**

88.  Plaintiff, Wunderground, restates and incorporates paragraphs 1-87 above as though fully restated herein.

89.  Defendants directly and/or contributory registered, trafficked in and/or used the Infringing Domains.

90.     The Wunderground Marks were distinctive and either federally registered with the USPTO or existing under common law, at the time Defendants registered and/or used the Infringing Domains.

91.     The Wunderground marks were famous at the time of Defendants registration, use and trafficking of the Infringing Domains and protected under 15 U.S.C. § 1125(c).

92.     The Infringing Domains are identical or confusingly similar to the Wunderground Marks.

93.     Defendants' registration, use and/or trafficking in the Infringing Domain Names with bad faith intent to profit from Wunderground's goodwill in the Wunderground Marks.

94.     Defendants' domain name registrations utilize, in bad faith, qwerty typos and sticky keys, captured in part via DNS error data, to capitalize off of the errors or shortcomings of Internet users seeking the legitimate domain name that incorporates an entity's trademark protected goods/services.

95.     Defendants have registered and/or acquired multiple domain names which it knows, or has the ability to know absent its willful blindness, are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties.

---

[3] To find otherwise would be equivalent to not punishing or penalizing someone for stealing a car because, upon being caught, that someone offered to return the car to its lawful owner.

96.     Defendants have used multiple domain names which they know, or have the ability to know absent their willful blindness, are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties.

97.     Defendants have registered and/or acquired multiple domain names which Defendant knows, or has the ability to know absent its willful blindness, are identical or confusingly similar to the marks of others that are dilutive of famous marks of others that are famous at the time of registration of such domain names without regard to the goods or services of the parties.

98.     Defendants have used multiple domain names which Defendant knows, or has the ability to know absent its willful blindness, are identical or confusingly similar to the marks of others that are dilutive of famous marks of others that are famous at the time of registration of such domain names without regard to the goods or services of the parties.

99.     Defendants have registered and/or used thousands of domain names that are identical, or confusingly similar, to distinctive and/or famous trademarks and service marks owned by unrelated third parties.

100.    Defendants do not have any intellectual property rights or any other rights in the Wunderground Marks or in the Infringing Domains.

101.    None of the Infringing Domains consists of the legal name of any of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

102.   Defendants have not made any prior use of the Infringing Domains in connection with a *bona fide* offering of any goods or services.

103.   Defendants' use of Infringing Domains was and is in federally regulated commerce, consistent with the definition set forth in 15 U.S.C. § 1127.

104.   Defendants registered, trafficked in and/or used the Infringing Domains to divert consumers from Plaintiff's web sites to a web site accessible at the Infringing Domains for Defendants' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the web site.

105.   Defendants registered and/or used Infringing Domains that Defendants knew or should have known were dilutive of famous marks owned by Plaintiff.

106.   Defendants have registered, trafficked in and/or used multiple domain names that Defendant knew through actual or constructive knowledge were distinctive of marks of others and/or dilutive of famous marks of others when the domain names were registered.

107.   Defendants' registration, use, or trafficking in the Infringing Domains constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiff to relief.

108.   By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants.

109.   By reason of Defendants' acts alleged herein, Plaintiff is entitled to recover Defendants' profits, actual damages and the costs of the action, or statutory damages under 15 U.S.C. § 1117, on election by Plaintiff, in an amount of one hundred thousand dollars ($100,000) for each domain name found to constitute cybersquatting.

110.    This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT II

## DIRECT & CONTRIBUTORY TRADEMARK INFRINGEMENT UNDER THE

## LANHAM ACT – 15 U.S.C. § 1114(1)

111.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-110 above as though fully restated herein.

112.    Defendants' direct and/or contributory use in commerce of the Wunderground Marks is likely to cause confusion, initial or otherwise, mistake and/or to deceive.

113.    Defendants' direct and/or contributory use in commerce of the Infringing Domains is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

114.    Defendants' direct and/or contributory use in commerce of the web sites and advertisements displayed at the Infringing Domains is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

115.    Defendants' direct and/or contributory acts constitute trademark infringement in violation of 15 U.S.C. § 1114(1), entitling Plaintiff to relief.

116.    Defendants have unfairly profited from the infringing actions alleged.

117.    By reason of Defendants' direct and/or contributory acts, Plaintiff has suffered damage to the goodwill associated with the Wunderground Marks.

118.   By reason of Defendants' direct and/or contributory acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants

119.   By reason of Defendants' direct and/or contributory willful acts, Plaintiff is entitled to damages, including but not limited to any and all damages available under 15 U.S.C. § 1117.

