# Exhibit I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC., )
a Michigan Corporation,        )
                               )
            Plaintiff,         )
                               )
    vs.                        ) Case No. 2:09-CV-10756
                               )
NAVIGATION CATALYST SYSTEMS,   ) Volume I
INC., a Delaware corporation;  )
BASIC FUSION, INC., a Delaware )
corporation; CONNEXUS CORP., a )
Delaware corporation; and      )
FIRSTLOOK, INC., a Delaware    )
corporation,                   )
                               )
            Defendants.        )
_____)

DEPOSITION OF DAVID GRAFF

New York, New York

Friday, June 24, 2011

Reported by: Danielle Grant

NDS Job No.: 143388

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF MICHIGAN
 3
 4
 5   THE WEATHER UNDERGROUND, INC.,  )
     a Michigan Corporation,         )
 6                                   )
                  Plaintiff,         )
 7                                   )
        vs.                          ) Case No. 2:09-CV-10756
 8                                   )
     NAVIGATION CATALYST SYSTEMS,    ) Volume I
 9   INC., a Delaware corporation;   )
     BASIC FUSION, INC., a Delaware  )
10   corporation; CONNEXUS CORP., a  )
     Delaware corporation; and       )
11   FIRSTLOOK, INC., a Delaware     )
     corporation,                    )
12                                   )
                  Defendants.        )
13   _____)
14
15
16           DEPOSITION OF DAVID GRAFF, held at the
17   offices of Butzel Long, 380 Madison Avenue, New
18   York, New York, on Friday, June 24, 2011, at 10:09
19   a.m., pursuant to Notice before Danielle Grant, a
20   Shorthand Reporter and Notary Public of the State
21   of New York.
22
23
24
25
```

1  contractual relationship with Azoogle, but not
2  with the advertisers.
3          Q    Back in June of 2007, when you
4  became associated with Azoogle, did Azoogle
5  have subsidiary companies that it -- it owned
6  or controlled?
7          A    Yes.
8          Q    What were those companies at
9  that time?
10         A    In June of 2007 there were two
11 companies that comprised Azoogle:  A company
12 called Azoogle.com, Inc., which was a Delaware
13 corporation.  And then a wholly owned
14 subsidiary called Azoogle Ads U.S., Inc., which
15 was also a Delaware corporation.
16         Q    And what roles did those two
17 subsidiaries play with respect to the Azoogle
18 parents' business model?
19         A    That corporate structure existed
20 when I started.  So, I'm not sure that I can
21 explain to you why it was created that way.
22 But, generally speaking, the folks that were
23 employed in New York were employed by the
24 Azoogle Ads U.S. entity.  And the folks that
25 were employed in Toronto had a Toronto office,

