IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

                            Case No. 2:09-CV-10756

vs.                             Hon. Marianne O. Battani

NAVIGATION CATALYST SYSTEMS, INC.,
    a Delaware corporation; CONNEXUS CORP.,
    a Delaware corporation; FIRSTLOOK, INC.,
    a Delaware corporation; and EPIC MEDIA
    GROUP, INC., a Delaware corporation,

        Defendants.
_____

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
BUTZEL LONG, P.C.
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
Local Counsel for Defendants
_____

**CONNEXUS, FIRSTLOOK, AND NCS'S EVIDENTIARY OBJECTIONS AND RESPONSES TO PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AND STATEMENT OF FACTS IN OPPOSITION THERETO**

TO THIS HONORABLE COURT, PLAINTIFF, AND ITS ATTORNEYS OF RECORD:

Connexus, Inc., Firstlook, Inc., and Navigation Catalyst Systems, Inc. (collectively the "Connexus Defendants") hereby submit their evidentiary objections and responses to Plaintiff's Motion for Summary Adjudication on its Anti-Cybersquatting Consumer Protection Act ("ACPA") Claim ("Motion," Docket No. 189).

This document is divided into two parts. The first part is a paragraph-by-paragraph Response to Plaintiff's Motion containing the Connexus Defendants' evidentiary objections and factual responses. As a result, the numbered paragraphs in the first part of this document correspond to the numbered paragraphs in Plaintiff's Motion. The second part of this document is a Statement of Facts submitted in opposition to Plaintiff's Motion. Immediately following the second part of this document is the Connexus Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion.

## PART ONE: EVIDENTIARY OBJECTIONS AND RESPONSES TO MOTION

As a general matter, the Connexus Defendants object to Plaintiff's wholesale attempt to introduce inadmissible evidence (e.g., documents that have not been authenticated, statements that are not contained in a sworn affidavit, documents that contain hearsay without any exception, statements that lack foundation, and improper opinion testimony) in connection with its Motion. *Turner v. Scott*, 119 F.3d 425, 430 (6th Cir. 1997) (noting that "summary judgment rulings must be based on admissible evidence"); *Peake v. Martinrea Fabco Hot Stamping, Inc.*, 2011 WL 1157864 (E.D. Mich. Feb. 28, 2011) ("[I]n resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, unsworn statements, inadmissible expert testimony, or hearsay evidence.") (citations omitted), *report and recommendation adopted by*

2011 WL 1118572 (E.D. Mich. Mar. 28, 2011); *Thomas v. City of Detroit*, 2007 WL 674593 at

*5 (E.D. Mich. Feb. 28, 2007) (Battani, J.) ("Moreover, in this Circuit, it is well settled that only

admissible evidence may be considered by the trial court in ruling on a motion for summary

judgment.") (internal quotations and citations omitted).

　　　Specifically, the Connexus Defendants object and respond to Plaintiff's Motion as

follows:

　　　1.　　The Connexus Defendants object to this statement because it is not contained

within a sworn affidavit or declaration of someone with personal knowledge.　Fed. R. Civ. P.

56(c)(2); Fed. R. Evid. 602, 603.

　　　2.　　The Connexus Defendants object to this statement because it is not contained

within a sworn affidavit or declaration of someone with personal knowledge.　Fed. R. Civ. P.

56(c)(2); Fed. R. Evid. 602, 603.

　　　3.　　The Connexus Defendants object to this paragraph because it is not contained

within a sworn affidavit or declaration of someone with personal knowledge.　Fed. R. Civ. P.

56(c)(2); Fed. R. Evid. 602, 603.　Further, Plaintiff's contention that its marks are "famous" is an

inadmissible opinion/legal conclusion for which there is no foundation by someone with personal

knowledge.　Fed. R. Evid. 701, 602.　The Connexus Defendants further object to the statements

that "Plaintiff's websites have received worldwide notoriety" and "Plaintiff's Wunder Marks are

'widely recognized by the general consuming public of the United States as a source of the goods

or services of the mark's owner'" as lacking foundation and inadmissible legal opinions.　Fed. R.

Evid. 701, 602.

　　　　　a.　　The Connexus Defendants object to the newspaper articles in Exhibit A as

hearsay.  Fed. R. Evid. 801, 802; *Park West Galleries, Inc., v. Global Fine Art Registry, LLC,* 2010 WL 987772 *3 (E.D. Mich. Mar. 12, 2010); *Turner v. City of Taylor*, 412 F.3d 629, 652 (6th Cir. 2005) (finding newspaper article to be inadmissible hearsay); *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ("[N]ewspaper articles have been held inadmissible hearsay as to their content.").

b.  The Connexus Defendants object to Exhibit B (printout from third party website, Quantcast) because it lacks authentication and no foundation is laid as to the contents (e.g., not contained in a sworn statement indicating that the document is what it purports to be by someone with personal knowledge).  Fed. R. Evid. 901; Fed. R. Evid. 602, 603; *In re HomeStore.com, Inc.*, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004) (web page press and earnings releases were not properly authenticated and, therefore, inadmissible); *see also St. Luke's Cataract and Laser Inst. v. Sanderson*, 2006 WL 1320242 *2 (M.D. Fla. May 12, 2006) (to authenticate web page printouts, party must submit "statement or affidavit" from someone "with *personal knowledge* of the contents of the…website."); *Toytrackerz LLC v. Koehler*, 2009 WL 2591329 *6 (D. Kan. 2009) (same).

4.  Plaintiff's statement is untrue.  Plaintiff commenced using the marks **THE WEATHER UNDERGROUND** and **WUNDERGROUND.COM** in 1995 (bold emphasis added). *See* Declaration of William A. Delgado, dated August 15, 2011 at ¶¶ 2-3, Exs. K and L.

3

5.     The Connexus Defendants object to this paragraph because (i) it is not within a sworn affidavit of someone having personal knowledge (Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 602, 603) and (ii) it appears to be based on the contents of a third party website, <quantcast.com>, which would be unauthenticated hearsay (Fed. R. Evid. 901, 801, 802); *see also* Response to Paragraph 3(b).

6.     The Connexus Defendants object to this paragraph because it is not within a sworn affidavit of someone having personal knowledge.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602, 603.  Instead, Plaintiff merely cites to an unverified First Amended Complaint which cannot be used for purposes of its motion.  *Jones v. Barnett*, 2007 WL 5227005 at *2 (E.D. Mich. Feb. 14, 2007) ("It is true that Plaintiff's complaint is not verified and, therefore, may not be used at the summary judgment stage.").

7.     The Connexus Defendants object to the introduction of the prior National Arbitration Forum ("NAF") UDRP between Plaintiff and Navigation Catalyst Systems, Inc. as irrelevant (Fed. R. Evid. 402) and inadmissible hearsay (Fed. R. Evid. 801, 802).  *Eurotech, Inc. v. Cosmos European Travels Aktieng-Esellschaft*, 213 F. Supp. 2d 612, 618 n.10 (E.D. Va. 2002) ("Worth noting here is that the result reached in the WIPO proceeding is neither admissible nor entitled to any deference, with respect to the merits issues presented in this suit."); *Dynamis, Inc. v. Dynamis.com*, 2001 WL 1659570 (E.D. Va. Apr. 27, 2011) ("[I]t is well settled that 'any decision made by a panel under the UDRP is no more than an agreed-upon administration that is not given any deference under the ACPA.'  Indeed, generally speaking, the UDRP panel's conclusion is inadmissible hearsay that cannot be considered in resolving this case.").

8.     *See* Response to Paragraph 7.

9.     The Connexus Defendants object to this paragraph and Exhibit G because (i) they lack authentication (Fed. R. Evid. 901) and (ii) they are not contained within the sworn affidavit of someone having personal knowledge (Fed. R. Civ. P. 56(c)(2), Fed. R. Evid. 602, 603).

10.    The Connexus Defendants object to the following statements: (i) that "Plaintiff's [sic] are not the only trademark holder targeted by Defendant…" because it is simply argumentative and lacks foundation.  Fed. R. Evid. 602; (ii) the statement "many high traffic web sites and registered trademarks" lacks foundation (Fed. R. Evid. 602) and relies on hearsay (Fed. R. Evid. 801, 802).

   a.     The Connexus Defendants object to the statement "[a] search of the top 60 Michigan companies" as lacking authentication (i.e., who conducted the search, how, when, etc.) (Fed. R. Evid. 901) and lacking foundation (i.e., how is "top 60" defined) (Fed. R. Evid. 602).  The Connexus Defendants further object to the sample list in Exhibit H as unauthenticated and lacking foundation.  *Id.*

   b.     This paragraph is based on the contents of a third party website, <alexa.com>.  As a result, it is inadmissible because the information is not authenticated, lacks foundation, and constitutes hearsay.  *See* Response to Paragraph 3(b).  Also, Plaintiff's reference to "famous trademarks" is not authenticated, lacks foundation, and constitutes an inadmissible opinion (i.e., there is no evidence that any of those words are actually trademarks or that they have found to be "famous" under the Lanham Act, which is a very high standard).  Fed. R. Evid. 901, 602, and 701.

121061.1

c.      The Connexus Defendants object to this paragraph as inadmissible as it simply relies on the unverified First Amended Complaint. *Jones,* 2007 WL 5227005 at *2 (cannot rely on allegations in an unverified complaint for purposes of motion for summary judgment).

d.      The Connexus Defendants object to the first sentence in this paragraph as inadmissible because it contains no citation to admissible evidence. Fed. R. Evid. 602. The Connexus Defendants object to Exhibit H as lacking authentication and foundation. Fed. R. Evid. 901, 602. In response, the Connexus Defendants note that the document in Exhibit L is actually called "Connexus Document Retention Policy" and contains a provision that "[i]n the event any legal action or government investigation is or is likely to be initiated, the General Counsel will order all destruction activities to be suspended immediately." Lastly, Plaintiff's statement is untrue. In this matter, NCS produced nearly 20,000 pages of third party communications, UDRP complaints, and cease-and-desist letters. Delgado Decl. at ¶ 4.

e.      The Connexus Defendants object to this paragraph and Exhibit M on the basis that Christopher Schwerzler and his opinions in this matter do not satisfy Fed. R. Evid. 702. The Connexus Defendants have concurrently brought a separate motion pursuant to *Daubert* to strike his report and testimony and prevent the use of same at trial.

f.      *See* Response to Paragraph 10(e); also, this paragraph relies on

6

information from Quantcast, a third party website, and is, therefore,

inadmissible because it lacks authentication and foundation and is hearsay.

