IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

                                                    Case No. 2:09-CV-10756
vs.                                                 Hon. Marianne O. Battani

NAVIGATION CATALYST SYSTEMS, INC.,
    a Delaware corporation; CONNEXUS CORP.,
    a Delaware corporation; FIRSTLOOK, INC.,
    a Delaware corporation; and EPIC MEDIA
    GROUP, INC., a Delaware corporation,

        Defendants.
_____

| | |
|---|---|
| Enrico Schaefer (P43506) | William A. Delgado |
| Brian A. Hall (P70865) | WILLENKEN WILSON LOH & LIEB LLP |
| TRAVERSE LEGAL, PLC | 707 Wilshire Boulevard, Suite 3850 |
| 810 Cottageview Drive, Unit G-20 | Los Angeles, CA 90017 |
| Traverse City, MI 49686 | (213) 955-9240 |
| 231-932-0411 | williamdelgado@willenken.com |
| enrico.schaefer@traverselegal.com | Lead Counsel for Defendants |
| brianhall@traverselegal.com | |
| Lead Attorneys for Plaintiff | Nicholas J. Stasevich (P41896) |
| | Benjamin K. Steffans (P69712) |
| Anthony P. Patti (P43729) | BUTZEL LONG, P.C. |
| HOOPER HATHAWAY, PC | 150 West Jefferson, Suite 100 |
| 126 South Main Street | Detroit, MI 48226 |
| Ann Arbor, MI 48104 | (313) 225-7000 |
| 734-662-4426 | stasevich@butzel.com |
| apatti@hooperhathaway.com | steffans@butzel.com |
| Attorneys for Plaintiff | Local Counsel for Defendants |

_____

**CONNEXUS CORPORATION, FIRSTLOOK, INC., AND NAVIGATION CATALYST SYSTEMS, INC.'S *DAUBERT* MOTION TO STRIKE REPORT OF CHRISTOPHER SCHWERZLER AND PROHIBIT HIS TESTIMONY ON SAME AT TRIAL**

## NOTICE OF MOTION AND MOTION

TO THIS HONORABLE COURT, PLAINTIFF, AND ITS ATTORNEYS OF RECORD:

Connexus, Inc., Firstlook, Inc., and Navigation Catalyst Systems, Inc. (collectively the "Connexus Defendants") hereby move this court pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) ("*Daubert*") for an order striking the expert reports of Christopher Schwerzler submitted as Exhibit M in support of Plaintiff's Motion for Summary Adjudication on its Anti-Cybersquatting Consumer Protection Act ("ACPA") Claim ("Motion", Docket No. 189) and prohibiting any testimony by Schwerzler in any capacity as an "expert" witness at the trial in this matter.

Additionally, the Connexus Defendants object to Plaintiff's Exhibit M, because it is not contained within a sworn affidavit or declaration of someone with personal knowledge. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602. Exhibit M consists of two reports prepared by Schwerzler, one dated August 9, 2010 (the "First Report"), and one dated October 10, 2010 (the "Second Report) (collectively, the "Report" or "Schwerzler's Report"). (Plaintiff's Ex. M.) The Report is unsigned. (*See id.*)

//

//

On August 10, 2011, William A. Delgado, counsel for Connexus, emailed Enrico

Schaefer and Brian Hall, counsel for Plaintiff, and explained the nature of this *Daubert* Motion

and its legal basis and requested, but did not obtain, concurrence in the relief sought.

RESPECTFULLY SUBMITTED this 15th day of August, 2011.

<div style="margin-left:40%">

*/s/William A. Delgado*
William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

</div>

## **STATEMENT OF THE ISSUE PRESENTED**

The issue presented in this Motion is whether Chris Schwerzler's testimony and expert report are permissible under the Federal Rules of Evidence. The Connexus Defendants respectfully submit that the answer is "no."

**<u>CONTROLLING AUTHORITY</u>**

Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113

S.Ct. 2786 (1993) ("*Daubert*").

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Part and parcel of the dog's breakfast submitted by Plaintiff The Weather Underground, Inc. ("Plaintiff") in support of its Motion for Summary Adjudication on its Anti-Cybersquatting Consumer Protection Act ("ACPA") Claim ("Motion", Docket No. 189), Plaintiff submitted as Exhibit M the "report" of their purported expert Christopher Schwerzler ("Schwerzler").

Exhibit M consists of two reports prepared by Schwerzler, one dated August 9, 2010 (the "First Report"), and a "supplemental" one dated October 10, 2010 (the "Second Report") (collectively, the "Report" or "Schwerzler's Report"). The Report appears to be a draft. More important, it is not even signed. This alone is grounds for exclusion of the Report as it is not contained within a sworn affidavit or declaration of someone with personal knowledge. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602.

