IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
   a Michigan corporation,

       Plaintiff,

vs.

NAVIGATION CATALYST SYSTEMS,
INC., a Delaware corporation;
CONNEXUS CORP., a Delaware
corporation; FIRSTLOOK, INC., a
Delaware corporation; and EPIC
MEDIA GROUP, INC., a Delaware
corporation;

       Defendants.

Case No. 2:09-CV-10756
Hon. Marianne O. Battani

---

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

---

## PLAINTIFF'S RESPONSE TO DEFENDANT EPIC MEDIA GROUP, INC'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Contents ....................................................................................................ii

Table of Authorities ...............................................................................................iii

Statement of Facts ................................................................................................. 1

Standard of Review ............................................................................................... 6

Law and Argument ................................................................................................. 6

    A.  A Reverse Triangle Merger Is a De Facto Merger if Designed to
        Disadvantage Creditors ................................................................................ 6

    B.  The Combination of Epic and Connexus is a De Facto Merger ...................... 8

    C.  Epic Has Used the Domains under the ACPA as agent or alter ego of
        Connexus ..................................................................................................... 11

    D.  Plaintiff's Allegations of Civil Conspiracy Are Sufficient to
        To State a Claim .......................................................................................... 14

    E.  Alternatively, Plaintiff Should Be Permitted to Proceed Against Epic
        After Liability Is Established Against the Connexus Defendants .................. 15

Conclusion .......................................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albert v. Alex. Brown Mgmt. Services, Inc.*, CIV.A. 762-N,
  2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ............................................................ 12

*Children's Orchard, Inc. v. Children's Orchard Store No. 142, Inc.*,
  10-10143, 2010 WL 2232440 (E.D. Mich. May 28, 2010) ...................................... 12

*Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1110 (E.D. Mich. 1997) ......... 8, 9

*DeWitt v. Sealtex Co., Inc.*, 273387, 2008 WL 2312668
  (Mich. Ct. App. June 5, 2008).................................................................................... 6

*First Presbyterian Church of Ypsilanti v H.A. Howell Pipe Organs*,
  2010 WL 419972 at 8 (E.D. Mich Feb.1 2010) ........................................................ 13

*Foster v. Cone-Blanchard Machine Co.*, 460 Mich. 696, 702-703,
  597 N.W.2d 506 (1999) ............................................................................................. 6

*Hawkins v. Anheuser-Busch, Inc.*, 517 F. 3d 321, 332 (6th Cir. 2008)........................... 6

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277
  (N.D. Cal. 2000) ........................................................................................................ 7

*Laborers' Pension Trust Fund v. Lange*, 825 F. Supp. 171, 176 (E.D. Mich. 1993) ...... 12

*Orzeck v. Englehart*, 195 A.2d 375, 378 (Del.Supr.1963) ............................................... 7

*Phoenix Canada Oil Co. v. Texaco*, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988)............. 12

*United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 307-08 (3d Cir. 2005) ........... 10

**Statutes**

Fed. R. Civ. P. 56(a)......................................................................................................... 6

**Other Authorities**

Restatement (Second) of Agency § 14M, cmt. (a) (1958) .............................................. 12

NOW COMES Plaintiff, The Weather Underground, Inc. (hereafter "Plaintiff"), by and through its counsel, Traverse Legal, PLC, and responds to Defendant Epic Media Group, Inc's Motion for Summary Judgment as follows:

## STATEMENT OF FACTS

Epic Media Group, Inc. ("Epic") claims that the merger between it and Connexus is a reverse triangular merger which allows Epic to escape any liability for the sins of Connexus and its wholly owned subsidiaries, Defendants FirstLook and Navigation Catalyst Systems (NCS).    Connexus is and was set up as a shell populated with subsidiary companies to engage in business which includes its illegal cybersquatting activities.  Connexus engages in no business of its own and generates no revenue other than what it receives through ownership of its subsidiaries. (*See generally Exhibit A, Art Shaw deposition, pp. 15-30, 70-73, 90-91, 108-109.*)  NCS is simply a corporate shell with no employees that is a registrant of domain names, and FirstLook supplies personnel to select and register the domain names and populate the parking pages with advertisements to monetize the domains. (*See generally Dkt. No. 131, Plaintiff's Motion for Joinder, pp. 7-11.*)  Epic was well aware from its pre-merger due diligence of both the cybersquatting scheme and this pending lawsuit when it decided to merge with Connexus and its subsidiaries. (*See generally Exhibit A, Art Shaw deposition, pp. 80-83.*)

