**Confidential - Under Seal**

1

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF MICHIGAN
 3
 4
 5   THE WEATHER UNDERGROUND, INC., )
     a Michigan Corporation,        )
 6                                  )
                    Plaintiff,      )
 7                                  )
        vs.                         ) Case No. 2:09-CV-10756
 8                                  )
     NAVIGATION CATALYST SYSTEMS,   ) Volume I
 9   INC., a Delaware corporation;  )
     BASIC FUSION, INC., a Delaware )
10   corporation; CONNEXUS CORP., a )
     Delaware corporation; and      )
11   FIRSTLOOK, INC., a Delaware    )
     corporation,                   )
12                                  )
                    Defendants.     )
13   _____ )
14
15              - CONFIDENTIAL - UNDER SEAL -
16
17           DEPOSITION OF ARTHUR V. SHAW
18              Los Angeles, California
19             Wednesday, June 8, 2011
20
21
22
23
24   Reported by:  Linda D. White
                   CSR No. 12009
25   NDS Job No.:  142760
```

**Confidential - Under Seal**

15

| | | |
|---|---|---|
| 09:31:47 | 1 | A.   Yes, CEO. |
| 09:31:59 | 2 | Q.   When was NetBlue created relative to your |
| | 3 | affiliation with the company?  I assume prior to |
| | 4 | your affiliation? |
| 09:32:09 | 5 | A.   Prior, yes. |
| 09:32:11 | 6 | Q.   How long had it been around? |
| 09:32:16 | 7 | A.   I don't know.  I can estimate 18 months. |
| 09:32:25 | 8 | Q.   So it was a relatively new company? |
| 09:32:28 | 9 | A.   Yes. |
| 09:32:31 | 10 | Q.   And when you became affiliated with |
| | 11 | NetBlue, what was it doing?  What kind of business |
| | 12 | did NetBlue do? |
| 09:32:39 | 13 | A.   Online marketing. |
| 09:32:45 | 14 | Q.   And when you joined NetBlue in 2005, did |
| | 15 | it have any other subsidiary companies that it was |
| | 16 | affiliated with? |
| 09:33:01 | 17 | A.   Did NetBlue have subsidiaries? |
| 09:33:03 | 18 | Q.   Correct. |
| 09:33:04 | 19 | A.   I don't recall. |
| 09:33:14 | 20 | Q.   When you joined NetBlue in 2005, was it |
| | 21 | involved in the acquisition and monetization of high |
| | 22 | traffic domain names? |
| 09:33:32 | 23 | A.   I'm not sure I understand the question. |
| 09:33:34 | 24 | Q.   All right.  We'll come back, because we're |
| | 25 | going -- I want to discuss what eventually Connexus |

Confidential - Under Seal

16

1    and Traffic Marketplace and Firstlook and Basic

2    Fusion and Navigation Catalyst all did, and what

3    their business model was.  And so it's probably

4    easier to circle back.

09:33:57   5    A.    Okay.  Sure.

09:33:58   6    Q.    All right.  At some point did NetBlue have

7    subsidiary companies underneath it?

09:34:12   8    A.    I don't recall the legal structure of

9    NetBlue.

09:34:18   10    Q.    Do you recall when you joined NetBlue,

11    whether Navigation Catalyst was affiliated with

12    NetBlue?  Or is that something that was created

13    under your watch?

09:34:27   14    A.    No.

09:34:30   15    Q.    I'm sorry.

09:34:30   16    A.    Not --

09:34:31   17    Q.    It was a poor -- it was a poor question,

18    because I asked you two questions --

09:34:33   19    A.    Two questions --

09:34:34   20    Q.    -- at one time.

09:34:35   21    A.    Navigation Catalyst was not part of

22    NetBlue.

09:34:47   23    Q.    Was Navigation Catalyst a company that was

24    created while you were at NetBlue?

09:34:59   25    A.    I don't know when Navigation Catalyst was

Confidential - Under Seal

17

