**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

WEATHER UNDERGROUND, INC., a Michigan corporation,

                Plaintiff,

v.

NAVIGATION CATAYLST SYSTEMS, INC., a Delaware corporation; BASIC FUSION, INC., a Delaware corporation; CONNEXUS CORP., a Delaware corporation; and FIRSTLOOK, INC., a Delaware corporation,

                Defendants.
                                           /

CASE NO. 09-10756

HON. MARIANNE O. BATTANI

**OPINION AND ORDER DENYING MOTIONS
FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on Defendants Connexus, Firstlook, and NCS' Motion for Summary Adjudication (Doc. No. 187), and Plaintiff's Motion for Partial Summary Judgment against National Catalyst Systems, Inc., Connexus Corp., and FirstLook Inc. (Doc. No. 189). The Court heard oral argument on September 14, 2011, and at the conclusion of the hearing took these matters under advisement. For the reasons that follow the motions are **DENIED**.

**I. INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff, Weather Underground, Inc. ("Weather Underground"), filed suit on October 26, 2009, against Defendants, alleging violations of federal and state law, including a claim that Defendants engaged in cybersquatting in violation of the Anticybersquatting Consumer Protection, 15 U.S.C. § 1125(d). Plaintiff, a commercial weather service,

indexes information provided to it by multiple weather stations. Plaintiff owns approximately 125 web addresses or domain names, including "Weather Underground," "Wund," "Wunderground," "Weather Sticker," "Wundersearch," "Wundermarp," and "Wunderradio." The majority integrate its trademarks and service marks.

According to Plaintiff, Defendants' business model capitalizes on Internet users' errors in typing the web addresses to businesses whose websites they intend to visit, a practice known as "typo squatting." Weather Underground alleges that Defendants infringed its trademarks by registering domain names with various misspellings of Plaintiff's web properties, <weatherunderground.com>, and <wund.com> in order to redirect Plaintiff's customers to competitors and third-party advertisers.

On August 28, 2008, Plaintiff filed a Complaint with the National Arbitration Forum to recover forty-one domain names registered by NCS. (Doc. No. 189, Ex. E). The Uniform Domain Dispute Resolution Policy ("UDRP") prohibits the registration of domain names with bad faith intent to profit that are identical or confusingly similar to either common law or registered trademarks.

On October 13, 2008, the arbitrator, Charles K. McCotter, Jr., found that NCS "is intentionally using the disputed domain names for commercial gain through a likelihood of confusion with [Plaintiff's] mark," and therefore the use "of the disputed domain names is also evidence of registration and use in bad faith." McCotter ordered NCS to transfer all 41 domain names, which constituted typographical errors of Plaintiff's registered and common law trademarks to Plaintiff.

**II. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) authorizes a court to grant summary judgment if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). However, the nonmoving party "cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009).

**III. ANALYSIS**

Both motions before the Court are directed to the anticybersquatting claims; both turn, at least in part, on whether Plaintiff can or cannot, as a matter of law, show Defendants' bad faith intent to profit as required under the Anticybersquatting Consumer Protection Act. Congress enacted the ACPA "to prohibit 'cybersquatting,' which occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." Sporty's Farm LLC v. Sportsman's Market, Inc., 202 F.3d 489 493 (2d Cir. 2000). A defendant engages in typosquatting when it "register[s] domain names that are intentional misspellings of distinctive or famous

3

names." Shields v. Zuccarini, 254 F.3d 476, 483 (3d Cir. 2001); see also Green v. Fornario, 486 F.3d 100, 103 n. 5 (3d Cir. 2007) (describing typosquatting as a "subgenera of cybersquatting" that "involves registering a domain name that is but a letter or two off from a distinctive mark").

To succeed on a claim under the ACPA, the trademark holder must establish five elements: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. Ford Motor Co. v. Catalanotte, 342 F.3d 543, 546 (6th Cir. 2003).  Only two elements are discussed below–confusing similarity and bad faith intent to profit.

### A. Confusing Similarity

The partes disagree on how the issue of confusing similarity of the 288 typographical variations and word swaps of Plaintiff's trademarks must be pursued. Plaintiff asks the Court to defer examination of the specific variations to the context of an assessment of statutory damages.  According to Plaintiff, at that time, the Court could review on a domain by domain basis. (Tr. at 7).  The Court declines Plaintiff's invitation. Defendants are correct that the issue of confusing similarity is an element of the claim. Therefore, the Court must rule on each of the challenged domain names before entering a judgment of liability.  Only after such a ruling do damages become relevant. Accordingly, Plaintiff has not met its burden to show it is entitled to judgment on its cybersquatting claims.

**B. Bad Faith Intent**

The parties' briefs focus primarily on the last factor of a trademark holder's claim–bad faith intent to profit. The statute sets out a list of nine nonexclusive factors that "a court may consider" in determining whether the "bad faith intent to profit" standard is satisfied. 15 U.S.C. § 1125(d)(1)(B)(i). The factors provided in the ACPA are "given to courts as a guide, not as a substitute for careful thinking" about the ultimate issue in a cybersquatting claim—"whether the conduct at issue is motivated by a bad faith intent to profit." Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d 806, 811 (6th Cir. 2004). The factors include:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the

5

> person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(b)(1). In assessing the factors, the Court is mindful of the harm the ACPA seeks to prevent. Congress designed the ACPA to "target a narrow class of cybersquatters consisting of those who have the bad faith intent to profit, and not to tread on the rights of those with any other motives." Mayflower Transit, LLC v. Prince, 314 F. Supp.2d 362, 370 (D. N.J. 2004). In Lucas Nursery and Landscaping, 359 F.3d at 810 (quoting S.Rep. No. 106-140 (1999), 1999 WL 594571, at *5-6 (emphasis added), the court elaborated:

> The Senate Report accompanying the Anticybersquatting Consumer Protection Act bolsters our understanding that a "bad faith intent to profit" is the essence of the wrong that the Act seeks to combat. That report defines cybersquatters as those who:
>
>> (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks"; (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder"; (3) "**register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site**"; (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities."
>
> With this harm in mind, the Court considers the arguments.

