IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
a Michigan corporation,

                              Case No.  2:09-cv-10756

         Plaintiff,                 Hon. Marianne O. Battani

vs.

NAVIGATION CATALYST SYSTEMS, INC.,
a Delaware corporation; CONNEXUS CORP.,
a Delaware corporation; and FIRSTLOOK, INC.,
a Delaware corporation,

         Defendant.

_____/

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Counsel for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

Anthony Patti (P43729)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Co-counsel for Plaintiff

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & DELGADO
LLP
707 Wilshire Blvd., Ste. 3850
Los Angeles, CA  90017
213-955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

_____/

**PLAINTIFF'S EMERGENCY MOTION TO COMPEL PRODUCTION OF ASSET
TRANSFER DOCUMENTATION AND BRIEF IN SUPPORT**

NOW COME Plaintiff, by and through counsel, HOOPER HATHAWAY, P.C. and TRAVERSE LEGAL, PLC and hereby submits its Emergency Motion to Compel Production of Asset Transfer Documentation and states as follows:

1. The trial in this matter is set to commence on May 29, 2012.

2. This case was brought pursuant to the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 USC § 1125(d), in connection with Defendants' extensive and long-standing practice of engaging in the unlawful practice of "typo-squatting", by registering millions of domains which are nearly identical to those of legitimate third party trademark owners, including hundreds of domains which infringe upon Plaintiff The Weather Underground, Inc.'s ("Weather Underground's") registered trademarks.

3. On February 28, 2012, this Court denied Defendants' Motion for a Protective Order and ruled that the deposition of Defendant FirstLook's former president, Seth Jacoby, should proceed as a *de bene esse* deposition in New York City. (Dk #270).

4. The deposition was further delayed when Defendants paid to have New York City counsel file a second motion for a protective order and to quash the subpoena in the Southern District of New York, which was likewise denied at a hearing held on April 10, 2012, the federal judge in New York deferring to and respecting this Court's prior ruling on the same subject. (Attached hereto as Exhibit E). In his New York motion papers, supporting affidavits, and in open court, he and his counsel repeatedly told the judge that he had "no connection to any of the Defendants in the Weather Underground Matter whatsoever," that he didn't "have a dog in that fight," that he "just has nothing to do with" this dispute anymore, that he is trying to "build his own business," and that he had to hire his own counsel at great expense. (See Exhibits A and B; Exhibit C, April 10, 2012 New York Hearing Transcript at 4-5, 13). All of

this was said in an attempt to hide the ongoing commercial connection between him and the Defendants, and all of it was untrue.

5.      Thereafter, the deposition took place with all due haste, and Mr. Jacoby was deposed for a full day on April 12, 2012.

6.      During the course of his deposition, Mr. Jacoby revealed that his new employer, a limited liability company in which he is ostensibly the only member, called Flipside, LLC, took most if not all of Defendants' key assets and employees in a "no money down, pay over time based on 'what I can afford'" transaction, in addition to coordinating with Defendants to hide the domain portfolio at issue in this case through the use of "domain proxies" and a related off-shore registrar.  He also revealed that Defendants are still paying for his attorney fees. (Jacoby Dep. Trans., attached hereto as Exhibit E, pp. 244, 257-260, 291-292).

7.      On its face, the transfer of Defendants' business to this new entity, headed by one of the Defendant's former presidents, appears to be yet another chapter in the corporate shell game which has characterized these proceedings from the beginning. More importantly, the transfer of domains, some of which Mr. Jacoby acknowledges as infringing trademarks, potentially undermines Defendants primary defense that they acted in good faith in vetting for trademarks, especially after a 2008 review of their portfolio wherein they eliminated trademark domains. The jury could conclude that they were not trying to eliminate trademarks but trying to hide domains under proxy, move many trademark domains overseas and then move them to Seth Jacoby's new company. To the extent the contract terms appear to be less than arms length, the jury could conclude that Defendants post-2008 actions further establish bad faith.

8.     Despite their ongoing duty to supplement discovery responses, Defendants refuse to turn over to Plaintiff any of the documentation relating to these transfers and transactions.

9.     Plaintiff believes that this documentation is relevant to proving bad faith under the factors set forth at 15 U.S.C. § 1125(d)(1)(B) and because this information goes to the bias, self-interest and impeachment of Mr. Jacoby, who has already been identified by this Court as "an important witness in this case," and others.   (Dk #280, February 28, 2011 Hearing Transcript at 15).   Until the transactional related documents are produced, this Court need not rule on relevance.

10.     Pursuant to Local Rule 7.1(a), Plaintiff's co-counsel conferred with the attorney for the Defendants, at which time he explained the nature of the request and its legal basis and requested concurrence therein, but he was unable to obtain concurrence in the request or in the relief sought in this motion.

11.     This motion requires consideration on an emergency basis because trial is less than a month away.  It could not be filed until now because the supporting deposition transcript was not released until last week.

