UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC., )
a Michigan Corporation,        )
                               )
              Plaintiff,       )
                               )
     vs.                       ) Case No. 2:09-CV-10756
                               )
NAVIGATION CATALYST SYSTEMS,   )
INC., a Delaware corporation;  )
BASIC FUSION, INC., a Delaware )
corporation; CONNEXUS CORP., a )
Delaware corporation; and      )
FIRSTLOOK, INC., a Delaware    )
corporation,                   )
                               )
              Defendants.      )
_____ )


VIDEOTAPED TRIAL DEPOSITION OF SETH JACOBY

New York, New York

Thursday, April 12, 2012


Reported by:  Jeremy Frank

NDS Job No.:  147647

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 119

1    don't know how you transfer that over so --

2         Q.    Now I think I understand.

3              So as part of your exit from Firstlook

4    what you're saying is that your new company

5    Flipside, LLC purchased the domain name Flipside.com

6    from the Connexus Group?

7         A.    Correct.

8         Q.    And the trademark which was owned by

9    Flipside, Inc which was part of the Connexus Group

10   at one time?

11        A.    Yes, that's how it was owned.

12             I don't know the ownership structure of

13   the actual trademark itself, but I know that the

14   trademark was assigned to me, I just haven't gone

15   through the process of actually, I don't know how

16   that works in terms of how it gets sent to me, but I

17   have got to do it, you reminded me of something.

18        Q.    So when you say that your company

19   Flipside, LLC has absolutely no relationship to

20   Connexus Group of companies, that's not really true,

21   is it, the connection is that you actually purchased

22   assets out of that company?

23        A.    Sure, I purchased assets out of that

24   company, but I have no, there is no other than that

25   relationship, and the sale of some assets, this

Page 127

1    $750,000?

2         A.    I did not but I remember it was high.

3         Q.    A seven-figure domain name occurs every

4    year, correct?

5         A.    Absolutely.

6         Q.    Absolutely.

7              And so in your discussions over the

8    purchase of this domain name with your former

9    employer, how much negotiation was there?  Did you

10   propose a number and they accepted, did they propose

11   a number and you accepted, tell me about the

12   negotiation.

13        A.    I'm not going to get into my negotiation

14   with them, I can tell you it happened over probably

15   several months.

16        Q.    Are there e-mails or records that

17   reflect the negotiations?

18        A.    Are there e-mails, probably, I would

19   imagine somewhere.

20        Q.    Is there a document which memorializes

21   the transaction, a domain name transfer agreement or

22   purchase agreement?

23        A.    Yes.

24        Q.    In that purchase agreement, does it also

25   specify that you're buying the trademark and they'll

Page 130

1            THE COURT REPORTER:  No, no.

2            I need you to wait for the attorneys to

3       finish speaking and also for the questioner

4       before answering.  Thank you.

5            Go ahead, please.

6       Q.   Did your former employer to your

7  knowledge ever put a value on the trademark

8  registration as part of that transaction?

9       A.   I have no idea how they figured the

10  transaction, how they valued their piece.

11       Q.   Did they ever say anything to you about

12  how they were going about their valuation during

13  negotiations?

14       A.   That would be kind of, no, they did not.

15       Q.   Sometimes you will say gee, Seth we took

16  at a look at least at four our transaction here, the

17  prices, and don't you think this is similar, so that

18  kind of thing does come up in some --

19       A.   No, I don't really remember how that

20  negotiation went in terms of the actual trademark

21  themselves, but I can tell you the focus was not on

22  the trademarks.  It I buy the domain name, then the

23  trademarks comes with it.  But it was never, I never

24  valued as a pure, you can see I don't value the

25  trademarks of Flipside as much as the domain name

1    considering I haven't even transferred it over to my

2    formal ownership yet.

3            Q.   Now, has anyone to your knowledge ever

4    made an offer for Flipside.com either the trademark

5    or the domain name while you were president?

6            A.   While I was the president, I couldn't

7    tell you.  I can tell you since I'm, excuse me, I'm

8    just fixing this, since I received offers for the

9    domain name.

10           Q.   Now, you have said a couple of times and

11   you said in an affidavit there was absolutely no

12   connection between your company, Flipside, LLC and

13   Flipside, Inc.  Now you're saying you meant to say

14   besides the fact that you bought the domain name and

15   got the trademark.

16               Isn't it true that you are also running

17   your new company off of Firstlook software?

18           A.   So going back to what I wrote, I said

19   that Flipside, LLC and Flipside, Inc are, the

20   defendants, have no corporate relationship with each

21   other.  There is a business transaction where I

22   purchased assets from them.  But beyond that, sort

23   of that transaction there is no relationship.

24               The second part of your question, yes,

25   some of the software, some of the software which

1    Firstlook was using I did purchase.

2         Q.    Okay.

3               So you also purchased Firstlook

4    software?

5         A.    Yes, some of it.

6         Q.    What parts?

7         A.    That's not relevant.

8         Q.    If I go to log in as a customer to your

9    website --

10        A.    Yes.

11        Q.    -- the software that is running in the

12   back end is running on Firstlook.com, correct?

13        A.    Yes, I own that domain name as well.

14        Q.    What else did you purchase or took with

15   you on the way out the door from Connexus when you

16   started Flipside, LLC?

17        A.    I purchased some software, I purchased

18   some domain names, and some contracts of customers

19   that like an assignment of some of those customers.

20        Q.    What domain name did you purchase

21   besides Flipside, did you purchase Firstlook.com?

22        A.    I purchased Firstlook.com, yes.

23        Q.    Was there anything left of Firstlook.com

24   at Connexus, at the Connexus companies after your

25   purchase?

1      A.    Yes.

2      Q.    What's left?

3      A.    You will have to ask them, I don't know

4  what's there now.

5      Q.    Okay.

6            What did you take with you besides the

7  domain names Firstlook.com, Flipside.com and the

8  trademark for Flipside?

9            MR. GREENE:  I object, this is going

10           towards bias?

11           MR. SCHAEFER:  Yes, if they essentially

12           gave him assets on the way out the door --

13           MR. GREENE:  They didn't give it, he

14           purchased it.

15           MR. SCHAEFER:  -- at below market value

16           or essentially took what he said was a

17           completely unrelated company is now doing

18           what Firstlook used to do in whole or in

19           part, then there is in fact a relationship

20           there.  And if he received an unwarranted

21           benefit from them then it goes to bias.

22           There is no way this is not relevant.

23           MR. GREENE:  You said doing what they

24           used to do, I don't think he testified to

25           that.

Page 143

1    A.   That's part of the reason but not solely

2  the reason.   Like I said before, the company was

3  moving in a direction that was not going to be

4  tenable long term.

