EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


THE WEATHER UNDERGROUND, INC., )

    a Michigan Corporation,     )

                          )

          Plaintiff,    )

                          )

   vs.                 ) Case No. 2:09-CV-10756

                          )

NAVIGATION CATALYST SYSTEMS,  )

INC., a Delaware corporation; )

BASIC FUSION, INC., a Delaware )

corporation; CONNEXUS CORP., a )

Delaware corporation; and    )

FIRSTLOOK, INC., a Delaware   )

corporation,               )

                          )

          Defendants.   )

_____)


VIDEOTAPED TRIAL DEPOSITION OF SETH JACOBY

New York, New York

Thursday, April 12, 2012


Reported by:  Jeremy Frank

NDS Job No.:  147647

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3
 4
 5    THE WEATHER UNDERGROUND, INC., )
 6         a Michigan Corporation,        )
 7                                        )
 8                   Plaintiff,           )
 9                                        )
10      vs.                              ) Case No. 2:09-CV-10756
11                                        )
12    NAVIGATION CATALYST SYSTEMS,        )
13    INC., a Delaware corporation;       )
14    BASIC FUSION, INC., a Delaware      )
15    corporation; CONNEXUS CORP., a      )
16    Delaware corporation; and           )
17    FIRSTLOOK, INC., a Delaware         )
18    corporation,                        )
19                                        )
20                   Defendants.          )
21    _____)
22
23
24        VIDEOTAPED TRIAL DEPOSITION OF SETH JACOBY,
25     held at Klein Zelman Rothermel, LLP, 485 Madison
26     Avenue, New York, New York, on Thursday, April
27     12, 2012, commencing at 9:06 a.m., before Jeremy
28     Frank, MPM and Notary Public.
29
30
31
32
33
34                                                    2
```

1   really work that way, some of the things that, some

2   of the things that Firstlook did were they, some of

3   the things that Firstlook did they were, that sort

4   of entity was doing earlier under Vendare, correct.

5            Q.   Okay.

6            A.   But not all of it, the business evolved.

7            Q.   So just so we are clear, if you will

8   take a look at deposition page 25, line 8.

9                 MR. DELGADO:  Thank you.

10                (Jacoby deposition of 9/15/10, marked

11            for identification, as of this date.)

12            A.   I think I'm looking at the wrong page.

13            Q.   Page 25.

14            A.   The smaller pages?

15            Q.   Yes.

16                 And at line eight the question starts:

17                 "At the time that you came into the

18            company, what was Vendare Media Group doing,

19            generally, for business?"

20                 Do you see that question?

21            A.   Yes, I do, on line eight.

22            Q.   And just so we are clear, the answer

23   was:

24                 "Well, there was the New.net business,

25            which was registering domain names, and, you

1          know, the searches, pretty much the same

2          thing the business is doing today -- which

3          the Firstlook business is doing today."

4              Is that a fair statement?

5          A.    Well, I think my point was is that yes,

6      the Firstlook business was doing that, was doing

7      that business, but the Firstlook business did a lot

8      more than that business.

9          Q.    Sure.

10         A.    So yes, that's fair.

11             I think what you're saying is that

12     exclusively that's what it was doing, and my point

13     is that the Firstlook business was carrying on much

14     of what the New.net business was doing, but it did a

15     lot more.

16         Q.    Right.

17         A.    Okay.

18         Q.    There were other parts of the business

19     besides registering and monetizing domain names?

20         A.    That was my point, correct.

21         Q.    For today we are going to be talking

22     mostly about the registration and monetization

23     domain names, that part of the business.

24         A.    That's fair.

25         Q.    By monetizing domain names so that we

 1    DNS error, yes.

 2         Q.    And when no one has registered that

 3    particular domain, that's a potential opportunity

 4    for you to register it and put up a lander page,

 5    correct?

 6         A.    You mean the company?

 7         Q.    The company.

 8         A.    Yes.

 9         Q.    Okay.

10               And then to put advertisements on the

11    lander page that people might click that might

12    generate revenue and profits to the company?

13         A.    Sure.

14         Q.    Okay.

15               One of the things that qualifies in your

16    company's world as DNS error data --

17         A.    Yes.

18         Q.    -- is when someone mistypes a domain

19    name of a real website that they're looking for,

20    correct?

21         A.    Say that again.

22         Q.    When someone mistypes a domain --

23         A.    Can you qualify that.

24         Q.    If you will go to your deposition on

25    page 61, line 14, I'm using your language here.

1          A.    Okay.

