IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THE WEATHER UNDERGROUND, INC.,
a Michigan corporation,

                                        Case No.  2:09-cv-10756
           Plaintiff,                      Hon. Marianne O. Battani

vs.

NAVIGATION CATALYST SYSTEMS, INC.,
a Delaware corporation; CONNEXUS CORP.,
a Delaware corporation; and FIRSTLOOK, INC.,
a Delaware corporation,

                Defendant.
_____/

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Counsel for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

Anthony Patti (P43729)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Co-counsel for Plaintiff

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & DELGADO
LLP
707 Wilshire Blvd., Ste. 3850
Los Angeles, CA  90017
213-955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants
_____/

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION TO
COMPEL PRODUCTION OF ASSET TRANSFER DOCUMENTATION**

Defendants' Response to Plaintiff's Emergency Motion to Compel Production of Asset Transfer Documentation completely ignores the unique legal and factual context of this case. This is an ACPA claim. Unlike other statutes, the ACPA specifically invites a court to consider behavior which may not relate directly to the cybersquatter's specific conduct vis-a-vis the plaintiff-victim, but rather to consider such things as a defendant's "intentional failure to maintain accurate contact information" and its registration of "multiple domain names" -- which may or may not be the plaintiff's own domain names -- and to analyze a defendant's "pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII) and (VIII). This is so because the ACPA permits statutory damages, with the goal of deterring or punishing particularly abhorrent conduct, such as that which occurred here. In order for the court to properly assess the appropriate statutory damages, and to understand the egregiousness of the conduct and exactly what it is that needs to be deterred or punished, a defendant's *overall behavior* with respect to both the plaintiff-victim's specific marks *and the marks of others*, and *patterns of conduct* relating to an entire domain portfolio (in this case containing hundreds of thousands at any given time and millions of domains over the course of time) may be considered in evaluating the cyber-pirate's bad faith.

Moreover, the factors enumerated by Congress in the ACPA are not exclusive; a court may and should evaluate "'the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.'" *Virtual Works, Inc. v Volkswagen of America, Inc.*, 238 F.3d 264, 268 (4th Cir. 2001) (*quoting Sporty's Farm, LLC v Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2nd Cir. 2000)). As the Second Circuit reasoned in *Sporty's Farm*, *supra*:

> The most important grounds for our holding that Sporty's Farm acted with a bad faith intent, however, are the *unique circumstances of this*

1

> *case*, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.  \*\*\* Several months later, and *after this lawsuit was filed*, Omega *created another company* in an unrelated business that received the name Sporty's Farm so that it could (1) use the sportys.com domain name in some commercial fashion, (2) keep the name away from Sportsman's, and (3) protect itself in the event that Sportsman's brought an infringement claim alleging that a "likelihood of confusion" had been created by Omega's version of cybersquatting.  \*\*\*  Given these facts and the district court's grant of an equitable injunction under the FTDA, there is ample and overwhelming evidence that, as a matter of law, Sporty's Farm's acted with a "bad faith intent to profit" from the domain name sportys.com as those terms are used in ACPA.

202 F.3d at 499 (emphasis added).  The Second Circuit's reasoning should be instructive here. In evaluating bad faith, it is entirely appropriate for the Court to consider such things as Defendants' actions to shift or hide domains in newly created (but related) business entities, even if this occurred after the lawsuit was filed.  Consideration of Defendants' post-lawsuit machinations with respect to its extraordinarily voluminous domain portfolio by the trier of fact is entirely appropriate.  This is a especially true because the statute itself mentions the cybersquatter's "registration or acquisition of multiple domain names" as a factor to be considered.  15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  The statute has no temporal component with respect to this factor or with respect to the cybersquatter's intentional failure to maintain accurate contact information."[1]

Furthermore, Defendants' blanket argument that all of its actions after 2009 are irrelevant in this lawsuit is not well taken.  In making this argument, Defendants skillfully blur

---

[1] Although factor VII does modify consideration of "a pattern of such conduct" with the words "prior conduct", the ACPA does not prohibit consideration of ongoing patterns of conduct.  On its face, the statute states that, "a court *may consider* factors such as, *but not limited to*" the eight factors listed.  15 U.S.C. § 1125(d)(1)(B)(i) (emphasis added).  As the Second and Fourth Circuit recognized in the cases cited above, these bad faith factors are suggestive, not restrictive, and a court may consider all of the circumstances of a case in coming to its conclusion about bad faith, even subsequent shell games and asset transfers.

the distinction between the act of typosquatting Plaintiff's domains and the bad faith nature of Defendants' activities.  While Defendants may be correct in asserting that their more recent transfer and concealment of their domain portfolio may not be relevant to the question of whether they typosquatted in excess of 250 of Plaintiff's domains between 2004 and 2009, this behavior is relevant to the bad faith factors of maintaining inaccurate contact information and the registration and acquisition of multiple domain names which Defendants "knows are identical or confusingly similar to marks of others …."  15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  It may also be relevant to the Court's consideration of Defendants' ongoing pattern of conduct for purposes of deterrence or punishment in assessing statutory damages.

