IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


THE WEATHER UNDERGROUND, INC.,
    a Michigan corporation,

        Plaintiff,

                                          Case No. 2:09-CV-10756

vs.                                          Hon. Marianne O. Battani

NAVIGATION CATALYST SYSTEMS, INC.,
    a Delaware corporation; CONNEXUS CORP.,
    a Delaware corporation; FIRSTLOOK, INC.,
    a Delaware corporation; and EPIC MEDIA
    GROUP, INC., a Delaware corporation,

        Defendants.

_____

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI  49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff


Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI  48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado
WILLENKEN WILSON LOH & DELGADO
LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA  90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants


Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
BUTZEL LONG, P.C.
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
Local Counsel for Defendants

_____

## DEFENDANTS CONNEXUS CORPORATION, FIRSTLOOK, INC., AND NAVIGATION CATALYST SYSTEMS, INC.'S TRIAL BRIEF

**TRIAL BRIEF**

I.   **INTRODUCTION**

Plaintiff has accused Connexus Corporation, Firstlook, Inc., and Navigation Catalyst

Systems, Inc., (collectively, "Connexus" or "Defendants") of violating the Anticybersquatting

Consumer Protection Act, 15 U.S.C. § 1125(d), ("ACPA") by registering over 250 domain

names that are confusingly similar to its trademarks, THE WEATHER UNDERGROUND and

WUNDERGROUND.COM.  However, to make out a *prima facie* case under the ACPA,

Plaintiff must show, *inter alia*, that the domain names at issue are confusingly similar to

Plaintiff's marks and that Connexus had a "bad faith intent to profit" from them.  Plaintiff cannot

make this showing.

The evidence at trial will demonstrate that Connexus was not even aware of Plaintiff or

its marks prior to registering the domain names at issue and did not target Plaintiff or the

goodwill of its marks.  Thus, Plaintiff's claim under the ACPA fails.  Moreover, Plaintiff's

requested damages under the ACPA are so disproportionate to Defendants' actual profits from

monetization of the domain names at issue as to render the requested damages unconstitutional.

II.   **STATEMENT OF FACTS**

Before addressing the merits of the issues before the Court, in sections II.A. and II.B.

below, Connexus provides a brief history of the businesses that underlie this dispute and a

detailed description of the process by which Navigation Catalyst Systems, Inc. ("NCS")

registered domain names.  Particularly in light of the fact that Plaintiff's ACPA claim hinges on

showing that Connexus had a "bad faith intent to profit" from Plaintiff's marks, it is helpful to

1

understand the process by which NCS registered domain names and, more importantly, what steps were taken to avoid the registration of domain names that corresponded to trademarks.

     A.     <u>Background Of Bulk Domain Name Registration And Monetization.</u>

     *<u>The Rise of Bulk Domain Name Registration.</u>*  In 1999, the ACPA was enacted in response to the intentional registration of domain names and subsequent "ransoming" of these names to a brand holder, such as Microsoft. Distinct from the practice of cybersquatting, other persons recognized that domain names could hold inherent value, apart from their association with trade or service marks. Thus, when domain name registration became generally available on a commercial basis, such persons sought to speculate in their value by registering and holding domain names for sale.

     Concurrently, as the commercial internet expanded, methods of searching the internet for relevant information became one of the primary activities conducted by internet users. Internet "search engines," such as Yahoo! and Google, partially filled this need. Aside from using internet search engines, however, another manner in which internet users find information is by what is called "Direct Navigation." In Direct Navigation, internet users type search queries directly into the "address bar" of web-browsing software (such as Internet Explorer or Mozilla Firefox).

     *<u>The Monetization of Domain Names.</u>*  As domain speculators accumulated portfolios of domain names for potential sale, they sought ways to earn income from their domain names which remained unsold. Meanwhile, internet search engine companies such as Yahoo! and Google determined that search could be made profitable by selling "search advertising." Search

advertising operates by inviting advertisers to submit bids for their advertisements to be displayed in response to searches conducted by internet search engine users.