120.   This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT III

## DIRECT & CONTRIBUTORY FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT – 15 U.S.C. § 1125(a)

121.   Plaintiff, Wunderground, restates and incorporates paragraphs 1-120 above as though fully restated herein.

122.   Defendants' direct and/or contributory use in commerce of the Wunderground Marks is likely to cause confusion, mistake and to deceive the relevant public by suggesting the Infringing Domains and the web sites and advertisements displayed at the Infringing Domains are authorized, sponsored, approved by or are affiliated with Plaintiff.

123.   Defendants' direct and/or contributory use of the Wunderground Marks is likely to cause confusion among the general public.

124.    The above-described direct and/or contributory acts of Defendants constitutes trademark infringement of the Wunderground Marks and false designation of origin in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

125.    Defendants have unfairly profited from the actions alleged.

126.    By reason of Defendants' direct and/or contributory acts alleged herein, Plaintiff has suffered monetary damage and damage to the goodwill associated with the Wunderground Marks.

127.    By reason of Defendants' direct and/or contributory acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants.

128.    By reason of Defendants' willful acts, Plaintiff is entitled to damages, including but not limited to treble damages under 15 U.S.C. § 1117.

129.    This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT IV

## DIRECT AND CONTRIBUTORY DILUTION UNDER 15 U.S.C. § 1125(c)

130.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-129 above as though fully restated herein.

131.    The Wunderground Marks are famous, as that term is used in 15 U.S.C. § 1125(c), and were famous before Defendants' registration and use of them and the Infringing Domains in commerce, due in part to the inherent distinctiveness and federal

registration of the Wunderground marks and the extensive and exclusive nationwide use, advertising, promotion, and recognition of the Wunderground Marks.

132.     Defendants' registration, use and trafficking of the Infringing Domains and corresponding web sites and advertisements in commerce is likely to cause dilution by blurring or dilution by tarnishment of the Wunderground Marks.

133.     Defendants' acts constitute dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Plaintiff to relief.

134.     Defendants have unfairly profited from the actions alleged.

135.     By reason of Defendants' acts, Plaintiff has suffered monetary damage and damage to the goodwill associated with the Wunderground Marks.

136.     By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 as it relates to domain names it owns and/or uses that is identical or confusingly similar to Wunderground's Marks.

137.     By reason of Defendants' willful acts, Plaintiff is entitled to damages, including but not limited to treble damages under 15 U.S.C. § 1117.

138.     This is an exceptional case making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## COUNT V

## UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT

## UNDER STATE COMMON LAW

139.   Plaintiff, Wunderground, restates and incorporates paragraphs 1-138 above as though fully restated herein.

140.   Defendants' use in commerce of the Wunderground Marks is likely to cause confusion, initial or otherwise, mistake and/or to deceive.

141.   Defendants' use in commerce of the Infringing Domains is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

142.   Defendants' use in commerce of the web sites and advertisements displayed at the Infringing Domains is likely to cause confusion, initial or otherwise, mistake, and/or to deceive.

143.   Defendants are palming off themselves as the Plaintiff, thus duping the public, in order to obtain benefits properly belonging to Plaintiff.

144.   Defendants' acts constitute unfair competition and trademark infringement, in violation of Michigan law.

145.   Defendants have unfairly profited from the infringing and unfair actions alleged.

146.   By reason of Defendants' acts, Plaintiff has suffered irreparable damage to the goodwill and reputation associated with Plaintiff itself, its products and services, and the Wunderground Marks.

147.    By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

148.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to permanent injunctive relief precluding registration, trafficking or use of domains identical or confusingly similar to Wunderground's Marks.

## COUNT VI

## VICARIOUS TRADEMARK INFRINGEMENT, DILUTION AND CYBERSQUATTING

149.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-148 above as though fully restated herein.

150.    Defendants have an actual or apparent control, agency and/or partnership with NCS.

151.    Defendants have the authority to bind one another in actions with third parties and regularly act on each other's behalf.

152.    Defendants have exercised control, individually, jointly and otherwise, over the Infringing Domains and other trademark protected domains.

153.    Defendants have exercised joint control, ownership, registration, use and trafficking over the Infringing Domains.

154.    Defendants deal directly with and act directly on behalf of NCS and their own behalf.

155.    Defendants have provided employees and services to NCS without compensation.

156.    Defendants have unfairly profited from their direct and/or contributory infringement.

157.    By reason of Defendants' acts, Plaintiff has suffered actual damages in the form of lost profits and/or damage to the goodwill associated with its company and its Wunderground Marks.

158.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants.  Accordingly, Plaintiff is entitled to permanent injunctive relief as it relates to other domain names they own and/or use that are identical or confusingly similar to Wunderground's Marks.

## COUNT VII

## CIVIL CONSPIRACY

159.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-158 above as though fully restated herein.