```
 1   with the company when it was founded, when it
 2   was founded, was it founded by Canadian
 3   citizens?
 4          A    One of the founders, Alex
 5   Chardonovsky, C-H-A-R-D-O-N-O-V-S-K-Y, was a
 6   Canadian citizen, remains a Canadian Citizen.
 7   Joseph Speiser, S-P-E-I-S-E-R, was the other
 8   founder, and he is a U.S. citizen.
 9          Q    And has Azoogle always been a
10   Delaware corporation?
11          A    Yes.
12          Q    At any point was there a prior
13   iteration of the business that was something
14   other than a Delaware corporation that you are
15   aware of?
16          A    To my knowledge, no.
17          Q    Since June of 2007 but before
18   the transaction where Epic merged with the
19   Connexus group of companies in May of 2010, did
20   Epic add any businesses under its umbrella
21   prior to that transaction?
22          A    Prior to the acquisition of
23   Connexus, Epic opened a -- an office in London.
24   And in connection with that, the company
25   established a UK subsidiary called Epic
```

1  Advertising Limited, which is a wholly owned
2  subsidiary of Azoogle.com. In addition, the
3  company established another subsidiary called
4  Online Intelligence. That is a Delaware LLC.
5  And Online Intelligence houses certain aspects
6  of the company's compliance and fraud detection
7  services.
8           Q    Tell me a little bit more about
9  Online Intelligence. You've testified that
10 they're involved in compliance and fraud
11 detection services I presume for Epic Media
12 clients?
13          A    Online Intelligence was started
14 as a way of potentially offering to Epic
15 clients the type of fraud and detection
16 services and in-compliance services that the
17 company performs on a routine basis. So, we
18 established a subsidiary to explore whether or
19 not those services could be offered to --
20 directly to Epic clients or to third party
21 companies that were not yet Epic clients. And
22 we thought that this might be a way to
23 introduce them to the Epic system. We only
24 have -- I'm trying to think. We haven't really
25 put a lot of resources into developing a client

1  two separate benefit plans.  The idea was to
2  offer the Connexus employees the opportunity to
3  participate in the -- I guess you could call it
4  the Epic plan, but really, it's just the plan
5  that the company made available.  So, there was
6  a transition over time and migration of folks
7  to -- over to that benefit plan.
8       Q    All right.  And we know by
9  virtue of the integration of the two companies
10 that some folks didn't survive the merger as
11 employees of one company or the other.
12           But my question is:  Did there
13 come a point in time where the Connexus side
14 employees became an employee of Epic Media
15 Group, Inc.?  In other words, they stopped
16 receiving their paychecks from Connexus and
17 started receiving their paychecks from Epic
18 Media Group, Inc.?
19      A    No.  The Connexus employees
20 remained Connexus employees and were paid under
21 the Connexus EIN number, employee
22 identification number.  And in our payroll
23 system, for example, which is essentially run
24 by ADP, there are essentially two separate
25 payrolls.

1                And, you know, there is -- this
2    is at large, right?  There's the Connexus
3    payroll and then there's the Epic payroll.  So,
4    they did not migrate -- none of those employees
5    migrated over to the Epic side.
6           Q    And that's still true today?
7           A    Yes, that's correct.
8           Q    Is there any plan to phase out
9    employees on the Connexus side and make them
10   Epic employees?
11          A    No, no.  I mean, there's no
12   current plan to do that.  I mean, the idea is
13   to continue to, you know, manage the enterprise
14   via these separate subsidiaries.
15          Q    I know from prior testimony that
16   the Epic side of finances lie primarily in
17   Toronto?
18          A    The financial organization.
19          Q    Financial team?
20          A    Financial team, that is correct.
21          Q    Does Connexus, to your
22   knowledge, still maintain its -- its bank
23   accounts that it had prior to the merger, or
24   are they now incorporated into the banking
25   system that Epic had in place?

1    A    Connexus maintains its own bank
2  accounts.  It maintained its own bank accounts
3  prior to the acquisition, it still does so
4  today.  Connexus uses Wells -- I should say
5  Connexus uses Wells Fargo.  There are also
6  separate bank accounts for First Look and for
7  TMP.  Epic uses RBC as its primary bank.  So,
8  those accounts -- and those banking
9  relationships exist today.
10   Q    Let's take a look at Slide 19.
11        And the title of that slide is
12  "Connexus Cash Used Fund, Joint Expenses."
13  ███████████████████████████████████████
14  ███████████████████████████████████████