*See* Paragraph 3(b).

g.     The Connexus Defendants objects to the first sentence as purely

argumentative and not a statement of fact with a citation to admissible

evidence.  Fed. R. Evid. 602.  The Connexus Defendants object to the

second sentence as inadmissible pursuant to *Daubert*.  *See* Response to

Paragraph 10(e).

11.     The Connexus Defendants object to the first sentence as argumentative and not a

statement of fact with a citation to admissible evidence.  Fed. R. Evid. 602.  The Connexus

Defendants object to the "Timeline" as lacking authentication (Fed. R. Evid. 901) and foundation

(Fed. R. Evid. 602).

12.     The Connexus Defendants object to the first sentence as argumentative and not a

statement of fact with a citation to admissible evidence.  Fed. R. Evid. 602.  The Connexus

Defendants object to the introduction into evidence of the cease-and-desist letters pursuant to

Fed. R. Evid. 801, 802 (hearsay); *see also* Cook v Caruso, 2010 WL 5887814 at *3 (E.D. Mich.

Dec. 20, 2010) ("The Court cannot consider either the letters or 'declarations.'  '[A]n

unnotarized statement…constitutes nothing more than unsworn hearsay that may not be

considered on a motion for summary judgment.") (citation omitted), *report and recommendation*

*accepted by* 2011 WL 768076 (E.D. Mich. Feb. 28, 2011) ("The Court agrees with the

Magistrate Judge that the unnotarized declarations and letters cannot be considered as evidence

on a motion for summary judgment.").

13.     No evidentiary objection.

14.     No evidentiary objection.

15.     The Connexus Defendants object to the characterization that "the Court found personal jurisdiction…"  The motion at issue was a Motion to Dismiss for Lack of Personal Jurisdiction.  As such, the Court merely found that, viewed in the light most favorable to the Plaintiff because no evidentiary hearing had taken place, Plaintiff had alleged enough facts to support assertion of personal jurisdiction at that point in time.

16.     The Connexus Defendants object to the characterization of NCS as a "shell" corporation on the basis that it is simply argumentative and not a statement of fact with a citation to admissible evidence.  Fed. R. Evid. 602.

17.     The Connexus Defendants object to this statement as lacking foundation.  Fed. R. Evid. 602.  Plaintiff cites to Page 30 of the Deposition of Seth Jacoby (which is not included in Exhibit J).  In fact, page 30 of the Deposition contains no testimony to support this alleged fact.  *See* Page 30 of Jacoby Deposition, attached as Exhibit M of Delgado Decl.

18.     No evidentiary objection.

19.     The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

20.     No evidentiary objection.

21.     The Connexus Defendants object to this paragraph and Exhibits Q and R as lacking authentication (Fed. R. Evid. 901) and foundation (Fed. R. Evid. 602).

22.     The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

8

23.     The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

a.      The Connexus Defendants object to the first sentence as inadmissible as it does not contain any citation to admissible evidence. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

b.      No evidentiary objection.

c.      Seth Jacoby is not employed by Epic Media for the reasons set forth in The Epic Media Group's Motion for Summary Judgment (Docket No. 178) (indicating that Connexus employees continued to be paid through Connexus and its Federal Employer Identification Number).

d.      As indicated in the Jacoby Deposition Transcript, Mr. Pirrone was only "involved" to the extent a particular activity required legal advice.  Jacoby Depo. at 34:19-35:6.

e.      No evidentiary objection.

f.      No evidentiary objection.

24.     The Connexus Defendants object to this paragraph as irrelevant (Fed. R. Evid. 401, 402) and lacking authentication (Fed. R. Evid. 901).

25.     The Connexus Defendants object to the first sentence in this paragraph as simply argumentative and not a statement of fact with a citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

a.      No evidentiary objection.

b.      No evidentiary objection.

9

      c.      No evidentiary objection.

      d.      No evidentiary objection.

      e.      No evidentiary objection.

26.      The Connexus Defendants object to this paragraph in that the Court's Order permitting Joinder did not find "personal jurisdiction over Connexus and Firstlook, Inc."  In fact, subsequent to the Order permitting Joinder, Connexus and Firstlook brought a Motion to Dismiss for Lack of Personal Jurisdiction.

27.      No evidentiary objection.

28.      Defendants have now answered the First Amended Complaint rendering this paragraph irrelevant.  In any event, the named Defendants fully participated in discovery, and no default was ever entered against any named defendant.  Plaintiff's Motion for Summary Judgment must be supported by admissible evidence (Fed. R. Civ. P. 56(c)(1)) not the entry of default.

29.      The Connexus Defendants object as follows:

      a.      The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

      b.      The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

      c.      The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P.

56(c)(2); Fed. R. Evid. 602.

30.     The Connexus Defendants object to the first sentence in this paragraph as simply argumentative and not a statement of fact with a citation to admissible evidence. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

31.     No evidentiary objection.

32.     No evidentiary objection.

33.     The Connexus Defendants object to this paragraph as lacking foundation because the citation to the Jacoby Deposition transcript does not support Plaintiff's statement.  Fed. R. Evid. 602.

34.     The Connexus Defendants object to this paragraph and the introduction of the lawsuit *Verizon California, Inc. v. Navigation Catalyst Systems* as irrelevant.  Fed. R. Evid. 401, 402.  That case involved different parties, different trademarks, and different evidence.

35.     *See* Response to Paragraph 34.

36.     *See* Response to Paragraph 34.  Also, the paragraph lacks foundation as the citations to the Jacoby Deposition Transcript do not support the purported statement of fact.  Fed. R. Evid. 602.

37.     No evidentiary objection.

38.     No evidentiary objection but one clarification: this document refers to the 2008 scrub of the portfolio not the daily registration process.

39.     No evidentiary objection.  For its response, the Connexus Defendants note that, when asked whether the trademark matching system was literal, Jacoby actually testified "I believe so.  I don't exactly remember what that—I don't know.  I can't recall…"  Jacoby Depo.

11

at 100:9-18.  As set forth in the Statement of Facts and the concurrently filed Declaration of

Mavi Llamas, the Connexus Defendants actually did have a fuzzy matching system in place as of

Fall 2004, making this statement disputed.

40.    No evidentiary objection.

41.    No evidentiary objection.  For its response, the Connexus Defendants note that, in

reality, Jacoby testified that the registration process, in 2005, *probably* did not catch a

typographical variation.  Jacoby Depo at. 130:21-23.  However, as set forth in the Statement of

Facts and the concurrently filed Declaration of Mavi Llamas, the Connexus Defendants actually

did have a fuzzy matching system in place as of Fall 2004, making this statement disputed.

42.    No evidentiary objection.  For its response, the Connexus Defendants note that, as

set forth in the Statement of Facts and the concurrently filed Declaration of Mavi Llamas, the

Connexus Defendants actually did have a fuzzy matching system in place as of Fall 2004,

making this statement disputed.

43.    No evidentiary objection.  For its response, the Connexus Defendants note that it

is unclear what "formal training" Plaintiff is referring to (i.e., formal training in what?) as is its

reference to "experience with regards to trademark issues or trademark law."

44.    The Connexus Defendants object to this statement as purely argumentative and

not a statement of fact supported by a citation to admissible evidence (e.g., when Jacoby is asked

"So the test is whether or not your two or so operators would have actually personally heard of

the website?", Jacoby responds "That's *part* of the test, yes.")  Jacoby Depo. Tr. 133:24-135:7.

45.    The Connexus Defendants object to this paragraph as lacking foundation (Fed. R.

Evid. 602) since the citation to the Jacoby transcript does not support the statement.

12

46.     The Connexus Defendants object to this paragraph as argumentative and not a statement of facts (e.g., what constitutes "real depth of understanding of trademark issues"). Fed. R. Evid. 401, 402.

47.     No evidentiary objection.  In response, the Connexus Defendants note that Plaintiff admits "there is inconsistency in the testimony amongst Defendants' employees."  As a result, given the inconsistency, this statement cannot be an **un**disputed statement of fact that supports a motion for summary judgment.

48.     The Connexus Defendants object to this paragraph as inadmissible as it does not contain any citation to admissible evidence.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

49.     No evidentiary objection.

50.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) as the citation to the Berryhill Deposition Transcript does not support Plaintiff's statement.

51.     No evidentiary objection.

52.     No evidentiary objection.  In response, the Connexus Defendants note that Mr. Berryhill did not "confirm" anything.  He merely acknowledged that he had once made that statement.

53.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.  Mr. Berryhill was testifying with respect to a registrant who "has [publicly] stated an intention to register these domain names because they are – because he states that they are misspells of established sites, presumably Google and Yahoo."  Berryhill Depo. at 243:13-19. There is no evidence (or even argument) here that the Connexus Defendants intentionally

13

registered any domain name because they were misspellings of Plaintiff's marks.

54.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) because the cite to the Jacoby Deposition Transcript does not support Plaintiff's statement.  In actuality, Jacoby testifies that "in hindsight, I wish I could have, you know, done a lot of things in life but, you know, it's not necessarily – I mean—."  Jacoby Depo. at 185:24-186:2.

55.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) insofar as it pertains to <qwunderground.com>.  It is true that Firstlook attempts to optimize *some* domain names by placing keywords on them (*see* Jacoby Depo. Tr. 136-145).  And, it is also true that Jacoby testified as to how Firstlook would *hypothetically* optimize <qwunderground.com>.  *See* Jacoby Depo. Tr. at 206-07.  However, Jacoby did not testify <qwunderground.com> was *actually* optimized or that "Defendants added the 'weather' related key words after determining that people going to the page were most likely looking for weather." In fact, the screenshot of <qwunderground.com> does **not** show optimization.  *See* Connexus Statement of Fact No. 45, *infra* (optimized webpage would have three tabs at the top called "Top Searches" which <qwunderground.com> does not have).  Thus, this statement is disputed.