Additionally, the Report must be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786 (1993) ("*Daubert*"). Schwerzler is not a qualified expert – he has never testified as an expert before and has none of the professional qualifications of an expert. He is no more than a biased advocate for Plaintiff. Indeed, he *is* the Plaintiff since he is a Director, board member, salaried employee, and major shareholder of Plaintiff and, thus, has an enormous financial stake in the outcome of this case. What's more, he readily admits that his purported "expert opinions" were preconceived in advance of doing any of his "testing" here, and that those purported "opinions" are one and the same as Plaintiff's claims in this lawsuit. Additionally, his methodology, which he created expressly for this litigation, is deeply flawed and entirely unreliable. The Report itself

is riddled with speculation and opinions on issues upon which Schwerzler is utterly unqualified to opine, including the ultimate issues in this litigation to be decided by the trier of fact.

For all of the reasons set forth herein, Connexus, Inc., Firstlook, Inc., and Navigation Catalyst Systems, Inc. (collectively the "Connexus Defendants") hereby move this court for an order striking the Report and prohibiting any testimony by Schwerzler in any capacity as an "expert" witness at the trial in this matter.

## II.   ARGUMENT

A.   Schwerzler's Report Is Inadmissible Under Federal Rule of Civil Procedure 56(c)(4) and Federal Rule of Evidence 602.

"Expert evidence, which is offered in support of a motion for summary judgment, must be admissible as evidence at trial." *In re Air Crash at Detroit Airport*, 737 F.Supp. 427, 430 (E.D. Mich.1989) *aff'd without opinion*, 917 F.2d 24 (6th Cir.1990); *Peake v. Martinrea Fabco Hot Stamping, Inc.*, 2011 WL 1157864 (E.D. Mich. Feb. 28, 2011) ("[I]n resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, unsworn statements, inadmissible expert testimony, or hearsay evidence.") (citations omitted), *report and recommendation adopted by* 2011 WL 1118572 (E.D. Mich. Mar. 28, 2011); *Thomas v. City of Detroit*, 2007 WL 674593 at *5 (E.D. Mich. Feb. 28, 2007) (Battani, J.) ("Moreover, in this Circuit, it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.") (internal quotations and citations omitted). Accordingly, expert evidence offered in support of a summary judgment motion properly should be presented as an affidavit or declaration, containing "facts that would be admissible in evidence" and showing "that the affiant or declarant is competent to testify on the matters

2

stated." *See* Fed. R. Civ. Proc. 56(c)(4). Schwerzler's Report is unsigned and contains no

statement that the facts therein are within his personal knowledge and, thus, is inadmissible and

should be excluded. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 602; *see also* Plaintiff's Ex. M.

      B.      Schwerzler's Report is Inadmissible Under Federal Rule of Evidence 702.

            1.      Standard for admissibility under Rule 702, *Daubert*, and its progeny.

Schwerzler's Report is inadmissible under Federal Rule of Evidence 702, which governs

the admissibility of expert testimony, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702. "In *Daubert*, the Supreme Court stated that the district court, when evaluating

evidence proffered under Rule 702, must act as a gatekeeper, ensuring 'that any and all scientific

testimony or evidence admitted is only relevant, but reliable.'" *Pluck v. BP Oil Pipeline Co*.,

640 F.3d 671, 677 (6th Cir. 2011) (quoting *Daubert*, 509 U.S. at 589).

In that task, "[f]irst, the court must determine whether the proposed expert is qualified by

knowledge, skill, experience, education, or training." *Hoganson v. Menard, Inc*., 567 F. Supp.

2d 985, 989 (W.D. Mich. 2008) (*citing* Fed. R. Evid. 702; *Daubert*, 509 U.S. 579). "Second, the

court must analyze whether the expert's underlying reasoning or methodology is scientifically

valid." *Ibid.* "[T]he *Daubert* Court set forth factors relevant to this inquiry: (1) whether the

theory or technique can be or has been tested; (2) whether it 'has been subjected to peer review

and publication'; (3) whether there is a 'known or potential rate of error'; and (4) whether the

theory or technique enjoys general acceptance in the relevant scientific community." *Pluck*, 640 F.3d 671 (*quoting Daubert*, 509 U.S. 593-594).

"A fifth factor has been added to the Supreme Court's list by a number of the circuits . . ., including the Sixth Circuit Court of Appeals: 'Whether the experts are proposing to testify about matters growing naturally and directly out of research they have concluded independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying,' because the former 'provides important, objective proof that the research comports with the dictates of good science.'" *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1097 (E.D. Tenn. 1999) (*quoting Smelser v. Norfolk Southern Railway,* 105 F.3d 299 (6th Cir.1997)).

"[I]n addition to requiring that a proposed expert's testimony be 'reliable,' Rule 702 requires that the expert's testimony assist the trier of fact." *Pride v. BIC Corp*., 218 F.3d 566, 578 (6th Cir. 2002) (citing *Daubert*, 509 U.S. at 592). "This requirement has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Ibid.*

"In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Id*. (quoting *Daubert*, 509 U.S. at 593). As demonstrated below, Plaintiff cannot meet this burden, where Schwerzler is unqualified, his extreme bias renders his opinions unreliable, his methodology is unreliable, and his opinions do not assist the trier of fact to decide any fact in issue.