Despite the labels Epic places on the transaction and its insistence the companies have not merged, the transaction between Epic and Connexus remains, in fact, a merger of the two companies.  Although Epic set up an intermediary company

specifically for the merger, Emerald Acquisition One Corporation, to effect the combination of the companies as a "reverse triangular merger," the transaction is and remains publically announced as a merger of Epic and Connexus. (*See Exhibit B, Merger announcements*.)  Connexus shareholders exchanged their stock for stock in Epic, and Connexus stockholders are now Epic stockholders.  (*See Exhibit C, Deposition of David Graff, p. 107, and Exhibit A, Deposition of Art Shaw p. 53.*)  The result is that Connexus shareholders own Epic stock, and Epic owns a single share of Connexus stock and is the sole stockholder of Connexus. (*See Exhibit C, Deposition of David Graff, p. 104.*)  The Epic Board of Directors, under the Merger Agreement, has four Epic members and three Connexus members. (*See Exhibit A, Deposition of Art Shaw, p. 59.)*

Epic labels the transaction a merger for public purposes and it has the indicia of a merger, but it is recast as an acquisition of Connexus by Epic when convenient for Epic.  The final round of discovery on the merger established more of the same hide the ball attitude from Defendants concerning the true nature of the transaction.   Art Shaw was the CEO of Connexus prior to the merger and became the sole CEO of Epic at the time of merger, but does not know if he also remained the CEO of Connexus or any of its subsidiaries after the merger. (*See Exhibit A, Deposition of Art Shaw, pp. 49, 61, 71.*) Mr. Shaw did not know whether there was a Connexus board of directors after the merger or whether Connexus or any of its subsidiaries conducted Board meetings after the merger.  (*See Exhibit A, Deposition of Art Shaw, p. 49, 61.*)  House counsel for the combined Connexus/Epic company and the individual named by Epic as most

2

knowledgeable concerning the merger, David Graff, opined and testified that after the merger "it was essentially Art Shaw who did double-duty as the CEO of the combined—of Epic Media Group or Epic Advertising and also of Connexus." (*See Exhibit C, Deposition of David Graff, p. 57.*)  Graff "believes" Graff and Epic President Don Mathis were "essentially" the Board of Directors for Connexus and all its subsidiaries including FirstLook after the merger. (*See Exhibit C, Deposition of David Graff, pp 57-58, 60-61.*) Graff testified that he and Don Mathis were "probably" the directors of NCS after the merger. (*See Exhibit C, Deposition of David Graff, p. 61.*) The effort to evade liability for the illegal activity of Connexus is so complex even the CEO and Corporate counsel are unsure of the corporate structure utilized to orchestrate Epic's hide from liability scheme.

Nevertheless, it is undisputed corporate formalities have been ignored and there have been no Board of Directors meetings for Connexus or the Connexus subsidiaries post merger, only Epic Board of Directors meetings, (*See Exhibit C, Deposition of David Graff, p. 61-62.*) which then begs the question: who's overseeing the Connexus side companies?  As the person most knowledgeable of the Epic/Connexus merger and in his Rule 30(b)(6) deposition, David Graff was asked whether it was his position that Epic, in fact, controls all of its subsidiaries through its own governance structure and board of directors, and he explained, "whatever control a parent company can exercise over a wholly owned subsidiary, that's the type of control Epic can exercise over its subsidiaries." (*See Exhibit C, Deposition of David Graff, p. 61.*)  In other words, Epic controls Connexus and its subsidiaries to the fullest extent possible whatever that might

3

be.  Epic ignores corporate formalities on the Connexus side, such as conducting board meetings, and simply exercises direct control over Connexus and its subsidiaries without believing it has any accountability for liabilities and while reaping the benefits of Connexus side subsidiary revenue and assets.  (*See Exhibit C, Deposition of David Graff, p. 61-62.*)  It was ultimately acknowledged by Mr. Graff that Epic and Connexus were conceptually "a combined enterprise" (*See Exhibit C, Deposition of David Graff, p. 82.)*, and by Mr. Shaw that they were a "combined consolidated entity." (See Exhibit A, Deposition of Mr. Shaw, p. 112.)