```
             1   created.
09:35:02     2        Q.   Were you involved in the formation or
             3   creation of Navigation Catalyst?
09:35:06     4        A.   No.
09:35:16     5        Q.   At some point did Navigation Catalyst
             6   become a -- an affiliated subsidiary of NetBlue or
             7   NetBlue Vendare, Media or Connexus?
09:35:32     8        A.   Yes to.  The best of my knowledge,
             9   Navigation Catalyst was started by Vendare.
09:35:41    10        Q.   So when NetBlue merged, you inherited
            11   Navigation Catalyst?
09:35:46    12        A.   Correct.
09:35:57    13        Q.   All right.  Are you familiar with Basic
            14   Fusion, the company?
09:36:03    15        A.   Yes.
09:36:04    16        Q.   And what did Basic Fusion do or what do
            17   they do?
09:36:17    18        A.   Well, I'm --
09:36:24    19        Q.   How would you personally describe what
            20   they do?
09:36:30    21        A.   I'm not sure I have clarity on what was in
            22   the Basic Fusion versus Navigation Catalyst.
09:36:40    23        MR. CLARK:  And Will doesn't get to testify.
            24   Okay.  That's a fair answer.
            25   ///
```

Confidential - Under Seal

18

1    BY MR. CLARK:

09:36:46  2        Q.   So your comment was is that you're having

3    difficulty distinguishing which company performed

4    what function?

09:36:54  5        A.   Correct.

09:36:58  6        Q.   Okay.  Was Basic Fusion a Vendare Media

7    company, do you recall?  Did they bring that to --

09:37:06  8        A.   Yes, I believe so.

09:37:07  9        Q.   -- NetBlue?

09:37:08  10       A.   I believe so.  They bought that to the

11   combination of Vendare NetBlue.

09:37:18  12       Q.   All right.  What about a company called

13   Firstlook, are you familiar with Firstlook?

09:37:22  14       A.   Yes.

09:37:23  15       Q.   And how would you describe what Firstlook

16   does as a company?

09:37:29  17       A.   Firstlook owns domains.  And monetizes

18   traffic.

09:37:52  19       Q.   All right.  And was Firstlook a Vendare

20   company that you inherited in the merger?  And when

21   I say "you," NetBlue, in the merger or is that

22   something that NetBlue created?

09:38:02  23       A.   Inherited under a different name.  It was

24   renamed Firstlook.

09:38:08  25       Q.   All right.  What was it when the companies

Confidential - Under Seal

19

|  | 1 | merged? |
| 09:38:12 | 2 | A.   I believe it was called New.net.  And, |
|  | 3 | yes, it was inherit -- it was from the Vendare side. |
| 09:38:40 | 4 | Q.   When NetBlue and Vendare merged companies, |
|  | 5 | what was the name of the survivor company of that |
|  | 6 | merger? |
| 09:38:52 | 7 | A.   I believe the parent company was called |
|  | 8 | Vendare NetBlue. |
| 09:39:05 | 9 | Q.   Can you describe in general terms what the |
|  | 10 | merger entailed? |
|  | 11 | Was it a stock transfer where one company |
|  | 12 | offered stock to the other in exchange for as a -- |
|  | 13 | and resulted in the merger of the companies, or was |
|  | 14 | it a purchase acquisition?  How would you describe |
|  | 15 | it? |
| 09:39:44 | 16 | A.   I don't recall. |
| 09:39:46 | 17 | Q.   Were you involved in the discussions or |
|  | 18 | negotiations concerning that merger? |
| 09:39:53 | 19 | A.   Yes, I was. |
| 09:39:53 | 20 | Q.   All right.  And from the NetBlue |
|  | 21 | perspective, what was attractive about what Vendare |
|  | 22 | was doing at the time of the merger that interested |
|  | 23 | your company? |
| 09:40:08 | 24 | A.   It was a breath of online businesses. |
| 09:40:21 | 25 | Q.   And what did Vendare do in general terms? |

Confidential - Under Seal

20

          1    If you could -- if you would list those for me.
09:40:27  2         A.    There was a business called Traffic
          3    Marketplace, which was predominantly a display
          4    business.
09:40:39  5         Q.    Advertising display?
09:40:40  6         A.    Yeah.  Display is the picture that shows
          7    up on a website, generally speaking.  There was the
          8    New.net business.  There was an affiliate business.
09:40:53  9         Q.    Now, the New.net, that was what eventually
          10   became Firstlook?
09:40:59  11        A.    Correct.
09:41:00  12        Q.    And you referenced that they own and
          13   monetize a domain names or sites?
09:41:09  14        A.    Correct.
09:41:13  15        Q.    Can you tell me a little bit more about
          16   the New.net/Firstlook business model, what was that?
09:41:22  17        A.    The business was the registration of
          18   domains.  A process of optimization around the
          19   domain.  And a Yahoo feed, which was the --
          20   essentially the primary sole source of the revenue.
09:41:57  21        Q.    All right.  The Yahoo feed would result in
          22   the monetization aspect of the -- of the model?
09:42:03  23        A.    Correct.
09:42:10  24        Q.    All right.  And that model came to NetBlue
          25   intact from Vendare; is that correct?

Confidential - Under Seal

21

| | | |
|---|---|---|
| 09:42:20 | 1 | A.    Correct. |
| 09:42:23 | 2 | Q.    Did you indicate that that was a -- |
| | 3 | shortly after you became CEO in '05, that that |
| | 4 | merger took place or did it take place? |
| 09:42:30 | 5 | A.    Middle of 2006. |
| 09:42:32 | 6 | Q.    2006.  When you inherited the -- we'll |
| | 7 | just call it the Firstlook, I guess, business model, |
| | 8 | just so we can keep it straight. |
| | 9 | Did you -- do you also inherit the systems |
| | 10 | that were in place for selecting and acquiring the |
| | 11 | domains that were being monetized? |