6

### 1. Level of intent

The parties' positions that they are entitled to partial summary judgment turn on whether Plaintiff can show a genuine dispute as to Defendants' bad faith.  Plaintiff argues that the Court may apply a willful blindness standard to the bad faith requirement. Plaintiff builds its argument on the absence of the term "subjective intent" in the statute, an omission that, according to Plaintiff, frees the Court to incorporate a willful blindness standard.  In contrast, Defendants argue that bad faith intent requires that Defendants knew of and targeted Plaintiff's good will.  Consequently, the standard is neither willful blindness nor negligence–it is a specific intent standard.

Weather Underground's argument has no support in case law; no court has applied a willful blindness standard to a cybersquatting case.  Moreover, the factors included in the statute undermine Plaintiff's position.  For example, factor V, requires consideration of "the person's **intent to divert** customers".  15 U.S.C. § 1125 (B)(1) (V) (emphasis added).  Factor VI likewise includes an assessment of the person's offer to sell a domain name it never used or had "**an intent to use**" in conjunction with the sale of goods and services.  15 U.S.C. § 1125 (B)(1) (VI) (emphasis added).  Factor VII analyzes the registration or acquisition of multiple domain names despite "**know[ing]**" they are confusingly similar. 15 U.S.C. § 1125 (B)(1) (VIII) (emphasis added).  The language in the statute undermines Plaintiff's position that willful blindness is all that it must show. Accordingly, the Court considers the statutory factors evidencing intent.

### 2. Evidence of Good Faith

The first four statutory factors "militate against a finding of bad faith by providing

some reasonable basis for why a defendant might have registered the domain name of another mark holder." Lucas Nursery and Landscaping, 359 F.3d at 809. Here, it is undisputed that Defendants have no trademark or other intellectual property rights in the wunderground.com domain name. The domain names registered by Defendants are not consistent with Defendants' names; nor is there any history of legitimate use of the domain name in connection with offering Defendants' services (see factors I-III). Moreover, the use here is strictly commercial (see factor IV).

Nevertheless, Defendants' witnesses have testified that they did not know about Plaintiff before Plaintiff filed a UDRP action against NCS. This testimony, although favorable to Defendants, fails to establish the absence of bad faith as a matter of law. A trademark holder does not need an admission from the accused infringer to prevail; a denial merely presents a credibility issue. Circumstantial evidence of an intent to profit satisfies the statute. And in this case, Defendants have no evidence supporting a good faith rationale for registering the contested domain names. Accordingly, the Court directs its attention to the facts suggesting bad faith intent to profit.

### 3. Evidence of Bad Faith

Although Plaintiffs offer some evidence that Defendants' sites have an inquiry option that they use to solicit the sale of their sites, the statute does not prohibit this conduct. There is no evidence presented that Defendants offered to transfer or sell the disputed sites to Plaintiff or its competitors. Because the websites contained a link that allowed

8

web users to "inquire about this domain", (see Doc. No. 189, Ex. GG), and Defendants included a legal disclaimer on some of the inquiry forms, which reads, "The existence of this form does not constitute an offer to sell this domain", (see Doc. No. 189. Ex. HH), Plaintiff conclude that the disclaimer is a ruse to avoid liability. Plaintiff is free to argue its interpretation to the jury.

The strongest evidence of bad faith presented to the Court at this juncture in the proceedings is Defendants' acquisition of multiple domain names which may be duplicative of the marks of others. (See Factor 8). According to Weather Underground, Defendants registered 288 variations of its trademark. In addition, Plaintiff maintains that Defendants did not limit registration to Plaintiff's mark, they registered variations of other third-party trademarks, received threat letters for trademark infringement, and have been involved in arbitrations and lawsuits on allegations of cybersquatting. The sheer number of sites creates an inference the Defendants acted with a bad faith intent to profit. Nevertheless, the number cannot be assessed in a vacuum. Other evidence plays into the analysis.

### 4. Additional Considerations

In addition to the statutory factors, both parties rely on Defendants' selection/exclusion system criteria, categorization training, and the optimization of ads process as evidence supporting their respective positions. Plaintiff focuses on the inadequacies; Defendants focus on the improvements.

The evidence, even when viewed cumulatively, does not support an award of summary judgment for either side. It merely demonstrate to the Court the existence of a

genuine dispute as to the issue of bad faith intent.

## IV. CONCLUSION

For the reasons stated above, both motions are **DENIED.**

**IT IS SO ORDERED.**

s/Marianne O. Battani  
MARIANNE O. BATTANI  
UNITED STATES DISTRICT JUDGE

Date:  November 9, 2011

## CERTIFICATE OF SERVICE

Copies of this Order were mailed and/or electronically filed to counsel of record on this date.

s/Bernadette M. Thebolt  
Case Manager