12.     Accordingly, Plaintiff hereby moves this Court for an order compelling Defendants to immediately produce the following items:

> (a)     any documents related to the transfer of assets (including but not limited to domain portfolios, servers, computers, trademarks, employees, contracts, and any other asset previously belonging to any Defendant in this case at any time) from Navigation Catalyst Systems, Inc., FirstLook, Inc., Connexus Corp., Basic Fusion, Inc., Flipside, Inc., Epic Media, Inc. or their related or affiliated companies to Seth Jacoby or Flipside, LLC, including but not limited to any and all contracts, agreements, memoranda of understanding, and intellectual property (including but not limited to domain) transfer lists;

3

     (b)     any and all drafts of the documents referenced in subpart "a" above;

     (c)     any and all documents reflecting communications of any kind which relate, refer, and/or pertain to the transfer of assets from or between Defendants Navigation Catalyst Systems, Inc., FirstLook, Inc., Connexus Corp., Basic Fusion, Inc., Flipside, Inc., Epic Media, Inc. or their related or affiliated companies to Seth Jacoby or Flipside, LLC;

     (d)     all documents referred to at p. 127, lines 16-23 and p. 174, lines 18-20 in the April 12, 2012 Deposition Transcript of Seth Jacoby[1]; and

     (e)     any and all records, checks, wire transfers or other documentation reflecting payments made by Seth Jacoby and/or Flipside, LLC to any of the Defendants or their related or affiliated companies in connection with the transfer of assets, business, employees, stock, ownership, domains, or intellectual property.

WHEREFORE, for the reasons set forth above and in the accompanying brief which appears below, Plaintiff asks this Court, on an emergency basis, to order the immediate production of the requested transactional records and documentation.

---

[1] These documents include e-mails reflecting negotiations, documents memorializing the transaction, a domain name transfer agreement and purchase agreement as well as contracts between Seth Jacoby and/or Flipside, LLC and the Defendants or their related or affiliated companies.  (Jacoby Dep. Trans., attached hereto as Exhibit D, pp. 127, 174).

4

Respectfully submitted this 4th day of May, 2012.

/s/Anthony P. Patti_____
Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Co-Counsel for Plaintiff

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI 49686
231-932-0411
enrico.schaefer@traverselegal.com
Lead Counsel for Plaintiff

# BRIEF IN SUPPORT

## Concise Statement of Issues Presented

1.    Should Defendants be immediately compelled to produce documents relating to transfers between Defendants and/or their related companies to Seth Jacoby and/or Flipside, LLC?

Plaintiff answers:  YES

Defendants answer:  NO

**Controlling or Most Appropriate Authority for the Relief Sought**

15 U.S.C. § 1125(d)………………………………………………………………………………...1

**Table of Contents**

Brief in Support……………………………………………………………………………..i

Concise Statement of Issues Presented……………………………………………………..i

Controlling or Most Appropriate Authority for the Relief Sought……………………………...ii

Table of Contents……………………………………………………………………………iii

Index of Exhibits Attached to the Brief………………………………………………………iv

I.      Introduction…………………………………………………………………………...1

II.     Factual Background…………………………………………………………………...1

        A.      Review of the Prior Proceedings in this Court Regarding the Jacoby
                Deposition……………………………………………………………………1

        B.      Court Proceedings in New York………………………………………………2

        C.      Jacoby's April 12, 2012 *De Bene Esse* Deposition……………………………...4

                1.      The Use of Proxies and Offshore Entities to Hide Domains…………….5

                2.      Defendants' Typosquatting Activities…………………………………...7

                3.      What Mr. Jacoby Took with Him When He Left Defendant
                        FirstLook and Moved to Flipside………………………………………10

                4.      The Transaction by Which Seth Jacoby Took Control of
                        Defendants' Business…………………………………………………..11

III.    Argument……………………………………………………………………………12

        A.      The Additional Discovery Requested by Weather Underground is
                Relevant to the Legal and Factual Issues of this Case…………………………12

        B.      Defendants Are Already Under Court Order to Produce Documents
                Regarding the Purchase of Domains, Including Documents Relating to
                Affiliated Companies …………………………………………………………15

IV.     Conclusion…………………………………………………………………………...16

**Index of Exhibits Attached to the Brief**

| Exhibit No. | Description |
|---|---|
| A | Affidavit of Seth Jacoby in Support of Motion to Quash |
| B | Affidavit of Seth Jacoby in Further Support of Motion to Quash |
| C | April 10, 2012 New York Hearing Transcript |
| D | Excerpts from Seth Jacoby's April 12, 2012 Deposition Transcript |
| E | New York Order Denying Motion to Quash the Subpoena |
| F | Ryaianir Domain Summary, Dep. Ex. P5.230A |
| G | Ryaneair Domain Summary, Dep. Ex. P5.233A |
| H | Ryanaair Domain Summary, Dep. Ex. P5.232A |
| I | Phoitobucket Domain Summary, Dep. Ex. P5.65A(1) |
| J | Humgryhowies Domain Summary, Dep. Ex. P5.45A(1) |
| K | Wanyestate Domain Summary, Dep. Ex. P5.91A |