5    Q.   What was that direction?

6    A.   Well as you can see, Firstlook doesn't

7  exist anymore, right?

8    Q.   I wasn't aware Firstlook doesn't exist

9  anymore.

10    A.   I don't think there is any employees on

11  Firstlook anymore, I don't know about the company

12  itself, but I don't think there is any employees

13  employed by Firstlook anymore.

14    Q.   What about Connexus, I understand there

15  was a merger with a company called Epic Media in May

16  2010?

17    A.   Correct.

18    MO.

19    MR. DELGADO:  I move to strike for the

20    purpose of enforcing an objection, I object

21    to the term merger.  I think this was decided

22    by the court it was not a merger, it was an

23    acquisition.

24    Q.   In lay terms you called it a merger in

25  your deposition, correct?

1     A.    Yes.

2     Q.    Without getting into the legal

3  technicalities of it, at some point all of the

4  Connexus employees became Epic Media employees?

5     A.    Yes, I think that's fair to say.

6     Q.    Okay.

7     A.    Yes.

8     Q.    To be fair to say, there are also no

9  Connexus employees left anymore, to your knowledge?

10    A.    Yes, I don't think so, yes.

11    Q.    Are there any Epic Media group employees

12  left as of the time that you departed the company?

13    A.    Yes, there were.

14    Q.    Okay.

15          And who was left when you --

16    A.    I don't know all of them, it was a big

17  company, I couldn't tell you how many people were.

18    Q.    And some of the Epic Media employees in

19  addition to yourself left in the months or in any

20  time in 2011 that you are aware of?

21    A.    Of course people left, I couldn't name

22  them, but yes.

23    Q.    Do any former Epic Media, Connexus

24  employees work for your company, Flipside?

25    A.    Some employees who worked for Firstlook

Page 145

1    specifically I did hire, yes.

2        Q.    What part of the Firstlook software are

3    you using on Flipside.com when I go to log in and I

4    see its now going to Firstlook.com servers?

5        A.    Parts of the account management service,

6    but I'm not going into details of my business.

7        Q.    Would that be the CMS software we had

8    talked about in the underlying case?

9        A.    Small parts of it.

10       Q.    Domain monetization?

11       A.    I'm not going into my business, I'm not.

12       Q.    Do you offer parking pages?

13       A.    I'm not getting into my business, it is

14   my business and it has nothing to do with this.

15       Q.    Do you now operate the domain

16   Connexus.com?

17       A.    Do I operate the domain Connexus.com,

18   no.

19       Q.    Do you own the domain Connexus.com?

20       A.    No.

21       Q.    Do you own the domain Firstlook.com?

22       A.    Yes.

23       Q.    Do you own the trademarks related to the

24   domain name Firstlook.com?

25       A.    I think I do.

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

1      A.    Yes.

2      Q.    So when you received the subpoena from

3  us to take your deposition for trial --

4      A.    Yes.

5      Q.    -- you hired an attorney and opposed

6  this deposition?

7      A.    Correct.

8      Q.    And according to your affidavit, the

9  reason that you did not want to have your trial

10 testimony taken is that in paragraph eight:

11         "Any further deposition of me would not

12         only be a waste of time but would be

13         extremely burdensome and a major

14         inconvenience."

15         Why did you believe that having the jury

16 hear your trial testimony would be a waste of time?

17     A.    Well, it is proven at least today you

18 have not asked me a single, barely a single new

19 question that you haven't asked me previously, with

20 the exception of a handful as we keep referring back

21 to my testimony, right?  So I have already testified

22 to this matter.

23         Secondly, I'm not party to this matter,

24 I have, you know, I'm not, I don't work for these

25 people anymore, I have nothing to do with them

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 162

1   anymore, and the reality is I have other things to
2   do.
3           Q.    And when you indicated that you have
4   nothing to do with the defendants in this underlying
5   Weather Underground case, correct?
6           A.    Correct.
7           Q.    But then again we have established that
8   you did walk away with some assets that used to
9   belong to that company.
10              MR. DELGADO:  Object to the
11          characterization walk away with assets.
12          Q.    You now allegedly own some of the assets
13  that used to belong to the prior company, correct?
14              MR. DELGADO:  Objection to the use of an
15          word allegedly.  The witness has testified he
16          purchased assets.  You want to ask him that
17          question, go for it.
18          A.    You know, my office buys coke and Bounty
19  paper towels, I have nothing to do with Procter &
20  Gamble or Pepsi Co.
21          Q.    Some of your current employees used to
22  work for the defendants in this case, correct?
23          A.    Yes.
24              One of my former employees used to work
25  for Exxon Mobil but I have nothing to do with them

1    associated since you purchased a number of assets

2    from them when you exited the company?

3                MR. DELGADO:  Objection argumentative,

4         vague and ambiguous.

5         A.    I own a Chrysler but I don't consider

6    myself associated somehow with Chrysler.

7         Q.    Do you still pay the defendant companies

8    or Epic Media any money as part of your asset

9    purchase?

10        A.    Yes.

11        Q.    Do you agree if you're paying them money

12   you certainly have an association with them?

13        A.    I think what you are trying to imply was

14   that I was a company associated with them.  What I'm

15   telling you is that not unlike my car example, if I

16   pay a car loan to Chrysler, that doesn't mean I have

17   any association with Chrysler Corporation.

18        Q.    Do you have contracts with the

19   defendants in the Weather Underground matter?

20        A.    Yes.

21        Q.    Don't you think that means that you in

22   fact have an association with them on a contract

23   level?

24        A.    On an arm's length business transaction

25   yes, not on a company corporation, no.

1    is a lawsuit against Chrysler and I own a Chrysler,

2    does that make me associated with Chrysler's

3    lawsuit, and the answer is absolutely no.  I'm

4    paying Chrysler and I'm use their product, when

5    Chrysler gets sued because they had bad brakes, I'm

6    not at fault.  And the reality here is that I'm not

7    connected to the defendants whatsoever other than

8    the fact I purchased some assets from them and I'm

9    paying them for those assets over time.

10           Q.   You would concede that is a connection,

11   would you?

12           A.   A connection like any commercial

13   connection, any product, we buy a connection of

14   another company.  I think you're stretching it to

15   think that I have some kind of, you know, that

16   corporate umbrella I'm under, I owe them stock or,

17   there's nothing of that effect, there is a business

18   transaction that happened.

19           Q.   Would you care to rephrase your

20   statement in your affidavit that you have no

21   connection with them whatsoever --

22           A.   Is there --

23           Q.   -- based on your testimony today?

24           A.   I think this was in response to this

25   affidavit was in response to you claiming that I

1    worked for the defendant, the answer is no.