2          Q.    Let's make sure we are talking about the

3    same thing.   Line 14, I had asked a question about

4    something a little bit different.

5                It says:  "Okay.  And so that link

6                traffic might be if someone who is putting

7                the tag on for the link mistypes the

8                destination URL?"

9                Your answer is:  "I don't know if

10               necessarily mistypes, but maybe doesn't have

11               the right URL there or what they were -- you

12               know, there is a number of reasons why that

13               link could be wrong.  Mistyping is not the

14               only one, but it could be a reason."

15               So tell me about this mistyping

16    phenomenon that you're referring to here.

17         A.    I can't remember exactly what I was

18    referring to.  Do you want me to read a bunch of

19    pages to see what led up to this or what came after

20    it?

21         Q.    If you don't have a recollection today

22    of how --

23         A.    My point is that mistyping is a number

24    of different things.  You could put an illegal

25    character in the search bar and it wouldn't resolve,

1    you could make a space between the period and a dot,

2    you know, there is an infinite number of ways that

3    you could actually deliver a DNS error.

4         Q.    One of the ways that people are typing a

5    domain that they mistype it?

6         A.    Sure, yes.

7         Q.    And that would result in a DNS error

8    because there is no, it wasn't registered, that

9    typo?

10        A.    Incorrect, no.

11        Q.    Incorrect?

12        A.    Yes.

13              Because not every mistype in error is a

14   domain name, that's my point.

15        Q.    Okay.

16        A.    There is an infinite number of ways that

17   you will have a DNS error.  One of them, one

18   singular instance is if a domain name which is

19   correctly formed is not registered, I think that's

20   what you're getting at.

21        Q.    Sure.

22        A.    My point simply is there is a million

23   different ways to deliver errors, DNS errors.

24        Q.    I think we are in agreement.

25              One example of an DNS error is when

Page 50

1          A.    In some cases.

2                There is 90 million domain names

3    registered so or something like that, its a huge

4    number, not every domain name registered certainly

5    is a registered trademark, but --

6          Q.    Okay.

7                Let's just make sure we are clear, let's

8    go to page 65 of the deposition.

9          A.    Sure.

10         Q.    Line nine.

11         A.    65, line 9.

12         Q.    Let's start with line four, review line

13   four and that's where the context is.

14         A.    Sure.

15               E-mails about typographical errors, am I

16   reading the right page?

17         Q.    Yes, we are talking about typographical

18   errors.  And then down to line 17 as part of your

19   answer, well, let's start with line 13.

20               You say:  "I'm sure that shows up in the

21         normal course of business, because, you know,

22         as part of a vetting process of trying to

23         figure out which domain names should be kept

24         and which domain names shouldn't be kept, a

25         qualification for a domain name that should

1         be excluded is clearly, you know, a domain

2         name that might be a typo of a website."

3         A.    Sure.

4         Q.    Okay.

5               And so just to be clear, you understood

6    that typos of websites might also be problematic

7    even if they weren't in a trademark registration

8    database?

9         A.    Sure, but that's not what I was saying

10   before, but sure.

11        Q.    Okay.

12              Now, as I understand your prior

13   testimony, you believe that even as of 2005 there

14   were human beings at defendant companies who were

15   reviewing DNS error data for trademarks; is that

16   correct?

17              You had believed, you started

18   April 2005, that's why --

19        A.    Look at the data or look at the

20   qualified domain names?

21        Q.    Looking at qualified domain names.

22        A.    Okay, the answer is yes.

23        Q.    As to say not all the data --

24        A.    Correct.

25        Q.    -- found into the bucket of when you

Page 54

1          A.    That's fair to say.

2          Q.    Okay.

3                And as far as you were aware did any of

4    them have any trademark experience prior to joining

5    your companies to do human review?

6          A.    I don't believe so.

7          Q.    Did you have an attorney in 2005

8    participating in trademark review?

9          A.    I don't believe so.

10         Q.    As I understand it, you didn't provide

11   these human reviewers any sort of training in terms

12   of trademark law or trademark issues prior to

13   turning them loose to do review?

14         A.    Formal trademark training?

15         Q.    Yes.

16         A.    From a qualified sort of trademark

17   attorney, I guess the answer is no.

18         Q.    Did you provide them any formal training