Most importantly, evidence of this behavior undermines Defendants' repeated assertion in these proceedings that its mass typosquatting of famous and distinctive marks was somehow inadvertent, unintentional, and constituted mere instances of some marks "slipping through the cracks."  It also undermines Defendants' claim that they solved this whole problem with their 2008 "scrub," which supposedly searched for and removed famous marks from their domain portfolio.  Defendants' subsequent and recent actions belie that contention.  Rather than "scrubbing and removing" domains which obviously violated the intellectual property rights of numerous well-known companies, Defendants did just the opposite, hiding marks which ought to have been removed behind phantom owners and offshore, related companies.  Contrary to their claim that they voluntarily gave up control of these offending marks by dumping them, they intentionally hid them behind proxy registrars, moved them to Vietnam, and transferred them for what appears to be dubious consideration to their former president.

Courts have long recognized that Defendants' subsequent actions may be considered for a variety of purposes.  Defendants actions in 2010 and 2011 with respect to the ongoing shell

3

game of "guess who really controls this massive portfolio" may certainly be considered by the trier of fact.  If, as Defendants contend, they have "nothing to hide," why are they hiding it?[2] Defendants' actions in the 2009-2011 period certainly appear to be inconsistent with their present contention that "we cleaned out the bad stuff in 2008 and since then have nothing to hide."  Were this a murder trial, evidence that the defendant was seen hiding, moving, burying or shipping the body overseas after the fact is certainly relevant, even if it's only circumstantial. Here, we have analogous evidence, albeit in a civil context, and the ACPA invites the trier of fact to consider just such behavior.   Evidence that tends to corroborate charges or undermines the defense is relevant, even if it would neither prove the charges nor necessarily be inconsistent with the defense.  *New Jersey v T.L.O.*, 469 U.S. 325, 345 (1985).   The transactional documents at issue here may well support an inference of bad faith by the Defendants, not just in 2011, but going back to 2008, when they supposedly changed their ways and cleaned out their portfolio, yet still felt the need to hide ownership.  The "basic test of relevance" is, "'[D]oes the evidence offered render the desired inference more probable than it would be without the evidence.'"  *North Am. Phillips Co. v Church*, 375 F.2d 93, 96 (2nd Cir. 1967) (internal citations omitted).  Here the requested documents may well render the inference of bad faith more probable than it would otherwise be.

Even if analyzed under the subsequent remedial measure rule – which is a real stretch here, since Defendants themselves affirmatively assert the success of their corrective measures and the evidence indicates that not much was actually remediated -- the court "may admit … evidence for another purpose, such as impeachment or -- if disputed -- proving ownership,

---

[2] Actually, we know the answer to this rhetorical question:  to hide ownership and to keep the domains from being seized by an American court.  (Jacoby Dep., pp. 211-212).  The Court is also reminded that the full extent of how many of Plaintiff's domains had been typosquatted by Defendants was kept under wraps until 20 months into this litigation.

4

control, or the feasibility of precautionary measures."  FRE 407.  Likewise here, evidence of Defendants' furtive maneuvers with respect to its enormous portfolio -- demonstrably including numerous marks, such as the various misspellings of Ryannair -- are relevant to:   (1) impeachment[3] (since they contradict Defendants' claim of having scrubbed its domains and its claim of operating completely above board); (2) proving ownership and control, and, (3) the effectiveness of its supposed "precautionary measures."   All of this evidence, including the August 2011 transaction between Defendants and Seth Jacoby, are consistent with an overall scheme of bad faith cybersquatting, under the enumerated factors and under the general circumstances of this case.[4]

For all of these reasons, this Court is respectfully asked to recognize the value or potential value of the documents requested and order their immediate production.

---

[3] By way of example, the transactional documents in question may well contradict Mr. Jacoby's recent testimony, and may have impeachment value with respect to future witnesses who appear live in court.

[4] Defendants also suggest that Plaintiff relied upon a "truncated version" of Judge Morgan's discovery order, but the language of that order, even as quoted in Defendants' response brief, fully supports Plaintiff's position, so long as one overlooks the selective highlighting done in Defendants' quotation.   The order is written conjunctively:   the first part calls for e-mails "shown on the bottom or all parked pages", as emphasized by Defendants; the second part after the word "and" more generally calls for the production of e-mails "for all domains registered by NCS during the period of January 1, 2008 through January 1, 2009."   Thus, if there are e-mails relating to the transfer of the 2008-2009 portfolio, or any portion thereof, to a proxy service, Vietnam, Seth Jacoby or anyone else, they should be produced.

5

Respectfully submitted this 15th day of May, 2012.

/s/Anthony P. Patti_____
Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Co-Counsel for Plaintiff

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI 49686
231-932-0411
enrico.schaefer@traverselegal.com
Lead Counsel for Plaintiff

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2012, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Counsel for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
Bruce L. Sendek (P28095)
BUTZEL LONG, PC
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
sendek@butzel.com
Local Counsel for Defendants

Anthony Patti (P43729)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Co-counsel for Plaintiff

William A. Delgado (admitted pro hac vice)
WILLENKEN WILSON LOH & DELGADO LLP
707 Wilshire Blvd., Ste. 3850
Los Angeles, CA  90017
213-955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

/s/Anthony P. Patti
Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Co-Counsel for Plaintiff

7