For example, the search term "automobiles," entered into a search engine such as Google or Yahoo! will cause the display of "sponsored links" or a similar indication, along with a listing of prominently displayed links to advertisers who have bid to pay a "click-through" fee to the search engine operator for each user which clicks on a sponsored advertisement to reach the advertiser's site through the search engine. This type of revenue model is referred to as "pay-per click" or PPC.

To capture potential visitor traffic from direct navigation, internet search engine companies such as Yahoo! and Google also distribute PPC advertisements via syndication to domain name registrants. For example, the registrant of a domain name such as DatingForBusyProfessionals.com, whether the domain name was registered for resale or future development, contracts directly or indirectly to allow the domain name to be used to display PPC ads. In such an arrangement, when an internet user visits the web page corresponding to the domain name, the web page is automatically populated by PPC advertisements provided by the search engine company. A share of the revenue from such PPC advertisements is paid by the search engine company to the domain name registrant, in exchange for providing the domain name as a platform for displaying such advertisements. Search engine companies typically refer to this method of distributing advertisements as the "domain channel" in contrast to the "search channel" wherein sponsored advertisements are displayed directly at the search engine site.

In a typical PPC advertising arrangement, the domain name is utilized as a publishing platform by the search engine company which populates the web page with sponsored PPC links

3

as if the domain name itself were entered into the search engine as a search term.  While the domain name registrant does not typically control the selection and arrangement of the advertisements, the search engine company, in turn, also has limited control over what search terms the advertisers select to have their advertisements displayed.

The distribution of PPC advertising by search companies through the domain channel has advanced to the point where domain names are often registered purely for their traffic potential, instead of for resale.  The ability to sell domain traffic resulting from direct navigation has led to a number of techniques for accumulating domain names which have the potential to generate traffic per se.

_The Inception of Domain Tasting._  In the year 2000, ICANN instituted a standard policy under which a domain name, once registered, could be deleted within five days of its initial registration without incurring a fee for registration of the domain name.  This period was known as the "five day grace period" or "add grace period."  The search for direct navigation traffic for domain names, combined with the five day grace period led to a practice known as "domain tasting."  In domain tasting, a domain name would be registered and then monitored during the five day grace period to determine whether its projected annual traffic value exceeded the registration fee.

The practice of domain tasting was conducted by a number of domain name registration companies using a variety of sources for character strings to be used to generate candidate domain names.  It is believed that such companies had access to search data from search engine companies themselves, as well as "error data" from internet service providers and domain name registries, which provided character strings having potential value, as such character strings

4

corresponded to entries by internet users into search engines or into the address bars of browsers for otherwise non-existent domain names.

*Addressing the Issue of Trademark Correspondence.*  One hazard of large-scale bulk domain registration is that some of the domain names may incidentally correspond to trade or service marks.  While a character string such as "Tide" may refer to the lunar gravitational effect on large bodies of water, it may also correspond to a brand of laundry detergent.  Since a domain name registrant does not typically control what advertisements are displayed on a webpage used to publish advertisements generated by a search company, there is no completely effective way for the domain name registrant to know whether a domain name containing the string "tide" will cause the display of surfing information or laundry information.  Furthermore, the advertising results generated by any particular keywords are determined by the collective action of those advertisers who bid on keyword placement with the search engine company, with whom the domain name registrant has no connection or contact.

As a result, responsible bulk domain registrants address the problems of incidental trademark correspondence in several ways.  First, while there is no completely reliable method of filtering large numbers of strings against any particular database of trademarks, bulk domain registrants have continued to develop and deploy filtering systems on their own and in cooperation with brand owners.  Second, responsible bulk domain registrants typically maintain staff and counsel for reviewing communications which may be sent by brand owners relating to brand-relevant domain names that may have escaped capture by the filtering methods employed by the bulk domain registrant.  Where a domain name contains an inappropriate character string, or may have been targeted inappropriately by the search engine company supplying the

advertising feed, responsible bulk domain registrants typically work with the brand owner to transfer or delete such domain names at no charge, and typically at a loss to the bulk domain registrant, and further to update the filtering method to include variations of the asserted mark.