160.    Defendants have acted in concert with a shared intent to harm Wunderground.

161.    The combination of all the Defendants enabled them to register, traffic, and use the Infringing Domain Names in violation of the laws cited herein.

162.    Defendants acted with a common design and plan in violation of the laws cited herein.

163.    Defendants' unlawful acts noted herein were done in furtherance of the conspiracy.

164.    Defendants have committed separate, actionable torts for trademark infringement, trademark dilution, cybersquatting, and unfair competition by Defendants' acts noted herein.

165.    Defendants have unfairly profited from the tortious, infringing and dilutive and other unlawful acts.

166.    By reason of Defendants' acts, Plaintiff has suffered actual damages associated with its company and its Wunderground Marks.

167.    By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendant. Accordingly, Plaintiff is entitled to permanent injunctive relief.

## COUNT VIII

## DECLARATORY JUDGMENT

168.    Plaintiff, Wunderground, restates and incorporates paragraphs 1-167 above as though fully restated herein.

169.    Defendants' above acts and omissions reveal an actual and substantial controversy between the parties, who possess adverse legal interests, to this Complaint.

170.    Defendants' above acts and omissions described herein are of sufficient immediacy and reality to warrant declaratory judgment.

171.     Defendants above acts and omissions warrant an order by this court for

declaratory relief pursuant to 28 U.S.C. § 2201 and consistent with the Prayer for

Relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment

against Defendants as follows:

1.     That the Court enter a judgment that Defendants have:

a.     violated Plaintiff's rights in the Wunderground Marks in violation of

15 U.S.C. § 1125(d);

b.     infringed Plaintiff's rights in the Wunderground Marks in violation of

15 U.S.C. § 1114(1);

c.     violated Plaintiff's rights in the Wunderground Marks in violation of

15 U.S.C. § 1125(a);

d.     violated Plaintiff's rights in the Wunderground Marks in violation of

15 U.S.C. § 1125(c);

e.     unfairly competed with Plaintiff by infringing Plaintiff's rights in the

Wunderground Marks in violation of Michigan law;

2.     That Defendants were be ordered to produce a list of every domain name it

has registered and/or used which is identical or confusingly similar to the

Wunderground Marks;

3.     That Defendants be ordered to transfer every domain name it owns which

is identical or confusingly similar to the Wunderground Marks to The

Weather Underground, Inc.;

4.      That the Court issue permanent injunctive relief against Defendants, and that Defendants, its officers, agents, representatives, servants, employees, attorneys, successors, assignees, licensees and all others in active concert or participation with Defendants, be enjoined and restrained from:

a.      registering, using or trafficking in, in any manner, any domain name that incorporates, in whole or in part, the Wunderground Marks;

b.      registering, using or trafficking in, in any manner, any domain name that is identical or confusingly similar to the Wunderground Marks;

c.      using any of the Wunderground Marks, or any other name, mark, designation or depiction in a manner that is likely to cause consumer confusion as to whether Defendants are affiliated with, associated with, or sponsored by Plaintiff;

d.      infringing, diluting, unfairly competing, falsely designating the origin of, passing off, or falsely advertising Plaintiff's trademarks and service marks, including the Wunderground Marks set forth above;

e.      registering, trafficking, maintaining, or using any domain name that incorporates, in whole or in part, the trademark or service mark of another, or anything confusingly similar thereto, in the matter of the public interest;

     f.     trafficking or using any domain name registered with an automated tool or process which fails to avoid registration of third-party trademarks;

     g.     registering, trafficking, using and maintaining any domain name without providing complete and accurate contact information, including the full legal name of the registrant;

     h.     assisting, aiding, or abetting any other person or business entity from engaging in or performing any of the activities referred to in subparagraphs above.

5.     That Defendants be ordered to account to Plaintiff for, and disgorge, all profits it has derived by reason of the unlawful acts complained of above;

6.     That Defendants be ordered to issue corrective advertising to the extent necessary to correct any consumer confusion resulting from Defendant's unlawful acts complained of above;

7.     That Defendants be ordered to pay damages, and that those damages be trebled, pursuant to 15 U.S.C. § 1117;

8.     That Defendants be ordered to pay statutory damages under 15 U.S.C. § 1117(d), on election by Plaintiff, in an amount of One Hundred Thousand Dollars ($100,000) per domain name infringement for cybersquatting;

9.     That Defendants be ordered to pay Plaintiff's attorneys' fees and costs; and

10.    That the Court grant Plaintiff all other relief to which it is entitled and

such other or additional relief as is just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury of all matters triable as of right in the

instant cause of action.

Respectfully submitted this 20th day of January, 2011.


/s/Enrico Schaefer
Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com

Lead Counsel for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2011, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado (admitted pro hac)
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

/s/Enrico Schaefer
Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
Lead Counsel for Plaintiff