15  ███████████████████████████████████████
16  ███████████████████████████████████████
17  ███████████████████████████████████████
18  ███████████████████████████████████████
19  ██████
20   A    That's correct.
21   Q    ████████████████████████████
22  ████████████████████████████████████
23  ████████████████████████████████████
24  ████████████████████████
25   A    I believe that is correct in the

1  And that's primarily what is meant by cost of
2  revenue.
3          Q   All right.  As I look at the
4  document under the revenue side rubric, it
5  appears as though at the top there is an Epic
6  accounting of revenue and then -- and then,
7  subsequently, a Connexus accounting of revenue.
8  But on the Connexus side, beginning in October
9  of '10, there is no revenue under those
10 columns.
11              And my question is:  Did
12 Connexus cease generating revenue at some
13 point?
14         A   No.  Connexus never ceased
15 generating revenue.  It still generates
16 revenue.
17         Q   Did it have a significant drop
18 in revenue that you are aware of?
19         A   No, not that I am aware of.
20         Q   Do you have any idea why there's
21 just simply blank numbers in those spaces
22 beginning in October of 2010 under the Connexus
23 side revenue boxes?
24         A   (Witness reviews document.)
25             I don't know.  I don't know.

1  could -- well, that was the intention behind
2  the creation of April C.
3       Q    To your knowledge, since the
4  merger, other than simply releasing domains,
5  have there been any transfer of domains out of
6  Navigation Catalyst to another entity under the
7  Epic umbrella?
8       A    Post acquisition, to the best of
9  my knowledge, there have been no transfers of
10 domains from NCS to any -- any other entity
11 associated with -- in any way, shape, or
12 form -- Epic Media Group.
13      Q    And I have some -- I have some
14 asset sheets that I'd just as soon avoid
15 marking and labeling, so we'll just talk about
16 them in general terms.
17           Have there been any wholesale
18 transfer of assets, including domain times,
19 from the Connexus side to the Epic side?  And
20 let's -- let's ask it has a general question
21 and then we can get more specific depending
22 upon your response.
23      A    No, there haven't been any asset
24 transfers from Connexus to Epic -- or from Epic
25 to Connexus for that matter.

1        Q    So, as a general statement,
2  then, if the Connexus/First Look side of the
3  business owned domains as assets at the time of
4  the merger, other than simply releasing some
5  that maybe were not of any value, there have
6  been no transfer of those domains?
7        A    That's correct.
8        Q    Have there been any DBAs filed
9  since the merger took place on the Connexus
10  side, where either Connexus or Traffic
11  Marketplace or First Look -- or any of those
12  entities under that umbrella -- are now doing
13  business under the Epic name, Epic Media Group?
14        A    No.
15        Q    Epic Media Group owns the stock
16  in Connexus Corporation, correct?
17        A    That's correct.
18        Q    It's a single share of stock at
19  this point or -- or is it something different?
20        A    It's a single share of stock if
21  I recall correctly. I recall that the -- yes,
22  that's correct.
23        Q    Tell me, from your understanding
24  or viewpoint, how the merger transaction took
25  place relative to the transfer of stock,

1  specifically with respect to Emerald
2  Acquisition Group, explain that process to me.
3      A    Well --
4      Q    As a non M&A guy.
5      A    Now, you're putting me on the
6  spot to be the M&A guy.
7           Well, we utilized the structure
8  that's referred to as a reverse triangular
9  merger in other to effectuate the acquisition.
10 And really all that means -- it's not as
11 complicated as the phrase might indicate -- is
12 that Epic created a wholly owned subsidiary
13 which we called Emerald Acquisition 1.
14 Acquisition because it was designed to acquire,
15 Emerald because this was the code name that the
16 bankers gave to the transaction, and when we
17 created the subsidiary, we didn't necessarily
18 want it telegraphed to the world that we
19 were -- prior to us being able to announce it,
20 that we were contemplating an acquisition;
21 hence, the Emerald Acquisition.
22          Under reverse triangular merger,
23 you create a wholly owned subsidiary.  And then
24 that subsidiary merged with, in this case,
25 Connexus Corporation.  The surviving entity

1  after that merger was Connexus; hence, the
2  reverse part of the reverse triangular merger.
3  Even though at Emerald, the acquisition was the
4  acquiring company.  Connexus was the surviving
5  company; hence reverse.
6              The end result of that
7  transaction is you have Connexus as a wholly
8  owned subsidiary of Epic.  Because you created