56.     No evidentiary objection.

57.     The Connexus Defendants object to the first sentence in this paragraph as lacking foundation (Fed. R. Evid. 602) as the Rhee Transcript does not support Plaintiff's statement. The Connexus Defendants object to the second sentence in this paragraph and Exhibit CC as lacking authentication (Fed. R. Evid. 901) and lacking foundation (Fed. R. Evid. 602).  The Connexus Defendants object to the last sentence in this paragraph and Exhibit EE as lacking

14

authentication (Fed. R. Evid. 901) and lacking foundation (Fed. R. Evid. 602).  Lastly, in response, the Connexus Defendants note that the screenshot for <ranunderground.com> (which, in any event, is not confusing similarly to Plaintiff's mark, WUNDERGROUND.com) does not show optimization because it does not contain the "Top Searches" tabs at the top.  *See*, Response 54, *supra*, and Statement of Fact No. 45, *infra*.

58.     The Connexus Defendants object to the first sentence in this paragraph as lacking foundation (Fed. R. Evid. 602) as the Jacoby Transcript does not support Plaintiff's statement.  The Connexus Defendants further note that because <qwunderground.com> was ***not*** optimized (*See* Response No. 55, *supra*) the Connexus Defendants did not "design ads to compete directly with that website…"  As such, this statement is disputed.

59.     The Connexus Defendants object to the first sentence in this paragraph as lacking foundation.  Fed. R. Evid. 602.  The CAT Training document was produced by Firstlook as a document it had in its possession, custody, and/or control, but the Jacoby Deposition Transcript does not establish who generated it.  On that point, Jacoby merely testified he "believed" it was Mavi Llamas.  Jacoby Depo. at 248:5-6.

60.     The Connexus Defendants objects to this paragraph as lacking foundation.  Fed. R. Civ. P. 602.  The citation to the Stevenson Deposition Transcript does not support Plaintiff's statement.  In addition, the CAT Training document does *not* instruct people to categorize websites after finding the "real website" as Plaintiff claims.  *See* Exhibit FF.  Lastly, even if it did say that, there is no foundation for Plaintiff's claim that these "real websites" "will often be trademark protected" so the statement is inadmissible pursuant to Fed. R. Evid. 602.

61.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R.

15

Evid. 602) as the Jacoby Transcript does not support Plaintiff's statement.

62.     The Connexus Defendants object to this paragraph in its entirety as irrelevant since it refers to the sale of domain names other than the ones in this lawsuit.  Fed. R. Evid. 401, 402.  Further, the Connexus Defendants object to the first sentence in this paragraph as argumentative and inadmissible as it contains no citation to admissible evidence.  Fed. R. Evid. 602.  The Connexus Defendants object to the fourth sentence in this paragraph as argumentative and inadmissible as it contains no citation to admissible evidence.  Fed. R. Evid. 602.  Lastly, the Connexus Defendants object to Exhibit II as irrelevant (Fed. R. Evid. 401, 402) as it simply refers to the sale of a domain name containing two generic words "Young" and "Chris."

63.     The Connexus Defendants object to this paragraph in its entirety as irrelevant since it refers to the sale of domain names other than the ones in this lawsuit.  Fed. R. Evid. 401, 402.

64.     The Connexus Defendants object to this paragraph as calling for speculation.  Fed. R. Evid. 602.  When asked whether Defendants' review would have revealed the WUNDERGROUND trademark, Counsel for Defendants interposed an objection that the question called for speculation. Jacoby Depo. Tr. at 148:4.

65.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) as the Jacoby Transcript does not support Plaintiff's statement that "Defendants were under constant threat of trademark infringement and cybersquatting" or the statement that the spreadsheets were "destroyed" (i.e., as opposed to, simply, not retained).  In response, the Connexus Defendants note that there is no overarching duty to preserve every single document that is generated in the course of business as Plaintiff suggests.  Many companies are under

16

"constant threat of litigation" and many companies get sued every single day, and, yet, no duty to retain every single business document is imposed on them. In any event, Defendants *did* produce some spreadsheets from 2004-2005 that they were able to retrieve from an out-of-commission laptop in the possession of Mavi Llamas. Delgado Decl. at ¶ 6.

66.     The Connexus Defendants object to this paragraph as lacking foundation since no definition for "Domain Tasting Period" is provided. Fed. R. Evid. 602.

67.     The Connexus Defendants object to this paragraph as lacking foundation since no definition for "Domain Tasting Period" is provided. Fed. R. Evid. 602.

68.     No evidentiary objection.

69.     No evidentiary objection.

70.     The Connexus Defendants object to this paragraph as pure argument that is irrelevant. Fed. R. Evid. 401, 402. Whether or not Jacoby (a New York resident) has heard of the Detroit Red Wings is neither relevant nor difficult to believe.

71.     The Connexus Defendants object to this paragraph and Exhibit R as lacking authentication (Fed. R. Evid. 901) and lacking foundation (Fed. R. Evid. 602).

72.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) because the Berryhill Deposition Transcript does not support Plaintiff's statement. Mr. Berryhill did not "agree" that willful blindness can rise to the level of bad faith. He actually testified that "there's always a question of, well, to what degree does some kind of willful blindness rise to the level of – of bad faith." Berryhill Depo. 164:5-13. The answer to that question may very well be that there is no such degree.

73.     The Connexus Defendants object to the sentence that commences "DNS error

data is fishing at 'dolphin depth'…" as purely argumentative and not an admissible statement of fact having proper foundation.  Fed. R. Evid. 602.

74.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) because the Berryhill Deposition Transcript does not support Plaintiff's statement.

75.     No evidentiary objection.

76.     No evidentiary objection.  In response, the Connexus Defendants note that Mr. Berryhill testified regarding the concept of "constructive notice" vis-à-vis a traditional trademark infringement claim but that one did not have "constructive notice" for purposes of an ACPA claim.  Berryhill Depo. at 359:2-7 ("What we're talking about under the ACPA is specific bad faith intent…  That's not a trademark infringement action for which purpose, yeah, we do have a –you know, you do have constructive notice.").

77.     The Connexus Defendants object to this paragraph as lacking foundation (Fed. R. Evid. 602) because the Berryhill Deposition Transcript does not support Plaintiff's statement. Moreover, Plaintiff's statement that these alleged examples are "almost identical to the facts in this case and support a finding of bad faith cybersquatting" is purely argumentative and not a statement of fact with a citation to admissible evidence.  Fed. R. Evid. 602.  Lastly, Exhibit LL (third party website printouts) constitutes hearsay without an objection.  Fed. R. Evid. 801, 802.

78.     The Connexus Defendants object to this paragraph and Exhibit MM as hearsay without an exception.  Fed. R. Evid. 801, 802.

79.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.  It does not matter whether or not Berryhill knows about the actions and motives of other domain name registrants.

18

80.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.  It does not matter whether or not Berryhill knows about the actions and motives of other domain name registrants.

81.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.  It does not matter why *other* people register domain names as that does not have anything to do with the intent of the Connexus Defendants.

82.     No evidentiary objection.  In response, the Connexus Defendants note that Berryhill actually testified that "Typographic similarity is more important, actually, because you know, you don't really navigate audibly."  Berryhill Depo. Tr. 336:4-6.

83.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.  This case does not involve domain names alleged to violate the MICROSOFT trademark which is a household name.

84.     The Connexus Defendants object to this paragraph as irrelevant.  Fed. R. Evid. 401, 402.

85.     The Connexus Defendants object to this paragraph as irrelevant (Fed. R. Evid. 401, 402), lacking foundation (Fed. R. Evid. 602) and argumentative, not a statement of fact.

86.     No evidentiary objection.

87.     The Connexus Defendants object to this paragraph as lacking foundation since it contains no citation to admissible evidence.  Fed. R. Evid. 602.

88.     The Connexus Defendants object to this paragraph as lacking foundation since it contains no citation to admissible evidence.  Fed. R. Evid. 602.  While Exhibit NN contains the WHOIS entry printout as of September 3, 2007, there is no admissible evidence that: (i) anything

19

changed after November 17, 2009 or (ii) "[a]fter Plaintiff filed suit against Defendants,

Defendants attempted to conceal numerous additional typosquatted Domain Names…"

89.    No evidentiary objection.

## PART TWO: THE CONNEXUS DEFENDANTS' STATEMENT OF FACTS IN OPPOSITION TO PLAINTIFF'S MSA

For its opposition, the Connexus Defendants submit the following Statement of Facts:

1.    The ACPA was enacted in 1999 to address issues that had arisen during the 1990s.  The practice of domain name tasting, which came later in 2004, did not inform the drafting of the statute.  Deposition of John Berryhill, taken January 11, 2011 ("Berryhill Depo.") at 134:2-135:13 (attached as Exhibit N to Delgado Decl.).

2.    The factors listed in the ACPA were developed in the context of the 1990s when the concern was the intentional registration of domain names and subsequent "ransoming" of the domain names to a brand holder, such as Microsoft.  Berryhill Depo. at 137:15-138:23; Declaration of John Berryhill, dated August 3, 2011 (Berryhill Decl.), at ¶¶ 4-5.

3.    Distinct from the practice of cybersquatting, other persons recognized that domain names could hold inherent value, apart from their association with trade or service marks.  When domain name registration became generally available on a commercial basis, such persons sought to speculate in their value by registering and holding domain names for sale.  *See, e.g. Cello Holdings v. Lawrence-Dahl Cos*, 89 F. Supp. 2d 464 (S.D.N.Y. 2000); 2002 U.S. Dist. LEXIS 1029 (S.D.N.Y. Jan. 24, 2002), *vacated on other grounds*, 347 F.3d 370 (2d Cir. 2003) ("A reasonable factfinder could conclude that Storey was not trying to extort a particular (or any) trademark holder. This was not, for example, a situation where a cybersquatter registered

20

'applecomputer.com' and then tried to extort Apple Computer into paying him money to release

the domain name. Rather, the instant case is more akin to the situation where a person registers

'apple.com' and then offers it to a number of parties that might be interested in the domain

name."). Berryhill Decl. at ¶ 6.

      4.     As domain speculators accumulated portfolios of domain names for potential sale,

they sought ways to earn income from their domain names which remained unsold.