2.      <u>Schwerzler is unqualified</u>.

"It is the trial court's responsibility under Federal Rule of Evidence 104(a) to make a preliminary finding of fact as to 'whether the witness's "knowledge, skill, experience, training or education" are such as to qualify him or her to testify as an expert at all.'" *Dow Corning Corp. v. Weather Shield Mfg., Inc*., Slip Copy, 2011 WL 2490962 at *4 (E.D. Mich. June 22, 2011) (*quoting Cook v. Am. S.S. Co*., 53 F.3d 733, 738 (6th Cir.1995), *abrogated on other grounds by G.E. v. Joiner*, 522 U.S. 136 (1997); *Berry v. Crown Equip. Corp*., 108 F. Supp. 2d 743, 749 (E.D.Mich. 2000).

"The gatekeeping function mandates 'intensive scrutiny' of expert qualifications in addition to scrutiny of proposed scientific theories." *Dow Corning,* 2011 WL 2490962 at *4 (citation omitted).  The trial court must determine whether the expert's training and qualifications relate to the subject matter of the proposed testimony.  *Id.* (*citing Smelser v. Norfolk S. Ry. Co*., 105 F.3d at 303.  The court is to examine "not the qualifications of the witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Ibid.*

Here, Schwerzler purports to have an expertise in computer science.  (Declaration of William A. Delgado, Ex. E, p. 23:10-12.)[1]  However, aside from earning a B.S. in computer engineering in 1996 (Ex. D, p. 173:1-6), Schwerzler does not have any other formal qualifications.  He is not accredited by any organization, has no licenses, is not a member of any professional associations, and is not a member of any computer science organizations.  (Ex. E., pp. 15:11-19; 22:9-11.)  He has never been published, let alone been published on any of the

---

[1] Hereinafter, all references to "Ex." Refer to exhibits to the Declaration of William A. Delgado.

topics upon which he purports to opine.  (*See* Ex. E., p. 19:9-19.)  He has never before been an

expert.  (Ex. E, p. 19:20-20:23.)  He does not even have a *curriculum vitae*.  (Ex. B, p. 2.)

Nor does Schwerzler make up for his lack of formal qualifications with any work

experience.  Indeed, prior to this litigation, Schwerzler had never conducted *any* independent

research into the key topics upon which he now purports to opine – computer science for string

comparison algorithms, domain name tasting, and domain name monetization.  (Ex. E., pp.

16:21-24, 18:14-20.)  Likewise, he admits that he has never before performed certain of the tasks

that he performed in preparing his expert report (e.g. restoration of a Microsoft SL database), and

other tasks he had not ever done except as part of his assignments as a high school student, and

perhaps in college (e.g., writing a string comparison program).  (*See* Ex. E, p. 12:2-13:23.)

Likewise, while he testified he "probably" looked through the USPTO database when "we were

first registering our trademarks," he admits that "doesn't have any regard to writing a

comparison algorithm" for trademarks – *i.e*., he has *never* performed the key task that he now

purports to perform as an expert for this litigation.[2]  (Ex. E, p. 14:3-20.)

Under such circumstances, Mr. Schwerzler plainly is not qualified as an expert.  *See

Communities for Equity v. Michigan High School, Athletic Assoc.*, 2007 WL 5830967 at * 4

(W.D. Mich. 2007) ("The Court has examined [the proffered expert's] resume and finds it to be

lacking of the credentials normally possessed by an expert. Although [the proffered expert] has

---

[2] Nor did he approach this task, or his role as an expert in this case generally, with the
appropriate level of professionalism that one would expect from an expert engaging in a
scientific process.  Indeed, he testified in deposition that in considering writing a comparison
algorithm for this case, he and co-worker considered a couple of alternatives and then "decided
that we weren't really in the business of trying to match strings for trademarks purposes, and we
went back to drinking beer."  (Ex. E, p. 51:8-23.)  Likewise, when asked in deposition for his
title, he responded, among other things, "director of llama wrangling."  (Ex. E, p. 10:21-11:2.)

vast . . . experience, he does not have the same type of education, publications, or previous experience [as the other experts]. Nothing indicates that [the proffered expert] has special skills, knowledge, or training sufficient to render him an expert in this case. The Court cannot find and does not find that [the proffered expert] is qualified to testify as an expert witness.") (*citing U.S. v. Moses,* 137 F.3d 894, 899 (6th Cir.1998)); *see also Rice v. Cincinnati, New Orleans & Pacific Ry. Co*., 920 F.Supp. 732, 737-738 (E.D. Ky, 1996) (excluding testimony of proffered experts, who, "although experienced" in their fields, did not have "expertise" or "qualifications" to provide "reliable testimony on" topics for which they were offered, and "[t]o allow them to offer educated or uneducated guesses would be misleading to the jury rather than of assistance to it.").