Connexus is Epic.   In December 2009, during merger discussions, Connexus had 8.5 million dollars of cash on hand, and when the merger agreement was executed in March 2010, Connexus had 6.8 million dollars in cash (*See Exhibit D, Epic Board Meeting Presentation dated June 2, 2010, Slide 29.*); however, immediately upon merger (within one week) Epic utilized cash from Connexus to fund significant joint expenses, including a 2.9 million dollar judgment against Epic, and the combined entity paid a 1.5 million dollar merger fee owed as a result of the merger, leaving Connexus with $360,000 cash at the end of June 2010, less than one month after the merger. (*See Exhibit E, Epic Board Meeting Presentation dated July 29, 2010, Slides 19 and 20.*)  The most recent accounting of cash on hand in its bank account produced for Connexus is $91,047.54, which means that Epic's cash grab from Connexus has made Connexus a cash poor company and potentially unable to fund a significant judgment against it, which was not the case pre-merger before Epic raided Connexus assets. (*See Exhibit D, Epic Board Meeting Presentation dated June 2, 2010, Slide 29.*) The

4

most recently provided Epic consolidated balance sheet shows a *negative* cash position

for Connexus of $573,149.00.  (*See Exhibit F, Epic Media Group, Inc. consolidated*

*balance sheet April 30, 2011*.)  It is of little consequence that Epic will claim it "owes"

Connexus the money back, Connexus is cash poor as well. (*See Exhibit F, Epic Media*

*Group, Inc. consolidated balance sheet April 30, 2011*.)  As a result of the merger, Epic

also intends to claim past operating losses of Connexus on its tax returns to reduce

Epic's own income for the sole benefit of Epic, though Mr. Shaw views Epic and

Connexus as "consolidated" entities. (*See Exhibit A, Deposition of Art Shaw, pp. 92-93,*

*112*.)  Even the internal Epic Board of Directors' presentations post-merger continue to

call the deal a merger between the companies! (See Exhibit G, *Epic Board Meeting*

*Presentation dated July 29, 2010*, Slide 5.)

     Despite labels and despite the temporary maintenance of separate bank

accounts and payrolls, there is no doubt that Connexus and its named subsidiary

Defendants in this case, FirstLook and NCS, are controlled by Epic and being operated

for the benefit of Epic and without regard to whether Connexus may potentially be

subject to a large judgment.  There is no loss reserve established or set aside for

Connexus to pay a judgment in this case (See *Exhibit A, Deposition of Art Shaw, pp 82-*

*83, and Exhibit C, Deposition of David Graff. pp. 44-45*.)  Epic was aware of the history

of illegal cybersquatting activities of Connexus and its subsidiaries, as well as this

lawsuit, when it decided to merge with Connexus.  Significantly in this case, the

post-merger Epic controlled Connexus continues to hold domains which are

cybersquatting Plaintiff's trademarked names for which Epic should be held accountable

as the controlling entity of Connexus and its subsidiaries. (*See Exhibit H, cybersquatted Connexus domain registrations which continue to be held post merger*.)  Even the latest limited discovery performed concerning the issue of the recent Epic/Connexus merger has identified numerous issues of fact that suggests Epic is, in fact, the alter ego and/or successor in interest to Connexus and should remain as a party Defendant subject to potential accountability for both the past and present actions of Connexus and its subsidiaries.

### STANDARD OF REVIEW

Summary Judgment under Rule 56 is only appropriate where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(a).  The Court must construe all the evidence and draw all reasonable inferences in favor of the non-moving party.  *Hawkins v. Anheuser-Busch, Inc.*, 517 F. 3d 321, 332 (6th Cir. 2008).