| 09:43:07 | 12 | A.    Yes. |
| 09:43:07 | 13 | Q.    Did you inherit -- and when I say "you," |
| | 14 | of course I mean NetBlue. |
| | 15 | Did you inherit employees that went along |
| | 16 | with that process? |
| 09:43:22 | 17 | A.    Yes. |
| 09:43:31 | 18 | Q.    Was Chris Pirrone a part of NetBlue at the |
| | 19 | time of that merger?  Am I saying the name |
| | 20 | correctly? |
| 09:43:45 | 21 | A.    Pirrone. |
| 09:43:45 | 22 | Q.    Pirrone. |
| 09:43:46 | 23 | A.    I believe not. |
| 09:43:51 | 24 | Q.    And did NetBlue Vendare Media hire Chris |
| | 25 | at some later time? |

22

| | | |
|---|---|---|
| 09:43:56 | 1 | A.    Yes. |
| 09:43:57 | 2 | Q.    Do you know approximately when?  In |
| | 3 | relationship to the merger. |
| 09:44:07 | 4 | A.    Six months to a year after the merger. |
| | 5 | There was an existing general counsel from Vendare |
| | 6 | at the merger, he was there for a few months.  And |
| | 7 | then Chris -- and then I recruited Chris. |
| 09:44:24 | 8 | Q.    Were you familiar with Chris from some |
| | 9 | other employment? |
| 09:44:27 | 10 | A.    No. |
| 09:44:39 | 11 | Q.    When the merger took place between Vendare |
| | 12 | and NetBlue, did you inherit with the merger?  And, |
| | 13 | again, did NetBlue inherit any lawsuits that claimed |
| | 14 | trademark infringement from the registration of the |
| | 15 | domain and monetization of the domain names, do you |
| | 16 | recall? |
| 09:45:05 | 17 | A.    I don't recall. |
| 09:45:12 | 18 | Q.    All right.  Let's talk about Traffic |
| | 19 | Marketplace.  You indicated that they were the |
| | 20 | display side.  Tell me a little bit about what |
| | 21 | Traffic Marketplace did when you acquired it. |
| 09:45:28 | 22 | A.    At the time of acquisition Traffic |
| | 23 | Marketplace would work with brand advertisers and |
| | 24 | display their ads on the Internet -- across the |
| | 25 | Internet, across sites on the Internet. |

Confidential - Under Seal

23

09:45:52  1        Q.   In the five years or so since the

        2   acquisition, has Traffic Marketplace's basic

        3   business model changed at all?

09:46:03  4        A.   That part hasn't changed.  How we do that

        5   has changed significant.

09:46:14  6        Q.   At the time of the merger between NetBlue

        7   and Vendare, what was NetBlue's primary business at

        8   that time?

09:46:26  9        A.   It was -- it was delivering cost

       10   performance -- cost per performance advertising.  So

       11   advertisers would pay when someone would perform an

       12   action.

09:46:45 13        Q.   Such as what?

09:46:46 14        A.   Such as sign up for Netflix.

09:46:55 15        Q.   And explain to me a little bit more about

       16   how that would work.  Was that a website that

       17   NetBlue would set up and own or was that something

       18   different?

09:47:11 19        A.   It was both a website that NetBlue would

       20   have and people who would have websites, we would

       21   have a direct relationship with the advertiser, like

       22   Netflix, they wouldn't.  But they could put that ad

       23   up on their site.  And so -- and if someone signed

       24   up, they would get paid.

09:47:32 25        Q.   I see.

Confidential - Under Seal

24

09:47:33  1        A.    Because we had a direct relationship often

2    with the client.

09:47:36  3        Q.    So it wasn't necessarily paper click, they

4    actually had to sign up?

09:47:40  5        A.    For something, yes.

09:47:41  6        Q.    In order for the revenue to generate?

09:47:44  7        A.    Generally speaking, correct.

09:47:52  8        Q.    And was it when you acquired Firstlook and

9    its business model that you began incorporating, for

10   instance, a pure paper click revenue side business

11   model into NetBlue or NetBlue Vendare?

09:48:16  12       A.    I'm not sure the question.

09:48:19  13       Q.    Well --

09:48:20  14       A.    Is it the First -- sorry.

09:48:21  15       Q.    You described the Firstlook business model

16   in general terms and indicated it involved the

17   registration of domains.

09:48:29  18       A.    Correct.

09:48:29  19       Q.    Which were generally, as I understand it,

20   higher traffic domain so that people would go to

21   them.  Yes, or is that a misunderstanding?

09:48:40  22       A.    We would purchase domains.  I don't know

23   how you would define higher traffic.

09:48:50  24       Q.    All right.

09:48:50  25       THE REPORTER:  Are you saying higher, hiring

Confidential - Under Seal

25

1    traffic?

09:48:50  2         THE WITNESS:  Higher, H-I-G-H-E-R.

3              The NetBlue model was not predominantly a

4    cost per click model.

5    BY MR. CLARK:

09:48:58  6         Q.   All right.

09:48:59  7         A.   That's the --

09:49:00  8         Q.   How would you describe it, in terms of the

9    nomenclature?

09:49:04  10        A.   Cost per action.

09:49:06  11        Q.   Cost per action.  And --

09:49:11  12        A.   So -- so generally speaking, there's a

13   cost per impression, where you tend to pay for

14   someone to see your ad, that's what Traffic

15   Marketplace did.  It's a cost per action where

16   someone does something, and there's a cost per

17   click, which was what the Firstlook model was based

18   on.

09:49:36  19        Q.   All right.  I think I understand.

20             All right.  You indicated that you -- you

21   were the CEO of the merged Vendare NetBlue merger?

09:49:50  22        A.   Correct.

09:49:51  23        Q.   Did Vendare's CEO play a role in the new

24   company at all?

09:49:57  25        A.   No.  There was an acting CEO when the

Confidential - Under Seal

26