## I.      Introduction

At the end of last year, Defendant FirstLook suddenly informed Plaintiff that its former president and key witness, Seth Jacoby, had parted for another company.  Plaintiff immediately asked for his current contact information, and Defendants ignored this request for several months.  When Plaintiff finally obtained the information and subpoenaed Mr. Jacoby for his *de bene esse* deposition in New York, Defendants moved this Court for a protective order, which was denied.  Defendants then paid for an attorney to file a Motion for a Protective Order and to Quash Subpoena in the Southern District of New York, which was likewise denied.  When the deposition finally took place on April 12, 2012, Mr. Jacoby made some remarkable revelations, namely, that his sworn affidavit denying any "connection … whatsoever" between his current employer and the Defendants was untrue.  As it turns out, his "new employer," a limited liability company in which he claims to be the sole member, now seems to miraculously have possession of hundreds of thousands of Defendants' domains, as well as their employees, computers, software, contracts, customers, trademarks and other assets.  Even more remarkably, the arrangement is so loose as to require no set consideration for this wholesale transfer of assets.  This motion seeks to quickly compel production of all documents and payment records relating to this implausible arrangement, as this evidence relates directly to Defendants' bad faith under the ACPA, as well as to the bias, self-interest and impeachment of Mr. Jacoby and others.

## II.     Factual Background

### A.      Review of the Prior Proceedings in this Court Regarding the Jacoby Deposition

Seth Jacoby was the president of Defendant FirstLook at the time of his September 2010 discovery deposition and apparently until late 2011.  As the Court will recall, on

1

November 11, 2011, Plaintiff's counsel asked about the status of Defendants' witnesses attendance at trial, requesting that contact information be provided for any witness no longer working for Defendants or any related company. (Dk # 268 at 3, Exhibit B thereto).[2]  Counsel for Defendants responded on November 29, 2012 that only two trial witnesses were still employed by Defendants, but did not provide any contact information as previously requested, instead suggesting that Plaintiff read in their discovery depositions.  On February 3, 2012, counsel for Plaintiff again asked for contact information for those witnesses who Mr. Delgado contended no longer worked for Defendants or related companies, noting that subpoenas would need to be issued for *de bene esse* depositions to preserve their trial testimony.  (*Id* and Exhibit C thereto).  Two months later, Defendants provided contact information, noting that, "the various witnesses are all outside the subpoena power of the Eastern District of Michigan[,] so it is unclear what you intend to send them."  (*Id*, Exhibit D thereto).  With the contact information in hand, Plaintiff served a subpoena on Seth Jacoby at his New York City address.  Defendants thereafter moved this Court for a protective order to prevent that deposition from occurring, to which Plaintiff filed a responding brief the following day.  (Dk ## 260, 268).  The Motion for a Protective Order was argued to this Court on February 28, 2012, at which time the Court stated that it sees Mr. Jacoby "as a important witness in this case," and accordingly denied the Motion for a Protective Order, granting Plaintiff the right to take his *de bene esse* deposition, without restriction.  (Dk #280, February 28, 2012 Hearing Transcript at 15).

### B.  Court Proceedings in New York

Before the next deposition could occur, Mr. Jacoby took a second bite at the proverbial apple by filing another motion for a protective order and to quash the subpoena in the Southern

---

[2] Items which are already part of the record in this case are referred to by docket number, so as not to re-attach the same material.

District of New York, which was not argued until April 10, 2012. In support of his motion, he filed two affidavits. In the first of these affidavits, he swore that he had "no connection to any of the defendants in the Weather Underground Matter whatsoever." (Exhibit A, ¶ 8). In the second of these affidavits, he swore that his new company, Flipside, LLC, "is not a subsidiary, parent, sister company or affiliate of any of the defendants in the underlying action." (Exhibit B, ¶ 2). In the "wherefore" clauses of both affidavits, he asked the Southern District of New York to award him his attorney fees against Weather Underground. (See Exhibits A and B). In the same vein, his New York attorney told the federal judge there that, "he doesn't have a dog in that fight, pardon the pun." (Exhibit C, April 10, 2012 New York Hearing Transcript at 4). His attorney also told the court that, "he has now had to retain counsel, obviously, and pay for that to come in and try to quash this. So it just seems very unfair that my client is being brought back into this action that he just has nothing to do with anymore, especially since he is trying to start and build his own business." (*Id* at 4-5). At the end of the New York argument, his attorney reminded the judge that, "[H]e's paying my bill …." (*Id* at 13).