2          Q.   We also claim that you were on assets

3    that used to belong to them, that was part of what

4    we arguing to court, we needed to discovery what the

5    relationship was.

6          A.   The answer to that is that I purchased

7    assets, and I believe, I don't remember exactly, I

8    certainly didn't read what the whole thing was, I

9    leave that to my attorneys, I trust my attorneys on

10   how they read that document.  But the assertion was

11   that somehow you were claiming that I am employed by

12   the defendant which is, or that my company is

13   associated with the defendants, and the answer to

14   that is simply not the case.

15              And that's exactly what it is in this

16   document, I'll use the commercial example over and

17   over and over again today if we have to.  The

18   reality is companies buy products from other

19   companies and I have no relationship whatsoever with

20   Dunkin Donuts, I do buy a doughnut every once in a

21   while, okay, fair?

22         Q.   If you owned Dunkin, if you were an

23   employee, president of Dunkin Donuts and Dunkin

24   Donuts was being sued for tens of million of dollars

25   which could potentially cause it severe economic

Page 204

1    like, then yes.

2              Q.    The next sentence says:

3                    "My knowledge of the matters herein is

4              based on personal knowledge and a review of

5              business records, except where stated upon

6              information and belief."

7                    Do you see that statement?

8              A.    No.

9              Q.    The last sentence of paragraph one.

10             A.    My knowledge, yes, okay.

11             Q.    What business records did you personally

12   review prior to giving this affidavit?

13             A.    I can't remember.

14             Q.    Is it possible that you didn't review

15   any business records and it was again prepared by

16   someone else?

17             A.    I can't remember.

18             Q.    Page three at the top right above

19   paragraph four, you're talking about Navigation

20   Catalyst's business and you refer to a portfolio of

21   domain names of approximately 766,087 websites.

22                   Would that be 766,087 domain names?

23             A.    Probably.

24             Q.    So you believe as of 2008 when you

25   signed this affidavit your portfolio of domain names

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

 1            listed as the registrant in the Whois

 2            database?

 3            Q.    Correct, that's correct, right?

 4            A.    Yes.

 5            Q.    That is to say you're telling the court

 6    here we provide our name Navigation Catalyst

 7    Systems, our address, our e-mail, our phone number,

 8    our fax number, to tell the world that we are the

 9    registrant of the domain name, we are not hiding,

10    correct?

11            A.    Yes.

12            Q.    At so some point your company actually

13    created and launched a proxy service, correct?

14            A.    Correct.

15            Q.    And that proxy service in fact would

16    preclude the world from seeing that Navigation

17    Catalyst Systems or a related entity was in fact the

18    registrant of a domain name, correct?

19            A.    That's pretty common practice, yes.

20            Q.    And so in this affidavit it appears what

21    you're saying is look at one of the reasons why you

22    should find we are not a bad faith cybersquatting is

23    because we tell, don't hide, we show the world we

24    are the actual owner of the domain.

25                  Is that fair?

1        A.    That's a fair question.

2        Q.    And after this Verizon lawsuit was

3   concluded the company made the decision to use a

4   proxy service so that people couldn't see that

5   Navigation, Navigation Catalyst Systems was a

6   registrant of the domain, correct?

7        A.    Correct.

8        Q.    The name of that company that your

9   entity created was called Domain Name Proxy?

10       A.    Something like that, yes.

11       Q.    Okay.

12             The effect of that would be that when

13  someone were to look up a domain name that they were

14  concerned about as a cybersquatter, they wouldn't be

15  able to see your name NCS, your address, your phone

16  number or that you will be able to see the

17  information Domain Name Proxy and that related

18  information?

19       A.    They would have all of that related

20  information, yes, more or less it was yes.

21       Q.    Whose Vietnam Domain Privacy Services?

22       A.    That was a privacy service for a Vietnam

23  registry, registrar.

24       Q.    Owned by Connexus?

25       A.    Correct.  Well, I don't know if it was

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 209

1    Connexus, again I don't know, but that company.

2         Q.    One of the Connexus companies?

3         A.    Yes.

4         Q.    Epic Media?

5         A.    Yes.

6         Q.    Okay.

7               So I understand that at one point you

8    moved domain names under proxy at Domain Name Proxy,

9    a company owned by one of the defendants, but it

10   sounds like you also moved domain names to a proxy

11   service in Vietnam called Vietnam Domain Privacy

12   Services.

13              What I want to understand is did you

14   move domains from Navigation Catalyst Systems under

15   proxy at Domain Name Proxy and from Domain Name

16   Proxy to Vietnam Privacy Services, or did you set

17   part of the portfolio under one proxy and another

18   part under the Vietnam proxy service?

19         A.    That's a good question.

20              I don't know how the decision was made

21   on how those names were actually, I think actually

22   what happened was names that were registered in

23   Vietnam were under a different proxy service name

24   that were registered from Navigation, right?

25   Navigation names I don't believe, are you asking me

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

1    if names at Basic Fusion had Vietnam proxy service

2    to it?

3          Q.    Yes.

4          A.    The answer would be no, no, that I don't

5    believe.

6          Q.    Let me make sure you understand.

7                So if there was a domain name that was

8    registered to Navigation Catalyst Systems --

9          A.    Yes.

10          Q.    -- if it went under proxy it went to

11    Domain Name Proxy or could it have also gone to

12    Vietnam proxy?

13          A.    It could have gone to either.  But I

14    don't know exactly how you know, I don't know really

15    know if we, it was either/or I believe.  I don't

16    know, I don't believe, we never had a name in

17    Vietnam that was registered under whatever.

18          Q.    Domain Proxy?

19          A.    Yes.

20          Q.    Then moved to Vietnam proxy?

21          A.    Yes, that never happened I don't

22    believe.

23          Q.    What was the criteria by which a domain

24    name --

25          A.    I don't believe it was ever a criteria,

Page 211

1   I think it was more of a timing issue, I think sort
2   of timing stopped on one and moved on to another.
3         Q.   And so at first you would have used
4   Domain Name Proxy, later you would have developed
5   Vietnam?
6         A.   I believe so, that's how it worked.
7         Q.   The Vietnam proxy would have been based
8   on servers located in Vietnam?
9         A.   I don't exactly know how, what do you
10  mean servers?
11        Q.   Well, what was the point of creating a
12  company in Vietnam, offshore in Vietnam?
13        A.   We have employees in Vietnam, we have 30
14  employees there, and so part of what we did when we,
15  you know, Net Blue probably had probably more than
16  30 employees.  And so a lot of our technical stuff
17  moved out to Vietnam, and a lot of development moved
18  to Vietnam, and that's just sort of how it evolved.
19        Q.   Wasn't the point of moving domain names
20  to Vietnam is to hide the registrant information,
21  number one, under proxy, and number two, to get
22  trademarks protected in domains offshore where they
23  couldn't be seized or attached?
24        A.   I think that in the environment that was
25  going on at the time, it seemed like a decent idea

Page 212

1    to have names that were domiciled in Vietnam, yes.