19   at all for anyone with regards to trademark review?

20         A.    Sure, yes.

21         Q.    Let's take a look at your deposition,

22   page 91, line 6.

23         A.    Yes.

24         Q.    Here we are talking about the 2005

25   period, there is this blacklist that we have

1   discussed.

2          A.    Yes.

3          Q.    And I ask:

4                "What else would they do, if anything,

5          to take a look at the trademark risk issue?"

6          A.    Just where are you?

7          Q.    9 and 10.

8          A.    Yes.

9          Q.    You said:

10               "That's what they do would do.  I mean,

11         it's a -- they would -- it was an art.  You

12         know, they looked at the domain name, you

13         know, they compared it to the U.S. PTO

14         matches, and that's more or less what they

15         did."

16         Q.    And we have talked about that, correct?

17         A.    Yes, I'm surprised I really talk like

18   that, but yes.

19         Q.    Okay.

20               Now, then I went on line 16:

21               "Now, was there -- what was the training

22         that they received in terms of the trademark

23         review process in 2005?"

24               And your answer is:  "You know, it

25         wasn't a formal training process, per se."

1          A.    Correct.

2          Q.    Is that to your recollection still true?

3          A.    Yes.

4                That's what I said, there was no formal

5     training from a trademark professional, but of

6     course anybody who walks into their first day on the

7     job has some sort of training or they wouldn't know

8     what to do.

9          Q.    To your knowledge these people weren't

10    provided any sort of trademark law materials or

11    training, correct?

12         A.    I don't believe so.

13         Q.    Was anyone with trademark experience

14    reviewing domain names for trademarks in 2005?

15         A.    I don't believe so.

16         Q.    What I'm trying to understand is if one

17    of the things that you say your company was trying

18    to do prior to registration was to reduce the risk

19    that you might be infringing someone's trademark,

20    why wouldn't you hire someone who understood what

21    trademarks were and how trademark law worked?

22         A.    It's a good question, I don't know.

23         Q.    Certainly if you had wanted to, if the

24    company had wanted to, and maybe it would have cost

25    a little bit more money, but you could have hired an

Page 61

1   that true?

2        A.    Correct, yes, I believe that's correct,

3   I think so.

4        Q.    Okay.

5              Let's go to page 105 of your deposition.

6        A.    Yes.

7        Q.    Your recollection may have been a little

8   bit better in 2010, I understand you have moved on.

9   Let's go to line 16.  Here we talk about whether or

10  not human reviewers in 2005 did any internet

11  research to determine whether or not there might be

12  a domain name that is close to the one that you're

13  contemplating registering a letter off, two letters

14  off that might have trademark rights?

15       A.    Yes.

16       Q.    And I am asking you did they do that.

17  And then on page 106, line 1, you say no.

18             Does that refresh your recollection?

19       A.    Yes, sounds right.

20       Q.    Why didn't you have the human reviewers

21  do a simple internet research to see if there might

22  be problematic websites out there before registering

23  domain names?

24       A.    I can't speculate on why I didn't do

25  that; I'm a bad manager.

Page 65

1    not a human reviewer was personally aware of a major

2    brand as part of the vetting process?

3         A.   I think that's a strange characteri-

4    zation, I don't know if I would necessarily say

5    that.

6         Q.   Okay.

7              With regards to your prior testimony, we

8    talked about a couple of typographical variations of

9    some domain names.  One of them was the Detroit Red

10   Wings.

11             Do you recall that?

12        A.   Vague, but I do think I remember that.

13        Q.   And I asked you whether or not you had

14   heard of them, you didn't really have any knowledge

15   of them.  I showed you a variation of a domain name

16   of the Red Wings.

17        A.   Yes.

18        Q.   You thought well, I don't recognize

19   that, so from my point of view, it is okay to

20   register?

21        A.   I don't recall, but if you want to go

22   through this again, I would be happy to do that.

23        Q.   Okay.

24             Let's take a look at, let's go to page

25   129 of your deposition.

Page 66

1          A.    Here we are.

2          Q.    And in this section, you can take a

3    minute, and we are done, I'm done here taking a look

4    at this.

5          A.    Yes.

6          Q.    We are talking about a domain name that

7    was my client's full trademark Wunderground with the

8    addition of the letter Q in front of it,

9    QWunderground.com.  And I asked you whether or not

10   that is a domain name that in fact incorporates my

11   client's trademark.  You didn't know, so I asked you