       B.     <u>The Domain Name Registration Process.</u>

      The process by which NCS registered domain names has changed over time, such that three different time periods must be evaluated:  (i) 2004 to late 2006, (ii) late 2006 to June 2008 (i.e., the Add Grace Period), and (iii) June 2008 through 2009.  Although the process has changed, at all times, NCS took steps to avoid registering and/or retaining domain names that corresponded to trademarks.  As detailed below, NCS started with (and always had) a "human" vetting process to review for trademarks, which was refined over a period of many years, and later added technology, which was further developed over the last few years.

      *2004 to Late 2006.*  Prior to Fall 2004, the process for registering domain names was as follows:  (a) an operator would be provided a spreadsheet of candidate domain names for registration, (b) the operator would review the spreadsheet to eliminate domain names that corresponded to trademarks based on their personal knowledge, and (c) the remaining domain names would be registered.

      In Fall 2004, the predecessor of the Connexus Companies implemented a trademark matching system based on the domain names in the USPTO database.  Subsequent to the implementation of that 2004 trademark matching system, the spreadsheets viewed by the operators would contain, *inter alia*, the candidate domain names and any potential matches to the USPTO database (both literal and "fuzzy matches" that were similar but not identical). Operators could then rely on the USPTO data included on the spreadsheet when making their

125675.1

decision to exclude domain names for trademark reasons.  After Fall 2004, operators also screened candidate domain names against an internally created blacklist.

_Late 2006 to June 2008._  While the Add Grace Policy was in place, the process for registering domain names was as follows:  (a) NCS would test all candidate domain names immediately, (b) NCS would identify candidates worthy of registration beyond the grace period because they were potentially profitable, (c) NCS would delete those candidate domain names that either (i) were unprofitable or (ii) corresponded to trademarks; and (d) NCS would then register the remaining candidate domains that were believed to be clean (i.e., they did not correspond to trademarks).  During the time that NCS was tasting domain names via the Add Grace Period, the process for registering domain names always included vetting for trademarks.

Throughout the years, NCS has refined its computer system so that its trademark matching system was more effective.  In late 2006, Donnie Misino was tasked with creating a new trademark tool that would have better fuzzy matching and better implementation of the internal blacklist.  Mr. Misino proposed additional refinements to the matching system and domain name registration process in January 2007.  In the interim, the company continued to use its existing trademark system as will be seen from e-mails during the time period referring to the trademark matching system.  Mr. Misino continued to work on a new fuzzy matching system through April 2007, and a version of his trademark fuzzy matching system likely came into use in late 2007.  In a further iteration, Mr. Misino added "N-Gram" matching to his trademark fuzzy matching system.

A further refinement to the registration process was the addition of an exclusion file containing a list of domain names previously considered for registration but rejected for

125675.1

trademark reasons.  Any candidate domain name which matched an entry in the exclusion file was automatically rejected and never even considered by an operator.

Throughout the years, NCS has also undertaken periodic scrubs of its domain name portfolio.  In 2008, NCS undertook a review of its entire domain name portfolio to identify and delete any domain names that potentially corresponded to a trademark that might not have been accurately avoided during the registration process.  To accomplish its 2008 domain name portfolio review, NCS created a special trademark tool for the task of comparing domain names to trademarks in the USPTO database.  The process also involved review by human operators.  The 2008 domain name portfolio review took months.  As a result of the 2008 review, approximately 25,400 domain names (or twenty percent (20%) of the domain name portfolio) were deleted.  NCS stopped tasting domain names via the Add Grace Period in June 2008.