9  essentially -- I don't mean to used too much
10 jargon -- a special purpose vehicle, an
11 acquisition, an entity as a wholly owned
12 subsidiary to effectuate the transfer.
13             So, the end result is, again,
14 Connexus being a wholly owned subsidiary of
15 Epic Advertising.  It's actually not a typical
16 structure in my personal experience.
17             MR. DELGADO:  Just so the record
18         is clear, did you say not atypical
19         or --
20         A    Let me rephrase that.
21             It's a fairly typical structure,
22 that M&A lawyers use to effectuate acquisitions
23 of other companies.  Whether it's a reverse or
24 a non reverse, it's a creation of a special
25 purpose vehicle to acquire other assets.  Real

1   estate companies, for example, do this all the
2   time to segregate their assets.
3       Q   And, as a result, the Connexus
4   shareholders were able to exchange their stock
5   for Epic stock under the ratios pursuant to the
6   agreement?
7       A   That is correct.
8       Q   I didn't bring the document, but
9   there was a change in the valuation on the Epic
10  side for the trade of stock, I think in April
11  as I recall.  The merger agreement had a set of
12  values for the valuation of stock, and then I
13  think after that there was a document that we
14  looked at, at Art Shaw's deposition, that
15  changed the value significantly downward on the
16  Epic side.
17          Are you familiar with that at
18  all?
19      A   I think I know what you are
20  referring to.  I believe you are referring to
21  the amendment to the merger agreement -- or an
22  amendment to the merger agreement, which, if I
23  recall correctly, changed the value of the --
24  of the preferred shares.
25          Yeah, I do recall the

1  accounting matter, Young would just account for
2  the expenses according to the subsidiary that
3  incurs the expense.
4         Q    I was provided with a document,
5  and we'll mark it and label it if we need to,
6  called Great Plains Migration Project Template.
7  Any idea what that references, the Great Plains
8  Migration Project Template?
9         A    Yes, I do.  Well, I know,
10 generally speaking, what -- what the document
11 is referring to.
12             Prior to the acquisition,
13 Connexus used Great Plains as their financial
14 software.  Great Plains is the company that
15 provides the financial software.  Epic uses
16 Oracle, it's a competitor to Great Plains, that
17 uses financial software.
18             Post acquisition, we were going
19 to migrate the data over from Great Plains to
20 the Oracle system, because it doesn't make too
21 much sense to have two -- those are big
22 systems -- to have two competing systems.  So,
23 that project plan -- it's a complicated thing
24 to migrate data, because you are essentially
25 creating a separate database within the Oracle

1  database for Connexus.  So, as a result, we
2  would have, roughly speaking, two general
3  ledgers.  Not entirely right, because
4  subsidiaries have their own separate general
5  ledgers.  But, conceptually, it's accurate
6  enough.  So, I think that's the team's project
7  plan for migrating that data over.
8          Q    All right.  We don't have to
9  mark the document.
10              MR. CLARK:  Are we up to 299?
11              THE COURT REPORTER:  Yes.
12              MR. CLARK:  All right.  I've got
13         a document I would like to mark and
14         label as Exhibit 299.
15             (Two-page corporate structure was
16             marked as Exhibit No. 299 for
17             identification, as of this date.)
18         (Off the record discussion.)
19  BY MR. CLARK:
20          Q    All right.  We're looking at
21  what we have marked and labeled as Deposition
22  Exhibit 299, and it appears to be a two-page
23  document which reflects the corporate structure
24  of Epic Media Group.
25              But I'll ask Mr. Graff to take a

```
                    ERRATA SHEET

If any corrections to your deposition are necessary,
indicate them on this sheet, giving the change, page
number, line number and reason for change.

PAGE   LINE   FROM                        TO

 59     8     Legonni                     Nyguyen
Reason        misspelled name

 71    3-5    I don't know what Art or    I don't know what Art or Don
              Don or I should say         was trying to say
Reason

101     5     with outside counsel        working with outside counsel
Reason        typo

106    15     not a typical               not atypical
Reason        typo

122     5     that really escaped         you can't really escape
Reason        typo

122   14-15   Knowing accepted borders    only the founders liked
Reason        typo

ALL           Global change: Kinexis to Connexus
Reason        typo

_____
Reason

_____
Reason

[signature]                           July 13, 2011
Signature of Deponent                 Date
```

127