Concurrently, as the commercial internet expanded, methods of searching the internet for

relevant information became one of the primary activities conducted by internet users. Internet

"search engines," such as Yahoo! and Google, partially filled this need and also sought means to

profit from the conduct of internet searches. *Id*. at ¶ 7.

      5.     Aside from using internet search engines, however, another manner in which

internet users find information is by what is called "Direct Navigation." In Direct Navigation,

internet users type search queries directly into the "address bar" of web-browsing software (such

as Internet Explorer or Mozilla Firefox). Typically internet users may add ".com" to the end of a

search term, but the frequency with which the "address bar" is used as a search bar led to

browser software developers to cause the software to automatically add ".com" to the end of

searches conducted via the address bar. *Id*. at ¶ 8.

      6.     Internet search engine companies such as Yahoo! and Google determined that

search could be made profitable by selling "search advertising." Search advertising operates by

inviting advertisers to submit bids for their advertisements to be displayed in response to

searches conducted by internet search engine users. For example, the search term "automobiles,"

entered into a search engine such as Google or Yahoo! will cause the display of "sponsored

21

links" or a similar indication, along with a listing of prominently displayed links to advertisers who have bid to pay a "click-through" fee to the search engine operator for each user which clicks on a sponsored advertisement to reach the advertiser's site through the search engine.  This type of revenue model is referred to as "pay-per click" or PPC.  *Id*. at ¶ 9.

7.      To capture potential visitor traffic from direct navigation, internet search engine companies such as Yahoo! and Google also distribute PPC advertisements via syndication to domain name registrants.   For example, the registrant of a domain name such as DatingForBusyProfessionals.com, whether the domain name was registered for resale or future development, contract directly or indirectly to allow the domain name to be used to display PPC ads.  In such an arrangement, when an internet user visits the web page corresponding to the domain name, the web page is automatically populated by PPC advertisements provided by the search engine company.   A share of the revenue from such PPC advertisements is paid by the search engine company to the domain name registrant, in exchange for providing the domain name as a platform for displaying such advertisements.  Search engine companies typically refer to this method of distributing advertisements as the "domain channel" in contrast to the "search channel" wherein sponsored advertisements are displayed directly at the search engine site.  *Id*. at ¶ 10.

8.      In a typical PPC advertising arrangement, the domain name is utilized as a publishing platform by the search engine company which populates the web page with sponsored PPC links as if the domain name itself were entered into the search engine as a search term. While the domain name registrant does not typically control the selection and arrangement of the advertisements, the search engine company, in turn, also has limited control over what search

121061.1

terms the advertisers select to have their advertisements displayed.  *Id*. at ¶ 11.

9.     The distribution of PPC advertising by search companies through the domain channel has advanced to the point where domain names are often registered purely for their traffic potential, instead of for resale.  The ability to sell domain traffic resulting from direct navigation has led to a number of techniques for accumulating domain names which have the potential to generate traffic per se.  *Id*. at ¶ 12.

10.     In the year 2000, ICANN instituted a standard policy under which a domain name, once registered, could be deleted within five days of its initial registration without incurring a fee for registration of the domain name.  This period was known as the "five day grace period" or "add grace period."  *Id*. at ¶ 13.

11.     The search for direct navigation traffic for domain names, combined with the five day grace period led to a practice known as "domain tasting."  In domain tasting, a domain name would be registered and then monitored during the five day grace period to determine whether its projected annual traffic value exceeded the registration fee.  *Id*. at ¶ 14.

12.     The practice of domain tasting was conducted by a number of domain name registration companies using a variety of sources for character strings to be used to generate candidate domain names.  It is believed that such companies had access to search data from search engine companies themselves, as well as "error data" from internet service providers and domain name registries, which provided character strings having potential value, as such character strings corresponded to entries by internet users into search engines or into the address bars of browsers for otherwise non-existent domain names.  *Id*. at ¶ 15.

13.     One hazard of large-scale bulk domain registration is that some of the domain

121061.1

names may incidentally correspond to trade or service marks.  While a character string such as "Tide" may refer to the lunar gravitational effect on large bodies of water, it may also correspond to a brand of laundry detergent.  Since a domain name registrant does not typically control what advertisements are displayed on a webpage used to publish advertisements generated by a search company, there is no completely effective way for the domain name registrant to know whether a domain name containing the string "tide" will cause the display of surfing information or laundry information. Furthermore, the advertising results generated by any particular keywords are determined by the collective action of those advertisers who bid on keyword placement with the search engine company, with whom the domain name registrant has no connection or contact. *Id.* at ¶ 16.

14.     As a result, responsible bulk domain registrants address the problems of incidental trademark correspondence in several ways.  First, while there is no completely reliable method of filtering large numbers of strings against any particular database of trademarks, bulk domain registrants have continued to develop and deploy filtering systems on their own and in cooperation with brand owners.  Second, responsible bulk domain registrants typically maintain staff and counsel for reviewing communications which may be sent by brand owners relating to brand-relevant domain names which may have escaped capture by the filtering methods employed by the bulk domain registrant.  Where a domain name contains an inappropriate character string, or may have been targeted inappropriately by the search engine company supplying the advertising feed, responsible bulk domain registrants typically work with the brand owner to transfer or delete such domain names at no charge, and typically at a loss, to the brand owner, and further to update the filtering method to include variations of the asserted mark.  *Id.*

24

at ¶ 17.

15.     Notably, the absence of bulk domain registrants would not eliminate the use of otherwise nonexistent domain names for PPC advertising purposes. For example, the reason why the second most popular internet browser, Mozilla Firefox, is distributed for "free" is that in a default installation of that browser, traffic to "non-existent" domain names is fed to Google Search, under an arrangement by which Google shares a portion of the resulting revenue to Mozilla. Based on press articles, in 2007, this arrangement yielded an income of US $70 million to the Mozilla Foundation. *Id.* at ¶ 18.

16.     In determining whether the practice of domain tasting constitutes "bad faith intent" under the ACPA, the Court can look beyond the statutory factors at such issues as: what was motivating the registrant, how they responded when approached by a trademark holder, what type of safeguards the registrant had implemented, and did they have a process in place to avoid registering domain names that corresponded to trademarks.  Berryhill Depo. at 127:21-8, 139:24-140:10, 142:23-144:20, 149:17-151:6.

17.     The registration of domain names comprised of generic or "dictionary" words or a combination of generic words may be a manifestation of naivety and not bad faith.  Berryhill Depo. at 159:2-160:2.

18.     Determining intent on the totality of the facts requires a determination of credibility and is, therefore, a jury question.  Berryhill Depo. at 167:7-168:16.

19.     "Constructive notice" (as the result of a trademark registration with the U.S. Patent & Trademark Office) is a legal concept in traditional Lanham Act claims for trademark infringement but not claims pursuant to the ACPA.  Berryhill Depo. at 191:8-14 and 358:14-

359:7.

20.     Prior to Fall 2004, the process for registering domain names was as follows: an operator (such as Mavi Llamas) would be provided a spreadsheet of candidate domain names for registration, the operator would review the spreadsheet to eliminate domain names that corresponded to trademarks based on their personal knowledge, and then the remaining domain names would be registered.  Deposition of Mavi Llamas, taken September 27, 2010, at 17:8-15, 14:1-10, 15:8-12 21:10-14, 61:2-62:2 (attached as Exhibit O to Delgado Decl.).

21.     In Fall 2004, the predecessor of the Connexus Companies implemented a trademark matching system based on the domain names in the USPTO database.  Declaration of Mavi Llamas, dated August 10, 2011 ("Llamas Decl."), ¶ 3, Exhibit D.

22.     Subsequent to the implementation of that 2004 trademark matching system, the spreadsheets viewed by the operators would contain, *inter alia*, the candidate domain names and any potential matches to the USPTO database (both literal and "fuzzy matches" that were similar but not identical).  Operators could then rely on the USPTO data included on the spreadsheet when making their decision to exclude domain names for trademark reasons.  Llamas Depo. at 50:2-51:1 and Ex. 137, 51:21-52:7;  Llamas Decl. at ¶ 2,  Exhibit C; Deposition of Donnie Misino, taken November 30, 2010 ("Misino Depo.") at 387:17-25 (attached as Exhibit P to Delgado Decl.).

23.     After Fall 2004, operators also screened candidate domain names against an internally created blacklist.  Deposition of Seth Jacoby, taken September 15, 2010 ("Jacoby Depo.") at 53:9-54:7 and 80:3-20 (attached as Exhibit Q); Llamas Depo. at 170:2-13.

24.     NCS began tasting domains during the Add Grace Period in late 2006.  Jacoby

26

Depo. at 49:6-13.

25.     While the Add Grace Policy was in place, the process for registering domain names was as follows: NCS would test all candidate domain names immediately, identify candidates worthy of registration beyond the grace period because they were potentially profitable, delete those candidate domain names that (i) were either unprofitable or (ii) corresponded to trademarks, and then register the remaining candidate domains that were believed to be clean (i.e., they did not correspond to trademarks).  Jacoby Depo. at 45:17-46:10 and 47:22-48:13.

26.     There was always vetting for trademarks during the grace period during the time that NCS was tasting domain names via the Add Grace Period.  Jacoby Depo. at 50:11-14.

27.     Human review for trademarks has always been part of the domain registration process.  Jacoby Depo. at 52:4-17.

28.     Throughout the years, NCS has refined its computer system so that its trademark matching system was better and better.  Jacoby Depo. at 121:4-15, Llamas Depo. at 66:20-67:4.

29.     In late 2006, Donnie Misino was tasked with creating a new trademark tool that would have better fuzzy matching and better implementation of the internal blacklist.  Declaration of Donnie Misino, dated August 4, 2011 ("Misino Decl.") at ¶¶ 2-3, Exs. E and F.

30.     Donnie Misino proposed additional refinements to the matching system and domain name registration process in January 2007.  Misino Decl. at ¶ 4, Ex. G.

31.     In the interim, the company continued to use its existing trademark system as can be seen from e-mails during the time period referring to the trademark matching system.  Misino Decl. at ¶ 5, Ex. H.

27

32.     Donnie Misino continued to work on a new fuzzy matching system through April 2007.  Misino Decl. at ¶ 6, Ex. I.

33.     Some version of Donnie Misino's trademark fuzzy matching system likely came into use in late 2007.  Jacoby Depo. at 87:14-19, Misino Depo. at 467:24-469:4.