In sum, Schwerzler is not qualified to be an expert in this case, and the Schwerzler Report and any testimony thus should be excluded under Rule 702.

3.      Schwerzler's opinions are unreliable because of his extreme bias.

While generally the potential bias of an expert simply is treated as a topic for cross-examination, where, as here, such bias is "extreme," it is grounds for exclusion of the expert's opinions altogether. *See In re Commercial Money Center, Inc*., 737 F. Supp. 2d 815, 844 (N.D. Ohio 2010); *see also In re Welding Fume Products Liability Litigation*, 534 F. Supp. 2d 761, 766 (N.D. Ohio 2008) ("extreme" bias is cause for exclusion under *Daubert*).

████████████████████████████████████████████████

███████████████████████████████████████. (Ex. F, pp. 95:2-10; 97:6-14.) He has worked for, and received a salary from, Plaintiff since 1998. (Ex. D, p. 108:14-18.) Indeed, as a "salaried employee," he did not bill Plaintiff for any work as an expert (though Plaintiff suggested otherwise in its Expert Designation by indicating that Schwerzler charges

 for expert testimony).  (Ex. G, p.62:13-63:7; Ex. B, p. 2.) ███████████████ ████████████████████████████████████████████████████████████. (Ex. F, p. 88:9-24.).  ██████████████████████████████████████ ██████████████████████████████████ (Ex. F, p. 92:7-11.)

Schwerzler thus not only has an apparent personal interest in this litigation, he also has a significant financial stake its outcome, where Plaintiff seeks many millions of dollars in damages. █████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████ ██████████████████. (Ex. G, p. 66:23-67:19.)

These facts alone render Schwerzler too biased to provide an expert report in this matter. In *In re Commercial Money Center, Inc*., 737 F.Supp.2d 815 (N.D. Ohio 2010), a *Daubert* motion was filed on the grounds that the proffered expert's "status as an owner and high-level officer of a party to this case . . . render[ed] [the proffered expert] partisan and far too biased to provide a reliable expert opinion in this matter." *Id.* at 840.  The District Court agreed, noting, "[f]inally, and most troubling, [the proffered expert] is a mere proxy for a party in this case, and his extreme partisanship renders any testimony that he could provide unhelpful.  . . . Because [*inter alia*] of his partisan status, . . . [the proffered expert] is not qualified to serve as an expert witness in these proceedings."  *Id.* at 844 (granting *Daubert* motion).  Likewise, here, "as an owner and high-level officer of a party to this case," Schwerzler is a mere proxy for Plaintiff.

Even if Schwerzler's status as a Director, board member, salaried employee, and "major shareholder" of Plaintiff alone were not dispositive of Schwerzler's bias, the Report and his

deposition testimony render his bias undeniable.  Schwerzler admits he played a role in deciding

to file this lawsuit in the first instance.  (Ex. E., p. 64:15-19.)  And, when pressed in deposition as

to whether he had any preconceived opinions before performing his work as an expert, he boldly

admitted that he had both opinions and suspicions, which were embodied "in our original claim

of the lawsuit," and which are essentially identical to those now proffered as his expert opinions.

(Ex. E, p. 179:12-181:5.)  In other words, not only does Schwerzler admit that he did not

undertake his tasks as an expert without preconceived opinions as to what his results would be,

*he admits that those same opinions were the basis for Plaintiff's claims in this lawsuit*.

This conclusion is bolstered by his Report, including, for example, that additional

discovery will "likely yield *additional claims of trademark abuse, beyond what is made in this*

*report*, as Weather Underground further understands the business nature of defendants . . . ."

(Ex. C, p. 26 (emphasis added).)  In other words, there is not even a façade of separation between

Schwerzler and Plaintiff – Plaintiff's "claims of trademark abuse" and the "opinions" in

Schwerzler's Report are one and the same.

The Report is littered with additional biased assertions that cause his Report to read like a

trial brief, rather than an expert report.  As but one example:   "[Defendants] claim not to know

that.  They claim to be trying to do better. . .  They have no intent of stopping this practice. . .

[Defendants] represent the worst intentional abusers of trademarks in modern history."[3]  (Ex. C,

_____

[3] Schwerzler also devotes an entire section of his Report to what he terms "Hiding of Activities"
(Ex. C, p. 19), which refers to Defendants' use of a privacy protection service.  This pejorative
characterization likewise is a strong indicator of bias, especially where the use of such a service
is perfectly permissible. *See Career Agents Network, Inc. v. Careeragentsnetwork.biz*, 2010 WL
743053 at *5 (E.D. Mich. Feb. 26, 2010) ("The record indicates that Defendants provided
accurate contact information, but that they utilized a privacy protection service so as to not make

p. 23.) Unsurprisingly, he even admits that counsel for Plaintiff helped him to edit his Report, including by deleting statements that sounded "hostile." (Ex. E., pp. 186:23-187:20.)