### LAW AND ARGUMENT

**A.    A Reverse Triangular Merger is a De Facto Merger if Designed to Disadvantage Creditors**

The traditional rule of successor liability examines the nature of the transaction between the companies.  If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities.  *DeWitt v. Sealtex Co., Inc.*, 273387, 2008 WL 2312668 (Mich. Ct. App. June 5, 2008) (citing *Foster v. Cone-Blanchard Machine Co.*, 460 Mich. 696, 702-703, 597 N.W.2d 506 (1999)).  Absent the use of an intermediary corporation wholly owned by Epic, Emerald Acquisition One, this transaction was effected through an exchange of

6

stock whereby Connexus shareholders ultimately received Epic stock for the purchase

of Connexus.  It is not any surprise, given the history of cybersquatting claims and

trademark infringement against Connexus, that Epic would search for a vehicle to evade

successor liability in the form of the reverse triangular merger for the potentially

significant liabilities of Connexus and its cybersquatting subsidiaries.

Nevertheless, a reverse triangular merger will not serve to insulate a successor

from liability if it was structured to disadvantage creditors.

> "[A] 'reverse triangular merger' of the sort performed here (merger of the
> target with a specially formed subsidiary of the acquirer, which then
> becomes the sole shareholder of the newly merged subsidiary), does not
> effect a 'de facto' merger unless the transaction has been structured to
> disadvantage creditors or shareholders." *In re McKesson HBOC, Inc. Sec.
> Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (citing *Orzeck v.
> Englehart*, 195 A.2d 375, 378 (Del.Supr.1963)).

It is evident an issue of fact exists as to whether this transaction was effected to

disadvantage creditors, including the Plaintiff in this case.  Virtually all of Connexus's

significant cash reserves were drained within one week after the merger to pay merger

costs and a 2.9 million dollar judgment against Epic!   Connexus's cash position went

from over six million dollars at the time of merger to virtually nothing immediately

thereafter and most recently sits at $91,047.54 according to the most recent bank

balance received May 1, 2001 (*See Exhibit I, Connexus Bank account ledger*.)   On its

face this transaction was designed to disadvantage the Plaintiff, who had a potential

existing claim exceeding 28 million dollars against Connexus and its subsidiaries at the

time of the merger ($100,000.00 maximum statutory damages under the ACPA for

registering or tasting 288 infringing domains).  It is beyond credible explanation Epic

could justify acquiring Connexus, a company with large liability exposure in this case,

without making a significant effort to insulate itself from liability, reap the immediate

financial rewards of the deal by siphoning off all the cash and utilizing carryover tax

losses of Connexus, and potentially frustrating Plaintiff The Weather Underground from

eventually collecting on a large judgment from Connexus.  The limited discovery which

has occurred after Epic was recently brought into this case creates issues of fact

whether Epic designed the merger as a reverse triangular merger to reap its own

immediate financial rewards and to disadvantage creditors including the Plaintiff in this

case.

### B.   The Combination of Epic and Connexus Is a De Facto Merger

Under Eastern District of Michigan precedent, "where the two companies merge

in effect, if not formally, the resulting corporation takes on the liabilities of both."

*Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1110 (E.D. Mich. 1997). Thus,

had Epic merely merged with Connexus, the newly formed company would have taken

on the liabilities of Connexus. Instead, Epic formed the Emerald Acquisition One

Corporation, an intermediary to combine the companies in what they label a reverse

triangular merger, which Epic claims allows it to evade any Connexus side liabilities but

reap any and all benefits it desires from Connexus.   Epic's position is that even though

Connexus shareholders became Epic shareholders, and the transaction left one share

of Connexus stock for itself, that Connexus remains an independent company

responsible for its own liabilities, and no merger occurred.

The reality is that Epic constitutes the product of a *de facto* merger of Epic with

the merged Connexus under Michigan law. The requirements for *de facto* merger under

Michigan law are:

1. Continuation of the enterprise of the seller corporation, with continuity of management, personnel, physical location, assets, and general business operations;
2. Continuity of shareholders, resulting from the purchasing corporation's use of its own stock to purchase acquired assets;
3. The seller corporation must cease ordinary business operations, liquidate and dissolve as soon as legally and practically possible; and
4. The purchasing corporation must assume the liabilities and obligations of the seller necessary for the uninterrupted continuation of normal business operations of the seller.

*Id*. at 1111.