```
         1    merger occurred, who had been a board member, who

         2    went back to becoming a board member.

09:50:14 3        Q.   And you indicated that Vendare NetBlue

         4    eventually became Connexus?

09:50:19 5        A.   Correct.

09:50:20 6        Q.   By way of a name change?

09:50:22 7        A.   Correct.

09:50:22 8        Q.   All right.  Was that -- was that in '07?

         9    Does that sound about right?

09:50:29 10       A.   That sounds about right.

09:50:32 11       Q.   I won't hold you to it.  I just remember

         12   --

09:50:35 13       A.   It's a good estimate.

09:50:36 14       Q.   -- looking at documentation that rings

         15   familiar.

         16           All right.  Let's say in 2007, when the

         17   name change occurred -- and, by the way, why did the

         18   name change occur?

09:50:54 19       A.   We thought the name Connexus, which sounds

         20   like connection, Connexus, was a more powerful name

         21   than a name that was a combination of prior names.

09:51:08 22       Q.   All right.  Did it have anything to do

         23   with branding then?

09:51:13 24       A.   Yes.  It was -- we thought was a better

         25   corporate brand.
```

Confidential - Under Seal

27

09:51:16   1      Q.   All right.  In '07, what companies were

2      underneath the Connexus umbrella, if you will?

3           We talked about Firstlook, Basic Fusion,

4      Traffic Marketplace.  Now, you also indicated that

5      you inherited Navigation Catalyst as well; is that

6      correct?

09:51:47   7      A.   I believe the Basic Fusion and Navigation

8      Catalyst were under Firstlook.

09:51:53   9      Q.   Okay.  Did there ever come a point in time

10      where Basic Fusion and Navigation Catalyst were not

11      a subsidiary of Firstlook?

09:52:15  12      A.   I don't know the legal structure.

09:52:24  13      Q.   What was the function or business model of

14      Navigation Catalyst, if you know?

09:52:41  15      A.   I don't know the distinction between Basic

16      Fusion and Navigation Catalyst.

09:52:46  17      Q.   All right.  So in terms of the function of

18      each one of those entities, you're not sure which

19      one does what?

09:52:54  20      A.   Correct.

09:52:55  21      Q.   Okay.  Are there two functions that you're

22      aware of that -- that those two businesses would do?

09:53:08  23      A.   There are multiple functions --

09:53:10  24      Q.   Okay.

09:53:11  25      A.   -- in Firstlook.

Confidential - Under Seal

28

09:53:18  1        Q.   All right.  Is one of the functions that

2        Firstlook does is the registration of domain names?

09:53:23  3        A.   Yes.

09:53:24  4        Q.   Okay.  Is that also a function of

5        Navigation Catalyst, if you know?

09:53:33  6        A.   I believe so.  I don't know.  I guess I

7        should say, I'm not sure.

09:53:38  8        Q.   Okay.  And that's a fair answer.  If

9        you're not sure, you don't know.

09:53:42  10        A.   Of the legal structure, correct.

09:53:44  11        Q.   All right.  It's an acceptable answer.

12             All right.  Tell me a little bit about

13        Basic Fusion.  What did -- as a company, what did it

14        do?  What was it responsible for?

09:54:03  15        A.   Same answer.

09:54:07  16        Q.   Not -- not quite certain?

09:54:08  17        A.   Not clear what existed within Basic Fusion

18        separate from Navigation Catalyst.

09:54:16  19        Q.   As the CEO of the combined enterprise

20        NetBlue and Vendare, was it important to you to have

21        an entity that held and registered the domain names?

09:54:42  22        MR. DELGADO:  Objection.  Vague and ambiguous.

09:54:47  23        MR. CLARK:  You can go ahead and answer if you

24        understand the question.

09:54:50  25        THE WITNESS:  I'm not going to answer, if he

Confidential - Under Seal

29

```
           1    wants to object.

09:54:52   2        MR. DELGADO:  No, no, no.  You should answer,

           3    unless I instruct you not to answer.

09:54:55   4        MR. CLARK:  From time to time -- and I should

           5    have said this in the ground rules, Mr. Shaw, Will

           6    and myself, if Will's asking the questions or

           7    happens to -- might object to a question.

09:55:06   8        THE WITNESS:  Right.  I should still answer it

           9    and someone will decide later?

          10    BY MR. CLARK:

09:55:09  11        Q.   Yeah.  And usually -- and usually it as to

          12    form, the form of the question.  If you understand

          13    the question, you can go ahead and answer.  If

          14    Mr. Delgado instructs you not to answer, it would be

          15    because of privilege or confidentiality or some

          16    other objection.  And then, in fact, you would not

          17    answer, based upon the instruction of your own

          18    counsel.