The Southern District of New York likewise found Mr. Jacoby to be "an important witness," denied the motion for a protective order, and refused to impose any limitations as to the length or content of the deposition. (*Id*., pp. 14, 16; Order, attached hereto as Exhibit E). The deposition took place two days later. Mr. Jacoby's testimony quickly revealed, notwithstanding his repeated representations to the court that he had to hire counsel and pay for attorney fees, that the Defendants to this action were actually paying for all of his attorney fees. (Jacoby Dep. Trans., attached hereto as Exhibit D, pp. 257-259, 291-292). In other words, he not only mislead the court as to who was paying his attorney fees and permitted his attorney to misstate the true state of affairs to a federal judge, but, tellingly, the whole expensive ordeal in

the Southern District of New York (in which Weather Underground filed a brief, hired local counsel, and had its Michigan counsel appear at oral argument) was seemingly orchestrated by the Defendants, in their attempt to make an end-run around this Court's prior ruling by presenting a "lateral appeal" to a sister court.

    C.       Jacoby's April 12, 2012 *De Bene Esse* Deposition

Plaintiff had previously suspected and earlier brought to this Court's attention the assertion that Mr. Jacoby might still have much more of a connection to Defendants than he was willing to voluntarily reveal. As noted in Plaintiff's response to the earlier of the two motions for a protective order, the "Flipside.com" website for Mr. Jacoby's new company "Flipside, LLC" has a homepage which contains a secure "customer login" with the flowing code from Defendant FirstLook.com, referring specifically to "domainparking.firstlook.com. (Dk # 268 at 5 and Exhibit G thereto, HTML Code for Flipside.com). Flipside.com is a domain previously owned by Defendant Navigation Catalyst Systems ("NCS") (or its precursor company), from 2004 until September, 2011, when it was "flipped" to an untraceable registrant called "Corporation Service Corp." (Dk # 268, Exhibit H thereto). "Flipside" was a trademark owned by NCS, according to Defendants' counterclaim in the Verizon case. (*Id*, Exhibit I thereto).[3] Flipside, Inc. was a company that was owned by NCS or "its affiliated companies," as also noted in the NCS counterclaims against Verizon. (*Id*). Seth Jacoby claims that he is the sole member of Flipside, LLC. In other words, even before his deposition was taken, by all appearances, Mr. Jacoby was working for a company using these Defendants' domain name, trademark and the software code, making Defendants' claim that Mr. Jacoby no longer worked for a company in any way connected to them highly suspect.

---

[3] Interestingly, the U.S. Patent and Trademark Office shows the trademark as being registered to Flipside, Inc.

4

When the deposition at long last took place, it immediately became clear why the Defendants had gone to such great lengths to keep this witness from testifying. Mr. Jacoby's sworn statement that he had "no connection to any of the Defendants in the Weather Underground Matter whatsoever" turned out to be untrue: It purposely ignored the fact that he had an ongoing, alleged contractual relationship with the Defendants, by which he deported the very domains which are at issue here and most if not all of the Defendants' related assets and employees. When he finally raised his right hand before a court reporter, his *de bene esse* testimony was eye-opening with respect to: his ongoing relationship with the Defendants; what he took with him when he allegedly set up his own company; the measures taken to hide domain registrations through proxies and offshore affiliates; and the apparent lack of consideration for his clearing out of Defendants' assets. It is the documentation, payment history, and communications surrounding these transfers and activities which are at issue in this motion. Mr. Jacoby's new revelations regarding his current relationship with Defendants are summarized below:

**1.      The Use of Proxies and Offshore Entities to Hide Domains.**

This whole case is about Defendants' unlawful, bulk domain registrations. Under the ACPA, Plaintiff will have the burden of proving Defendants' "bad faith intent to profit" from their typo-squatting practices. 15 U.S.C. §1125(d)(1)(A)(i). The ACPA sets forth nine non-exclusive bad faith factors that a court may consider. Among these are the cyber pirate's: "intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct," 15 U.S.C. §1125(d)(1)(B)(VII); and, the "registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others …." *Id*, subpart (VIII). In previous federal litigation against

Verizon, Mr. Jacoby told the Central District of California, by way of affidavit, that Defendant NCS does not hide its contact information, but openly provides its address, email, phone number and fax number to the world. (Jacoby Dep. Trans., Exhibit D hereto, p. 207).  However, at some point, Defendants actually created and launched a "proxy service," which would in fact *preclude the world from seeing* that NCS or a related entity was in fact the registrant of a domain name, which Mr. Jacoby notes is "pretty common practice, yes." *Id.* After the Verizon lawsuit, Defendants made the decision to use the proxy service so that people couldn't see that NCS was the registrant. (*Id.* p. 208). To hide the contact information even more effectively, Defendants set up Vietnam Domain Privacy Services, a privacy service for a Vietnam-based registrar, owned by either Defendant Connexus or its related company, Epic Media, a former defendant in this case. (*Id.* pp. 208-209).  So if a domain name was registered to NCS, it would be placed in proxy to either Domain Name Proxy or the Vietnamese proxy, the later domains being put in Vietnam. (*Id.* pp. 210-211). In fact, when his current company, which now holds hundreds of thousands of NCS domains, runs afoul of a third party trademark or domain owner, the UDRP threat letters go to the Vietnam proxy service. (*Id.* pp. 241-243, 246). Mr. Jacoby explained the reason for moving domain names offshore:

> Q:    Wasn't the point of moving domain names to Vietnam [sic] is to hide the registrant information, number one, under proxy, and number two, to get trademarks protected in domains offshore where they couldn't be seized or attached?
>
> A:    I think in the environment that was going on at the time, it seemed like a decent idea to have names that were domiciled in Vietnam, yes.
>
> Q:    Offshore?
>
> A:    Yes.