2         Q.   Offshore?

3         A.   Yes.

4              MR. SCHAEFER:  I'm going to hand you

5         what's been marked as P230A.  It is actually

6         P230A through P230C (XII).

7              (P5.230A, Domain name summaries and

8         Whois histories, marked for identification,

9         as of this date.)

10        Q.   First off, are you familiar with the

11   airline company called Ryan Air?

12        A.   I believe its like a low cost airline in

13   Europe.

14             Is that right?

15        Q.   I think so.

16             I'll hand you this document and this is

17   a domain name summary sheet and I'll represent on

18   the first page that it shows that you, Navigation

19   Catalyst Systems were the registrant of the domain

20   listed.

21             Would you care to sell that domain?

22        A.   R-Y-A-I-A-N-I-R.

23             THE COURT REPORTER:  One more time.

24        Q.   Dotcom?

25        A.   Yes.

Page 213

1              THE COURT REPORTER:  Do it again.

2      R-Y-A-N --

3              THE WITNESS:  R-Y-A-I-A-N-I-R.

4      Q.    And you would agree that that appears to

5  be a typographical variation of the airline company

6  Ryan Air?

7      A.    Could be.

8      Q.    It according to this sheet anyway it was

9  registered in or about December 21st, 2007?

10     A.    Yes.

11     Q.    And I'll represent to you that the

12 domain history in your own portfolio database and is

13 confirmed by Domain Tools shows it was listed as a

14 Navigation Catalyst domain until November 2nd, 2009.

15 And that would have meant this domain would have

16 been supposedly scrubbed by your new heightened

17 trademark scrubbing process --

18     A.    You're much better than me.

19             THE COURT REPORTER:  You're talking over

20         him.

21             Was scrubbed over, your new high tech

22         what?

23     Q.    -- trademark scrubbing process was in

24 2008, correct?

25     A.    I think so, yes.

Page 214

1      Q.    So this domain based on the dates would
2  have gone through your alleged enhanced trademark
3  screening process?
4      A.    Looks that way, yes.
5      Q.    And then in November 2009 it was moved
6  to the registrar or as listed as registrant to
7  Domain Name Proxy, LLC, it was placed under proxy,
8  you couldn't see Navigation Catalyst Systems as the
9  owner, correct?
10      A.    Let me look here, you're looking at
11  actual domain history.
12      Q.    Yes, this would be in the Domain Tools
13  data.
14      A.    Yes.
15      Q.    Then, contrary to what you say, they
16  never went from Navigation Catalyst Systems to
17  Domain Name Proxy to Vietnam Domain Privacy
18  Services, this domain information went from Domain
19  Name Proxy Service to offshore Vietnam Domain
20  Privacy Services November 2nd, 2011, and remains
21  there to this day, or at least through February 2nd,
22  2012 when this report was run.
23           MR. DELGADO:  Objection, lacks
24           foundation.
25      A.    Yes, this obviously happened after my

Page 215

1    exit from Firstlook so I can't tell you exactly how

2    that happened.

3              Q.    Okay.

4              But then in any event this domain which

5    you agree appears similar to the airline company?

6              A.    Yes.

7              Q.    Supposedly would have been vetted before

8    it was registered in December 21st, 2007 for

9    trademark issues, correct?

10             A.    Yes.

11             Q.    Then it would have gone through this

12   supposed enhanced vetting process in 2008 and

13   decided to be kept, correct?

14             A.    Yes.

15             Q.    Then it would have been put into Domain

16   Name Proxy where it, Navigation Catalyst Systems

17   could be identified as registrant?

18             A.    Yes.

19             Q.    Then was moved offshore to Vietnam

20   Domain Privacy Services where it appears to have

21   lasted until February 2nd, 2012, the date of this

22   report, fair?

23             A.    That's fair to say.

24             Q.    If we look at the second page which is

25   Plaintiff's 5.230B.

Page 216

1          A.    What are you --

2          Q.    The second page, this is information

3    pulled from your database which shows the

4    registration dates and also something called

5    categorization.  And that last box says that the

6    domain that we are talking about in February 2009

7    appears to have had key words associated with it

8    which include cheap flights, cheap airline, airline

9    tickets.

10              Would those have been the key words that

11   would have been placed on the domain as part of your

12   optimization process to drive more revenue?

13          A.    This is a seeded key word so I don't

14   quite know this.  I'm not the terminology, there are

15   some key words created that drive better words.

16   Some key words use to display results but more or

17   less those are the names, those are the key words

18   associated with the domain name but I don't know

19   exactly, there is different ways these key words are

20   actually used technically.

21          Q.    But in any event it appears that people

22   in your company would have added cheap flights,

23   cheap airlines and cheap tickets on to the lander

24   page in order to offer the user a link they could

25   click on which would then take them to another page

Page 217

1   which showed ads, correct?

2        A.   I don't know if exactly that's the way

3   it worked, but more or less in that sort of general

4   you know, characterization of it is relatively

5   correct, although I can't tell you exactly how these

6   key words were used together.

7        Q.   And could you explain to the jury how it

8   is that your categorization employees could identify

9   this otherwise arbitrary nondictionary word of

10  Ryaianir to the airline company but your trademark

11  review people couldn't see the trademark problem?

12       A.   Well, part of optimizing itself was a

13  little a bit more involved than and lot more timely.

14  And so what they would do is they do research on

15  what they believe that domain name to be by doing

16  searches.

17       Q.   That's the Google search we were talking

18  about earlier.

19       A.   Right.

20       Q.   So if you just simply type in the domain

21  name as exactly appears here, Google will say did

22  you mean and offer the real website of the airline

23  company?

24       A.   Yeah, that's part of the process, yes.

25       Q.   And you realize that if you were serious

Page 218

1    about actually vetting for trademarks you could have

2    also done that same Google search to find

3    quote/unquote a real website to see if there might

4    be a trademark problem.

5            Would you agree with that?

6        A.   I would agree with that.

7        Q.   Are you familiar with the website

8    PhotoBucket?

9        A.   Yes.

10           MR. SCHAEFER:  I'll hand you what has

11       been marked Plaintiff's 5.65A(1) through

12       P5.65D which is the same type of information.

13           (Plaintiff's 5.65A(1), Domain name

14       summaries and Whois histories, marked for

15       identification, as of this date.)