12   to assume that.

13          Assume for the purposes of my questions

14   today that my client has a longstanding trademark

15   for Wunderground.com.

16          A.    You want me to read this now?

17          Q.    Take a second to read, there is a whole

18   section here, 129 and 130.

19          A.    Give me a minute, okay.

20          Q.    We have a little back and forth about it

21   and initially you thought, well our system would not

22   have flagged that, but then later on you agreed

23   since it incorporated the entire trademark

24   Wunderground that your system even back in 2005

25   should have flagged that trademark, correct, because

Page 72

1    he was.

2         Q.   Do you think it is funny that Pitney,

3    you indicated --

4         A.   No, I said you were stretching an

5    example.

6         Q.   But you had indicated because it

7    included, you said Pitney Bowes did not include any

8    dictionary words, and in fact it, you would agree it

9    does?

10        A.   I think any reasonable person would take

11   the word Pitney Bowes and say that just really just

12   means Pitney Bowes.  I think any reasonable person

13   would look at QWunderground and say wow underground

14   is a pretty massive part of that combination of

15   letters, yes.

16        Q.   So your test back in the day was if

17   there was a dictionary word that was primary in the

18   URL, then from your point of view irrespective of

19   whether or not there were registered trademarks it

20   was okay to register in general?

21        A.   I never said that.

22        Q.   As we go on to page 133 on the bottom I

23   ask, line 24:

24             "Okay.  So the test is whether or not

25             (you two or whether) your two or so sponsors

1          would have actually personally heard of the

2          website?"

3               And you answered that:  "That is part of

4          the test, yes.  I mean, I think it just uses

5          common sense.  There's a name like

6          Wunderground which incorporates generic terms

7          and it doesn't mean a whole lot, and that's--

8          I think that's a qualification for

9          registration."

10               Do you see that testimony?

11     A.   Go back to, I actually lost you, what

12 page are we on?

13     Q.   133 at the bottom, line 24.  My

14 question, okay --

15     A.   I got it, got it.

16     Q.   Yes.

17               So the test is whether or not your two

18 or so operators, reviewers, would have, actually

19 have personally heard of the website.  And the

20 answer is, "That's part of the test, yes."  Then you

21 talk about common sense and whether or not the word

22 incorporates a generic term.

23     A.   Right, exactly.

24               My common sense argument is

25 Wunderground, there is one letter in front of

Page 76

1          A.   Sure.

2          Q.   And even as of the time of the

3    deposition you believed that you would have

4    registered it again if in fact that domain came

5    across the wire?

6          A.   Did I say that?

7          Q.   Do you recall whether or not you said

8    that?

9          A.   I have no idea.

10         Q.   Would you today believe that it was okay

11   to register QWunderground.com as a domain name?

12         A.   I'm not in that business and I don't

13   really care so I wouldn't make a determination

14   whether or not I would register it.

15         Q.   As of the last day of your employment

16   with Firstlook.

17         A.   I can't speculate on my last day of

18   employment with Firstlook what I would have been

19   thinking.

20         Q.   Let's go to your deposition and take a

21   look at page 160, line 18, and --

22         A.   160, I'm sorry.

23         Q.   160 line 18.

24              This is the precursor section with your

25   saying you think the system worked correctly and it

1   was appropriate to register QWunderground.com at the

2   time of registration.

3           A.   That's what I said then, yes.

4           Q.   Okay.

5                Let's go to page 142.

6           A.   Yes.

7           Q.   On line 16 I say:

8                "Okay.  And today do you believe that

9           it's not an issue?"

10               Your answer is:  (Sitting here today or)

11          "Sitting here in this room today I can see

12          where your client would say, look, this

13          domain name incorporates our trademark, and

14          in the instance that they contacted us and

15          said, hey, this is the problem, we would have

16          said, you know what, we see your point, and

17          handed it over, which we offered without

18          issue, without a problem."

19               Do you see that testimony?

20          A.   I see that, yes.

21          Q.   So as of 2010 your position at the time

22   of your deposition was that you understood that

23   there may be a trademark infringement issue here and

24   you would have offered and in fact did offer to

25   simply give back the domain?

Page 84

1          MO

2          MR. SCHAEFER:  I would have move strike

3      that as nonresponsive.

4      Q.   You agree that part of the traffic you