_June 2008 to through 2009._  After NCS stopped tasting domain names through the Add Grace Period, the domain name process was as follows:

a.      The process of selecting names to be registered as domain names begins with names that are typed into the URL window of a browser by a user, but do not resolve to valid domain names.  This is referred to as "DNS error data."  Some of this data comes from toolbars owned by Firstlook that have been installed by users, and some of it is purchased from third parties.  This data is used to initially populate the spreadsheet of candidate domain names.

b.      The first step in filtering candidate domain names is to remove domain names that have previously been considered for registration but rejected as being too similar to registered trademarks.  The system maintains a list of all the previous names

8

that have been considered in a file called "search_algo_clean_domain_names." As of September 13, 2010, this file contained about 75 million different names. A small fraction of these, currently about 372 thousand, have previously been flagged as being similar to trademarks and rejected (i.e., the exclusion file). These are the names that have a non-null "trademark_date." The first filtering step is to look up each candidate domain name in this table, and if the exact same name has previously been flagged as corresponding to trademarks, to reject it from further consideration.

c.    The next step in the evaluation of candidate domain names is to add traffic data to the names. The "traffic" of a given name is an estimate of how often that name is typed into the URL window of a browser by a user, within a given time period. This data is acquired from Verisign corporation for the .com and .net domains. The more often that a name is typed into a browser, the more profitable a given name is likely to be if registered. Thus, each name in the spreadsheet of remaining candidate names is annotated with various estimates of the amount of traffic that name has received in the past.

d.    The next step is to annotate the names with data from what is referred to as the "blacklist." This is a list of approximately ten thousand strings that were generated by hand, to avoid the registration of trademarks. In this step, each candidate name which includes a blacklisted name as an exact substring is marked in the spreadsheet. For example, the string "dow" is in the blacklist, presumably because it is part of trademarks owned by Dow Jones and Dow Chemical

9

corporations.  Any candidate name, such as "shadow.com" that includes the string "dow" as a substring, will be marked in the spreadsheet at this stage, and the corresponding blacklisted string, "dow" in this case, will be stored with the candidate string.  In the past, these names were automatically excluded from the list of candidate names.  As of at least December 2010, they were simply marked in the spreadsheet with the corresponding blacklist string.

e.      The next step is a manual review and filtering performed by Dennis Rhee. The candidate names are automatically sorted by the amount of traffic they generate, and Mr. Rhee only retains those names whose traffic threshold is above a certain level.  In addition, Mr. Rhee marks those blacklist matches that appear to correspond to trademarks.

f.      The next step is to automatically compare each of the candidate names to the database of registered trademarks published by the U.S. Patent and Trademark Office (the "USPTO database").  This database contains about 1.5 million trademarks.  In this case, the matching is more complex than simply performing an exact complete match or an exact substring match, since the goal is to avoid registering names that are confusingly similar to registered trademarks, in addition to exact matches.  Two different algorithms are used here.  The first is called a "fuzzy match" and the second is called an "N-gram match."  No actual filtering is done at this stage, but the results of the fuzzy and N-gram matches are added to the spreadsheet of candidate names, if they exceed a particular threshold.

g.    The fuzzy match is performed by a piece of proprietary software that was purchased from a third party.  Given two text strings, the fuzzy match is applied to the pair, and the value returned is a number between zero and one hundred, indicating the degree of similarity between the two strings.  For each of the remaining candidate names, and each entry in the USPTO database, the fuzzy match is applied to that pair of strings.  For each candidate name, those trademarks in the USPTO database that return a value equal to or above a certain threshold (e.g., 60% or 70%) are stored, along with the score itself.

h.    Defendants' employees observed by experimentation that the fuzzy match algorithm does not return high scores when the two strings in question differ significantly in length.  For example, if a registered trademark appears exactly in a much longer candidate name, the fuzzy match algorithm may not return a high score, even though the candidate name may lead to confusion with the trademark. To deal with these cases, Firstlook added an "N-gram match" which breaks up each string into shorter character sequences that appear in it (e.g., the character sequences would be called "digrams" if the system were using two-letter sequences).