34.     In a further iteration, Donnie Misino added "N-Gram" matching to his trademark fuzzy matching system.  Misino Depo. at 401:24-402:21.

35.     A further refinement was made to the registration process: the addition of an exclusion file which contained a list of domain names previously considered for registration but rejected for trademark reasons.  Any candidate domain name which matched an entry in the exclusion file was automatically rejected and never even considered by an operator.  Jacoby Depo. at 72:23-75:9, 79:19-25 and Misino Depo. at 481:16-24.

36.     Throughout the years, NCS has undertaken periodic scrubs of its domain name portfolio.  Deposition of Christopher Pirrone, taken May 3, 2011, at 183:22-184:24 (attached as Exhibit R to Delgado Decl.).

37.     In 2008, NCS undertook a review of its entire domain name portfolio to identify and delete any domain names that potentially corresponded to a trademark that might not have been accurately avoided during the registration process.  Jacoby Depo. at 178:8-13, 181:21-182:24; Misino Depo. at 384:15-386:16, Pirrone Depo. at 92:4-16.

38.     To accomplish its 2008 domain name portfolio review, NCS created special trademark tool for the task of comparing domain names to trademarks in the USPTO database.  Jacoby Depo. at 182:25-183:14.  The process also involved review by human operators.  Jacoby Depo. at 191:18-192:18.

39.     Building the special trademark tool was a rigorous project which required employees like Donnie Misino to work late nights and through weekends.  Misino Decl. at ¶ 7, Ex. J.

40.     The 2008 domain name portfolio review took months. Pirrone Depo. at 184:21-24.

41.     As a result of the 2008 review, approximately 25,400 domain names (or twenty percent (20%) of the domain name portfolio) were deleted.  Pirrone Depo. at 94:5-15. Delgado Decl. at ¶ 12.

42.     NCS stopped tasting domain names via the Add Grace Period in June 2008. Llamas Depo. at 82:22-83:15.

43.     After NCS stopped tasting domain names through the AGP, the domain name process was as follows:

     a.     ███████████████████████████

             ████████████████████████

             ███████████████████████

             █████████████████████████

             █████████████████████████

             ████████████████████████

             ███████████████████. Declaration of Richard Korf, dated August 4, 4011 ("Korf Decl.") at ¶ 7.

     b.     ██████████████████████████

             █████████████████████████

29

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. *Id.* at ¶ 8.

c.     ██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. *Id.* at ¶ 9.

d.     ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

30

121061.1

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. *Id.* at ¶ 10.

e.   ███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████. *Id.* at ¶ 11.

f.   ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

31

121061.1

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████. *Id*. at ¶ 12.

g.  ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████. *Id*. at ¶ 13.

h.  ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████



██████████████████████████████████████████████

█████████████████████████. *Id.* at ¶ 14.

i.  ██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████. *Id.* at ¶

15.

j.  ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████. *Id.* at ¶ 16.

k.  ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

33

121061.1



*Id.* at ¶ 17.

l.

. *Id.* at ¶ 18.

44.     It would be impossible to build a domain name registration system that registered domain names with 100% accuracy (i.e., it never registered a domain name that potentially corresponded to a trademark).  Deposition of Richard Korf, taken December 8, 2010, at 133:7-134:13 and 283:22-284:24 (attached as Exhibit S to Delgado Decl.).

45.     A domain name that had been keyword-optimized by Firstlook would show three tabs called "Top Searches" at the top.  Llamas Depo. at 143:5-17.

46.     NCS has a policy to transfer any domain name upon request to a third party with legitimate rights.  Pirrone Depo. at 74:20-75:3.

34

47.     NCS did not offer to sell the domain names at issue in this matter to Plaintiff. Deposition of Jeff Masters, taken August 3, 2010 ("Masters Depo.") at 35:23-36:1 (attached as Exhibit T to Delgado Decl.).

48.     Plaintiff takes its name from the 1960s radical organization "Weather Underground" which originated at the University of Michigan.  Masters Depo. at 16:6-23.

49.     There is an organization named "Weather Underground Hong Kong" that uses Plaintiff's name as well as Plaintiff's software.  Masters Depo. at 10:1-7 and 20:4-17.

50.     There was a Wunder Brewery in San Francisco, California.  Deposition of Chris Schwerzler, taken April 29, 2010 ("Schwerzler Depo.") at 117:14-21 (attached as Exhibit U to Delgado Decl.).

51.     There is a Wunderground Magic Store in Michigan.  Schwerzler Depo. at 118:9-17.

RESPECTFULLY SUBMITTED this 15th day of August, 2011.

/s/William A. Delgado
William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

                                      Case No. 2:09-CV-10756

vs.                                  Hon. Marianne O. Battani

NAVIGATION CATALYST SYSTEMS, INC.,
    a Delaware corporation; CONNEXUS CORP.,
    a Delaware corporation; FIRSTLOOK, INC.,
    a Delaware corporation; and EPIC MEDIA
    GROUP, INC., a Delaware corporation,

        Defendants.

_____

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI 49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA 90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
BUTZEL LONG, P.C.
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
Local Counsel for Defendants

_____

**<u>CONNEXUS, FIRSTLOOK, AND NCS'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
ADJUDICATION</u>**

## **STATEMENT OF THE ISSUES PRESENTED**

1.      Whether Plaintiff has established each element under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA") as a matter of law.

2.      Whether each of the 288 domain names that Plaintiff alleges are at issue is identical or confusingly similar to a distinct mark owned by the Plaintiff.

3.      What level of culpability is required to support a finding of "bad faith intent to profit" under the ACPA (i.e., intentional targeting, "willful blindness" or mere negligence).

4.      Whether Plaintiff has established that the Connexus Defendants meet that requisite level of culpability as a matter of law.

121061.1

## CONTROLLING AUTHORITY

The ACPA is set forth at 15 U.S.C. 1125(d)(1) and provides:

    (A)    A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

        (i)    has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

        (ii)    registers, traffics in, or uses a domain name that—

            (I)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

            (II)    in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

            (III)    is a trademark, word, or name protected by reason of section 706 of title 18 or section 220506 of title 36.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>INTRODUCTION</u>**

In its Motion for Summary Adjudication, Plaintiff argues that it has established liability under the Anti-Cybersquatting Consumer Protection Act ("ACPA") as a matter of law.  It is difficult to determine which element of Plaintiff's Motion is most notable.  Is it that Plaintiff's Motion rests almost entirely on inadmissible evidence?  Or, is it that, even if the Court accepted all of Plaintiff's inadmissible exhibits, Plaintiff's Motion would still fail?

This Court should decline Plaintiff's invitation to commit a series of reversible errors and, instead, deny Plaintiff's Motion and, instead, grant the Connexus Defendants' Cross-Motion on the claim.  Plaintiff's Motion is, as noted above, supported by *in*admissible evidence.  Moreover, even if the Court reached the merits of the Motion by accepting Plaintiff's evidence, Plaintiff could never establish "bad faith intent to profit"—the key element under the ACPA—as a matter of law.  As the Connexus Defendants point out in their Cross-Motion, absent actual knowledge on their part of Plaintiff's marks, there can be no liability.  Plaintiff submits no evidence to show actual knowledge.

Even if the Court accepted Plaintiff's position that it could substitute "willful blindness" for "actual knowledge," the Motion would still fail.  To show "willful blindness," Plaintiff would have to show that the Connexus Defendants knew of a potential wrong and deliberately failed to act.  That is simply not the case.  From nearly the very beginning and throughout the years, the Connexus Defendants have implemented a series of processes and systems (comprised of both humans and machines) to avoid the registration of domain names that corresponded to trademarks.  These efforts cannot, as a matter of law, support a finding of "deliberate failure to

1

act."

In reality, Plaintiff's pursuit of this matter, as reflected in its Motion, has always been misplaced.  Plaintiff seeks to judge the Connexus Defendants based on how well (or how poorly) they were able to avoid trademarks.  But, even if the Connexus Defendants did not do a good job of filtering out trademarks (they did, by the way), the ACPA does not impose liability for poor performance.  It does not punish performance at all.  It punishes intent.  And, here, there is no evidence that the Connexus Defendants had a "bad faith intent to profit" from the goodwill of the Plaintiff's marks.  For that reason, Plaintiff's Motion must be denied, and the Connexus Defendants' Motion must be granted.

## II.    STATEMENT OF FACTS

*Background of Bulk Domain Name Registration and Monetization*.  The history of bulk domain name registration and monetization is set forth in the Connexus Defendants' Statement of Facts Nos. 1-15; Declaration of John Berryhill.  In short, bulk registrants seek out and register domain names that might be profitable (either because they can be resold or monetized.  The registrant can "monetize" these domain names by placing Pay-Per-Click hyperlinks on the domain names.  *Id*.  One hazard of bulk domain name registration is that a domain name may correspondent to trade or service marks (e.g., "Tide" can refer to the lunar gravitational effect on large bodies of water or a brand of laundry detergent).  SOF No. 13.  So, responsible bulk registrants establish procedures to address the unintentional registration of domain names in which a third party claims intellectual property rights.  SOF No. 14; Berryhill Decl. at ¶ 17.

*Background of Defendants' Business*.   NCS is one of the many registrants that registers domain names in bulk.  NCS is a subsidiary of Firstlook, which, in turn, is a subsidiary of

2

Connexus Corporation.  After NCS registers a domain name, Firstlook monetizes the domain name by creating web pages with hyperlink advertisements upon which visitors to the domain name can click.  *See Weather Underground, Inc. v. Navigation Catalyst Systems, Inc.*, 688 F. Supp. 2d 693, 695 (E.D. Mich. 2009).

        *The Domain Name Registration Process*.  Because Plaintiff's Motion focuses on whether the Connexus Defendants had a "bad faith intent to profit," it is critical to evaluate the process by which NCS registered domain names and what steps were undertaken to avoid the registration of domain names that corresponded to trademarks.  That domain name registration process changed over time such that three different time periods must be analyzed: (i) 2004-late 2006, (ii) late 2006-June 2008 (i.e., the Add Grace Period), and (iii) June 2008 to the present.  The process during the first period (2004-late 2006) is described in detail in SOF Nos. 20-23.  The process during the Add Grace Period (late 2006 through June 2008) is described in detail in SOF Nos. 24-42.  The process during the third period is described in detail in SOF Nos. 43(a)-(l).