In short, the Report is not the work of an objective expert – it is the product of the extreme bias of a party/advocate. *See In re Air Crash at Detroit Airport*, 737 F. Supp. 427, 430 (E.D. Mich.1989) *aff'd without opinion*, 917 F.2d 24 (6th Cir.1990) ("where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading") (citations omitted) (excluding expert testimony).

Because Schwerzler's bias is so extreme, his Report and testimony should be excluded.

        4**.**    <u>Schwerzler's methodology is unreliable</u>.

Schwerzler's methodology is not reliable. It appears to have consisted of two related processes: (1) a review of discovery in this Action – most relevant, the code for Defendant's software that screens potential domain names to be registered for trademarks, and (2) the creation, for purposes of this litigation, of an alternative code likewise purportedly designed to screen for trademarks.[4] (*See* Ex. C, generally.) Based on this methodology, Schwerzler opines, among other things, that the Connexus Defendants' software is ineffective "by design" as it purportedly results in the registration of trademarks or "near-trademarked" terms, and the Connexus Defendants thus are "knowingly brokering in cyber squatting [sic]." (Ex. C, p. 24.)

─────────────────────────

their contact information readily available to the general public. Use of the privacy protection service is not the same thing as providing false or misleading contact information.").

[4] Not only is the methodology described unreliable, the Report submitted into evidence appears to be a *draft* – rendering the Report as whole further unreliable. Indeed, it contains certain statements that Schwerzler omitted from a later draft of the Report. (*See* Ex. E, p. 181:12-188.)

a.     Schwerzler's methodology for review of the Connexus Defendants' software is unreliable.

Schwerzler's methodology for review of discovery in this Action, and, specifically, his review of the Connexus Defendants' software, was deeply flawed, as is apparent from his glaring missteps.  First, what methodology Schwerzler even employed here is unclear, as he freely admits he did not keep complete records of his testing or the materials he relied upon in forming his opinions.  (Ex. E, pp. 33:13-34:15; 70:3-5; 83:17-84:7.)  This alone weighs in favor of exclusion as his methodology is thus wholly unverifiable.  *See In re Commercial Money Center, Inc.*, 737 F.Supp.2d at 843-844 (excluding report where, *inter alia,* "during the *Daubert* hearings, . . .[the expert] was unable to identify the specific documents upon which he relied to formulate his opinions, stating that, 'I looked up things online, I looked at dictionaries, I looked at a whole bunch of things that I did not and do not retain copies of....'); *Pluck*, 640 F.3d 671 (*Daubert* factors include "whether the theory or technique can be or has been tested") .

Second, when pressed in deposition, Schwerzler admitted conspicuous oversights in his methodology.  Schwerzler admitted it did not include any analysis of the software's "blacklist" – a list of trademarked domain names the Connexus Defendants' software uses as a screen.  (Ex. E. p. 89:22-90:10.)  This is an integral piece of the Connexus Defendants' trademark screening process, and the failure to consider it is a significant omission in Schwerzler's methodology.

Additionally, in preparing his First Report, Schwerzler entirely missed a path in the Connexus Defendants' code that checks domain names against the USPTO trademark database, leading him to erroneously conclude that the code did not perform that function at all. (Ex. C, p. 12; Ex. E, pp. 90:25-92:14.)  Accordingly, he had no choice but to issue a Supplemental Report

11

and admit in deposition that, in fact, a different part of the code "*make[s] use of the same loading of trademarks and then actually does do Fuzzy comparison against trademarks and candidate domains*." (Ex. C, p. 3; Ex. E, pp. 71:24-72:22 (emphasis added).) In other words, whatever methodology Schwerzler employed allowed him initially to miss another key piece of the Connexus Defendants' screening process: the very piece that uses trademarks to compare potential domain names to register with what Schwerzler has called "near-trademarked" terms.

Finally, while Schwerzler opines that the Connexus Defendants intentionally registered trademarked domains, he bases this only on the *results* the Connexus Defendants obtained – *i.e.*, because the Connexus Defendants actually registered trademarked domains, they intended to do so. This is the final and most significant flaw in Schwerzler's methodology for review of Defendant's software. Schwerzler did not include any effort to determine the actual *process* for registering domain names – that is, whether the software *intentionally* targeted trademarks. This renders his methodology wholly unreliable vis-à-vis his conclusions, as a methodology that only considers "effectiveness" does not actually get at the question of intention. Indeed, a program might screen 99% of trademarks, but intentionally select 1% of trademarks that are particularly valuable. While the results might appear to indicate that the program was highly effective in that it screened 99% of trademarks, it *intentionally* would be selecting trademarks for registration.[5]

In sum, Schwerzler's methodology in reviewing the Connexus Defendants' software is inadequately documented, and thus cannot be tested or verified, and, in any event, is deeply flawed as is evident by the holes in his analysis.