As to the first element it is acknowledged and asserted by Epic in its Motion the

corporate entity Connexus continues to exist as before absent some reduction in

personnel to avoid a duplicity of positions in the merged operations as indicated in

Defendant Epic's brief.  As to the second element, Epic used its own stock to purchase

Connexus providing Epic stock to Connexus shareholders.  Epic claims in its Motion for

Summary Judgment that Plaintiff cannot prove elements Number Three and Number

Four, required to establish a de facto merger.

The third element requires that the seller corporation, in this case Connexus,

must cease ordinary business operations, liquidate as soon as possible and dissolve.

Nevertheless, the "business" of Connexus was and is simply the ownership if its

subsidiary companies and as such has no actual commercial business operations to

wind up and cease.  This is true even though Epic notes in its Motion that Connexus

continues to maintain bank accounts and a payroll for the benefit of the business

operations of its subsidiary companies.  The fact is that Connexus continues to be the

9

parent shell company with no real business activity of its own other than to own its subsidiaries which is not a commercial business activity.   If Epic were to simply assume the payroll activities of Connexus there would be NO change in the business of Connexus because Connexus conducts no commercial business activity.  A shell company cannot have ordinary business operations and there is no third prong to meet in this case. *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 307-08 (3d Cir. 2005).  There is no third element of the cessation of business activity required in this case to meet the test of a de facto merger because there is no commercial business activity.

The fourth element for a de facto merger requires the purchasing corporation, in this case Epic, to assume the liabilities and obligations of the seller necessary for the uninterrupted continuation of normal business operations of the seller company.  But if the seller company, as in this case, has no actual business operations and its primary function is simply as a repository of revenue and payroll manager of its subsidiary companies who conduct the actual commercial business activities in the marketplace, then there is no fourth element in this case to meet.   It would be disingenuous to suggest that Epic could have the benefit of millions of dollars of Connexus cash from the Connexus shell and actually generated by the Connexus side subsidiaries, together with unused carryover tax losses, and then claim it had no responsibilities for the assumption of any of the liabilities of Connexus.  The only activity required of Epic to assume for the uninterrupted continuation of Connexus to meet the fourth element is a payroll function and the accounting of revenues generated by its subsidiaries.

10

Connexus has no commercial business activity of its own and even if it did Epic controls

the operations of Connexus to the extent that "whatever control a parent company can

exercise over a wholly owned subsidiary, that's the type of control Epic can exercise

over its subsidiaries." (*See Exhibit C, Deposition of David Graff, p. 61*.).  There are no

liabilities per se for Epic to assume because Connexus has no business of its own.

## C.   Epic Has Used the Domains under the ACPA as agent or Alter Ego of Connexus

Epic devotes a significant part of its Motion attempting to convince the Court it

was not around at the time of the alleged wrong on the Connexus side, because the

domain registrations occurred prior to the merger.  That analysis ignores the applicable

law.   The ACPA requires either 1) registration, 2) trafficking in, or 3) use of a domain

name.  Although Connexus has not registered any infringing domains after the merger,

it continues to use and traffic in violation of Plaintiff's trademarks.  Epic controls

Connexus.  FirstLook and NCS through Connexus employees have continued to traffic

and use domain names which infringe on Plaintiff's trademarks even after the merger.

Epic claims it is now the parent company of Connexus and by its own admission

exercises maximum control over Connexus and its subsidiaries, making it liable for the

acts of Connexus even under simple agency principles.

"[W]hile one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven." *Albert v. Alex. Brown Mgmt. Services, Inc.*, CIV.A. 762-N, 2005 WL 2130607 (Del. Ch. Aug.

11

26, 2005) (citing *Phoenix Canada Oil Co. v. Texaco*, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988); (Restatement (Second) of Agency § 14M, cmt. (a) (1958)).

Clearly, Epic is fully aware of the domain name assets held by Connexus (it produced them recently in discovery). Epic controls Connexus. Connexus continues to hold the infringing domain name registrations through its subsidiary NCS and therefore Epic must also be liable under the ACPA because it controls Connexus and its subsidiaries and has done nothing to purge the infringing domains.