09:55:30  19        A.   As part of the Firstlook entity we had an

          20    entity that would register names.  As part of the

          21    Firstlook business I should say.

09:55:43  22        Q.   All right.  Why have an entity that would

          23    simply register names, do you know?

09:55:52  24        A.   I'm not familiar with the why behind the

          25    legal structure.
```

Confidential - Under Seal

30

09:56:06   1        Q.   All right.  Let's go back and take a look

2   at Exhibit 285.  I think we went over some of the

3   inaccuracies relative to your biography.  It also

4   indicates up at the top that you're serving as the

5   co-chief executive officer of Epic Advertising, Inc.

6   Alternate name is Epic Media Group.

7            To your knowledge, is there a company

8   called Epic Advertising, Inc., an entity?

09:56:47   9        A.   I believe there is.

09:56:49  10        Q.   Do you know?

11            And the reason I ask you the question --

12   I'm not trying to trick you -- I haven't been able

13   to find it, which doesn't mean it doesn't exist, it

14   just means that I haven't been able to locate the

15   registration for that entity.

09:57:09  16        A.   So Epic Advertising, Inc. I believe was

17   the company that acquired Connexus.

09:57:25  18        Q.   All right.

09:57:27  19        A.   And I became co CEO.  First I became CEO

20   and then I became chairman and co CEO of the

21   combined companies.

09:57:41  22        Q.   All right.  Let's --

09:57:42  23        A.   Which we named, for branding purposes,

24   Epic Media Group.

09:57:47  25        Q.   All right.  And as I understand it, the

Confidential - Under Seal

40

1    and put him under Mark as well, for streamlining the

2    process of operations.

10:10:54    3        Q.   I see.  Did it have anything do with the

4    pending discussions with Epic?

10:11:12    5        A.   I don't believe so.

10:11:26    6        Q.   When you were employed with Connexus, did

7    you receive a paycheck?

10:11:35    8        A.   Yes.

10:11:35    9        Q.   All right.  Who issued the paycheck?

10   Which company?  Was it Connexus?

10:11:43   11        A.   I believe so.

10:11:45   12        Q.   You say "I believe so," are you uncertain?

10:11:49   13        A.   I'm not 100 percent sure.

10:11:51   14        Q.   If it -- if --

10:11:53   15        A.   But I believe it was Connexus.

10:11:55   16        Q.   All right.  Were there other entities

17   under the Connexus umbrella that would have issued

18   paychecks to employees of Connexus and any one of

19   those subsidiaries other than Connexus, do you know?

10:12:09   20        A.   I don't know that.

10:12:20   21        Q.   So you're not sure what the accounting

22   side was with respect to payroll issues, with

23   respect to yourself first off; is that correct?

10:12:31   24        A.   I'm not positive.  My belief is that I was

25   paid by Connexus.  That's -- that's my

Confidential - Under Seal

43

10:15:58   1        THE WITNESS:   (Witness complies.)

2    BY MR. CLARK:

10:16:05   3        Q.    Dated June 13th, 2008.  It indicates, by

4    way of the resolution, that Arthur Shaw is elected

5    as the sole director of Navigation Catalyst Systems,

6    Inc.  Is that accurate?

10:16:37   7        A.    I believe that that's what that indicates.

10:16:39   8        Q.    All right.  This is as of 2008, but do you

9    believe that the business structure was as is since

10   the acquisition of Navigation Catalyst Systems?

11   Were you the sole director of that company during

12   your tenure with Connexus?

10:17:03   13       A.    I don't know that.

10:17:11   14       Q.    Okay.  Who would know, do you know?

10:17:13   15       A.    I believe Chris Pirrone would know this

16   and other issues of legal structure.

10:17:21   17       Q.    All right.

10:17:22   18       A.    And corporate structure.

10:17:23   19       Q.    So back in 2008, as general counsel, would

20   Chris have been responsible for, for instance,

21   drafting these documents, or what that be something

22   outside counsel would do?

10:17:34   23       A.    I believe Chris would do that.

10:17:41   24       MR. CLARK:  All right.  Let's mark and label

25   this as 289.

Confidential - Under Seal

44

1    (Whereupon Exhibit 289 was marked for identification)

10:17:55  2        THE VIDEOGRAPHER:  Time is 10:17 a.m.  We are

3    off the record.

4                    (A break was taken)

10:30:30  5        THE VIDEOGRAPHER:  The time is 10:30 a.m.  We

6    are on the record.

7    BY MR. CLARK:

10:30:36  8    Q.   Very good.  I think when we left we were

9    looking at Deposition Exhibit 289.  And, Mr. Shaw,

10   you want to take a look at that document for just a

11   minute, and we'll ask you some questions about it.

10:30:50  12   A.    (Witness complies.)  Okay.

10:31:46  13   Q.   All right.  And it purports to be a

14   written consent again from Navigation Catalyst

15   Systems.  And it says, as of April 9th, 2007, and it

16   involves this time the election of officers as

17   opposed to the election of you as the director of

18   Navigation Catalyst.

19            And it appears as though the resolution

20   provides, insofar as corporate officers are

21   concerned, that you would be the chief executive

22   officer and president, and Chris Pirrone the vice

23   president and secretary of Navigation Catalyst

24   Systems, Inc.

25            Do you recall that?

Confidential - Under Seal

45

10:32:35  1        A.   I don't recall it, but that is my

2     signature.

10:32:38  3        Q.   All right.

10:32:39  4        A.   I'm confident I signed this.

10:32:41  5        Q.   All right.  And my question to you is

6     this:  It appears as though Navigation Catalyst

7     System -- Systems, Inc., at least as of 2007/2008

8     time frame, were set up to where you were the

9     director, and then you were the chief executive

10     officer and president, and Chris Pirrone vice

11     president and secretary with respect to officers.

12             And I'm wondering, were the other Connexus

13     companies set up the same way in terms of

14     directorship and officers?

10:33:24  15        A.   I don't know.

10:33:25  16        Q.   All right.

10:33:27  17        A.   Similarly, I didn't recall this, but I --

18     that is my signature.

10:33:35  19        Q.   All right.  So you -- in terms of

20     Firstlook, Traffic Marketplace, those other

21     companies, you don't -- you're not sure whether it's

22     set up in a similar fashion for officers and

23     directors?

10:33:48  24        A.   Correct.

10:33:51  25        Q.   Now, what about Connexus, the parent

46

|   |   |   |
|---|---|---|
| | 1 | company?  You're the chief executive officer there, |
| | 2 | correct? |
| 10:34:02 | 3 | MR. DELGADO:  Did you say you were or you are? |
| 10:34:05 | 4 | MR. CLARK:  Were. |
| 10:34:06 | 5 | THE WITNESS:  Were.  Yes, I was. |
| | 6 | BY MR. CLARK: |
| 10:34:07 | 7 | Q.   All right.  And let's talk about premerger |
| | 8 | acquisition, Epic now. |
| 10:34:13 | 9 | A.   Okay. |
| 10:34:14 | 10 | Q.   Same time frame, 2007/2008. |
| | 11 | You were also on the board, correct? |
| 10:34:21 | 12 | A.   Correct. |
| 10:34:22 | 13 | Q.   And you've testified that you were not -- |
| | 14 | you didn't hold a position on the board other than |
| | 15 | board member; is that correct?  Or did you? |
| 10:34:31 | 16 | A.   I was CEO of the company Connexus and |
| | 17 | board member. |
| 10:34:42 | 18 | Q.   Who composed the Connexus board of |
| | 19 | directors in that time frame, say, 2008? |
| 10:34:49 | 20 | A.   I believe there were seven folks. |
| 10:34:54 | 21 | Q.   You remember their names? |
| 10:34:55 | 22 | A.   Yes.  Myself, Linda Levinschien, Deven |
| | 23 | Parekh, Marcia Goodstein, Fred Harmon, Mark Flynn, |
| | 24 | and Bill Gross. |
| 10:35:34 | 25 | Q.   That's seven.  Was the board the same in |

Confidential - Under Seal

49