(*Id.* pp. 211-212).

6

### 2.      Defendants' Typosquatting Activities.

Defendants' defense in this case has hinged upon convincing this Court that it inadvertently typo-squatted on a few trademarks and third party domains here and there, as confusingly similar typographical errors occasionally slipped through the cracks in its enormous domain portfolio. In particular, Defendants have contended that they developed a more thorough "scrubbing" process in 2008, by which they reviewed their entire domain portfolio and eliminated those domains which appear to be infringing upon the intellectual property rights of others. Mr. Jacoby's testimony, however, revealed that in 2009, *one year after* this supposedly "heightened level of scrutiny" (to borrow some verbiage from Constitutional Law), Defendants knowingly proceeded to *register even more typographical errors* of known trademarks, but used a domain proxy and offshore registrar scheme to hide their connection to them.

By way example, Mr. Jacoby is familiar with the discount European airline Ryan Air. (*Id.* p. 212). On December 21, 2007, Defendants registered the astonishingly similar domain "RYAIANIR." (*Id.* p. 213). It was listed as an NCS domain until November 2, 2009, somehow making it through Defendants' alleged enhanced trademark screening and scrubbing process, which was instituted the year before. (*Id.* pp. 213-214). Then, in November 2009, it was moved to Domain Name Proxy, LLC, in other words, placed under proxy so that the public could not see that NCS was the true owner. (*Id.* p. 214). Then it was moved offshore to Vietnam Domain Name Privacy Services. (*Id.* p. 214). As Mr. Jacoby admits:

> Q:      But then in any event this domain which you agree appears similar to the airline company?
>
> A:      Yes.

Q:  Supposedly would have been vetted before it was registered in December 21, 2007 for trademark issues, correct?

A:  Yes.

Q:  Then it would have gone through this supposed enhanced vetting process in 2008 and decided to be kept, correct?

A:  Yes.

Q:  Then it would have been put into Domain Name Proxy where it, Navigational Catalyst Systems could [sic] be identified as registrant?

A:  Yes.

Q:  Then was moved offshore to Vietnam Domain Privacy Services where it appears to have lasted until February 2, 2012, the date of this report, fair?

A:  That's fair to say.

(*Id.* pp. 214-215, 234; see also, Domain Name Summary History, Exhibit F hereto and marked as Dep. Ex. P5.230A-C).

In order to monetize this mark, Defendants' employees would "do research on what they believed that domain name to be by doing searches" through Google. (*Id.* p. 217). Google, recognizing RYAIANIR.com as an obvious typographical error of Ryan Air, would then show a screen which asks the question, "Did you mean Ryan Air?", offering the real website of the actual airline company. Defendants' employees could then figure out that the keywords they should use to optimize the typographical error RYAIANIR should relate to discount airlines. They would, therefore, add "cheap flights", "cheap airlines" and "cheap tickets" on the lander page of the Defendants' typo-squatted version of the domain in order to offer users a link they could click on, which in turn would take them to ads for those subjects, all (unlawfully) utilizing the legitimate airline and trademark owner's goodwill. (*Id.* pp. 216-217). Mr. Jacoby

8

realizes that if Defendants were serious about actually vetting for trademarks, all that they had to do is search on Google for their own misspellings, preferably *before* registering them; but instead, Defendants were using that same process, not to vet out and discard such "typo-domains," but rather, to figure out what key words and ad words should be used to optimize them for their own benefit. (*Id.* pp. 216-218).

And RYAIANIR.com is hardly an isolated example of this deliberate practice. Defendants also registered and hid behind a proxy, and moved offshore to Vietnam the domains RYANEAIR.com and RYANAAIR.com. (*Id.*, pp. 234-236; see also Summaries, attached hereto as Exhibits G and H and marked as Dep. Exs. P5.233A-C and P5.232A-C). It requires little imagination to understand whose goodwill they were attempting to misappropriate by registering these additional variations. This apparently did not bother Mr. Jacoby, who knew as early as 2008 that his company had registered a typo of a major discount airline, and who also knew that it had domain names that were similar to other domain names, and in fact were not only similar to but incorrect spellings of real websites. (*Id.* pp. 226, 221). Similarly, and also only by way of seemingly endless example, they followed the same process with such well known trademarks and domains as Photobucket, resulting in Defendants' registration of PHOITOBUCKET.com, (*Id.* pp. 218, 226-227; Exhibit I hereto, Dep. Ex. P5.65A-D), HUMGRYHOWIES.com (for Hungry Howie's) (*Id.* pp. 236-237; Exhibit J hereto, Dep. Ex. P5.45A-D), and WANYESTATE.com (for Wayne State) (*Id.* p. 239; Exhibit K hereto, Dep. Ex. P5.91A-D), to name a few. The typo-squats of Wayne State University's and Photobucket's domains are, not surprisingly, held in Vietnam. (*Id.* pp. 228, 240). Defendants' employees knew exactly which key words to associate with these domains -- despite their defense of inadvertent registration: "pizza restaurant" for HUMGRYHOWIES.com and

9

"Detroit University Information," "Detroit College Courses," and "Detroit College Events" for WANYESTATE.com. (*Id*, pp. 237, 239).