16           MR. SCHAEFER:  Let's take a break, we

17       have now a tape issue.

18           THE VIDEOGRAPHER:  We are now going off

19       the record at approximately 2:38 p.m., April

20       12th, 2012.  This concludes tape number

21       three.

22           Off the record.

23           (Whereupon, an off-the-record discussion

24       was held.)

25           THE VIDEOGRAPHER:  This is the beginning

Page 221

1    understood that there might be a change to the

2    policy which would effect your domain tasting --

3          A.    It seems so.

4          Q.    -- efforts?

5          A.    Potentially, yes.

6          Q.    Then he says interestingly:

7                "Many of our domain names involve an

8          incorrect spelling of some other domain

9          names."

10               Was that true at the time did you have

11   an understanding that many of your domain names

12   involved an incorrect spelling of some other domain?

13         A.    I think you have to qualify many,

14   certainly we had domain names that were similar to

15   what he's talking about, yes.

16         Q.    Or not only similar but incorrect

17   spellings of a real website of a real domain name?

18         A.    In some cases, yes.

19         Q.    Do you have any idea why he would have

20   said many of our domain names or do you disagree

21   with that?

22               MR. DELGADO:  Objection, compound.

23         A.    Yes, well I don't know what many, what

24   he thinks is many but you know, certainly I don't

25   know what the breakdown is, I don't really remember

Page 226

1    recollection of the test, so its unlikely that I --

2              THE COURT REPORTER:  So I what --

3         A.   I have absolutely no recollection of

4    this e-mail and I have absolutely no recollection of

5    that test so --

6         Q.   And in any event, you knew as of the

7    date of this e-mail in 2008 that your company had

8    registered a typo of a major discount airline,

9    correct?

10        A.   This RyanAir.com domain name?

11        Q.   Yes.

12        A.   It was in this e-mail, yes.

13        Q.   And your response doesn't say anything

14   about the fact that it may be a problem that you

15   have this typo of a major discount airline, does it?

16        A.   No.

17        Q.   Do you recall if you did anything to

18   divest yourself of that domain after seeing this

19   e-mail where you have got a typo of a misspelled

20   domain of a real website?

21        A.   I have no idea.

22        Q.   Let's take a look at the PhoitoBucket

23   exhibit which is P5.65A(1), and it goes through

24   5.65D, and so this is a domain name and its

25   PhotoBucket except it adds an I after the first O,

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

1    P-H-O-I-T-O.

2              Is that correct?

3         A.    Yes, that's what we are looking at.

4         Q.    And would it surprise you looking at any

5    keyboard it appears that the O and the I are right

6    next to each other on the keyboard?

7         A.    If you say so.

8         Q.    And so given that it looks like, have

9    you ever heard of the phrase sticky key?

10        A.    No.

11        Q.    Someone hits two keys at the same time

12   by accident?

13        A.    I'm sure that happens, of course.

14        Q.    You by registering domains like this

15   that are sticky keys of websites that do significant

16   traffic like PhotoBucket, you have the opportunity

17   to make money by showing ads and diverting that

18   traffic, correct?

19        A.    That's correct.

20        Q.    So this domain name summary which I'll

21   represent is a summary of the information to follow

22   indicates that Navigation, Navigation Catalyst

23   Systems the defendants registered in February 2005.

24              Do you see that on the summary sheet?

25        A.    Yes.

Page 228

1        Q.   And then under other registrants it says

2    that the domain was moved to Domain Name Proxy

3    February 2010 to August 2011 which granted would

4    have been just after you left, correct?

5        A.   Excuse me, correct.

6        Q.   Then they move to Vietnam Domain Privacy

7    Service from August 2011 until this data was

8    captured just last month.

9             Do you see that?

10       A.   I see that.

11       Q.   So, you acknowledge that this appears to

12   be a typo of the real website PhotoBucket.com,

13   correct?

14       A.   Yes.

15       Q.   In fact if we go to the next page which

16   is P5.65A(2), that appears to be a parking page

17   delivered by the Firstlook software?

18       A.   It looks like our page.

19       Q.   It says, Welcome to, it lists the

20   literal spelling of the domain name with the extra

21   I?

22       A.   Mm-hmm.

23       Q.   Then the first key word underneath it

24   says in fact Photo Bucket.

25             MR. PATTI:  We need an actual answer.

1    typos as exhibits.  This next one Plaintiff's

2    Exhibit 5.233A, which appears to be another

3    typographical variation of Ryan Air, this one

4    R-Y-A-N-E-A-I-R.com, registered by Navigation

5    Catalyst Systems in August 2007, moved to

6    Domain Name Proxy in 2009 and Vietnam Domain

7    Privacy Service November 2011.

8         (P5.233A, Domain name summaries and

9    Whois histories, marked for identification,

10   as of this date.)

11        Q.   Let's take a look at the second page

12   again, this appears that this 2009 which would have

13   been after the supposed vetting for trademarks seed

14   key words would have been added by Firstlook

15   personnel that would have included cheap airlines,

16   cheap flights and discount air travel, correct?

17        A.   Yes.

18        Q.   Is this a domain that might be one that

19   you purchased from Connexus Firstlook when you

20   started your new company?

21        A.   I have no idea.

22        Q.   It is possible but you don't know?

23        A.   I don't know.

24        Q.   You do know some names that you do have

25   under Vietnam Domain Privacy Service.

Page 236

1        Q.    We look at the search domain portfolio

2   from the second page, it looks like the initial

3   registration was 2004.

4        A.    You're mistaking the cache date in the

5   Domain Tools is the date you put in.

6        Q.    Okay, that might be an error on our

7   part.

8             In any event the data from your database

9   appears that it was 2004, and again this would have

10  gone to Domain Name Proxy, then to Vietnam Domain

11  Privacy Service through last month with

12  categorization of this one has got different

13  categorizations.

14             So let's take a look at that, looks like

15  December 9th user ID 105, role ID three, put key

16  words in cheap hotel, discount air travel, bargain

17  travel.  But then December 11th a couple days later

18  it was changed to cheap airfare, plane tickets

19  online, book a flight.

20             Do you have any idea why within a couple

21  of days the seed key words would have been changed?

22        A.    No idea.

23             MR. SCHAEFER:  Let's take look at a

24        P5.45A(1) and all the way through P5.45D.

25        This is a domain name and its

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

1    Hungryhowies.com except instead of an N it is

2    an M, H-U-M-G-R-Y.

3         (P5.45A(1), Domain name summaries and

4    Whois histories, marked for identification,

5    as of this date.)