5  were receiving in all likelihood, using common sense

6  was people look for my client's website?

7          MR. DELGADO:  Same objection.

8      A.   Yes.

9      Q.   Did you ever seek permission from the

10  plaintiff Weather Underground to use their trademark

11  in any way?

12      A.   No.

13      Q.   At your deposition, I want to go back

14  and talk a little about the Detroit Red Wings.  I

15  understand you're not a hockey fan.

16      A.   That's definitely true.

17      Q.   Okay.

18          But at your deposition you actually

19  suggested that you really had never heard of the

20  Detroit Red Wings.

21          Was that true at the time of your

22  deposition?

23      A.   I don't remember in context what we are

24  talking about, but again I'm not a hockey fan.  I

25  could tell you a couple of that you know, I live in

Page 85

1    a town where the New York Rangers play, that's for

2    sure.

3           Q.   Do you understand that one of the teams

4    that the Rangers play is one of the original six

5    teams, the Detroit Red Wings?

6           A.   You're asking the wrong guy about sports

7    history.  It is one thing my wife yells at me about

8    not taking my kid to play sports or to games.

9           Q.   Would it surprise you in your portfolio

10   of domain names there was registration of variations

11   of the Red Wings brand?

12          A.   I have no idea.

13          Q.   You also indicated that you had never

14   heard of Henry Ford Hospital at the time of the

15   deposition.

16               Was that testimony true?

17          A.   That's correct.

18          Q.   Would it surprise you if your company

19   had registered typographical variation of Henry Ford

20   Hospital and monetized them?

21          A.   I have no idea.

22          Q.   At your deposition you had indicated

23   that you had never heard of Auto Owners Insurance,

24   was that testimony true?

25          A.   That's certainly true.

Page 86

1          Q.   Would it surprise you if your company

2     had registered and monetized typo variations of Auto

3     Owners' trademarks?

4          A.   I have no idea.

5          Q.   We talked a little about the receipt of

6     trademark letters and UDRP.  I want to talk a little

7     about letters that your company would have received

8     from trademark owners saying hey, you're violating

9     our trademarks and you're violating the ACPA.

10              What was the process at Firstlook for

11     handling just the intake of those letters?  Did

12     those come through your office, where did those

13     letters come into?

14          A.   If I recall they went to, I mean I think

15     we had some modifications, I'm not sure, again the

16     process sort of changed from 2005 through whatever,

17     2010.  But it either went to an attorney's desk like

18     Chris Pirrone or I think more likely it went to a

19     clerk, a clerk that worked for the team that managed

20     the intake of those letters and notices.

21          Q.   Okay.

22              Would you have typically in say 2006

23     received notice that someone had made a trademark

24     infringement claim?

25          A.   Me personally?

Page 89

1    and our domain name, we decided that that was not a

2    domain name we would handle over.

3         Q.    Let's go to page 115 of the deposition,

4    line 11.

5         A.    Yes.

6         Q.    And through line 116 you're suggesting

7    now that you weren't turning over domain names

8    because you were infringing trademarks, but just as

9    a matter of good internet citizenship.

10              Do you recall at your deposition the

11   following question:

12              "Okay, but those decisions are made at

13         legal, in terms of third-party threat

14         letters, not by you guys?"

15              Answer:  "No, we made the decision that

16         legal should hand over domain names that,

17         through their legal advice, infringed on

18         third parties."

19              Do you recall that testimony?

20        A.    Sure, yes.

21        Q.    Was that testimony true?

22        A.    Yes, that's what I just said.

23        Q.    What you just said was that you were

24   doing it because you were being a good internet

25   citizen.

Page 94

1          A.    Gosh, I have no idea what kind of

2    thresholds we were thinking about in 2005.

3          Q.    If you go to page 93 of your deposition.

4          A.    Yes.

5          Q.    Line 10.

6                Question:  "Did you have some sort of

7                threshold for them (human reviewers) in 2005

8                in terms of how close is close?"

9                Answer:  "There is no formal threshold,

10               no."

11         A.    Okay.

12         Q.    Do you believe that testimony was

13   accurate?

14         A.    Yes, I mean it sounds probably accurate.

15         Q.    As the president of Firstlook whose job

16   it was to not violate third-party trademarks --

17         A.    Yes.

18         Q.    -- how is it that you were tracking the

19   performance of these human reviewers to see if they

20   were doing a good job?