i.    For example, the string "nike" consists of three digrams:  "ni," "ik," and "ke." The N-gram score is the percentage of digrams in the shorter string that appear as digrams in the longer string.  Again, this match is performed for all pairs of remaining candidate names and trademarks in the USPTO database.  For each remaining candidate name, all the trademarks that generated an N-gram score

11

equal to or above a certain threshold are listed, along with their corresponding N-gram scores.

j.    In the next step of the process, Mr. Rhee reviews the results of the fuzzy and N-gram matches to the USPTO database. Those names that, in his opinion, are sufficiently close to a registered trademark are marked with an "X" in the spreadsheet of candidate names. Mr. Rhee also marks those names that appear to him to correspond to trademarks, even if they do not match names in the USPTO database.

k.    In the next step, David Hull reviews the candidate names in the spreadsheet. Mr. Hull marks with an "X" those names that, in his opinion, should not be registered. While Mr. Hull may rely on all the information available to him at this point, his decisions are based primarily on blacklist matches and his subjective impression of the similarity of a candidate name to a registered trademark. Mr. Hull's Xs are placed in a different column of the spreadsheet than those of Mr. Rhee.

l.    Finally, the spreadsheet of candidate names is reviewed by Lily Stevenson, who adds her own Xs to those names she believes should not be registered. Again, this can be based on all the information available to her at this point, but is primarily based on blacklist matches and her subjective impression of the similarity of a candidate name to a registered trademark. Ms. Stevenson also has the authority, though rarely exercised, to override decisions of Mr. Hull.

m.    Those candidate names that have not been marked with an X by Mr. Rhee, Mr. Hull, or Ms. Stevenson, or for which a veto of Mr. Hull has been overridden by

12

Ms. Stevenson, are then registered by Mr. Rhee on behalf of NCS, if they have not already been registered by someone else.

C.    Defendants' Lack Of Knowledge Of Plaintiff At The Time Of Registration.

The evidence at trial will show that Connexus had no knowledge of Plaintiff or its marks prior to the registration of the domain names at issue, which were registered between 2004 and 2009. Connexus's witnesses will testify that they did not, in fact, know of Plaintiff prior to Plaintiff filing a UDRP action against NCS. Such testimony is consistent with the deposition testimony of Plaintiff's officers. Plaintiff's President, Alan Steremberg, has previously admitted to having no knowledge or proof that Defendants knew of Plaintiff prior to registration of the domain names at issue. Similarly, Plaintiff's Chief Financial Officer and 30(b)(6) designee Jeffrey Ferguson admitted in his deposition that he did not know what evidence existed to show that Defendants knew of Plaintiff. Plaintiff's Chief Meteorologist, Jeffrey Masters, also admitted his lack of knowledge regarding whether Defendants knew about Plaintiff before registering the domain names at issue.

In addition, the evidence at trial will demonstrate that NCS's software, which runs the domain name registration process, does not target trademarks (i.e., purposefully register domain names because they are confusingly similar to a known trademark).

## III.    ARGUMENT

A.    The Prima Facie Elements Of An ACPA Claim.

The ACPA is set forth at 15 U.S.C. 1125(d)(1) and provides, in relevant part:

(A)    A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
    (i)    has a bad faith intent to profit from that mark . . . ; and
    (ii)    registers, traffics in, or uses a domain name that—

125675.1

(I)   in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . . .

Thus, to prevail on an ACPA claim, a plaintiff must show that:  (1) the defendant has registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a distinctive trademark; and (3) the defendant had a bad faith intent to profit from the mark.

Because the domain names at issue are not identical or confusingly similar to Plaintiff's marks and the evidence at trial will show that Connexus did not have a bad faith intent to profit from Plaintiff's marks, Plaintiff cannot prevail on its ACPA claim.