        The important takeaway is this: at all times, the NCS  took steps to avoid registering and/or retaining domain names that corresponded to trademarks.  It started with (and always had) a "human" vetting process (i.e. human operators attempted to exclude domain names that corresponded to trademarks from registration) and, in time, added technology (e.g., blacklists that helped identify domain names that NCS did not want to register and trademark filters that could compare candidate domain names to trademarks in the USPTO database).  It spent years refining that process (e.g., adding operators to the review process, conducting  internal scrubs of the portfolio, transferring domain names to trademark owners upon request) and further developing its technology (e.g., adding an exclusion file to automatically exclude previously

121061.1

rejected names, adding a fuzzy match system to the trademark filter, adding N-Gram matching to

the trademark filters).  SOF Nos. 20-43, 46.  It is important to note that the last domain name of

which Plaintiff complains in its FAC was registered in March 2009, more than two years ago.

FAC, Exs. T and U.

III.    **ARGUMENT**

A.    Plaintiff Did Not Submit Admissible Evidence in Support of Its Motion.

In connection with its Motion, Plaintiff filed various exhibits but, as noted in the

Connexus Defendants' Evidentiary Objections, the vast majority of Plaintiff's evidence is

inadmissible under the Federal Rules of Evidence.  As a result, Plaintiff's Motion immediately

fails.  Summary judgment is not a mechanism by which a party can file an exhibit full of binders

and simply say "See, I win."  It requires the submission of *admissible* evidence (e.g., documents

that have been authenticated, statements that are contained in a sworn affidavit of someone with

personal knowledge, documents that do not contain hearsay).  Fed. R. Civ. P. 56(c); *Turner v.

Scott*, 119 F.3d 425, 430 (6th Cir. 1997) (noting that "summary judgment rulings must be based

on admissible evidence"); *Peake v. Martinrea Fabco Hot Stamping, Inc.*, 2011 WL 1157864

(E.D. Mich. Feb. 28, 2011) ("[I]n resolving a Rule 56 motion, the Court should not consider

unsworn or uncertified documents, unsworn statements, inadmissible expert testimony, or

hearsay evidence.") (citations omitted), *report and recommendation adopted by* 2011 WL

1118572 (E.D. Mich. Mar. 28, 2011); *Thomas v. City of Detroit*, 2007 WL 674593 at *5 (E.D.

Mich. Feb. 28, 2007) (Battani, J.) ("Moreover, in this Circuit, it is well settled that only

admissible evidence may be considered by the trial court in ruling on a motion for summary

judgment.") (internal quotations and citations omitted).

121061.1

The few pieces of evidence that Plaintiff submitted to which the Connexus Defendants have no evidentiary objection are insufficient to establish liability under the ACPA as a matter of law.[1]  As a result, Plaintiff's Motion must be denied.

        B.      <u>Plaintiff Did Not Provide Any Analysis on the Issue of "Confusing Similarity."</u>

In its Memorandum supporting the Motion, Plaintiff concedes that to prevail on its ACPA claim, it must show that each and every domain name at issue is identical or "confusingly similar" to a distinctive mark belonging to the Plaintiff.  *See* Memorandum in Support of Motion for Partial Summary Judgment ("Memo.") at 3.  Yet, Plaintiff provides no analysis whatsoever as to why any domain name is confusingly similar to its marks.  Indeed, Plaintiff implicitly concedes that there are some domain names that "can be debated" but then invites the Court into committing reversible error by nevertheless granting summary adjudication and simply factoring "in the similarity requirement on those few domains in determining statutory damages."  Memo. at fn. 2.

Plaintiff is plainly wrong.  "Confusing similarity" is a *prima facie* element of liability not merely an element to consider as part of a damages award.  15 U.S.C. 1125(d)(1).  That Plaintiff does not want the Court to actually compare the marks to the domain names is not surprising since it would be difficult for Plaintiff to justify how certain names are, in fact, confusingly similar.  For example, <undergroundware.com> is not similar to <wunderground.com>.  The same is true for <ranunderground.com>.  Persons looking for <wunderground.com> did not accidentally type "r-a-n" instead of a "w."  They clearly just combined two generic words: "ran" and "underground."  Lastly, consider <newundergorun.com>, which might be a typo of the

---

[1] Indeed, even if the Court were to examine all of the evidence submitted by Plaintiff, it would not be sufficient to establish liability as a matter of law.  *See* Section III (B)-(D), *infra*.

combination of two generic words "new" and "underground" but is not confusingly similar to <wunderground.com>.

Having failed to provide any meaningful analysis of this element under the ACPA, Plaintiff cannot meet its burden, and its motion must fail.[2]

C.      Plaintiff's Motion Fails Because Plaintiff Cannot Show "Bad Faith Intent to Profit."

1.      "Bad faith intent to profit" requires that the Connexus Defendants have known of and targeted the goodwill of Plaintiff's marks.

As the Court is aware, the Connexus Defendants filed their own Motion for Summary Adjudication on Plaintiff's ACPA claim since the Connexus' Defendants did not actually know of or target the goodwill of Plaintiff's marks. For the sake of brevity, the full arguments in that motion are simply incorporated herein by reference. Suffice it to say, both the legislative history and the words in the statute suggest that targeting of a particular trademark is required to establish bad faith intent. *Harrods Ltd. v. Sixty Internet Domain Names,* 110 F. Supp. 2d 420, 426 (E.D. Va. 2000) (the ACPA "does not extend to innocent domain name registrations by those *who are unaware of another's use of the name*, or even to someone who is aware of the trademark status of the name but registers a domain name containing the mark for *any reason other than with bad faith intent to profit from the goodwill associated with that mark.*") (quoting H.R. Conf. Rep. No. 106-464 (1999)) (emphasis added); *see also* 15 U.S.C.

---

[2] In the event that the Court relieves Plaintiff of its burden to prove a *prima facie* case and presses forward with its own analysis, it should bear in mind that, on the internet, one letter can make a significant difference and, as a result, variations by one or two letters do not necessarily represent "typosquatting" as Plaintiff argues. For example, <nikeshoes.com> and <niceshoes.com> differ by only one letter, but, as the Court can ascertain for itself by visiting these websites, the domain names relate to two very different companies.

1125(d)(1)(B)(i)(VIII) (suggesting that the Court can consider the person's registration or acquisition of multiple domain names which the person **knows** are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain).

If the Court agrees with the Connexus Defendants', Plaintiff's Motion instantly fails since it does not establish that the Connexus Defendants targeted Plaintiff's marks at the time of registration. Instead, the Connexus Defendants' Motion must be granted.

   2. <u>The Court cannot import the legal concept of "willful blindness" from the traditional trademark claim into the ACPA</u>.

Realizing that it is impossible for it to show intent based on actual knowledge (i.e., that the Connexus Defendants purposefully targeted domain names that corresponded to Plaintiff's marks because they knew of Plaintiff's marks), Plaintiff essentially argues that the Connexus Defendants were "willfully blind," a legal concept imported from the traditional trademark infringement context. Memo. at 9-10; *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992) ("[W]e have held that willful blindness is equivalent to actual knowledge for purposes of the Lanham Act…").[3]

However, while both traditional False Designation of Origin and ACPA claims are codified at 15 U.S.C. § 1125, courts have been careful to note that they are very different types of claims because the latter requires a showing of "bad faith." *See, e.g.*, *Lahoti v. VeriCheck*,

---

[3] Plaintiff's reliance on "willful blindness" which is the equivalent of **actual** knowledge belies any argument that constructive notice as the result of Plaintiff's trademark registrations is sufficient. Constructive notice is a concept in traditional trademark cases and is not relevant to ACPA cases. SOF No. 19. After all, if "constructive notice" based on a trademark registration was sufficient, the ACPA would be transmogrified from a statute that is based on "intent" into a statute that imposes strict liability.

7

Inc. 586 F.3d 1190, 1202 (9th Cir. 2009) ("A finding of bad faith is an essential prerequisite to finding an ACPA violation, though it is not required for general trademark liability.").  Importing "willful blindness" or "reckless disregard" from the traditional trademark context (where bad faith intent is not at issue) into the ACPA context (which specifically requires a showing of bad faith intent) would not be appropriate given the statute's narrow scope. *Cf. Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1101 (C.D. Cal. 2009) ("In considering these [novel] issues, the court is mindful that the statute's scope is narrow.").

Unsurprisingly, **none** of the cases cited by Plaintiff regarding "willful blindness" involved an ACPA claim.[4]  This Court should not rush to accept Plaintiff's invitation to expand the scope of a statute that is universally accepted as "narrow."  It should, instead, pass on that invitation and focus on what Congress actually intended when it enacted the ACPA (i.e., the prevention of ransoming of domain names).

3.    Even if the court did accept the premise that a showing of "willful blindness" was sufficient under the ACPA, Plaintiff's motion would still fail.

Ironically, even if the Court accepted Plaintiff's premise that a finding of "willful blindness" was sufficient to establish liability under the ACPA, Plaintiff's Motion would still fail. In one of the leading cases on contributory infringement and the concept of "willful blindness," the *Hard Rock* Court stated that "[t]o be willfully blind, a person must suspect

---

[4] *Louis Vuitton S.A. v. Lee* involved traditional trademark claims.  *Berg v. Symons* involved copyrights and trade dress.  *Microsoft Corp. v. Wholesale Club, Inc.* involved copyright and traditional trademark claims.  *A Touch of Class Jewelry Co. v. J.C. Penny* involved traditional trademark claims.  *Securacomm Consulting, Inc. v. Securacom* involved traditional trademark claims.  *Basic Books, Inc. v. Kinko's Graphics Corp.* involved copyright claims.