---

[5] The Connexus Defendants are not suggesting that any portion of its software intentionally targets trademarks. This is simply an illustration as to why the methodology is flawed.

        b.      <u>Schwerzler's Methodology In Creating a PHP Script Is Also</u>
                <u>Unreliable.</u>

The second component of Schwerzler's methodology is no more reliable.  Schwerzler created a PHP script, which, like the Connexus Defendants' software, has "the purpose of doing trademark matching."  (*See* Ex. C, p. 20; Ex. E, 156:1-7.)  Schwerzler admits he created this PHP script "specifically for the purposes of this litigation."  (Ex. E, p. 155:23-25.)  He also admits that he has never before created a PHP script for trademark matching.  (Ex. E., pp. 155:23-156:7.)  He further admits that no one else has ever used his PHP script.  (Ex. E, p. 156:8-11.)

While Schwerzler purportedly created the PHP script for the purpose of "trademark matching," his method of employing it consisted of comparing Defendant's domain name portfolio with the "top trafficked" ***domain names – not trademarks***.  (Ex. E, p. 177:23-25.)  As a result of this flawed methodology, Schwerzler's Report shows only any overlap between Defendant's domain name portfolios and popular domains, not Defendant's domains and trademarks.  (Ex. C, pp. 20-21.)  Thus, as a result of Schwerzler's methodology, the efficacy of the PHP script in screening against actual ***trademarks*** is entirely untested.  Indeed, Schwerzler admits that his PHP script *could* be used to compare the Connexus Defendants' portfolio to the USPTO trademark database, but he admits never did so.[6]  (Ex. E, pp. 156:25-157:5; 171:9-23.)

Nonetheless, Schwerzler opines that the Connexus Defendants' software "will yield a large number of near trademarked terms" based only upon his PHP script comparison of the Connexus Defendants' domain name portfolio with "top trafficked websites."  (Ex. E, p. 177:13-

---

[6] Accordingly, his opinion that if Defendants "were serious" about avoiding registering trademarked sites, they could effectively do so – pointing to the PHP script he created, is plainly unsupported.  (*See* Ex. C, p. 20.)

25.)   When asked in deposition whether his methodology included any analysis to determine whether the top trafficked websites actually had a trademark, he stated his belief that top trafficked websites are either trademarked, or "they are probably common law trademarks through use" – a belief he bases solely on "[a] conversation with counsel."  (Ex. E, p. 178:1-8.)

        As an initial matter, this theory is inadmissible, unreliable hearsay under Rule 703 – it is wholly improper to attempt to use Schwerzler as a mouthpiece for Plaintiff's counsel.[7]  *See* Fed. R. Evid. 703.  Moreover, this theory that the top trafficked sites are trademarks, whether registered or common law, went totally untested under Schwerzler's methodology.[8]  Indeed, Schwerzler did not compare the Connexus Defendants' portfolio to the USPTO trademark database, or put such a comparison side by side with his own results to determine any overlap, or

---

[7] *See Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 721-722 (6th Cir. 1999) ("Although it is true that an expert may base an opinion on otherwise inadmissible evidence, the courts are constantly looking behind an expert's opinion to determine if the basis for that opinion is reliable and trustworthy.  . . .  By ensuring that an expert's opinion is based on reliable information, the courts prevent the abuse of expert testimony by those who seek to use experts as a pretense for the admission of otherwise inadmissible and unreliable hearsay.") (*citing* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6273 (1997) ("... Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control. [citations omitted]"); *see also In re Commercial Money Center, Inc.*, 737 F. Supp. 2d at 844 (N.D.Ohio) (excluding proffered expert report, reasoning *inter alia*, "[w]hile [the expert] may be qualified by general experience to opine as to some limited issues set forth in his expert report, vast portions of that report go far beyond his experience and are based primarily on legal analysis provided to [the expert] by his counsel.").

[8] While it may be the case that some overlap does exist between top trafficked domain names and trademarks, this is merely an untested hypothesis – and thus it is plainly improper as an "expert opinion."  *See Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 670 (6th Cir. 2010) ("That is a plausible hypothesis.  It may even be right.  But it is no more than a hypothesis, and it thus is not 'knowledge,' nor is it 'based upon sufficient facts or data' or the 'product of reliable principles and methods ... applied ... reliably to the facts of the case.'") (quoting Fed. R. Evid.702) (excluding expert testimony).

perform any other sort of analysis of Plaintiff's counsel's hearsay statements to determine whether the top trafficked sites actually have any significant correlation with trademarks. (Ex. E, pp. 156:25-157:5; 171:9-23; 178:1-8.) Most important, it reveals that there is simply no link between Schwerzler's methodology – determining the correlation between the Connexus Defendants' domain names and top trafficked domain names – and his opinion that the Connexus Defendants' domain names actually correlate with trademarks.