Additionally, Epic remains liable as an alter ego of Connexus post merger. Epic is the alter ego of Connexus and may be liable for the actions of Connexus. Under Michigan law, "the actions of one defendant may be attributed to another where one is the 'alter ego' of the other, for example, in a subsidiary-parent corporation relationship." *Children's Orchard, Inc. v. Children's Orchard Store No. 142, Inc.*, 10-10143, 2010 WL 2232440 (E.D. Mich. May 28, 2010). "Proof of a corporate alter ego relationship requires that the two enterprises 'have substantially identical management, business, purpose, operation, equipment, customers, supervision, and ownership." *Id*. (citing *Laborers' Pension Trust Fund v. Lange*, 825 F. Supp. 171, 176 (E.D. Mich. 1993)). There is little question the entities have the same management, and the merger announcements make it clear the two enterprises have substantially the same ownership and business purposes. (David Graff "believes" that he and Epic CEO Donald Mathis make up the Board of Directors of the Connexus companies (though no meetings are held)). (*See Exhibit C, Deposition of David Graff, p. 57-58*.) Under either an agency or alter ego analysis, Epic is liable under the ACPA as the entity controlling the actions of Connexus and its subsidiaries for the continuing use of the infringing domain names.

12

As indicated in Epic's Brief in Support of its Motion, corporate veils will be pierced only to prevent fraud or injustice. *First Presbyterian Church of Ypsilanti v H.A. Howell Pipe Organs,* 2010 WL 419972 at 8 (E.D. Mich Feb.1 2010).  To succeed on an alter ego claim and pierce the corporate veil, a plaintiff must establish the existence of three elements:  the corporate entity must be a mere instrumentality of another; the corporate entity must be used to commit a fraud or wrong; and there must have been an unjust loss or injury to the plaintiff.  *Id.*  Connexus has always existed as a shell company used to shield itself from liability of its cybersquatting subsidiaries while reaping the monetary benefits both before and after the merger with Epic.  Epic was aware of the fraudulent schemes of Connexus going into the merger discussions and was fully aware of the schemes as outlined in this Plaintiff's Complaint.  Epic cannot deny it siphoned off the cash assets of Connexus as are result of the merger and has acknowledged it exercises the full amount of control over Connexus allowed by law, whatever that is, though it actually exercises total control without observing basic corporate formalities such as conducting Board Meetings for Connexus and its subsidiaries.   All of these factors taken together clearly suggest that the Connexus merger was the best way to preserve Connexus shareholder value and insulate them from a large lawsuit judgment.  If Connexus goes bankrupt, the former Connexus shareholders who now own only Epic stock are in a far better position financially than if the merger had not occurred. Whether measured from the standpoint that Epic acquired Connexus to reap the immediate cash and tax benefits of the transaction to the detriment of creditors, or that Connexus continues to possess infringing domains of Plaintiff's while being controlled

13

by Epic, or that the reverse triangular merger was the best way to mitigate the potentially adverse affects of a large judgment against Connexus and its former shareholders who are now Epic shareholders, Epic should remain a defendant in this lawsuit to share the potential liability for those wrongs.  Plaintiff has raised sufficient issues of material fact to sustain its claims against Epic for the wrongs of Connexus under agency or alter ego theories of liability.

      **D.**     **Plaintiff's Allegations of Civil Conspiracy Are Sufficient to State a Claim**

Defendant Epic argues that, because it is entitled to summary judgment on all substantive counts that, the conspiracy claim must be dismissed.  As has been indicated, issues of fact remain on all substantive counts, and there is no basis to dismiss the conspiracy claim.  Plaintiff's conspiracy claims are sufficiently plead to withstand Summary Judgment, and there is sufficient evidence of conspiratorial conduct in raiding the cash from Connexus immediately upon merger and continuing to maintain registered infringing domain registrations by the combined entity post-merger.  There is no loss reserve to pay a judgment in this case nor did Epic ask during due diligence that a loss reserve be established for these claims.  Although the Epic CEO and Corporate Counsel didn't know much in deposition it was acknowledged Epic controls Connexus.  For all of these reasons the conspiracy claims must survive Epic's Motion for Summary Judgment.