```
              1    a -- also a Connexus board intact after the Epic

              2    Advertising deal, correct or incorrect?

10:39:09      3         A.    There was a board of --

10:39:12      4         Q.    Directors?

10:39:12      5         A.    -- Epic Media Group.

10:39:14      6         Q.    I see.  All right.  Let me ask you this

              7    question, while we're on the topic:  Was there a

              8    board of directors after the -- after the Epic

              9    Advertising deal in place with Connexus?  Or, I'm

             10    sorry --

10:39:42     11         MR. DELGADO:  Objection to the extent it calls

             12    for speculation.

10:39:47     13         THE WITNESS:  Can you repeat the question.

             14    BY MR. CLARK:

10:39:49     15         Q.    Sure.  After the deal, was there -- was

             16    there a Connexus board of directors?

10:39:58     17         MR. DELGADO:  Same objection.

10:40:04     18         THE WITNESS:  I don't know.

             19    BY MR. CLARK:

10:40:16     20         Q.    You remained the CEO of Connexus after the

             21    Epic Advertising deal, correct?

10:40:25     22         A.    I became CEO of Epic Media Group.

10:40:30     23         Q.    Co CEO?

10:40:31     24         A.    Co -- I became CEO.

10:40:34     25         Q.    Okay.
```

Confidential - Under Seal

53

```
           1    (Whereupon Exhibit 290 was marked for identification)
10:45:40   2         THE WITNESS:  Do you have 289?  I have 289.
           3    Excuse me.
           4    BY MR. CLARK:
10:46:15   5         Q.   All right.  Take a look at that, Mr. Shaw.
           6    It's entitled, A Memorandum of Understanding between
           7    Azoogle, Inc., dba, Epic Advertising and Connexus
           8    Corporation, dated January 2010.  And it looks like
           9    the document that proposed conceptually the deal.
          10    And I'll ask you a couple of questions about that.
          11              All right.  Your signature's on that
          12    document, correct?
10:50:07  13         A.   Yes, it is.
10:50:08  14         Q.   And it's entitled A Memorandum of
          15    Understanding.
10:50:11  16         A.   Yes.
10:50:12  17         Q.   And describe for me what this document is
          18    or your understanding of what the document is.
10:50:21  19         A.    It -- it basically by agreeing to the
          20    consideration points that I referenced before.
          21    Again, the three being most important, the preferred
          22    ratio, the preference amount, and the common ratio.
          23              It essentially then put us into a period
          24    of essentially exclusive due diligence without
          25    shopping for another deal.
```

Confidential - Under Seal

54

10:50:52  1        Q.   All right.

10:50:52  2        A.   And it also set, essentially, that the

3    Epic side would have a majority of the board of

4    directors.

10:51:02  5        Q.   All right.  And it looks like the -- the

6    points that you've referenced, in terms of ratios,

7    it didn't change a whole lot between the Memorandum

8    of Understanding and the actual deal; is that

9    accurate or not?

10:51:14  10       A.   I think that's correct.

10:51:22  11       Q.   What is your understanding of how the deal

12   actually was consummated?

13            This Memorandum of Understanding, for

14   instance, references the fact that it's possible

15   that the companies might form a new company, and

16   each have the stock ratios that you've indicated.

17   Was that what happened?  Or was this a different

18   deal structure, do you know?

10:51:53  19       A.   My understanding is that the Epic lawyers

20   reviewed legal structures and chose the acquisition

21   as the structure, and wrote the documents, which

22   were then distributed to the Connexus lawyers for

23   review.

10:52:25  24       Q.   All right.  Ultimately, Mr. Shaw, did you

25   receive Epic stock as a result of the transaction?

Confidential - Under Seal

59

| | | |
|---|---|---|
| | 1 | purchases.  So to create our own destiny, without |
| | 2 | waiting for someone to come looking, we thought |
| | 3 | scale would be helpful. |
| 10:59:40 | 4 | Q.   Now, we talked about the fact that the |
| | 5 | resultant company was going to have four Epic board |
| | 6 | seats and three Connexus board seats.  Did that, in |
| | 7 | fact, happen? |
| 10:59:58 | 8 | A.   Yes. |
| 10:59:58 | 9 | Q.   All right.  Who -- right after the merger? |
| 11:00:02 | 10 | A.   Yes. |
| 11:00:03 | 11 | Q.   Who were the Connexus board members that |
| | 12 | sat on the Epic board of directors? |
| 11:00:09 | 13 | A.   Myself, Deven Parekh and Marcia Goodstein. |
| 11:00:21 | 14 | Q.   Are you still on the board? |
| 11:00:23 | 15 | A.   I am not. |
| 11:00:24 | 16 | Q.   Who replaced you, Art, do you know? |
| 11:00:26 | 17 | A.   I don't believe anyone has. |
| 11:00:28 | 18 | Q.   What about Deven and Marcia? |
| 11:00:30 | 19 | A.   I believe they're still on the board. |
| 11:00:39 | 20 | Q.   Did the Epic board have seven board member |
| | 21 | seats prior to the deal, do you know? |
| 11:00:49 | 22 | A.   I don't recall the number.  I do recall |
| | 23 | they had more board members that ended up on the |
| | 24 | post transaction board.  They had more than four |
| | 25 | board members prior to the transaction.  I don't |

61

11:02:35  1      Q.   All right.  So after the merger,

2      immediately after the -- the deal, you remained the

3      CEO of Connexus or no?

11:02:57  4      A.   I don't know.  I know I became the CEO.  I

5      believe I became the CEO of Epic Media Group.

11:03:07  6      Q.   As -- as the deal concluded?

11:03:09  7      A.   Yes.  I don't know if I remained CEO of a

8      unit called Connexus or not.

11:03:18  9      Q.   Would that hold true of any Connexus

10      subsidiaries?  Assuming that the document suggests

11      that you were on a board and officers of those

12      subsidiaries?

11:03:27  13      A.   Yes.  I don't know how those changed, from

14      a legal standpoint, as a result of the transaction.

11:03:38  15      Q.   After the transaction, do you recall

16      attending any board meetings for Connexus or any of

17      the subsidiaries?

11:03:45  18      A.   Board meetings?

11:03:47  19      Q.   Board meetings.

11:03:48  20      A.   No, I don't recall doing that.

11:03:53  21      Q.   What happened, then, on the date of

22      closing to Don Mathis, who was the former CEO, and

23      is now the current CEO of Epic Media Group?

24           Your testimony was, is that you became the

25      CEO for a period of time, and you became the co CEO

Confidential - Under Seal

11:14:47   1        Q.   Were there any Connexus employees after

2    the deal was done or did they all become Epic

3    employees or some other company?

11:15:08   4        A.   I don't know.  I believe they were paid --

5    the Connexus employees were paid by Connexus through

6    the end of the year, at least.

11:15:19   7        Q.   Of -- of 2010?

11:15:21   8        A.   Yes.

11:15:27   9        Q.   And -- and do you know thereafter, did

10   they become employees of Epic or no?

11:15:36  11        A.   I don't know the legal structure of the

12   employees.

11:15:40  13        Q.   All right.  Do you know whether your

14   paycheck, January 1st of '11, came from a different

15   source or no?

11:15:54  16        A.   I can find out.

11:15:58  17        Q.   Just wondered if you knew if you sat -- as

18   you sat here.

11:16:11  19        A.   I don't know for sure.

11:16:12  20        Q.   Okay.  Let me see if we can ask some more

21   questions to flush that out a little bit.

22             Did Connexus maintain any bank accounts

23   after the -- after the deal?

11:16:26  24        A.   Yes, I believe so.

11:16:27  25        Q.   Okay.  Did it maintain any bank accounts

Confidential - Under Seal

71