> **3.     What Mr. Jacoby Took with Him When He Left Defendant First Look and Moved to Flipside.**

In addition to moving domains into proxies and overseas in order to hide their ownership, Seth Jacoby also explained that "hundreds of thousands" of Defendant NCS's domains, or "slightly over fifty percent" came with him to his new company, although he has "no idea on the actual number of domains." (*Id.* pp. 240-241). This is not insignificant, because he acknowledges that NCS owned 766,087 domains when he signed his affidavit in the Verizon litigation back in 2008. (*Id.* p. 204). This would, no doubt, include the majority, if not all, of the domains revealed in this litigation when Defendants finally turned over the terabyte drive in late 2010.

Moreover, Mr. Jacoby also claims to have purchased Defendant Connexus's software, trademarks, furniture, chairs, 40 or more computers, desks, printers, customer contracts, and some domain names, including the domain names firstlook.com and flipside.com, now conveniently used by his new company, Flipside, LLC. (*Id.* pp. 119, 243, 260-261; see also, pp. 130-132). He also bought the Vietnamese domain registrar, known as April Sea, which took over the function that had previously been performed by Defendant Basic Fusion (*Id.* p. 261). In August 2011, his new company ended up taking control or becoming the registrant of the portfolio that used to belong to Connexus, parking some of the domains on Firstlook software. (*Id.* pp. 265-266). He admits that he is using Firstlook's software on flipside.com for account management services, and that his new company now also owns the domain firstlook.com and the trademarks relating to it. (*Id.* p. 145). Neither Defendant Firstlook nor Defendant Connexus has any employees left, and he admits to hiring "some" of Firstlook's employees. (*Id.* pp. 143-

145).   When asked if there's anything left in the Connexus companies in the wake of his transfer, he deferred to Defendants, saying, "I don't know what's there now."   (*Id*, pp. 132-133).  It has long been a matter of record in this case that Defendant NCS "does not have any employees," and is "really just a computer system that registers domains in bulk." (Dk. #234, Feb. 11, 2010 Hearing Trans. at 6).  Notwithstanding all of this, he continues to insist, as he did in the affidavit submitted in the Southern District of New York, that he has "no relationship," "no connection" and "nothing to do with" the Defendants anymore. (*Id.* pp. 161-162, 131; Exhibit A ¶8).[4]

### 4.     The Transaction By Which Seth Jacoby Took Control of Defendants' Business.

Seth Jacoby contends that he merely purchased assets from the Defendants. Defendants refuse to turn over any documents relating to this transfer, although Mr. Jacoby admits that he has contracts with them. (*Id*. p. 174). He also claims there are emails or records which reflect negotiations with them, and documentation which memorializes the transactions, such as a domain name transfer agreement or a purchase agreement. (*Id*. p. 127). Mr. Jacoby states that he "didn't read what the whole thing was," in terms of this new arrangement with the Defendants (*Id*. p. 178), and actually doesn't know whether his contract for all these assets is with Epic Media, Firstlook, Connexus, or all of them, although he knows he negotiated with Epic's in-house counsel. (*Id*. pp. 245-246). He's not sure who owned the portfolio that he purchased containing hundreds of thousands of domains. (*Id*. p. 246). He claims that the purchase price was $8,000,000 in a financed transaction, although he did not put any money

---

[4] Elsewhere in his deposition Mr. Jacoby states that, "and the reality here is that I'm not connected to the defendants whatsoever other than the fact that I purchased some assets from them and I'm paying them for those assets over time." He concedes that this is a "connection like any commercial connection…." (*Id*. p. 177).

down and is authorized to make unspecified quarterly payments, the amount of which "depends [upon] what I can afford." (*Id.* pp. 244, 260). He claims that he gave a security interest in his company, but is not sure exactly what is secured, or who holds that interest, since he does not know with which of the defendant companies he actually contracted. (*Id.* pp. 245-246).[5] In other words, Seth Jacoby, Firstlook's president until very recently, has moved all or most of the Defendants' pertinent assets and employees over to his new company for a purchase price of $8,000,000 with no money down and with no real commitment to pay over time, a song and a dance if there ever was one. Plaintiff suspects that it will be obvious to the Court why the details of this transaction warrant further discovery.