6    Q.   You certainly recognize the brand Hungry

7 Howie's, correct?

8    A.   Never heard of it.

9    Q.   You never heard of a pizza chain Hungry

10 Howie's?

11   A.   Never.

12   Q.   It appears your categorization folks on

13 page P5.45B under categorization, your employees

14 actually added the seed key word pizza restaurant.

15   A.   Looks that way.

16   Q.   This would have been a domain

17 registration in November 2007 by Navigation Catalyst

18 Systems, correct?

19   A.   Correct.

20   Q.   I can't remember from this morning, is

21 late 2007 a period where you say you were doing a

22 better job at vetting domains for trademarks or

23 hadn't already started that yet?

24   A.   I can't really remember.

25   Q.   This looks like a domain that you have

1    tasted.  If you look at that data page that's your

2    data, there is a tasting record which shows that it

3    was tasted November 26th, 2007.

4         A.   I'm not sure.

5         Q.   I'll represent to you that's coming out

6    of your tasting database and that that reflects that

7    you would have tasted and then decided to keep this

8    particular domain.

9         A.   Okay, if you say so.

10        Q.   Okay.

11             Given that your categorization people

12   could identify this as a pizza restaurant, do you

13   have any explanation as to how this could have

14   gotten through your trademark vetting system?

15        A.   No.

16        Q.   In any event, if we go to the very last

17   page, P5.45D, we see that HungryHowie's is in fact a

18   registered trademark for restaurant services with a

19   filing date of 1987.

20             Does that appear to be correct?

21        A.   That appears to be correct, actually

22   that's incorrect.

23        Q.   What do you see?

24        A.   Registration date is 1988.

25        Q.   Let's see, I'm seeing a filing date of

Page 239

1    1987.

2          A.    Filing date of 1987 is correct.

3          Q.    Okay.

4                Are you familiar with something in

5    Detroit called Wayne State?

6          A.    The university, that guy was crazy and

7    shot a lot of kids.

8          Q.    You got it.

9          A.    I think so, yes.

10               MR. SCHAEFER:  So let me hand you P5.91A

11               which is a domain and its W-A-N-Y-E-

12               S-T-A-T-E.com, WanyeState.com.

13               (P5.91A, Domain name summaries and Whois

14               histories, marked for identification, as of

15               this date.)

16         Q.    It appears to have been registered in

17   January 2008, and again if we look at the

18   categorization even though perhaps you can make the

19   argument that that could be lots of different

20   things, right, Wanyestate.com, it appears your

21   categorization people were able to identify several

22   key words seeds, Detroit University Information,

23   Detroit College Courses and Detroit College Events.

24               Do you see that?

25         A.    Yes, I see that.

1    Q.   And so again, any idea how your

2  categorization people could see how to optimize this

3  domain towards the university and your trademark

4  vetting people couldn't identify this as a

5  trademark?

6    A.   I'm not sure.

7    Q.   If we go to the last page 5.91D, we see

8  that Wayne State University is in fact a registered

9  trademark since 1956, filed in 1990, correct?

10    MR. PATTI:  1990?

11    MR. SCHAEFER:  Filed December 13th,

12    1990, second line from the bottom off the

13    right.

14    A.   Filed December 13th, 1990, registered

15  November 5th, 1991, yes.

16    Q.   Again this is a domain that appears to

17  have been put into proxy and moved offshore to

18  Vietnam Domain Privacy Service, correct, at least

19  from the summary page which the Domain Tools history

20  will back up.

21    A.   It looks that way.

22    Q.   Again this domain might be under

23  Flipside, we just don't know sitting here today?

24    A.   I have no idea.

25    Q.   How much of the domain portfolio from

1  Navigation Catalyst Systems Firstlook Connexus did

2  you purchase, approximately how many domains?

3           A.    I have no idea on the actual number of

4  domains.

5           Q.    Is it hundreds, thousands, tens of

6  thousands, hundreds of thousands?

7           A.    Its hundreds of thousands.

8           Q.    Was it to your knowledge most of the

9  Navigation Catalyst Systems portfolio?

10          A.    No, most meaning more than 50 percent?

11          Q.    More than 50 percent.

12          A.    Slightly over 50 percent is currently

13  owned.

14          Q.    And I take it that you paid, you have

15  some sort of arrangement with them where you're

16  paying them for that portfolio?

17          A.    No, not just for the portfolio.

18          Q.    Let me ask you --

19          A.    The portfolio is a fraction of my

20  business, a tiny portion.

21          Q.    Let's me ask you this.

22                The portfolio domain names that you now

23  have that used to be listed as Navigation Catalyst

24  Systems --

25          A.    Yes.

Page 242

1       Q.    -- did you pay for those domains or were
2   they simply transferred to you?
3       A.    I paid for them.
4       Q.    Did you license them or --
5       A.    No.
6       Q.    -- or purchase them outright?
7       A.    Purchased them.
8       Q.    Okay.
9             And how much did you allocate to the
10  purchase of the domain portfolio as part of that?
11      A.    Well, the domain, so the domains were at
12  the time of the purchase probably to be honest, we
13  never really looked at it that way, I mean, I don't,
14  we didn't value it that way, I didn't value it that
15  way.
16      Q.    How did you value the assets that you
17  purchased, was it just bulk price, did you try and
18  categorize the assets by category, what was the
19  general model?
20      A.    No, it was based on a multiple of the
21  business.
22      Q.    Okay.
23            A multiple of the total business?
24      A.    Right.
25      Q.    For instance, domain names monetization?

Page 243

1          A.    No, the domain name monetization

2    portion, this is a tiny fraction of the business,

3    maybe 10 percent.

4          Q.    What beyond the domain portfolio did you

5    buy from Firstlook?  I understand that you have new

6    things that you're doing, so just for now I want to

7    focus in on what did you buy from Firstlook

8    Connexus.

9          A.    Sure, I bought software as I mentioned.

10         Q.    That would be the Firstlook software?

11         A.    Some of it, yes.

12         Q.    Some of it?

13         A.    Yes.

14               I bought furniture, chairs, computers,

15   desks, printers, I bought contracts, so customer

16   contracts that were assigned to me, I bought some

17   domain names, I bought, that's it.

18         Q.    So part of what you bought was the kind

19   of portfolio domain name I take it were some special

20   domain names separate from the portfolio

21   Flipside.com that you purchased as well?

22         A.    Yes, there was, they were in the

23   portfolio domain name.

24         Q.    You were not monetizing those as lander

25   pages per se?

Page 244

1          A.    Yes, I am, with the exception of

2    Flipside.

3          Q.    So if I type Wunderground.Flipside.com,

4    I'll get a lander page with advertising on it,

5    correct?

6          A.    Wunderground.Flipside.com, no, you will

7    not.