21         A.    I have absolutely no recollection of how

22   we were doing that, if at all.

23         Q.    Do you have any idea what was in these

24   human reviewers' heads as they were going through

25   the process of determining --

Page 95

1          A.   If you expect me to think what is going

2     in a human reviewer's head, I'm not Superman.

3          Q.   Well, I know, but a lot of companies

4     they'll provide, they'll provide a structure for an

5     employee to make decisions, correct, you're

6     certainly familiar with that process?

7               MR. DELGADO:   Objection to the extent it

8               calls for speculation as to what other

9               companies do.

10         A.   The reality is I don't know what is in

11    their heads, no?

12         Q.   Isn't it true in 2005 human reviewers

13    were only supposed to be looking for under your

14    policies literal matches of trademarks?

15         A.   I don't believe that would be in the

16    policy, no.

17         Q.   Let's take a look at page 98, line 24.

18    We are talking about the U.S. PTO matching.

19              The question is:  "Now, the U.S. PTO

20              matching that would be output into the

21              spreadsheet, was that literal or fuzzy?"

22              "At the time?"

23              "At the time, 2005."

24              "It was a literal match."

25              So I want to you ask you about that.

Page 96

1  The spreadsheet that these human reviewers were

2  receiving --

3        A.   Yes.

4        Q.   -- would include the potential domain

5  name for registration?

6        A.   Yes.

7             Yes, I mean I don't exactly remember

8  what these spreadsheets looked like in 2005, but

9  certainly if that's the testimony I gave you, that's

10  probably accurate at the time, yes.

11        Q.   Okay.

12             But in 2005 you believe the information

13  that the human reviewers would have received in

14  terms of trademark registration from the U.S. PTO

15  would have been literal as opposed to some sort of

16  fuzzy matching system?

17        A.   You're asking me if the actual matching

18  in the spreadsheet was literal and not fuzzy?

19        Q.   Correct.

20        A.   The answer is probably yes.  The

21  question you asked me before is whether it was going

22  on in their heads it was a fuzzy match or not.

23        Q.   Then we go on to talk about a domain

24  name you registered, K-I-D-E-R-O-C-K --

25        A.   Yes.

Page 98

1          Q.    We will have dates eventually.

2          A.    Good.

3          Q.    Your trademark vetting process that, the

4    fuzzy matching process --

5          A.    Yes.

6          Q.    -- that didn't come into play until

7    domain tasting under the ad grace period; is that

8    true?

9          A.    I honestly don't remember exactly.

10          Q.    Did the trademark clearance, your

11    internal process, the vetting process, did it have

12    any significant changes between the time you arrived

13    in 2005 and the beginnings of your domain tasting

14    under ad grace period?

15          A.    I don't recall.

16          Q.    Let me see if I can refresh your

17    recollection.  Let's go to page 119 of your

18    deposition.

19          A.    Yes.

20          Q.    On line three I ask the question:

21              "Prior to implementation of the change

22              which was able to take advantage of the AGP,

23              was the process that we talked about before

24              lunch, in terms of trademark clearance, the

25              same through that period?"

Page 99

1              Answer:  "Domain registration process,

2        is that what you're saying?"

3              Question:  "Yes, in terms of trademark

4        clearance."

5              Answer:  "Was the trademark vetting

6        process the" -- this is you.  "Was the

7        trademark vetting process the same during

8        that period?"

9              You're asking me if that's what I'm

10   asking.

11       A.    Yes.

12       Q.    I say:

13             "Yes."

14             You say:  "Yeah, I believe there weren't

15        any significant iterations during that period

16        of time."

17       A.    Okay.

18       Q.    So at the time of your deposition you

19   didn't believe there were any significant changes to

20   the trademark vetting process until we got to the ad

21   grace period?

22       A.    Sure.

23       Q.    Do you have any reason to disagree with

24   your recollection at that time?

25       A.    No, if that's what I said that was the

1  lawsuit.

2          A.    In my personal belief I do believe that.

3          Q.    And you were aware that your company

4   sued Verizon for doing virtually the exact same

5   thing that we are suing you for?

6          A.    I'm aware of that, yes.

7          Q.    You asked a court of law to award your

8   company Connexus $100,000 per domain name against

9   Verizon for cybersquatting on virtually the exact

10  same facts we have here.

11         A.    That's correct.

12               MO

13               MR. DELGADO:  I move to strike that for

14         purposes of interposing an objection.  I