B.   The Domain Names At Issue Are Not Confusingly Similar To Plaintiff's Marks.

"Confusing similarity" is a *prima facie* element of liability that Plaintiff will not be able to establish at trial.  15 U.S.C. § 1125(d)(1).  To satisfy this element, Plaintiff must show that each and every domain name at issue is identical or "confusingly similar" to a distinctive mark belonging to the Plaintiff.  This is a showing that Plaintiff cannot make.

By way of example, the domain name <undergroundware.com> is not similar to <wunderground.com>.  The same is true for <ranunderground.com>.  Persons looking for <wunderground.com> did not accidentally type "r-a-n" instead of a "w."  Instead, they clearly just combined two generic words:  "ran" and "underground."  As another example, consider <newundergorun.com>, which might be a typo of the combination of the two generic words "new" and "underground" but is not confusingly similar to <wunderground.com>.

In short, Plaintiff cannot establish the *prima facie* element of "confusing similarity" necessary to impose liability on Connexus under the ACPA.

14

C.     Defendants Did Not Have A Bad Faith Intent To Profit From Plaintiff's Marks.

To prevail on its ACPA claim, Plaintiff must also show that Connexus had a "bad faith intent to profit from [the] mark." 15 U.S.C. § 1125(d)(1)(A)(i). The legislative history and the language of the statute suggest that targeting of a particular trademark is required to establish bad faith intent. Thus, Plaintiff must demonstrate that Connexus had an intent to trade on the goodwill of Plaintiff's marks. Because Plaintiff cannot meet this burden, its ACPA claim fails for this additional reason.

1.     Defendants did not target Plaintiff or the goodwill of its marks.

Since the ACPA does not extend to those who are unaware of another's use of the name, to prevail on its cybersquatting claim, Plaintiff must show that Connexus: (a) knew of Plaintiff's marks and (b) registered confusingly similar domain names with the bad faith intent to profit from those marks. Given the statutory language, requiring Plaintiff to first show that Connexus actually *knew* of Plaintiff's marks prior to registration is logical. It would be impossible, of course, to form the intent to profit from a mark if one does not first know of the existence of the mark. Here, however, the evidence at trial will demonstrate that Connexus did not know of Plaintiff's marks prior to their registration. *See supra* pp. 13.

2.     The statutory factors do not support a finding of bad faith intent.

The ACPA provides a non-exclusive list of nine factors that a court "may consider" in determining whether a person has a bad faith intent to profit:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

15

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

Several factors focus on whether the defendant's actions are indicative of the presence of bad faith and factor nine considers the "extent to which" the plaintiff's marks are or are not distinctive or famous. Here, these factors favor Connexus:

- Factor 5: This factor requires that the use of the domain name create a "likelihood of confusion." But, the evidence will show that there is no likelihood of confusion here. Plaintiff and Defendants are not competitors offering similar services. Plaintiff's website contains weather information, photographs, and weather data. Connexus's website only contains hyperlinks. A visitor to Connexus's website would not confuse that website for Plaintiff's.

16

- <u>Factor 6</u>*:*  This factor examines the traditional "ransoming" situation where a person offers to transfer, sell, or otherwise assign the domain name to the mark owner for financial gain.  Here, the evidence at trial will show that Connexus never attempted to ransom the domain names at issue to Plaintiff.

- <u>Factor 7</u>:  This factor relates to the provision of material and misleading false contact information when applying for registration of the domain name.  The evidence will show that NCS did not provide any misleading false contact information when it registered the domain names at issue.

- <u>Factor 8</u>:  This factor considers the person's registration of multiple domain names which the person knows are dilutive of famous marks of others.  Over time, NCS has considered millions of domain names for registration through its bulk registration process.  Thus, even if Plaintiff provides evidence of 10-20 names registered by NCS which are claimed to correspond to the trademarks of others, given the relative numbers, it cannot be said as a matter of law that NCS's process is indicative of an intent to register domain names that correspond to trademarks.