8

wrongdoing **and deliberately fail to investigate**." *Hard Rock,* 955 F.2d at 1149 (emphasis

added).  The *Hard Rock* Court criticized the district court for failing to evaluate the defendant's

state of mind and its choice to focus exclusively on the failure to take precautions against

counterfeiting.  *Id.*  Ultimately, the *Hard Rock* Court observed that the district court found the

defendant to be merely negligent not willfully blind.  *Id.*

     Plaintiff cannot show that the Connexus Defendants deliberately failed to investigate

their domain name registration process.  The admissible facts submitted into evidence by the

Connexus Defendants establish that, in fact, they **took action** to exclude domain names that

corresponded to trademarks.  They had human operators screen for trademarks.  They developed

an internal blacklist containing thousands of entries to prevent registration of certain strings of

characters.  They spent years at great cost and manpower time refining their software to assist

with the trademark clearing process.  That included upgrading their fuzzy matching software,

adding an N-Gram matching component, and adding an exclusion file.  They scrubbed their

portfolio periodically and, on one occasion in 2008, reviewed every single domain name.  As a

result of that process, they deleted over 25,000 domain names, thereby sacrificing $1,000,000 in

profit margins, essentially "putting their money where their mouth is."  They transferred domain

names to trademark owners who made a legitimate claim.  SOF Nos. 20-43, 46.  These are not

the actions of someone who is merely paying lip service.  These are serious efforts undertaken by

a bulk registrant who is seeking to **exclude not include** registrations of domain names that

correspond to trademarks.  Put simply, the fact that the Connexus Defendants took action

precludes a finding of "willful blindness," and, as a result, the Connexus Defendants would still

be entitled to summary adjudication in their favor even if the Court imposed this standard.

Cognizant of the actions taken by the Connexus Defendants, Plaintiff simply denigrates them by saying that they are "too little too late."  But, by arguing that these efforts were not sufficient (i.e., too little) and not timely (i.e., too late), Plaintiff is really arguing that the Connexus Defendants' were *negligent*.  However, as the *Hard Rock* Court noted, negligence is not equivalent to "willful blindness."[5]  Moreover, negligence merely speaks to how well the Connexus Defendants performed not what they *intended* to do in the first instance.  As a result, a showing of negligence would not be sufficient to prevail on an ACPA claim which requires an affirmative showing of bad faith *intent*. Thus, once again, it is the Connexus Defendants who would be entitled to summary adjudication.

   4. <u>Even under a "negligence" standard, Plaintiff cannot establish "intent" in this case as a matter of law.</u>

For the reasons set forth above, this Court should not hold that mere negligence is sufficient to impose ACPA liability.  Negligence measures the *efficacy* of performance but says nothing about the *intent* behind the performance which is the *sina quo non* of the ACPA. Nevertheless, even if the Court did hold as such, the facts submitted by the Connexus Defendants establish that a jury trial would be required on that issue.

Time and again, courts (including the Sixth Circuit) have held that summary judgment is typically inappropriate when "intent" is at issue.  *Hoover v. Radabaugh*, 307 F.3d 460, 467 (6th Cir. 2002) ("The third part of a First Amendment speech claim looks to the defendants'

---

[5] Obviously, the Connexus Defendants would argue that they were not even negligent.  Their system was fairly sophisticated and, while it does not meet Plaintiff's standard of 100% perfection, it would be impossible to build a system that actually registers domain names but nevertheless performs perfectly (i.e., did not register a single name that corresponded to a trademark).  SOF No. 44.

motivation in terminating [plaintiff].  When the defendants' intent is at issue, 'summary judgment is particularly inappropriate.'") (citation omitted); *Marohnic v. Walker*, 800 F.2d 613, 617 (6th Cir. 1986) ("recognizing that summary judgment is particularly inappropriate when intent is at issue, because evidence of intent must generally be inferred from the surrounding facts and circumstances"); *Sara Lee/De Int'l B.V. v. Pell, Inc.*, 2005 WL 1498873, at *1 (W.D. Mich. June 23, 2005) ("Summary judgment is particularly inappropriate as to questions of the intent of a party.  In this case, the trademark claims involve the issue of whether Defendants acted knowingly and intentionally.  Likewise, the conversion claims (both the third-party and counterclaims) involve the question of whether the Counter and Third-Party Defendants intentionally exercised wrongful dominion over the lawful property of another.  These questions are not properly decided under Rule 56.") (citations omitted); *see also* SOF No. 18 (Berryhill Depo. at 167:7-168:16).

Put simply, the Connexus Defendants' Statement of Facts sets forth many facts which Plaintiff does not address in its Memorandum regarding the attempts that were made to exclude domain names that corresponded to trademarks: the use of human reviewers, the exclusion file, the fuzzy match trademark filter, the N-gram match trademark filter, the transfer policy, the periodic portfolio scrubs (including the 2008 scrub which Plaintiff admits resulted in the loss of $1,000,000 in profit margins (Plaintiff's Motion at No. 49)).  So, even if the Court improperly holds that Plaintiff can show "bad faith intent to profit" by showing *negligence*, then the existence of these facts create a triable jury issue.  A jury, viewing all of these facts and considering the credibility of the Connexus Defendants' witnesses, could reach the conclusion that the Connexus Defendants intended to register generic/descriptive domain names and did *not*

11

intend to register the domain names at issue.  In fact, Plaintiff's Motion concedes that credibility is at issue by arguing that Seth Jacoby said things at deposition that were *not* credible.  Plaintiff's Motion at No. 70.  Plaintiff is free to tell a jury that Jacoby is not credible but, pursuant to the Seventh Amendment, that determination must be made by a jury not this Court.

Given the existence of various disputed facts and the need for a jury to make a determination of credibility in examining those facts, summary adjudication would still be inappropriate under a "negligence" level of culpability.

4.    The statutory factors are not important in a bulk registration case.

Plaintiff's exclusive reliance on the eight statutory factors in ACPA to show "bad faith intent to profit" is misplaced.  The ACPA was enacted in 1999 *before* the practice of domain name tasting was in vogue.  SOF No. 1.  As a result, its language (including the nine statutory factors regarding bad faith codified at 15 U.S.C. § 1125(d)(1)(B)(i)) was crafted while Congress considered the "traditional" cybersquatter situation where an individual, with knowledge of a specific trademark, sits at his computer and registers a domain name that is identical or confusingly similar to that trademark, so that he can, for example, ransom the domain name to the trademark holder or one of its competitors.  SOF No. 2.

This is not a case involving an individual at a computer whose intent must be discerned.  In such a case, it would be impossible to read a person's mind to see what they were thinking when they registered the domain name.  Therefore, it would be appropriate to rely on circumstantial evidence of the sort listed in the nine statutory factors.  Here, we have a bulk registration process that was codified in software and company operating procedures.  If we want to see *why* a domain name was registered, we need to examine the process itself, not a set of

12

unrelated factors.

Indeed, even the language of the ACPA itself recognizes that the statutory factors are not appropriate for every case and, instead, merely suggests that "[i]n determining whether a person has a bad faith intent described under subparagraph (A), a court **may** consider factors such as, **but not limited to**…." 15 U.S.C. § 1125(d)(1)(B)(i) (emphasis added). Evaluating the factors is not required. On the other hand, considering the totality of circumstances—including the Connexus Defendants' efforts to avoid trademarks—would be.[6] *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002) ("Congress did not mean these factors to be an exclusive list; instead, the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress.") (internal citations and quotations omitted); *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004) ("The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit.").

Nevertheless, even if the Court examined the statutory factors, it would not find that all of the factors weigh in Plaintiff's favor as Plaintiff suggests. For example, Factor 5 requires that the use of the domain name create a "likelihood of confusion." But, there is no likelihood of confusion here. Plaintiff and Defendants are not competitors offering similar services.

---

[6] The Court can look at such factors as: how the registrant reacted when approached by a trademark holder, what type of safeguards were implemented, and, generally, what was the process to avoid registration of domain names that corresponded to trademarks. SOF No. 16.

The Court should also remember that the registration of domain names comprised of "dictionary" words or a combination of such words (as in this case) may be a manifestation of naivety and not bad faith. SOF No. 17.

Plaintiff's website (Ex. 58 to Deposition of Jeff Ferguson, attached as Exhibit V to Delgado Decl.) contains weather information, photographs, and weather data.  Defendants' website only contains hyperlinks (Plaintiff's Exs. BB and EE).  A visitor to Defendants' website would not confuse that website for Plaintiff's.

Ironically, Plaintiff's citations to *HER, Inc. v. RE/MAX First Choice, LLC* and *Victoria's Secret Stores v. Artco Equip. Co., Inc.* only serve to drive the point home.  In both cases, the parties were direct competitors of each other, and it was *that* fact which resulted in the "likelihood of confusion."  In addition, the defendant in *Victoria's Secret* actually created a website peppered with references to Plaintiff Victoria's Secrets so as to make it appear as though a visitor to the website was actually purchasing something from Plaintiff.  *Victoria's Secret v. Artco Equip. Co., Inc.*, 194 F. Supp. 2d 704, 713 (S.D. Ohio 2002).

That is a far cry from this case.  The Connexus Defendants did not create a website that looks like Plaintiff's for the purpose of tricking visitors into thinking they were at Plaintiff's website or somehow doing business with Plaintiff.  To the contrary, Plaintiff denigrates Defendants' websites by referring to them as "low quality pay per click parking pages" (Memo. at 11) but that only serves to underscore the fact that a visitor to Defendants' websites would know that they were ***not*** visiting Plaintiff's website (which Plaintiff would undoubtedly call "high quality").  With that knowledge, a visitor to Defendants' website could either leave the website or click on a hyperlink on Defendant's site, but the decision to click on a hyperlink would have been a decision born of the visitor's willful volition ***not*** confusion (i.e., "I know this is not The Weather Underground but I'm going to click on it anyway").

Similarly, Factor 6 (provision of false information) does not support Plaintiff.  In fact, in

its Motion, Plaintiff does not even argue that NCS provided false information.  Instead, it argues

a plethora of unrelated other things completely unrelated to the provision of WHOIS

information.