Under such circumstances, where there is "too great an analytical gap" between the data studied and the opinion proffered, a judge may properly exclude the expert's conclusions. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (court had discretion to exclude opinion that exposure to chemical caused plaintiff's cancer where opinion was based on animal studies involving different type of cancer and greater exposure to chemical). Indeed, an opinion based on such "speculative jumps" is not the sort of "knowledge" that Rule 702 permits an expert to impart to the trier of fact but, rather, is inadmissible speculation. *See id.* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *accord Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 670-71 (6th Cir. 2010). Schwerzler's opinions plainly ask this Court to take such illogical "leaps of faith," and thus should be excluded. *See Tamraz v. Lincoln Elec. Co.,* 620 F.3d at 671.

     c.     <u>None of the Factors Set Forth in Daubert or Its Progeny Are Satisfied.</u>

In sum, the Daubert factors can be quickly dispensed of – plainly none of them are satisfied:

(1) "whether the theory or technique can be or has been tested":  Schwerzler's "testing" of the Connexus Defendants' software cannot be replicated because he has not maintained the full records of his methodology, nor has his own PHP script has been tested by anyone, nor has his theory that it can screen for trademarks ever been tested;[9]

(2) "whether it 'has been subjected to peer review and publication'":  Schwerzler's methodology has not been reviewed by anyone, let alone subject to peer review or publication;

(3) "whether there is a 'known or potential rate of error'":  Plainly the potential rate of error is high, where, as discussed in detail *supra*, Schwerzler's analysis of the Connexus Defendants' software was fraught with errors, and his own software screens for popular domain names, not trademarks; and,

(4) "whether the theory or technique enjoys general acceptance in the relevant scientific community":  Again, none of Schwerzler's methods have been subject to any review, let alone have any level of acceptance in the field of computer science. *See Pluck,* 640 F.3d 671 (quoting *Daubert*, 509 U.S. 593-594).

Where, as here, consideration of these factors reveals that the expert's methodology is not reliable, the expert's opinions are properly excluded.  *See id.,* 640 F.3d 671 (affirming exclusion of testimony, where expert failed to employ a "reliable" methodology); *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 431-33 (6th Cir. 2007) (affirming trial court's exclusion of expert testimony, finding that purported expert's alternative design theory was untested, and that expert lacked significant technical expertise in industry, so as to overcome lack of testing).

---

[9] That Schwerzler's PHP Script is a new methodology does not shield it from scrutiny.  *See Mike's Trainhouse, Inc. v. Lionel, LLC*, 472 F.3d 398 (6th Cir. 2007) (quoting *Daubert,* 509 U.S. at 593).

Additionally, as noted above, the Sixth Circuit Court of Appeals (among others) has added a fifth factor to the Supreme Court's list and has noted that district courts may properly "view[] the prepared-solely-for-litigation factor as a very important one." *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d at 430; *see also Mike's Trainhouse, Inc. v. Lionel, LLC*, 472 F.3d at 398 (referring to this factor as a "very significant fact to be considered") (quotation marks and citation omitted).

Plainly, Schwerzler's entire methodology and his opinions have been developed for the purpose of testifying in this litigation.  Indeed, he admits he created his PHP script "specifically for the purposes of this litigation," and that he has never created a trademark PHP script before. (Ex. E., pp. 155:23-156:7.)  Under such circumstances, the Report and his opinions should be excluded.  *See Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d at 430 (affirming the grant of summary judgment, and exclusion of expert testimony, where expert's "opinions were prepared entirely in preparation for this litigation, and therefore lack any indicia of reliability they may have otherwise possessed by virtue of arising naturally and independently"); *Mike's Trainhouse, Inc. v. Lionel, LLC*, 472 F.3d at 398 (remanding for new trial where court erred in admitting expert testimony; holding, "the record indicates, and [plaintiff] concedes, that [the proffered expert] not only created his report for the purposes of litigation, but that he created the precise methodology at issue for that purpose as well.  We have been suspicious of methodologies created for the purpose of litigation, because 'expert witnesses are not necessarily always unbiased scientists'.  . . . That this methodology was created for the purposes of litigation further supports our conclusion that [the proffered expert's] testimony was not reliable under *Daubert*") (quoting *Turpin v. Merrell Dow Pharms., Inc.* 959 F.2d 1349, 1352 (6th Cir.1992)).

17

In sum, because none of these factors are satisfied, the Schwerzler Report and his testimony must be excluded under *Daubert* and its progeny.

     5.    <u>Schwerzler's Report Will Not Assist the Trier of Fact.</u>

Finally, even if Schwerzler were qualified and his methodology were reliable – neither of which is the case, his Report and testimony still should be excluded because they will not "assist the trier of fact." *See Pride*, 218 F.3d at 578 (*citing Daubert*, 509 U.S. at 592). As noted above, the requirement that expert testimony assist the trier of fact means that "there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Ibid.* Here, no such connection exists.