**E.     Alternatively, Plaintiff Should Be Permitted to Proceed Against Epic After Liability Is Established Against the Connexus Defendants**

After Epic was joined as a Defendant in this case earlier this year, Plaintiff took the deposition of the Epic/Connexus CEO and Epic corporate counsel as the person most knowledgeable concerning the merger.  Consistent with the theme throughout the case, those two deponents had little knowledge of anything relevant concerning the transaction.  It simply isn't credible the Connexus CEO who became the Epic CEO after the merger, Art Shaw, did not know if he remained the CEO of Connexus and its subsidiaries after the merger, whether there was a Connexus Board of Directors after the merger, or whether Connexus or its subsidiaries ever conducted any Board Meetings after the merger. (Exhibit A, Deposition of Art Shaw, pp. 46, 49, 61, 71.)  The Chief Executive Officer, Mr. Shaw, testified he had no idea whether he was a Director of NCS and who composed the Board of Directors of the Connexus subsidiaries pre-merger (Exhibit A, Deposition of Art Shaw, pp. 43-45.)  Mr. Shaw would not even acknowledge he or the other shareholders received Epic stock as part of the merger and would only say he "believes" he owns Epic stock (Exhibit A, Deposition of Art Shaw, p. 54.)  Mr. Shaw testified he could not say whether he received his paychecks from Connexus, but also did not know whether any Connexus subsidiaries issued any paychecks (Exhibit A, Deposition of Art Shaw, p. 40.)  Mr. Shaw believes there were people employed by Connexus subsidiaries FirstLook and Traffic Marketplace but did not know which entity

15

issues paychecks or if NCS had any employees (Exhibit A, Deposition of Art Shaw, p. 40.)

The person most knowledgeable concerning the Connexus/Epic merger, David Graff, was equally elusive in answering questions offering that he "believes" he and Epic President Don Mathis were "essentially" the new Board of Directors for Connexus and its subsidiaries and that he and Don Mathis were "probably" the directors of NCS after the merger. It was acknowledged that there have been no Board Meetings of any Connexus side entity since the merger but that whatever control can be exercised that is the control Epic exercises over Connexus (Exhibit C, Deposition of David Graff, pp. 57-58,61-62.)

It has become abundantly clear that there are no straight answers in this case from any Defendant witness, including now Epic, which is not altogether surprising when the truth is neither convenient nor favorable for these Defendants. The recent limited discovery with Epic suggests it will continue to be difficult to obtain the clear answers to even simple questions concerning the merger and operations of Connexus and Epic. If the Court is at all inclined to determine there are not sufficient issues of fact to sustain claims against Epic at this stage of the proceedings, Plaintiffs believe a reasonable solution is to allow a bifurcated trial to allow Plaintiff to establish liability against the Connexus Defendants and thereafter conduct a trial on these issues of Epic liability after further discovery. It would be unjust to allow Epic to claim it did not actually merge but it simply acquired Connexus in the middle of the case, evade salient

16

questions to perpetuate the myth that no actual merger occurred and therefore Epic acquired no liability, siphon off assets of Connexus to the detriment of Plaintiff, and then escape liability on the merits via summary judgment. Preserving potentially valid claims against Epic by means of a bifurcated trial after further discovery or other reasonable alternative is appropriate given the history of this case.

## CONCLUSION

A reverse triangular merger cannot be used as a means to frustrate creditors as it has in this case. Although a reverse triangular merger in name, the Epic/Connexus combination was a de facto merger in which Epic controls Connexus and should be required to assume its liabilities. Epic, as the entity in control of Connexus and its subsidiaries, is liable as a user of the infringing domain names under the ACPA. Finally, Plaintiff has sufficiently stated its claims for conspiracy sufficient to withstand Epic's motion for dismissal of those claims.

Plaintiff has established sufficient issues of fact that precludes summary judgement in favor of Epic in this matter. To the extent the Court is inclined to grant Epic Summary Judgment at this stage it should forego such a ruling and grant Plaintiffs the further opportunity to establish liability against Epic after additional discovery and bifurcated trial. Based on the foregoing, Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted this 15th day of August, 2011.

/s/Enrico Schaefer
Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com

Lead Counsel for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2011, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado (admitted pro hac)
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

/s/Enrico Schaefer
Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
Lead Counsel for Plaintiff

19