```
         1    after the first of this year 2011?
11:16:34 2         A.   I don't know.  No, I don't know.
         3              Yes, I believe we maintained -- to the
         4    best of my knowledge, we maintain -- Connexus
         5    maintains separate bank accounts.
11:16:49 6         Q.   Okay.  That was going to be one of my
         7    questions on the accounting side.  And maybe we'll
         8    take a look at that here in just a minute.  Let's
         9    follow up the other line of questioning.
        10              When you became a director of Epic --
11:17:07 11        A.   Correct.
11:17:08 12        Q.   Did you attend some board meetings after
        13    the merger?
11:17:11 14        A.   I did.
11:17:11 15        Q.   All right.  And you didn't -- you didn't,
        16    as I understand it, attend any board meetings for
        17    Connexus after the merger or the deal, whatever you
        18    want to call it?
11:17:24 19        A.   Correct.
11:17:38 20        Q.   And you indicated you didn't -- you don't
        21    know whether you retained the CEO title at Connexus
        22    after the deal; is that correct?
11:17:48 23        A.   Correct.  What I do know, as I said, is I
        24    became CEO of Epic Media Group.
11:17:59 25        Q.   Right.
```

Confidential - Under Seal

72

11:17:59  1        A.    My holdings in the subsidiary companies, I

2    don't know the structure of that.

11:18:06  3        Q.    Sure.  And what I'm trying to get a

4    conceptual framework around is, after the deal, you

5    would be at an Epic board meeting, for instance.

6    And you would be reviewing the performance of the

7    different subsidiary companies.  And, you know, in

8    terms of Connexus, you know, would you sit there and

9    review the Connexus numbers and point at somebody,

10   and say, this is the guy who needs to step it up, or

11   he's doing a great job or --

11:18:42  12       A.    So we would --

11:18:43  13       Q.    Structure wise, I'm trying to get my brain

14   about how that whole thing worked.

11:18:49  15       A.    So to the question how did -- what would I

16   review at a board meeting?

11:18:54  17       Q.    Well, if you were attending Epic

18   Advertising board meetings after the transaction --

11:18:59  19       A.    Epic Media Group.

11:19:01  20       Q.    Epic Media Group.

11:19:02  21       A.    Yeah.

11:19:03  22       Q.    And you were reviewing performance of

23   subsidiaries like Connexus or Basic Fusion or

24   whatever, and I assume that stuff went on?

11:19:15  25       A.    So what we would do is, we would review

73

1    business units with the knowledge that Firstlook as

2    a business unit was a Connexus business unit.

3    Traffic Marketplace was a Connexus unit.  The

4    balance sheets we would review as separate balance

5    sheets, Connexus.  And then we would review the Epic

6    business unit, called Epic Direct, and the Epic

7    Advertising.  And then we would show a consolidated

8    picture.  And that was the process.

11:20:01  9        Q.    Okay.  So the --

11:20:02  10       A.    And it was a business unit discussion,

11    which tied to our knowledge of the businesses as

12    they had existed before.  But I can't speak to the

13    legal structure of that.

11:20:16  14       Q.    Who's the guy who was accountable for

15    Connexus, if it wasn't you?  Maybe it was you.  I

16    don't know.

11:20:21  17       A.    Well, there was a guy accountable for

18    Traffic Marketplace.

11:20:25  19       Q.    Okay.

11:20:26  20       A.    And there was a guy accountable for

21    Firstlook.

11:20:29  22       Q.    Seth Jacoby?

11:20:31  23       A.    And there's a guy accountable for Epic

24    Direct but, yeah.

11:20:40  25       Q.    All right.  Seth Jacoby was the president

Confidential - Under Seal

80

|  | 1 | in -- since the merger concerning the issue of |
|--|---|--|
|  | 2 | holdback? |
| 11:38:21 | 3 | A.   Any discussions? |
| 11:38:23 | 4 | Q.   Let me rephrase the question.  It's very |
|  | 5 | general. |
| 11:38:25 | 6 | A.   Yeah. |
| 11:38:25 | 7 | Q.   Have you been involved in any |
|  | 8 | conversations or discussions with anyone at either |
|  | 9 | Epic or Connexus or associated with those companies, |
|  | 10 | since the plan of merger, that involved whether or |
|  | 11 | not the -- the stock shares were -- were or were not |
|  | 12 | going to be released in terms of, hey, you guys |
|  | 13 | misrepresented something concerning your company and |
|  | 14 | we're going to holdback some stock? |
| 11:38:54 | 15 | A.   Not to my knowledge. |
| 11:38:57 | 16 | Q.   Those -- those issues, to your knowledge, |
|  | 17 | haven't been raised, at least as far as you know? |
| 11:39:04 | 18 | A.   Correct. |
| 11:39:06 | 19 | Q.   All right.  When you were in the process |
|  | 20 | of -- |
| 11:39:11 | 21 | A.   Or not to me. |
| 11:39:12 | 22 | Q.   Not to you, right. |
|  | 23 | If they were discussed, you don't have any |
|  | 24 | knowledge of it? |
| 11:39:17 | 25 | A.   Correct.  About whether or not the stock |

Confidential - Under Seal

81

1    would actually be moved.

11:39:22   2        Q.    Correct.  Or whether there were any issues

3    that may prevent the stock from -- from being moved,

4    that you were involved in?

11:39:40   5        A.    I -- I don't remember all the -- I don't

6    recall, I guess is the clearest.

11:39:46   7        Q.    All right.  When you were doing the

8    negotiations, after you signed the Letter of

9    Understanding, saying everybody wants to go forward

10    with the deal provided everything checks out, you

11    were doing your due diligence, so to speak, and they

12    were doing their due diligence, was there

13    information requested by Epic concerning pending

14    lawsuits?

11:40:15   15        A.    In the due diligence, was there

16    information requested by Epic about lawsuits?  Yes,

17    I believe there was.

11:40:23   18        Q.    All right.  Did it matter to you that Epic

19    had -- may have had lawsuits pending?

11:40:34   20        A.    Yes, it did.

11:40:35   21        Q.    Okay.  On your end, the Connexus end, what

22    did you guys do to investigate pending litigation

23    that they -- they had ongoing at the time?

11:40:50   24        A.    Chris basically looked at their lawsuits

25    and met with their general counsel.

Confidential - Under Seal

82

| 11:41:03 | 1 | Q.   Okay.  Did they do the same thing with |
| | 2 | respect to any lawsuits that you may have had going |
| | 3 | on -- ongoing at the time? |
| 11:41:10 | 4 | A.   I believe so. |
| 11:41:11 | 5 | Q.   Okay.  And would Chris have been involved |
| | 6 | in that -- those disclosures? |
| 11:41:17 | 7 | A.   Yes. |
| 11:41:17 | 8 | Q.   And due diligence? |
| 11:41:18 | 9 | A.   Yes. |
| 11:41:21 | 10 | Q.   Were you directly involved? |
| 11:41:25 | 11 | A.   On legal issues? |
| 11:41:27 | 12 | Q.   Correct. |
| 11:41:28 | 13 | A.   I don't recall being directly involved. |
| 11:41:35 | 14 | Q.   At the time that the deal was signed in |
| | 15 | March of 2009, did Connexus -- I'm not asking you, |
| | 16 | and I don't want you to disclose any amounts -- have |
| | 17 | a reserve on the Weather Underground lawsuit? |
| 11:41:56 | 18 | MR. DELGADO:  Can I get that read back. |
| | 19 | (The requested testimony was read back) |
| 11:42:15 | 20 | MR. CLARK:  A loss reserve. |
| 11:42:17 | 21 | MR. DELGADO:  I'm going to object to the date. |
| | 22 | I think you're off on a year.  I don't know if you |
| | 23 | want to rephrase your question. |
| 11:42:24 | 24 | MR. CLARK:  I will. |
| 11:42:24 | 25 | MR. DELGADO:  Okay. |

Confidential - Under Seal

83

1    BY MR. CLARK:

11:42:24  2        Q.   So we got -- we got -- we got March of

3    2010 as the date.  Were there -- were there any

4    discussions at the time that this deal was signed in

5    March of 2010, or was there a loss -- was there a

6    loss reserve put on the Weather Underground lawsuit

7    or not?  There may or may not have been.

11:42:50  8        A.   I don't believe so.

11:43:05  9        Q.   During the due diligence, did Epic ask you

10   to put one on?  A loss reserve on the case?

11:43:12 11        A.   I do not believe so.

11:43:24 12        Q.   As of the time that you left in March of

13   this year, which entity, if you know, was paying the

14   legal fees associated with the Weather Underground

15   lawsuit?

11:43:43 16        A.   I don't know that for sure.

11:44:13 17        Q.   As you sit here today, do you know whether

18   there has been a loss reserve placed on the Weather

19   Underground lawsuit?

11:44:23 20        A.    I do not know that there has been one

21   placed.

11:45:27 22        MR. CLARK:  Let's have this one marked and

23   labeled.  I don't have a third copy of this.  I'm

24   not going to -- back this.

11:45:46 25        MR. DELGADO:  Okay.

Confidential - Under Seal

90

11:55:13  1      A.    Correct.

11:55:20  2      Q.    Now, am I correct, Connexus itself was a