## III.   Argument

### A.   The Additional Discovery Requested by Weather Underground is Relevant to the Legal and Factual Issues of this Case

The shell game that has characterized this lawsuit throughout continues. Seth Jacoby's deposition revealed that Defendants' actions have been even more nefarious than Plaintiff could have imagined. In the second half of 2011, with a quickly approaching trial, Defendants used Mr. Jacoby as the conduit to strip their companies down to nothing, leaving Defendants with no employees and no assets. The domain portfolio, which has been at the heart of this case, and which is the subject of the terabyte drive that was turned over in discovery, has not only been moved to a new owner with nothing down, but has been deliberately hidden from view through domestic and offshore proxy services. Totally undercutting their defense in this case, Mr. Jacoby's *de bene esse* deposition demonstrates that, rather than giving heightened scrutiny to their domain registration practices through "special scrubbing processes" from 2008

---

[5] He supposedly did actually pay something less than $20,000 to rent space for the new company, although no money was paid to the Defendants simultaneous to the transfer of the numerous assets described above. (*Id.* pp. 244, 260, 263).

forward, Defendants were actually: 1) aggressively going after misspelled domains of known and famous marks; 2) hiding them, here and offshore; and 3) transferring them out of Defendants' *ostensible* control in sham transactions. Part and parcel to this cabal is the transfer of assets to Firstlook's former president, whose personal attorney is still being financed by Defendants. While Defendants seek to characterize this as an innocent, arm-lengths transaction, the admitted terms of the deal make it appear anything but that.

The documents which relate to this transaction are, therefore, relevant to determining whether the transaction is real, or simply another effort to hide the true ownership of the hundreds of thousands of domains held by the Defendants. From Mr. Jacoby's own testimony, it appears that domains, employees and other assets were transferred to his "new" company without any requirement that he pay any specific consideration, and with a security interest, by which Defendants could simply declare a default whenever they please and take back all of the assets.

Among the various bad-faith factors enumerated in the ACPA, is the cybersquatter's "intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. §1125(1)(B)(i)(VII). Thus, if this is a sham transaction, as it appears on the surface, it is just another attempt to hide the true owner of the extensive domain portfolio, and in the context of this specific litigation, yet another effort to make judgment collection difficult. The Court is respectfully asked to insist that Defendants come clean with the true details of what occurred here when the three remaining Defendants suddenly became shell corporations, and the former president of FirstLook somehow managed to maintain control over all these assets valued at $8,000,000, but with nothing down and no specific requirement to pay.

13

In addition to the value these documents may have in proving bad faith against the Defendants, it appears that they will also be relevant and admissible for the purpose of showing that, contrary to his testimony, Mr. Jacoby does indeed have "skin in the game" or, to use his own counsel's expression, "a dog in the fight." (See Exhibit C, New York Hearing Trans. at 4). Much of Mr. Jacoby's deposition testimony was self-serving or defensive of the Defendants' actions. The records requested in this motion may not only provide evidence of bad faith under the ACPA, but may also demonstrate Mr. Jacoby's bias, interest and motivation, and may provide a means to impeach future witnesses or to contradict Mr. Jacoby's own testimony.

The primary defense in this case has been that Defendants have supposedly worked very hard to cull trademarks out of their database as evidence of their good faith effort to avoid trademarks. Furthermore, they claim in their defense that while they may have made some mistakes earlier, they cleansed their portfolio of trademark issues during the highly questionable "scrub" of 2008. They hope the jury will find that their good faith efforts in 2008 preclude a finding of bad faith across the board. The evidence now, however, is that they moved domains, including ones they knew were trademark-protected, into Domain Name Proxy and Vietnam Privacy Services. Both companies were owned by Connexus. Both companies and most of the domains were then transferred to Flipside, LLC. The jury can conclude that Seth Jacoby's and Defendants' credibility on the primary defenses are undermined by the fact that they moved their portfolio into a proxy where no one could see who the registrant was, then moved them offshore outside U.S. jurisdiction, then moved them to Flipside, LLC under contract terms which may lack consideration. What the contract said and what was negotiated could completely undermine Defendants' defense and the credibility of their main witnesses. The jury is entitled to know the details of the negotiation and those

14

terms. If the requested documents tend to show that they in fact moved domains which are clear trademark violations -- such as misspellings of Ryan Air, Photobucket, Hungry Howie's and Wayne State -- into proxy services and Vietnam-based servers, and then transferred those assets to Seth Jacoby and/or his company on dubious terms, this "good faith" defense will crumble.

It is expected that this documentation may well further undermine Defendants' previous arguments that they do not hide their identity as the domains owners (because they "have nothing to hide") and that they are not intentionally infringing upon third party intellectual property rights. The typo-squats of Ryan Air, Photobucket, Hungry Howie's and Wayne State are just examples of instances where Defendants had actual knowledge of trademark rights and attempted to specifically conceal their ownership of those domains and transfer them to Vietnam, where a U.S. court could not attach them, and/or to Flipside, LLC, a non-party, which may, in reality, be just another affiliated entity. (See Jacoby Dep. Trans. pp. 211-212). Accordingly, this Court should order the production of all documents relating to the Jacoby/Flipside, LLC transaction.