8          Q.    Did they take a security interest as

9    they being your former companies as part of this

10   transaction?

11         A.    Did they take a security interest?

12         Q.    Did they give you a loan or finance the

13   transaction?

14         A.    A loan, they financed the transaction.

15         Q.    So you're making payments to them?

16         A.    Yes.

17         Q.    What was the total purchase price of the

18   transaction with Firstlook Connexus?

19         A.    Total purchase price without interest,

20   of course interest will be added was $8 million.

21         Q.    And did you put some money down or it

22   was all financed?

23         A.    Some of my own money was spent to start,

24   finance of the business, it wasn't paid to them.

25         Q.    Okay.

Page 245

1           So you're paying them monthly,

2    quarterly, annually?

3        A.   Quarterly.

4        Q.   Quarterly.

5           And over what term do you owe them

6    money?

7        A.   I believe the term goes through 2015,

8    what year is it now, 2012, to 2015, I believe.

9        Q.   And there is interest on the financing?

10       A.   Of course, yes.

11       Q.   And they took a security interest in the

12   domains and other assets that were transferred?

13       A.   I think they have a security interest in

14   the company in case I default of some sort, yes.  I

15   don't really know how the security interest works

16   technically, but I remember that term coming up

17   during the negotiation.

18       Q.   Kind of an all asset?

19       A.   Excuse me?

20       Q.   All asset security interest where you

21   have an asset and they a security interest in it?

22       A.   I couldn't tell you.

23       Q.   Who was the transaction with, was it

24   with Epic Media Group, Connexus, Firstlook, all of

25   those companies, some other companies?

Page 246

1          A.    I negotiated the agreement with Dave
2     Graff.
3          Q.    Do you recall on the contract who the
4     other contracting party was, was it Epic Media, was
5     it Firstlook, was it Connexus, was it all of them?
6          A.    To be honest with you, I don't really
7     know.
8          Q.    Who owned the domain portfolio at the
9     time that you purchased it, which company, do you
10    know?
11         A.    I'm not sure.
12               There was a period of time where I
13    wasn't employed by the company and when I purchased
14    the assets, so I don't know.
15         Q.    Have you received any trademark
16    infringement letters or UDR proceeding to the
17    portfolio since you took the portfolio?
18         A.    Have I, no.
19         Q.    Your company Flipside?
20         A.    Flipside, LLC has not, no.
21         Q.    Has Vietnam Proxy Service on your behalf
22    received those kind of letters, threat letters,
23    UDRPs, et cetera?
24         A.    I believe so.
25         Q.    What assets to your knowledge that used

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 257

1          for speculation and lacks foundation.

2          A.   I believe he works for Epic Media.

3          Q.   Give me a second.

4               When was the last time you spoke to

5     David Graff?

6          A.   Last time I spoke to him was two days

7     ago.

8          Q.   Okay.

9               And did you speak to him in preparation

10    for this deposition?

11         A.   No.

12         Q.   With regard to, you did hire an attorney

13    to be with you here with you today for you

14    personally, correct?

15         A.   Correct.

16         Q.   Whose paying for that attorney, you or

17    Epic Media, Connexus, et cetera?

18         A.   The latter.

19         Q.   You're paying for your own attorney or

20    your company is?

21         A.   I said the latter.

22         Q.   Epic Media is paying for your attorney?

23         A.   Yes.

24         Q.   Again, that doesn't sound like no

25    relationship whatsoever with Epic Media, Connexus

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 258

1    companies.

2              When you represented to the court that

3    there was no relationship whatsoever between your

4    new company and Epic Media, had Epic Media, Connexus

5    agreed to pay your attorneys fees at that point?

6         A.   No.

7              MR. SCHAEFER:   Let's take a five-minute

8         break.

9              THE VIDEOGRAPHER:   We are now going off

10        the record at approximately 3:49 p.m., April

11        12th, 2012.

12             (Whereupon, an off-the-record discussion

13        was held.)

14             THE VIDEOGRAPHER:   This is the

15        continuation of tape number four of the

16        deposition of Mr. Seth Jacoby.   We are now

17        going on the record at approximately 4:04

18        p.m., April 12th, 2012.

19             THE WITNESS:   If I can correct my last

20        answer, I think I misunderstood.

21        Q.   Go ahead.

22        A.   The arrangement for my attorneys fees in

23   relation to anything related to this matter was made

24   long ago, you know, last summer.   So I thought you

25   had mentioned, asked was it made like now, the

Page 259

1    answer is no, it was made, you know, last July.

2            Q.    Okay.

3                  So July 2011 as part of your departure?

4            A.    It was if I have to get roped back into

5    this thing you guys are going to pay, you have to

6    pay for my attorney.

7            Q.    Being who?

8            A.    Epic.

9            Q.    Epic Media Group?

10           A.    Yes.

11           Q.    Connexus, Firstlook, correct?

12           A.    Yes.

13           Q.    The conversation that you did have with

14   David Graff a couple days ago, first off he's not

15   your attorney, is he?

16           A.    No.

17           Q.    What did you talk about with David

18   Graff?

19           A.    Cape Cod --

20                 THE VIDEOGRAPHER:  Can you raise your

21           mike up.

22           A.    -- Nantucket, and he asked me how my

23   family was.  I asked him how his family was, and

24   then he asked for a time, I owe him a quarterly

25   payment of course, we are at that quarterly time so

Page 260

1  he wanted to know, you know, when he could show me,

2  when he would see the payment.

3          Q.    Were you late on the quarterly payment?

4          A.    No, payment is not due until the end of

5  this month.

6          Q.    What is the quarterly payment that you

7  pay?

8          A.    Depends what I can afford.

9          Q.    And did you put any money down in the

10  transaction or was the whole thing financed by

11  Connexus EMG?

12          A.    You had asked that previously, the

13  answer is I didn't pay any money down to them but I

14  helped but I personally financed the startup of the

15  business.

16          Q.    Meaning that you had to sign a rental

17  contract for space?

18          A.    Yes, that kind of stuff.  I needed to

19  pay, I had to get things going, I had to, you know,

20  general sort of startup stuff, you know, that I

21  self-financed that.

22          Q.    And okay.

23                Just ballpark in general how much by way

24  of computers did you purchase from Connexus?

25          A.    How many computers?

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 261

1        Q.    Yes.

2        A.    I think I probably purchased actually

3    its a big number, I probably purchased maybe 40

4    computers.

5        Q.    What kind of computers?

6        A.    Personal computers?

7        Q.    Well, that's a good question, let's

8    start with the big stuff, servers, you know,

9    nonpersonal computers?

10       A.    I couldn't say the number there, but --

11       Q.    A lot?

12       A.    A lot, what do you consider a lot, I

13   don't know to be honest with you.