15         interpose the objection for calling for a

16         legal conclusion and calling for speculation.

17         Q.    Let's go, to clean it up, we will go to

18  page 163 of the deposition.  On line two we are

19  talking about the Verizon lawsuit and counterclaims.

20               The question I asked was:  "Okay.  Are

21         you aware that your company took the position

22         that DNS wildcarding by Verizon whereby

23         typographical errors of domain names and the

24         web browser was unlawful under the Anti-

25         cybersquatting Consumer Protection Act?"

1          Your answer:  "Again, I didn't make the

2          legal decision on, you know, exactly the

3          definitions in that case.  What I can tell

4          you is that the process of our business" --

5          (being Connexus Firstlook.)

6     A.   Yes.

7     Q.   "Is no different than what Verizon is

8  doing as a wildcarding."

9     A.   Yes.

10    Q.   "An ISP or as a default browser is in

11 Google Chrome, for example.  From a practical

12 matter, there's absolutely zero difference."

13    A.   I agree with that statement.

14    Q.   Did you ever voice as the president of

15 Firstlook any concerns that your company was suing

16 Verizon in court for violating the ACPA on a

17 business model where there was absolutely zero

18 difference between what you were doing and what they

19 were doing?

20    A.   No.

21         I think the general, again I don't

22 recall those conversations, that was a while ago,

23 but I think the general, you know, mood was that it

24 was a bit of sort of the pot calling the kettle

25 black in a way to show how ludicrous in some ways

Page 158

1    the names.  In fact, I believe there was software we

2    built that actually goes through the names

3    individually.  And the goal was to get rid of names

4    that were potentially, you know, that didn't fit

5    with the sort of new company policy which was not to

6    own domain names which would be potentially

7    problematic, yes.

8         Q.   Not only potentially problematic, but in

9    your company viewpoint were problematic?

10        A.   Right, of course, that's how we got rid

11   of them.

12        Q.   If you go to page 182 of your

13   deposition, line four, there is a question about

14   this purge, 182, line 4.  I ask a question about

15   this process and your answer on line 10 is:

16             "So what we did is we looked back at our

17        process and said it's good, but it's not good

18        enough, so let's go back and go through our

19        whole portfolio and identify domain names

20        that we should have known."

21             Meaning that you could have caught

22   before, you should have caught before, but under

23   this new company policy, we are now going to get rid

24   of these domains?

25        A.   That's a fair, yes, that's a fair

1   characterization.

2        Q.   Why did it take you until 2008 to start

3   taking trademark issues serious enough to have this

4   new policy?

5        A.   I can't speculate what was going on then

6   to understand exactly why we made that shift, but

7   you know, the business was maturing and we changed.

8        Q.   Okay.

9             MR. SCHAEFER:  This will be a new trial

10            exhibit and it will be a trial exhibit, I

11            have got it somewhere.

12            Let's go off the record a second.

13            THE VIDEOGRAPHER:  We are now going off

14            the record at approximately 1:26 p.m., April

15            12th, 2012.

16            (Whereupon, an off-the-record discussion

17       was held.)

18            THE VIDEOGRAPHER:  This is the

19            continuation of tape number three of the

20            deposition of Mr. Seth Jacoby.  We are now

21            going on the record at approximately 1:30

22            p.m., April 12th, 2012.

23            (Plaintiff's Exhibit 276, Affidavit of

24            Seth Jacoby in Support of Motion to Quash,

25            marked for identification, as of this date.)

Page 291

1        A.    No.

2        Q.    In general though you're making in

3   excess of $10 million annually off of this business

4   model?

5        A.    No.

6        Q.    Or you were at one time?

7        A.    At one time, possibly.

8        Q.    There was a discussion about affidavits

9   and whether or not they were accurate.  You

10  testified that initially that you thought that the

11  agreement was recent that the defendants would pay

12  your attorneys fees.  And then you came back after

13  the break and changed that and said you know what, I

14  think that was part of my exit deal.

15       A.    Not think, I know.

16       Q.    You know it was part of your exit deal

17  approximately 10 months ago or so, July 2011?

18       A.    Correct.

19       Q.    But in your affidavit that you submitted

20  in New York to try and avoid this deposition, your

21  affidavit says:

22            "Wherefore it is respectfully requested

23            that the application seeking to quash the

24            subpoena and an issuance of a protective

25            order be granted, in judgment together with