- <u>Factor 9</u>:  This factor examines "the extent to which" Plaintiff's marks are or are not distinctive or famous.  Considering the many other uses of Plaintiff's marks is helpful in this analysis:  (a) Plaintiff's name "The Weather Underground" is derived from a 1960s terrorist group, (b) there is a "Weather Underground" in Hong Kong, (c) there was a "Wunder" Brewery in San Francisco at one point, and (d) there is a "Wunderground" Magic Shop in Michigan.  As a result, it is impossible to determine whether a visitor to one of the domain names at issue was actually trying to reach

17

Plaintiff or was simply looking for information on the 1960s terrorist organization, the Hong Kong entity, a brewery or a magic shop.

In summary, the first four statutory factors do not have any practical application in bulk registration cases such as here and the remaining five factors weigh in Connexus's favor. Thus, the statutory factors here do not support a finding of bad faith intent to profit by Connexus.

        D.      <u>Defendants' Actual Profits Were Minimal Compared To The Requested Damages, Making The Latter Unconstitutional.</u>

Because the ACPA's statutory damages provision is broad, ranging from $1,000 to $100,000, it provides no real guidance as to how to make an award within that range. Statutory damages under the ACPA are, however, limited by constitutional protections of due process. *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919) (announcing the test as whether the "prescribed penalty is so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable").

Here, the evidence at trial will show that Connexus's actual profits from the monetization of the domain names at issue did not exceed $4,000. Yet Plaintiffs have requested $100,000 per domain name infringement and alleged in the First Amended Complaint that 264 domain names registered by Connexus are infringing. In total, Plaintiff has requested $100,000 per domain name infringement x 264 domain names, or $26.4 million in damages. Without question, Plaintiff's requested award is "so severe and oppressive as to be wholly disproportionate" to Connexus's actual profits and thus unconstitutional.

18

**IV.**     <u>**CONCLUSION**</u>

      Plaintiff cannot prevail on its ACPA claim because the domain names at issue are not identical or "confusingly similar" to Plaintiff's marks and Connexus did not form a "bad faith intent to profit" from those marks.  In addition, Plaintiff's requested damages are so disproportionate to Connexus's actual profits as to render them unconstitutional.  For these reasons, Connexus respectfully requests that the Court find in its favor on Plaintiff's ACPA claim.

                                    Respectfully Submitted,

Dated:  May 25, 2012                   */s/William A. Delgado*_____
                                    William A. Delgado
                                    WILLENKEN WILSON LOH & DELGADO LLP
                                    707 Wilshire Boulevard, Suite 3850
                                    Los Angeles, CA  90017
                                    (213) 955-9240
                                    williamdelgado@willenken.com
                                    Lead Counsel for Defendants

125675.1

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2012, I electronically filed the foregoing paper with the Court using the ECF system which will send notification of such filing to the following:

Enrico Schaefer (P43506)
Brian A. Hall (P70865)
TRAVERSE LEGAL, PLC
810 Cottageview Drive, Unit G-20
Traverse City, MI 49686
231-932-0411
enrico.schaefer@traverselegal.com
brianhall@traverselegal.com
Lead Attorneys for Plaintiff

Nicholas J. Stasevich (P41896)
Benjamin K. Steffans (P69712)
BUTZEL LONG, P.C.
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
stasevich@butzel.com
steffans@butzel.com
Local Counsel for Defendants

Anthony P. Patti (P43729)
HOOPER HATHAWAY, PC
126 South Main Street
Ann Arbor, MI 48104
734-662-4426
apatti@hooperhathaway.com
Attorneys for Plaintiff

William A. Delgado
WILLENKEN WILSON LOH & DELGADO LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA 90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

_/s/William A. Delgado_
William A. Delgado
WILLENKEN WILSON LOH & DELGADO LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA 90017
(213) 955-9240
williamdelgado@willenken.com
Lead Counsel for Defendants

125675.1