First, Plaintiff argues that the Connexus Defendants failed to identify any further domains

beyond the 41 identified in the Complaint in response to discovery.  Memo. at 13.  That has

nothing to do with Factor 6, but, in any event, here is what actually happened: Plaintiff issued a

First Set of Requests for Production which essentially asked NCS to identify "the other domain

names that infringe [Plaintiff's] marks."  *See* Delgado Decl. at Ex. W (statement by Plaintiff's at

a discovery hearing on May 19, 2010).  Realizing that Plaintiff's request was simply the ACPA-

equivalent of the infamous Groucho Marx question "Have you stopped beating your wife?",

NCS objected to the question because: (i) *any* answer would implicitly concede that NCS had, in

fact, registered an "infringing" domain name, which NCS was not going to concede, (ii) even if

NCS was willing to make that concession, it could not know what should be deemed to be an

"infringing" domain since the parties clearly disagree on that point, and (iii) to the extent outside

counsel was involved in analyzing the request and the response thereto, any response would have

waived the attorney work product doctrine because it would reveal counsel's mental impressions

as to what counsel believed was an infringing domain.  Delgado Decl. at ¶¶ 17-19 and Ex. W.

As a result, NCS stood on its objections and offered to conduct an unlimited number of

character string searches (e.g., "weather", "wund," etc.) against its domain name portfolio so that

Plaintiff could see what the results were and select the "domain names at issue" from those

results.  In fact, that offer was repeated in open court at the May 19, 2010 hearing before

Magistrate Judge Morgan.  Ultimately, the parties' disagreement on this issue became a non-

issue because the Connexus Defendants were able to provide a database of all past and present domain names which Plaintiff could examine and select the domain names it wanted to put at issue. Delgado Decl. at ¶¶ 20-21 and Ex. W. In short, this is a non-issue now.

Second, Plaintiff argues that the Connexus Defendants' destroyed e-mails and other documents despite the "constant threat of litigation." Memo. at 13. Not only does this have nothing to do with Factor No. 6, but, Plaintiff makes no showing as to any particular document or e-mail. Rather, Plaintiff is taking the overbroad (and, quite frankly, ridiculous) position that a company under the "constant threat of litigation" has a duty to preserve **every single document** in its possession, custody, and/or control. That is not the law, much to the relief of major corporations such as General Motors and Walmart who are also under the "constant threat of litigation" and get sued in some court somewhere in the United States every single day.

Third, Plaintiff argues that NCS is a "shell" company. Even if that were true, it has nothing to do with Factor 6.

Lastly, Plaintiff argues that NCS utilized a privacy protection service to shield its registrant information from the public. Memo. at 13-14. Nevertheless, using a privacy protection service is entirely appropriate and **not** the equivalent of providing false information. *Career Agents Network, Inc. v. Careeragentsnetwork.biz*, 2010 WL 743053 at *5 (E.D. Mich. Feb. 26, 2010) ("The record indicates that Defendants provided accurate contact information, but that they utilized a privacy protection service so as to not make their contact information readily available to the general public. Use of the privacy protection service is not the same thing as providing false or misleading contact information.").

With respect to Factor No. 7, which examines the traditional "ransoming" situation, it is

16

undisputed that the Connexus Defendants did **not** attempt to ransom the domain names at issue to Plaintiff. SOF No. 47.

With respect to Factor No. 8, Plaintiff lists sixteen domain names that it claims correspond to the trademark of others. Conveniently, Plaintiff fails to acknowledge that, over time, NCS has considered **millions** of domain names for registration. SOF No. 43(b). Given the *relative* numbers, it cannot be said that NCS's process evidences an intent to register domain names that correspond to trademarks as a matter of law.

Lastly, with respect to Factor No. 9, the "extent to which" Plaintiff's marks are or are not distinctive or famous, Plaintiff also conveniently fails to note the many other uses of its marks. For example, Plaintiff's name "The Weather Underground" is derived from a 1960s terrorist group. SOF No. 48. There is a "Weather Underground" in Hong Kong. SOF No. 49. At one point, there was a "Wunder" Brewery in San Francisco. SOF No. 50. And, there is a "Wunderground" Magic Shop in Michigan. SOF No. 51. As a result, it is impossible to determine whether a visitor to one of the domain names at issue was actually trying to reach Plaintiff or was simply looking for information on the terrorist organization, the Hong Kong entity, a brewery or a magic shop.

> 5.      Summary on bad faith intent.

To the extent that actual knowledge is required to establish "bad faith intent to profit" under the ACPA, the Connexus Defendants, not Plaintiff, are entitled to summary adjudication on the issue of liability. The Court should decline to import "willful blindness" into the ACPA because doing so would run counter to the narrow scope of the ACPA, but, even if it did, the Connexus Defendants, not Plaintiff, would still merit summary adjudication because they took

17

action to avoid trademark issues in the domain name registration process.  That those actions might not have been 100% effective is immaterial since the ACPA imposes liability based on intent not performance.

> D.      Plaintiff Did Not Provide Any Serious Analysis as to Why Epic Media, Connexus, and Firstlook Should Be Held Liable

Plaintiff seeks to impose liability for the registration of the domain names at issue in this matter on Epic Media Group, Connexus and Firstlook, despite acknowledging that NCS is the registrant of the domain names.  Memo at 16.  Plaintiff's argument in this regard, contained in a single paragraph of what is otherwise a fifty-four page document, is lacking.  Said paragraph **makes no mention of Epic Media Group at all.**  Moreover, Firstlook (the parent company of NCS) and Connexus Corporation (the parent company of Firstlook) are separate and distinct Delaware corporations in good standing whose corporate form cannot be disregarded on a whim. *See* Epic Media Group's Motion for Summary Judgment at 4 (Docket No 178); *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("'Persuading a Delaware court to disregard the corporate entity is a difficult task.'") (citations omitted).

What little Plaintiff does say in that one paragraph is unpersuasive.  Plaintiff's citations to *Inwood* and *Gucci* are inapposite as neither case involved a claim under the ACPA, and, therefore, neither case helps this Court discern whether to impose either direct or contributory cybersquatting on Connexus or Firstlook or provides any guidance in conducting an alter ego analysis.  *Solid Host* involved an ACPA claim but, in a unique context, which caused the court to readily acknowledge, "[s]everal of the statutory interpretation questions before the court stem

18

from the parties' efforts to apply the ACPA to a situation that does not involve traditional

cybersquatting." *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1102 (C.D. Cal.

2009).  Lastly, in *Ford Motor Co. v. Greatdomains.com, Inc.,* 177 F. Supp. 2d 635, 647 (E.D.

Mich. 2001), the Court actually ruled that contributory cybersquatting could only exist in

"exceptional circumstances" and *dismissed* the Plaintiff's claim for contributory liability for

failure to allege such exceptional circumstances.

   Lastly, even if Firstlook could be held liable for direct infringement because the Firstlook

team performed work on behalf of *NCS*, there is no evidence that the Firstlook team performed

work on behalf of *Connexus*.  Even if Connexus paid all of its subsidiaries' employees through a

single EIN, there is no evidence that these employees were performing work on behalf of

Connexus as opposed to the subsidiary for which they worked.  Put differently, Firstlook

employees (like Seth Jacoby, Mavi Llamas, Donnie Misino, and Dennis Rhee) worked on behalf

of Firstlook not Connexus.  Similarly, employees of other subsidiaries, such as Traffic

Marketplace, Netblue Vietnam, and/or Matchpoint (other Connexus subsidiaries that are not a

party to this action) worked on behalf of that particular subsidiary not Connexus.  Thus, the

theory of "direct infringement" can only apply at Firstlook.

   In addition, Plaintiff's Motion contains no evidence or argument that these subsidiaries

ever commingled their employees, assets or liabilities such that the distinction as between

Connexus, Firstlook, Traffic Marketplace, Netblue Vietnam, and Matchpoint can be ignored.

*Compare* Declaration of David Graff, filed July 15, 2011 (Docket No. 179) at Ex. G (showing

that accounting system has different ledgers for Connexus, Firstlook, Traffic Marketplace,

Netblue Vietnam, and Matchpoint) and Ex. H (showing that Connexus's financial documents

19

distinguish as between Connexus and Firstlook, Traffic Marketplace, and Netblue Vietnam (NBVN))[7].

For the foregoing reasons, the Court cannot find Epic Media, Connexus, and Firstlook liable under any theory as a matter of law.  At best, there is a question for the jury as to whether Firstlook can be liable, but, in actuality, Epic Media and Connexus are entitled to summary judgment on all of Plaintiff's claims.  Epic Media has already brought a motion requesting that judgment, and Connexus will seek that judgment at trial.

**IV.   CONCLUSION**

Plaintiff's Motion is unsupported by admissible evidence and legally flawed.  The Court should deny Plaintiff's Motion and, instead, grant the Connexus Defendants' Motion for Summary Adjudication.

Dated: August 15, 2011                    Respectfully Submitted,


                                          _/s/William A. Delgado_____
                                          William A. Delgado
                                          WILLENKEN WILSON LOH & LIEB LLP
                                          707 Wilshire Boulevard, Suite 3850
                                          Los Angeles, CA  90017
                                          (213) 955-9240
                                          williamdelgado@willenken.com
                                          *Lead Counsel for Defendants*

---

[7] Matchpoint is now defunct.

20

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2011, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Enrico Schaefer (P43506) | Nicholas J. Stasevich (P41896) |
| Brian A. Hall (P70865) | Benjamin K. Steffans (P69712) |
| TRAVERSE LEGAL, PLC | BUTZEL LONG, P.C. |
| 810 Cottageview Drive, Unit G-20 | 150 West Jefferson, Suite 100 |
| Traverse City, MI  49686 | Detroit, MI  48226 |
| 231-932-0411 | (313) 225-7000 |
| enrico.schaefer@traverselegal.com | stasevich@butzel.com |
| brianhall@traverselegal.com | steffans@butzel.com |
| Lead Attorneys for Plaintiff | Local Counsel for Defendants |
| | |
| Anthony P. Patti (P43729) | William A. Delgado |
| HOOPER HATHAWAY, PC | WILLENKEN WILSON LOH & LIEB LLP |
| 126 South Main Street | 707 Wilshire Boulevard, Suite 3850 |
| Ann Arbor, MI  48104 | Los Angeles, CA  90017 |
| 734-662-4426 | (213) 955-9240 |
| apatti@hooperhathaway.com | williamdelgado@willenken.com |
| Attorneys for Plaintiff | Lead Counsel for Defendants |

*/s/William A. Delgado*
William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
*Lead Counsel for Defendants*

21

121061.1