Schwerzler's Report is offered is to prove that the Connexus Defendants had a "bad faith intent to profit" from the registration of the domain names at issue. (*See* Motion, pp. 6-7.) For the reasons explained in detail *supra*, the actual results of Schwerzler's testing do not speak to either the Connexus Defendants' intentions or whether their domain portfolio actually correlates to trademarks (as opposed to top trafficked domains). Indeed, Schwerzler admits that his conclusion that the Connexus Defendants' system "will yield a large number of near trademarked terms" is based only upon the PHP scripts comparing domain names with "top trafficked websites." (Ex. E, p. 177:13-25.) Likewise, the various iterations of his opinion that the Connexus Defendants' software is "ineffective" in that it does not prevent the registration of trademarks, "likely by design," are based on nothing but inadmissible speculation, as nothing in his testing examined whether the software *intentionally* targeted trademarks. (*See* Ex. C, pp. 16, 24.) Accordingly, Schwerzler's Report simply is not helpful to the trier of fact here. *See Weinstein v. Siemens*, Slip Copy, 2010 WL 4825205 at *8 (E.D. Mich. November 22, 2010)

("This proposed testimony simply contains too may 'speculative jumps' in the chain of events to render this opinion reliable or helpful to the jury.") (citing *Tamraz v. Lincoln Elec. Co.,* 620 F.3d at 670).

Furthermore, the Schwerzler Report not only would be unhelpful, it would be downright confusing, as Schwerzler opines on matters having no relation to his claimed expertise:

- He offers multiple, grand opinions as to the Connexus Defendants' "intentions," which are based on nothing more than his own "beliefs."[10]  (*See, e.g.,* Ex. C, p. 22 ("My opinion is that the defendants intended to start dealing in riskier registration practices and saw the opportunity to obscure their identity and add a lawyer [sic] of corporate legal protections to their actions"); Ex. E, pp. 160:15-161:10; *see also* Ex. C, p. 23 ("[Defendants] represent the worst intentional abusers of trademarks in modern history.")

- He offers legal opinions, though, of course, he has no legal degree.  (Ex. E, p. 7:20-21; 15:6-10; *see, e.g.,* Ex. C, p. 18 (opinion as to what is "consistent with [Defendants'] document retention policy"); p. 19 (opinion as to whether Defendants' representative was acting in "bad faith"); p. 20 (opinion as to what domains are "too high a legal risk to hold") p. 23 (opinion as to the purpose of the subject statutory scheme:  "I believe the ACPA was created exactly for this reason . . .");

- He opines on ultimate issues for the trier of fact.  (*See, e.g.,* Ex. C, p. 17 (opinion as to whether domains "represent additional violations of the Weather Underground's marks by defendants"); p. 24 ("The defense . . . is still knowingly brokering in cybersquatting").

---

[10] Unsurprisingly, in deposition Schwerzler distanced himself from certain of these unsupported "conclusions," including the assertion that the registration of typographical variations of trademarks appears to be defendant's "business model."  (Ex. C, p. 7; Ex. E, pp. 75:14-76:1.)

- He offers opinions regarding brand value, though he admits he does not have a marketing degree.  (*See*, *e.g.*, Ex. C, p. 24; Ex. E, pp. 7:5-7; 162:19-163:8.)

The expert report of the proffered expert in *In re Commercial Money Center, Inc*., 737 F.Supp.2d 815 (N.D. Ohio 2010) was excluded in the summary judgment context under strikingly similar conditions:

> [The proffered expert] displayed a willingness to opine on virtually any matter, including issues calling for legal conclusions, or matters plainly within the province of the fact finder. . . . [The proffered expert] report is riddled with vague and unsupported statements, many of which are outside the area of proper expert testimony, and many of which are blatantly improper legal conclusions.  [The proffered expert] shows no hesitation in opining as to the Sureties' alleged fraudulent intent, or in determining the Sureties' violation of law based upon a single reading of a statute.

*See id.* at 844.  The Court thus excluded the expert report and expert testimony, concluding that, "[the proffered] expert report demonstrates that his testimony would be, at best, unhelpful to the jury. At worst, expert testimony by [the proffered expert] would be confusing and extremely misleading."  *Id*. at *843-844.  Schwerzler's Report likewise should be excluded.

## CONCLUSION

For all of the foregoing reasons, the Connexus Defendants respectfully request that this Court exclude the Schwerzler Report.

RESPECTFULLY SUBMITTED this 15th day of August, 2011.

<div style="text-align:right">

*/s/William A. Delgado*
William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2011, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
BUTZEL LONG, P.C.
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
Local Counsel for Defendants

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

/s/William A. Delgado
William A. Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
*Lead Counsel for Defendants*

21