3    parent company and it really wasn't a unit and

4    didn't really have any ongoing business on its own;

5    is that accurate?

11:55:35  6      A.    From a descriptive point of view, Connexus

7    was a -- yes, three with Matchpoint, two without

8    Matchpoint business lines.  The corporate was at the

9    Connexus level.

11:55:48  10     Q.    Right.

11:55:49  11     A.    One legal team under Chris.  One HR team,

12   which became under Chris as he -- but separate

13   technologies in the groups.  Separate sales,

14   separate businesses within the two.

11:56:03  15     Q.    Right.

11:56:03  16     A.    So there was no sale staff for business

17   line that reported into Connexus with a revenue

18   line, separate from those three and then two

19   businesses.

11:56:14  20     Q.    So am I correct, that there probably

21   wouldn't be an operating unit committee of Connexus

22   reporting to Don, it would simply be the units, or

23   do you know?

11:56:26  24     A.    I don't believe there is one but -- I

25   believe it would be a collection of the folks on

Confidential - Under Seal

|   |   |
|---|---|
| | 1   that page. |
| 11:56:38 | 2   Q.   A collection of the folks? |
| 11:56:40 | 3   A.   Who are on his page reporting to Don. |
| 11:56:45 | 4   Q.   In the prior page that we looked at? |
| 11:56:47 | 5   A.   Correct. |
| 11:56:48 | 6   Q.   I understand.  Okay. |

7          The next page is a page entitled

8   "Immediate Cost Reductions."  And it looks like some

9   folks didn't make the cut relative to the

10   combination of the companies.  Is that -- am I

11   correct, is that what we're looking at?

11:57:16   12   A.   We're looking at three, two founders from

13   the Epic side, and the chair from Epic side, who

14   were making salary that were no longer going to be

15   making salary, or the founders case, as much salary

16   as they had before.

17          One director of distribution that wasn't

18   replaced.  And then we're looking at corporate staff

19   from the Connexus side, as we consolidated the

20   corporate staff units.

11:57:56   21   Q.   All right.  Is Sandeep still with the

22   company?

11:57:59   23   A.   No, he's not.

11:58:01   24   Q.   He was the controller.  Did he find a spot

25   with another company prior to the merger?

Confidential - Under Seal

92

11:58:07    1        A.    No.   That was Mark Lambert.

11:58:09    2        Q.    Mark Lambert.

11:58:10    3        A.    Who was the CFO.   Sandeep worked for Mark

            4    and Sandeep stayed, and we told Sandeep, you won't

            5    be here, and we gave him a package after he stayed

            6    for some time.   So.

11:58:25    7        Q.    Okay.   Let's go to the next page under

            8    Finance and Accounting.   Future cost savings.   These

            9    are projected cost savings, I presume?

11:58:37    10       A.    Correct.

11:58:38    11       Q.    Let's take a look at those and see what

            12   they say.   Finance and accounting:   Deployment of

            13   Connexus NOLs, and I assume that's Net Operating

            14   Loss?

11:58:49    15       A.    Yes.

11:58:49    16       Q.    All right.   Tell me what the deployment of

            17   the Connexus NOLs were?

11:58:55    18       A.    So Connexus over time had losses that were

            19   not able to be used, to the best of my

            20   understanding, against income.   To the extent that

            21   the combined entity had income, that was once a

            22   worthless asset to Connexus, is now potentially an

            23   asset to be leveraged and save tax over time

            24   appropriately, as they could be deployed.   Which

            25   there's a lot of finance rules what can and can't be

Confidential - Under Seal

93

1    done.  So we have to put it through that process.

2    And as is appropriate, that would be what was once

3    not worth something, is now worth something.

11:59:36   4         Q.    All right.  Were these prior carryover

5    losses from Connexus that could now be used for the

6    benefit of the Epic entity?

11:59:47   7         A.    Correct.

11:59:48   8         Q.    Okay.

11:59:49   9         A.    I believe so.

11:59:55  10         Q.    All right.  And it says, the next -- next

11   one is, "One audit, one tax firm expected by end of

12   year."

13              And I think you already -- you touched on

14   that.  You moved out the Connexus accounting folks

15   and the Epic folks assumed that role?

12:00:15  16         A.    Yeah.  So the Epic systems became the

17   finance and accounting systems over time.  There

18   were still Connexus systems.  I don't know where

19   that is now.  The Epic audit firm became over time

20   the audit firm.  We only need one tax firm so, yes.

12:00:36  21         Q.    Sure.  One valuation.  And I think that

22   dovetails back into the question of Connexus when --

23   obviously when it was its own entity and its own

24   parent company, had a consolidated financial

25   statement.

Confidential - Under Seal

108

1    of -- all of those items are projections, but it

2    says, "Financials combined."  What's that mean?

3    What's going to happen there?

12:29:49   4        A.   We -- my sense was, I'll have to go back

5    in time a year.  My sense was that meant was, we

6    were presenting it as Epic legacy and Connexus

7    legacy.  We were now going to present it as Epic

8    Media Group, which would include both of those.

9            So it would say Firstlook, Epic Direct,

10   and Traffic Marketplace, as units going to an Epic

11   revenue line, consolidated -- Epic consolidated

12   expense line.  As opposed to two pages, it would now

13   be one.

12:30:30   14       Q.   All right.

12:30:32   15       A.   That's my sense.  I think, I believe it

16   did not mean balance sheets combined.  I think those

17   remain separate, but the presentations of the P & L

18   would be one P & L now called consolidated Epic

19   Media Group as opposed to --

12:30:49   20       THE REPORTER:  Now called what?  Consolidated?

12:30:53   21       THE WITNESS:  Consolidated -- sorry.

12:30:54   22       THE REPORTER:  Epic Group?

12:30:54   23       THE WITNESS:  Media Group.  I'm sorry.

24   BY MR. CLARK:

12:30:57   25       Q.   All right.  Let's look at slide number 11.

Confidential - Under Seal

109

| | | |
|---|---|---|
| 12:31:01 | 1 | A.   (Witness complies.) |
| 12:31:06 | 2 | Q.   And that looks like the second quarter |
| | 3 | 2010 financials, Epic Media Group total.  Epic Media |
| | 4 | Group total, Page 11.  And it has first quarter and |
| | 5 | second quarter revenue totals.  And under revenue |
| | 6 | and also margin totals, it has Epic Direct, TMP, |
| | 7 | which is Traffic Marketplace, Firstlook, and then |
| | 8 | the same categories under gross margin. |
| | 9 |         And my question is:  It doesn't say |
| | 10 | Connexus, how come? |
| 12:31:55 | 11 | A.   We didn't use the labels Epic Advertising, |
| | 12 | we used Epic Direct. |
| 12:31:59 | 13 | Q.   All right. |
| 12:32:00 | 14 | A.   And we didn't use Connexus because it |
| | 15 | didn't have a revenue line.  As we talked about |
| | 16 | prior.  The revenue lines for Connexus were Traffic |
| | 17 | Marketplace and Firstlook. |
| | 18 |         So you could say Connexus with those two |
| | 19 | points or you could just list those two, as those |
| | 20 | were the operating revenue units of Connexus. |
| 12:32:23 | 21 | Q.   All right.  Let's look at Page 19. |
| 12:32:34 | 22 | A.   (Witness complies.) |
| | 23 |         Do you mind if I just leaf through this |
| | 24 | real quick -- |
| 12:32:39 | 25 | Q.   Sure. |

Confidential - Under Seal

112

12:35:11    1        Q.    Okay.  All right.  We talked about the

            2    loss carryovers of Connexus being able to be

            3    utilized by Epic, I guess.

12:35:34    4        A.    Correct.  By the combined consolidated

            5    entity.

12:35:37    6        Q.    Yes.  All right.  Let's -- let's move on

            7    to Page 38.

12:35:48    8        A.    (Witness complies.)

            9             Just give me a second.

12:36:31   10        MR. CLARK:  Let's go ahead and mark the next

           11    one.

12:36:45   12        THE WITNESS:  Okay.

           13    (Whereupon Exhibit 295 was marked for identification)

12:36:45   14        MR. CLARK:  Mr. Shaw, before I ask you the

           15    question about this page, I want to ask you a quick

           16    question about what we've marked and labeled as

           17    Exhibit 295.

12:36:52   18        THE WITNESS:  Okay.

12:36:53   19        MR. CLARK:  It's entitled Minutes of a Meeting

           20    of the Board of Directors of Connexus, June 30th of

           21    2008.

12:37:00   22        THE WITNESS:  Okay.

           23    BY MR. CLARK:

12:37:00   24        Q.    And it was really just a small part of

           25    this document that I want to look at.  On the first