### B. Defendants Are Already Under Court Order to Produce Documents Regarding the Purchase of Domains, Including Documents Relating to Affiliated Companies

As the Court will likely remember, the first year and a half of this litigation was consumed with extensive motion practice regarding Defendants' reluctance to make initial disclosures and to comply with discovery requests, resulting in roughly half a dozen hearings before Magistrate Judge Morgan and several orders compelling disclosure or discovery. Magistrate Judge Morgan made it clear that the Court was not going to tolerate Defendants' use

of related and affiliated companies to "hide the ball."  As she colorfully stated at the May 12, 2010 hearing:

> I do share some of the plaintiff's concerns about gamesmanship.
>
> I don't like the multiple hats. I don't like the documents coming from one company at one time, another company another time, and yet you are claiming they are not sufficiently related to go forward.
>
> So cut the crap. I'm not going to hear it anymore. Answer on behalf of all related companies. And if your guy continues to set up a bunch of extra companies, then you'll answer for them, too.

(Hearing Trans., Dk#86 at 10-11). The order compelling discovery from that hearing and the one that followed it a week later required, *inter alia*, production of emails "regarding the purchase or sale of domain names for the Domains at Issue, and for all domains registered by NCS during the period January 1, 2008 through January 1, 2009. (Dk# 82, ¶23).  Significantly, the order defines, "you," "your," "NCS," and "defendant" to include "Connexus, Firstlook, Basic Fusion, and any other affiliated companies that are involved in the registration, use or trafficking of domain names registered by Navigation Catalyst Systems, Inc." (*Id.* ¶3). Likewise, Defendants have at all times been obligated to turn over information which demonstrated the ownership of their domain portfolio. Accordingly, Defendants should not be entitled to fall back on a claim that there is no obligation to produce these records if it turns out that Mr. Jacoby happened to make his deal for the transfer of assets with parent company Epic Media or some other fly by night entity, rather than directly with one of the Defendants.

## IV.    Conclusion

"Something is rotten in the State of Denmark." (Shakespeare, *Hamlet*, Act I, Scene IV, 87-91). Seth Jacoby has just testified that the Defendants are now mere shell corporations, but he is somehow miraculously up and running with the same employees, same computers, same

software, and same domain portfolio, all for nothing, or, perhaps, whatever he "can afford." (See Jacoby Dep. Trans. p. 260). Meanwhile, Defendants maintain the right to take it all back apparently at any time through a security interest. While all of this is going on, domains are moved in and out of domestic and offshore proxies, so that the public won't know who owns them. If it smells like a sham transaction, and looks like a sham transaction, it most likely is a sham transaction. In order to tell whether it in fact is a sham transaction, thus constituting yet more evidence of Defendants' bad faith, this Court is respectively asked to grant this motion and order production of the following documents reasonably in advance of trial:

> (a)  any documents related to the transfer of assets (including but not limited to domain portfolios, servers, computers, trademarks, employees, contracts, and any other asset previously belonging to any Defendant in this case at any time) from Navigation Catalyst Systems, Inc., FirstLook, Inc., Connexus Corp., Basic Fusion, Inc., Flipside, Inc., Epic Media, Inc. or their related companies to Seth Jacoby or Flipside, LLC, including but not limited to any and all contracts, agreements, memoranda of understanding, and intellectual property (including but not limited to domain) transfer lists;
>
> (b)  any and all drafts of the documents referenced in subpart "a" above;
>
> (c)  any and all documents reflecting communications of any kind which relate, refer, and/or pertain to the transfer of assets from or between Defendants Navigation Catalyst Systems, Inc., FirstLook, Inc., Connexus Corp., Basic Fusion, Inc., Flipside, Inc., Epic Media, Inc. or their related companies to Seth Jacoby or Flipside, LLC;
>
> (d)  all documents referred to at p. 127, lines 16-23 and p. 174, lines 18-20 in the April 12, 2012 Deposition Transcript of Seth Jacoby; and
>
> (e)  any and all records, checks, wire transfers or other documentation reflecting payments made by Seth Jacoby and/or Flipside, LLC to any of the Defendants or their affiliated companies in connection with the transfer of assets, business, employees, stock, ownership, domains, or intellectual property.

Respectfully submitted this 4th day of May, 2012.

/s/Anthony P. Patti_____
Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Co-Counsel for Plaintiff

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI 49686
231-932-0411
enrico.schaefer@traverselegal.com
Lead Counsel for Plaintiff

18

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of May, 2012, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Counsel for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

Anthony Patti (P43729)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Co-counsel for Plaintiff

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & DELGADO
LLP
707 Wilshire Blvd., Ste. 3850
Los Angeles, CA  90017
213-955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

/s/Anthony P. Patti
Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Co-Counsel for Plaintiff