14       Q.    Did you end up buying April C?

15       A.    That's did I buy the registrar?

16       Q.    Yes.

17       A.    Yes.

18       Q.    April C is a company which is

19   incorporated out of where?

20       A.    Vietnam.

21       Q.    It took over the function that had

22   previously been performed by Basic Fusion, correct?

23       A.    Correct.

24       Q.    April C as a registrar is ICANN

25   accredited?

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

Page 263

1    privacy service that lists out as Vietnam Privacy

2    Service?

3           A.    Something like that.

4           Q.    Who are the board members of your

5    company Flipside?

6           A.    None.

7           Q.    Did anyone else besides yourself put

8    money into the startup of Flipside?

9           A.    No, it was my wife of course, but --

10          Q.    Okay.

11                So the financing came all from the

12   Connexus Epic Media side.  Any miscellaneous things

13   that needed to be purchased were purchased by you?

14          A.    Yes.

15          Q.    Approximately how much money did you

16   have to put into to start up the company, more than

17   100,000, less than 100,000?

18          A.    Less than 100,000.

19          Q.    Less than 10,000?

20          A.    No, more than 10,000.

21          Q.    Less than 20,000?

22          A.    Probably in that ballpark.

23          Q.    And what is the address of your company

24   Flipside?

25          A.    Do you mean where we actually work or

Page 265

1    Flipside or ultimately are you responsible for it?

2         A.    Ultimately I'm responsible for it.

3         Q.    Whose actually paying the Verisign fees,

4    is this Epic Media Connexus?

5         A.    No, April C is.

6         Q.    Is the money that April C is using to

7    pay Verisign coming out of its own bank accounts or

8    does it have some sort of arrangement, credit

9    arrangement or otherwise where someone sells, is

10   footing that bill?

11        A.    No, its coming from me, no one else is

12   footing that bill.

13        Q.    So the revenue that you have coming in

14   is enough to renew domains and buy new domains, et

15   cetera?

16        A.    We don't buy new domains really, but as

17   I told you before the domain business is a tiny

18   portion of the overall size of revenue of the

19   business.

20        Q.    What month and year did your, Flipside

21   end up taking control or becoming the registrant of

22   the portfolio that used to belong to Connexus?

23        A.    Sometime in August 2011.

24        Q.    Did it happen all at once or did it have

25   to phase over time?

1          A.    No, it appeared all at once.

2          Q.    Are you familiar with a company called

3    Rook Media?

4          A.    Yes.

5          Q.    What is Rook Media?

6          A.    They are a domain parking company.

7          Q.    Are you or your company affiliated with

8    Rook Media in any way?

9          A.    No, we will, well, we have, we are

10   their, we are their customer.

11         Q.    Meaning you park some of your domains on

12   their software platform?

13         A.    Just recently, yes.

14         Q.    And so is it true some of your domains

15   which used to be Navigation Catalyst Systems domains

16   are parked on the Firstlook software and some are

17   parked on the Rook Media software?

18         A.    Yes.

19         Q.    And what is the attraction to the Rook

20   Media software that you're trying them out for

21   parking?

22               MR. DELGADO:  Can I ask what this has to

23         do with this case?  I mean I understand you

24         had some questions about his business to go

25         to bias, but now you're asking about Rook

Page 291

1          A.    No.

2          Q.    In general though you're making in

3    excess of $10 million annually off of this business

4    model?

5          A.    No.

6          Q.    Or you were at one time?

7          A.    At one time, possibly.

8          Q.    There was a discussion about affidavits

9    and whether or not they were accurate.  You

10   testified that initially that you thought that the

11   agreement was recent that the defendants would pay

12   your attorneys fees.  And then you came back after

13   the break and changed that and said you know what, I

14   think that was part of my exit deal.

15         A.    Not think, I know.

16         Q.    You know it was part of your exit deal

17   approximately 10 months ago or so, July 2011?

18         A.    Correct.

19         Q.    But in your affidavit that you submitted

20   in New York to try and avoid this deposition, your

21   affidavit says:

22              "Wherefore it is respectfully requested

23         that the application seeking to quash the

24         subpoena and an issuance of a protective

25         order be granted, in judgment together with

1          movement's attorneys fees be entered against

2          Weather Underground."

3               The reality is you're the movement, you

4     didn't have any attorneys fees, did you?

5          A.    That's correct.

6               MR. GREENE:   Objection.

7               Go ahead.

8          Q.   Were you aware your counsel in court had

9     represented to the judge in New York in order to

10    avoid this deposition that you had to retain counsel

11    obviously and pay for that to come in and try and

12    quash this, that you had to pay attorneys fees?

13         A.    I'm unaware of what went on in court.

14         Q.    With regard to these other companies

15    that were identified, these other parking companies

16    that counsel went through with you and I don't

17    remember all of them, Skenzo and some of these

18    familiar companies, do you know if Skenzo is

19    registering and parking typographical variations of

20    registered trademarks?

21         A.    I have no idea what Skenzo is doing.

22         Q.    What about those other companies, do you

23    know if they're using their parking software to

24    display ads on cybersquatting domains?

25         A.    I couldn't speak to their, you're

Page 298

1  STATE OF NEW YORK              )
                                  )   SS:
2  COUNTY OF NEW YORK             )

3

4           I, JEREMY FRANK, do hereby certify:

5

6           That I am a duly qualified Certified Shorthand

7  Reporter and Notary Public in and for the State of New

8  York and that I am authorized to administer oaths and

9  affirmations;

10          That the foregoing deposition testimony of the

11 herein named witness was taken before me at the time and

12 place herein set forth;

13          That prior to being examined, the witness named

14 in the foregoing deposition, was duly sworn or affirmed

15 by me, to testify the truth, the whole truth, and

16 nothing but the truth;

17          That the testimony of the witness and all

18 objections made at the time of the examination were

19 recorded stenographically by me, and were thereafter

20 transcribed under my direction and supervision;

21          That the foregoing pages contain a full, true

22 and accurate record of the proceedings and testimony to

23 the best of my skill and ability;

24          That prior to the completion of the foregoing

25 deposition, review of the transcript was requested.

da0eaf5c-3263-47f7-9ea2-ead76534e0a0

1          I further certify that I am not a relative or

2     employee or attorney or counsel of any of the parties,

3     nor am I a relative or employee of such attorney or

4     counsel, nor am I financially interested in the outcome

5     of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8     this _____ day of _____, _____.

9

10

11          _____

12          JEREMY FRANK, MPM

13

14

15

16

17

18

19

20

21

22

23

24

25

da0eaf5c-3263-47f7-9ea2-ead76534e0a0